1   **GEORGE D. CROOK, SBN #60889**
    **HENRY TOVMASSIAN, SBN #140388**
2   **NEWMAN.AARONSON.VANAMAN**
    14001 Ventura Boulevard
3   Sherman Oaks, CA 91423
    Telephone: (818) 990-7722
4   Facsimile: (818) 501-1306

5   Attorneys for Defendants and Counterlaimants
    ERIN MAGEE, by and through her guardian
6   ad litem MARYL MAGEE, and MARYL MAGEE

7

8                   **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  TORRANCE UNIFIED SCHOOL          )   CASE NO. CV 07-2164 CAS (RZx)
    DISTRICT,                        )
12                                   )   **MEMORANDUM OF POINTS AND**
                                     )   **AUTHORITIES IN SUPPORT OF**
13          Plaintiff/Counterdefendant,  )   **DEFENDANTS AND**
                                     )   **COUNTERCLAIMANTS' MOTION**
14  vs.                              )   **FOR SUMMARY JUDGEMENT**
                                     )
15  ERIN MAGEE, a minor, MARYL       )   **[Notice of Motion for Summary**
    MAGEE, and CALIFORNIA            )   **Judgment Filed Concurrently**
16  OFFICE OF ADMINISTRATIVE         )   **Herewith Under Separate Cover]**
    HEARINGS,                        )
17                                   )   DATE:  March 31, 2008
                                     )   TIME:  10:00 a.m.
18          Defendants/Counterclaimants.  )   CTRM: 5
    ─────────────────────────────── )       312 N. Spring Street
19                                   )       Los Angeles, California 90012
    AND CONSOLIDATED ACTION          )
20  ─────────────────────────────── )

21

22

23

24

25

26

27

28

───────────────────────────────────────────────────────────────
        MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AND
              COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGEMENT

# TABLE OF CONTENTS

PAGE

I.  **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. **RELEVANT SUBSTANTIVE AND PROCEDURAL ASPECTS OF IDEA.** . . . 2

    A.  **The Substantive Requirements Of A Free Appropriate Public Education ("FAPE") And An Individualized Education Program ("IEP").** . . . . . . . 2

    B.  **The Procedures For Due Process Disputes And Appeals.** . . . . . . . . . . . . . 3

    C.  **The Burden Of Proof** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  **Erin's Difficulties Through Second Grade And Their Manifestation At School.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  **Erin's Third Grade Year, The Involvement of Dr. Akyuz, And The Continued Manifestation of Her Inappropriate Behaviors at School.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.  **Erin's Fourth Grade Year And The Continued Manifestation of Her Inappropriate Behaviors At School.** . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.  **Erin's Fifth Grade Year, The Continued Manifestation of Her Inappropriate Behaviors At School, And Mrs. Magee's Futile Request For An Assessment.** . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.  **Erin's Truncated Sixth Grade Year And Dr. Liberati's Decision To Expel Her From The District.** . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F.  **The District's Assessment And The October 27, 2005 IEP.** . . . . . . . . . . . 13

    G.  **Erin's Enrollment At The Center.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    H.  **Dr. Kaler's Assessment Of Erin.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. **ERIN IS A "CHILD WITH A DISABILITY" UNDER THE IDEA.** . . . . 20

    A.  **Erin's Inappropriate Types of Behavior Or Feelings Under Normal Circumstances.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.  **Erin's Behavior Qualifies Her Under Prong C of the ED Criteria Because She Is Unable To Control Her Behavior And Conform Her Conduct To Socially Acceptable Norms.** . . . . . . . . . . . . . . . . . . . . . 21

        2.  **The District's Own Witnesses Also Establish That Erin Meets Prong C of the ED Criteria.** . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.  **Erin's General Pervasive Mood Of Unhappiness Or Depression.** . . . . . . 24

i

C.    Erin Also Meets Prong B of the ED Criteria. . . . . . . . . . . . . . . . . . . . . . . 25

D.    The Origin Or Cause of Erin's Emotional And Behavioral Difficulties Is
      Not A Factor In Determining Eligibility.  . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.    Erin's Emotional Difficulties And Inappropriate Behaviors Adversely
      Affected Her Educational Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

F.    Erin Is Eligible Even Though She Has Been Academically Successful. . . 29

V.  THE DISTRICT VIOLATED ITS "CHILD FIND" OBLIGATIONS DURING
    THE 2003-2004 AND 2004-2005 SCHOOL YEARS. . . . . . . . . . . . . . . . . . . . . . 32

VI.      MRS. MAGEE IS ENTITLED TO REIMBURSEMENT OF THE COSTS
         SHE INCURRED IN ENROLLING ERIN AT THE CENTER AND IN
         RETAINING DR. KALER TO CONDUCT AN IEE. . . . . . . . . . . . . . . . 33

VII.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AND
COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGEMENT

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Alamo Heights Independent School Dist. v. State Bd. of Educ.*, 790 F.2d 1153,
1161 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Board of Education of the Hendrick Hudson Central School District v.
Rowley*, 458 U.S. 176, 189, 201 and 203, 102 S.Ct 3034 (1982) . . . . . . . . . . 2, 30

*Capistrano Unified School Dist. v. Wartenberg,*
59 F.3d 884, 891 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*County of San Diego v. California Special Hearing Office,*
93 F.3d 1458, 1466 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dep't of Educ., State of Haw. v. Cari Rae S.*, 158 F.Supp.2d 1190, 1194
1196-1197 (D.Haw. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 32

*Doe v. Maher*, 793 F.2d 1470, 1480 footnote 8, (9th Cir. 1986) . . . . . . . . . . . . . . . . . . 22

*Florence County School Dist. Four v. Carter*, 510 U.S. 7,
114 S.Ct. 361, 364-369 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Frank G. v. Board of Education of Hyde Park*, 459 F.3d 356 (2nd Cir. 2006) . . . 33

*Handberry v. Thompson*, 219 F.Supp.2d 525, 540 (S.D.N.Y.2002) . . . . . . . . . . . . . . . 32

*Honig v. Doe*, 484 U.S. 305, 320, 108 S.Ct. 592, 595 (1988) . . . . . . . . . . . . . . . . . . 20, 22

*Hood v. Encinitas School District*, 46 F.3d 1099, 1104 (9th Cir. 2007) . . . . . . . . . 3

*Independent Sch. Dist. No. 284 v. A.C. by C.C.*, 258 F.3d 769,
775-776 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson v. Metro Davidson County School System,*
108 F.Supp.2d 906, 918-919 (M.D.Tenn 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mary P. v. Illinois State Board of Education*, 919 F.Supp. 1173 (N.D. Ill. 1996) . . . . . 31

*Mr. and Mrs. I. v. Maine School Administrative District 55,*
416 F.Supp.2d 147, 160 (D. Me, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Muller v. Committee on Special Education of the East Islip Union Free School District,*
145 F.3d 95, 104 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*New Paltz Central School District v. St. Pierre,*
307 F.Supp.2d 394, 399 (N.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Oberti v. Board of Education of the Burrough of Clementine School District,*
995 F.2d 1204, 1213 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

iii

*Polk v. Central Susquehanna Intermediate Unit 16,*
    853 F.2d 171, 185 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*School Committee of Town of Burlington v. Department of Education,*
    471 U.S. 359, 368-370, 105 S.Ct. 1996, 2002 (1985) . . . . . . . . . . . . . . . . . 2, 3, 33

*W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Westchester Area School District v. Bruce and Suzanne C.,*
    194 F.Supp.2d 417, 421-423 (E.D. Penn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Yankton School District v. Schramm,* 93 F.3d 1369, 1374-75 (8th Cir. 1996) . . . . . . . . 30

## FEDERAL STATUTES

20 U.S.C. §1401(8)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20 U.S.C. §1401(25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20 U.S.C. §1401(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

20 U.S.C. §1401(8)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20 U.S.C. §1412(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

20 U.S.C. §1414(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

20 U.S.C. §1415(i)(2) (C)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

20 U.S.C. §1415(i)(2)(C)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## FEDERAL REGULATIONS

34 C.F.R. §300.125(a)(2)(ii) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

34 C.F.R. §300.502(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

34 CFR §§ 300.5(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

34 C.F.R. §300.8(c)(4)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

34 C.F.R. §340 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## CALIFORNIA STATUTES

California's Education Code §56329(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Education Code §56329(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## AUTHORITIES WITHOUT OFFICIAL CITATIONS

*Board of Education of Montgomery County v. S.G.*, 2006 WL 544529 (D.Md. 2006) . . 29

*Clint Indep. Sch. Dist.*, 508 IDELR 204 (SEA TX 1986) . . . . . . . . . . . . . . . . . . . 22

*Corchado v. Board of Education*, 86 F.Supp.2d 168, 176 (W.D.N.Y. 2000) . . . . . . . . 30

*Fresno Unified School District*, 39 IDELR 28, (SEA CA 2003) . . . . . . . . . . . . . . . 21, 22

*In re East Side Union High School District*, 502 IDELR 374 (SEA CA 1981) . . . . . . . 27

*In re Kristopher H.*, 507 IDELR 183 (SEA WA 1985) . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re: Burton Valley School District,*
   503 IDELR 256 (SEA CA 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jeffrey K v. Concord Carlisle High School*, 501 IDELR 205 (SEA Mass. 1979) . . . . . . 27

*Letter to Anonymous*, 213 IDELR 247 (OSEP 1989) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Los Gatos-Saratoga Joint Union High School District,*
   41 IDELR 227 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Manhattan Beach Unified School District*, 34 IDELR 249 (SEA CA 2001) . . . . . . 21, 22

*Oxnard Union High School District*, 102 L.R.P. 19526 (2002) . . . . . . . . . . . . . . . . . . 29

*Student v. Oakland Unified School District*, 507 IDELR 191 (SEA CA 1985) . . . . . . . 31

*Venus Independent School District v. Daniel S.*, 36 IDELR 185 (N.D.Tex. 2002) . . . . 31

## OTHER RESOURCES

Funk and Wagnall's <u>New Standard Dictionary</u>, page 790 (1946) . . . . . . . . . . . . . . . . . 31

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

This is an appeal by Torrance Unified School District ("District") pursuant to the Individuals With Disabilities Act, 20 U.S.C. §1400 *et seq*. ("IDEA").  At issue is a January 5, 2007 decision ("the Decision") by California's Office of Administrative Hearings ("OAH").  The Decision found that Erin Magee ("Erin") is a child with a disability as defined at 20 U.S.C. §1401(3) under the qualifying category of serious emotional disturbance ("ED"), that she requires at least "counseling, social skills training with an emphasis on anger management and conflict resolution, and a behavioral intervention plan" ("BFP"), that her mother, Maryl Magee ("Mrs. Magee") should be reimbursed her educational expenses, and that Erin should remain a student at the Center for Learning Unlimited, a California certified non public school ("NPS") for the entire 2006-2007 school year at District expense.  [AR 0001-0033.[1]]

In utter contradiction to its appeal, the District now **admits** that Erin is a child with a disability as defined by §1401(3).  Specifically, after District psychologist Elaine Semple, Ph.D. performed a new psychoeducational assessment and diagnosed Erin with Asperger's Syndrome ("AS"), the District convened IEP meetings for Erin on December 17, 2007 and February 7, 2008, and found that Erin **is** a child with a disability under the IDEA.  Further, the District itself has now offered Erin the exact same interventions she sought from and was granted by the hearing officer; i.e., placement at an NPS, a BFP, and social skills and counseling services.  [AE 3-73[2].]

---

[1] "AR" refers to the Administrative Record filed by the District on November 19, 2007 and supplemented and corrected on January 30, 2008.  References herein to "Ex." are to the official exhibit letter or number designations by the hearing officer.

[2] "AE" refers to "additional evidence" submitted pursuant to 20 U.S.C. §1415(i)(2)(C)(ii) and attached to the accompanying declaration of Henry Tovmassian.  We hereby request that the Court consider Dr. Semple's assessment and the December 17th and February 7th IEPs pursuant to 20 U.S.C. §1415(i)(2)(C)(ii), which provides

1    Thus, the District has come full circle.  After expelling Erin for her

2   behaviors and refusing her eligibility under the IDEA, the District has finally

3   recognized that Erin **is** a "child with a disability" and has offered her the exact

4   same interventions the hearing officer found she needed.  The District's attempt to

5   nevertheless overturn the OAH Decision must fail.

6   **II.    RELEVANT SUBSTANTIVE AND PROCEDURAL ASPECTS OF**

7   **IDEA.**

8   A.    **The Substantive Requirements Of A Free Appropriate Public**

9   **Education ("FAPE") And An Individualized Education Program**

10   **("IEP").**

11    Substantively, IDEA requires that school districts provide disabled students

12   with a "free appropriate public education" ("FAPE").  To constitute a  FAPE, a

13   child's program must provide "individualized consideration [and] instruction," be

14   "individually designed," provide "personalized instruction" to meet his or her "unique

15   needs," and be supported by "such services as are necessary to permit" the child "to

16   benefit" to a degree that is meaningful and not merely "de minimis" or "trivial." 20

17   U.S.C. §1401(25); *Board of Education of the Hendrick Hudson Central School*

18   *District v. Rowley*, 458 U.S. 176, 189, 201 and 203, 102 S.Ct 3034 (1982); *Oberti v.*

19   *Board of Education of the Burrough of Clementine School District*, 995 F.2d 1204,

20   1213 (3rd Cir. 1993).

21    A FAPE is implemented through an "Individualized Education Program"

22   ("IEP").  20 U.S.C. §§1401(8)(D), and 1414(d).  As stated in *School Committee of*

23   *Town of Burlington v. Department of Education*, 471 U.S. 359, 368, 105 S.Ct. 1996

24   (1985), "[t]he  IEP is in brief a comprehensive statement of the educational needs of

25   a handicapped child and the specially designed instruction and related services to be

26

27   that the Court shall "hear additional evidence at the request of a party".  Evidence of

28   "relevant events occurring subsequent to the administrative hearing" is thus routinely
     admitted.  *Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993).

1  employed to meet those needs." *Id.* at 2002.  It is developed by an "IEP Team"

2  composed of school district representatives and the child's parents and must be

3  developed pursuant to detailed substantive and procedural requirements. 20 U.S.C.

4  §1414(d), 34 C.F.R. §340 et seq.  So important is the IEP and the collaborative

5  process underlying it that a child's education also must be "provided in conformity

6  with the individualized Education program" if it is to constitute a FAPE. 20 U.S.C.

7  §1401(8)(D).  If a school district fails to identify a student as eligible for special

8  education, and therefore fails to develop an appropriate IEP for the student, the school

9  district has denied a FAPE.  *Dep't of Educ., State of Haw. v. Cari Rae S.*, 158

10  F.Supp.2d 1190, 1196-1197 (D.Haw. 2001)

11  **B.   The Procedures For Due Process Disputes And Appeals.**

12  The courts' review of IDEA administrative decisions is unique.  The Court is

13  to "(i) ... receive the records of the administrative proceedings; (ii)... hear additional

14  evidence at the request of a party; and (iii) basing its decision on the preponderance

15  of the evidence, ... grant such relief as the court determines is appropriate." 20 U.S.C.

16  §1415(i)(2)(C).  Then, "the court in recognition of the expertise of the administrative

17  agency, must consider the findings carefully and endeavor to respond to the hearing

18  officer's resolution of each material issue.  After such consideration, the court is free

19  to accept or reject the findings in part or in whole.  Despite their discretion to reject

20  the administrative findings after carefully considering them, however, courts are not

21  permitted simply to ignore the administrative findings." *County of San Diego v.*

22  *California Special Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996).  Deference to

23  the hearing officer's findings increases when they are "thorough and careful."

24  *Capistrano Unified School Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir. 1995).

25  **C.   The Burden Of Proof**

26  The burden of proof is on the District as the party challenging the OAH

27  Decision.  *Hood v. Encinitas School District*, 46 F.3d 1099, 1104 (9th Cir. 2007).

28

## III.   **FACTUAL BACKGROUND.**

Erin is a gifted thirteen year old girl with superior intelligence who has been diagnosed with Dysthymia, Major Depressive Disorder, Identity Disorder, which is a juvenile precursor to Borderline Personality Disorder, and, most recently, AS. Her longstanding history of emotional lability and associated difficulties with anger management, social conflicts, and inappropriate behaviors took the form of physical assaults on students and teachers and other inappropriate behaviors at school and home, as well as summer camp and Hebrew school. The District ineffectually suspended her no fewer than eight (8) times through her fifth grade, attempted other interventions available in general education, and ultimately expelled her at the start of her sixth grade. Even though the District acknowledged many of Erin's needs, it failed and refused to recognize her IDEA eligibility and provide the necessary services, including an NPS, a BFP, counseling and social skills development services, until the December 17th and February 7th IEPs.

At the administrative hearing, the District's primary defense was a garbled argument that Erin did not meet the ED eligibility criteria. Its second line of defense was the assertion that all of her needs could have been met without special education. As will be shown herein, Erin is a virtual "poster child" for ED eligibility, and the District itself admits that its attempts to educate her without special education have failed. Dispositively, Erin's last District principal, Mario Liberati, Ed.D. and assistant principal, Jane Tasker (Sifford), testified that Erin posed a danger to herself and other students on a public school campus, and would continue to do so in view of the failure of the District's interventions over several years. The District's Director of Special Education, Aaron Benton, J.D. agreed and testified that if Erin were to return to a general education classroom, she would not be able to control herself and would resume her prior assaultive and otherwise inappropriate behaviors. The evidence is irrefutable: Erin is and has long been eligible for special education placement and services in order to address her emotional lability and change her

**4**

inappropriate behavioral responses to normal events in life sufficiently to be able to benefit from her public education.

A.    **Erin's Difficulties Through Second Grade And Their Manifestation At School.**

Erin's emotional and behavioral difficulties have existed for most of her life. Mrs. Magee testified that they had become pronounced by the time she was 4. [AR 0514:7-517:11, 0918:14-20.] She was defiant, had outbursts of anger, failed to understand (or ignored) non verbal cues, and encroached on the personal space of others by sitting too close or being overly touchy. [AR 0911:21-0916:25.] During the 1999-2000 school year, when Erin was in kindergarten at Edison Elementary School, "behavior" was already a significant issue, and her teachers were urging her to learn "to take responsibility and accept consequences for her behavior." [Ex. 29, AR 2091; Ex. 32, AR 2108.] As early as January 24, 2000, she was suspended for biting and causing bruises on a fellow student, and this clearly was not an isolated incident; the suspension notice stated that "Erin ha[d] been **warned many times** before about this." [Ex. R-1, AR 1733; emphasis added.] Shortly thereafter, on February 3, 2000, Erin was suspended again when she "spit on a student" because "she wanted to." [Ex. Q-1, AR 1731.]

By the second grade, Erin was still exhibiting inappropriate behaviors. She was disruptive in class and would speak out of turn. She also encroached on the personal space of other students. Erin's teacher, Mrs. Gomez, moved Erin's desk closer to hers, and away from the other students, so that she could minimize disruptions and provide Erin with additional one to one attention. Mrs. Gomez also sent **daily or every other day** behavioral reports to Mrs. Magee reflecting the need to improve Erin's behaviors, such as the one dated May 9, 2002. [AR 0911:21-0913:23; Ex. MM, AR 1865.]

Erin's behaviors were also significant enough for Mrs. Gomez to reference them on her report card. For the first trimester, Mrs. Gomez stated that Erin

"continues to lack self-control." By the third trimester, Mrs. Gomez was still reporting that Erin "needs reminders about appropriate classroom behavior." Areas of difficulty were following classroom rules, interacting appropriately with peers, working appropriately in groups, resolving conflicts appropriately and accepting personal responsibility for behaviors. [Ex. 29, AR 2093.]

> **B.    Erin's Third Grade Year, The Involvement of Dr. Akyuz, And The Continued Manifestation of Her Inappropriate Behaviors at School.**

In an attempt to address Erin's emotional and behavioral difficulties, Mrs. Magee engaged Rebecca Akyuz, MFT, Psy.D., at the beginning of Erin's third grade. [AR 0518:13-21.] The District had full knowledge; Mrs. Magee testified that she told Erin's third grade teacher, Ms. Yacoob and Edison's principal, Katie Krumpe, that she had retained Dr. Akyuz to address Erin's difficulties, and she signed release of confidentiality forms to allow Ms. Yacoob and Ms. Krumpe to confer with Dr. Akyuz regarding Erin. [AR 0918:21-0920:9.]

Dr. Akyuz testified that she diagnosed Erin with Dysthymic Disorder, DSM IV-R 300.4, the essential features of which in children are a chronically depressed or irritable mood that occurs for most of the day more days than not for at least one year. The associated features of Dysthymic Disorder include feelings of inadequacy, social withdrawal, and subjective feelings of irritability or excessive anger, all of which Erin was exhibiting. [AR 0235:22-0236:24; Ex. I, AR 1714.]

Erin continued to exhibit inappropriate behaviors in school. Ms. Yacoob noted that Erin needed "to work on developing positive relationships with others and controlling anger." [Ex. 2, AR 1937.] Mrs. Magee testified that Erin was having difficulty working cooperatively in groups, and also verified that Ms. Yacoob wrote a one page teacher recommendation [Ex. OO, AR 1870[3]; AR 0921:24-0925:11] documenting that Erin "has a hard time working cooperatively in groups." Tellingly,

---

[3] AR 1870 which purports to be a copy of Exhibit OO is actually a different document. The parties will file a stipulation correcting this error in the record.

when Ms. Yacoob was asked in December, 2002 to place check marks on a form of all positive traits or behaviors that she had observed in Erin, noticeably absent were check marks for the following positive behaviors: "Self-confident with other children;" "Well liked by classmates;" "Cooperative;" "Expresses Self Well;" "Will not become upset by change;" "Sociable, prefers not to be alone;" "Can be counted on to participate;" "Shows sportsmanship;" "Shows emotional sensitivity;" "Flexible and adaptable;" and "Adapts, improves and modifies." [Ex. YY, AR 1894]

Toward the end of the third grade, on May 6, 2003, the District held a Student Success Team ("SST") meeting to discuss Erin's inappropriate behaviors. The main area of concern was: "Behavior - Erin becomes upset and acts inappropriately. Erin threw chair at teacher; Erin banged head with objects - water bottle, clipboard." Mrs. Magee told the SST team that Erin was very "dramatic" and lived "in a sit-com life." Mrs. Magee also advised them that Erin was volatile and that Dr. Akyuz was working on strategies to help Erin cope and behave in the classroom, as well as techniques on helping her improve her behavior, such as "stop, think, act." Despite these problems, the District did not assess Erin, instead simply offering her membership in a "Friendship Club." [AR 0920:13-0921:12, Ex. E, AR 1703.]

**C.    Erin's Fourth Grade Year And The Continued Manifestation of Her Inappropriate Behaviors At School.**

Erin's inappropriate behaviors did not improve during the 2003-2004 school year. On January 30, 2004, while attending Walteria Elementary School[4], Erin was suspended again for causing, attempting to cause, or threatening to cause physical injury to another person. The suspension notice described the incident thus: "Erin was told by the teacher that she would be attending study hall to finish a math assignment. Erin's response was to throw a tantrum which included pounding her head on her desk, hitting her head with a water bottle and then throwing a water bottle

_____

[4]The Magee family moved toward the end of 2003, and Walteria became Erin's home school. [AR 0518:22-0519:21.]

across the table.  The water bottle hit another child directly in the arm.  There was a previous incident of Erin throwing a chair in Mrs. Tons' Room.  Her mother was notified of this incident." [Ex. P-1, AR 1729; emphasis added.]

On April 7, 2004, Erin's teacher, Maria Guarderras sent her to the office of Cindy Ryan, Walteria's principal, based on a report from another student: "Eric Ramirez came to me to let me know Erin Magee was grabbing his arm and squeezing down on it.  He asked her to stop 4 times and she continued to squeeze his arm. While doing this she was growling and making animal noises and getting in their face.  She also was swinging her water bottle like she was going to hit Ben and Kevin."  When Eric Ramirez was interviewed, he reported that Erin had been hitting him about 3 times daily.  Ms. Ryan assigned Erin to lunchtime detention.[5]  [Ex. S, AR 1735.]

On April 22, 2004, Erin even signed a "Student Behavior Contract" describing her behavior problem as "Self Control - inside and outside of the classroom," and pledging to change her behavior within two weeks, **by May 6, 2004**, by "talking about it," "Ignor[ing]," "Walking away," and "Talk[ing] to the teacher" instead of losing control. [Ex. S, AR 1740.]  Despite her evident and unquestionably sincere desire to change her behavior, Erin was not able to do so.  As Mrs. Magee testified, Erin can talk about what should be done before and after an incident, but is not able to change her behavior dur ing an incident. [AR 0920:13-0921:12.]   She was suspended again on April 27, 2004, a mere five days after signing the "Student Behavior Contract," when she "caused, attempted to cause, or threatened to cause physical injury to another person." [Ex. O-1, AR 1727.]  Erin described the incident in writing as follows: "I was at chess club playing chess with my friend.  She was letting me move her pieces but the girls that were next to me kept on telling us to stop

---

[5]Ms. Guarderras testified that Erin regularly exhibited "inappropriate behaviors" in the classroom and the school yard, such as arguments and physical altercations with peers.  Erin was sent to Ms. Ryan's office on other occassions when she engaged in inappropriate behaviors.  [AR 0792:3-0794:25.]

cheating.  They kept on saying that they were in charge of shcool (sic) and they could boss us around.  I tried to ignore it, but I finally grabbed one girl's hair back and punched her in the stomach."  [Ex. S, AR 1747.]

Erin's inappropriate behaviors continued during the following months.  On May 3, 2004, she received an "in house suspension"[6] for the following described behavior:  "Erin was on grassy area behind classroom.  She thought one of the students told her to take her shoes off.  She did and another student said her feet 'were stinky.'  Erin gestured to hit her in the head w/notebook.  Another student stepped between them & said 'don't hit Alexa.'  So Erin hit this student (Sharon) in the nose w/ a fist."  [Ex. S, AR 1734.]  Then, on May 17, 2004, Erin assaulted two more students and described the incident thus:  "At recess I pinched Grace and pulled her hair due to a temper outburst.  My outburst probably occured (sic) to lack of food at lunch.  In line, I punched someone in the stomach.  I don't remember who I punched or why I did it.  I did it because she bossed me around."  [Ex. S., AR 1744.]  Erin's playground use was revoked for the week.  [Ex. S, 1750.]  Finally, just three weeks later, on June 9, 2004 Erin described still another incident:  "at lunch recess, on Wednesday, June 9, I was playing with six of my friends.  We were all down on out knees and being very active.  I jumped on Ryan.  I didn't get off when he told me to, and did on the second time."  [Ex. S, AR 1745] She was removed from the playground for unsatisfactory behavior. [Ex. S, AR 1752.]

**D.  Erin's Fifth Grade Year, The Continued Manifestation of Her Inappropriate Behaviors At School, And Mrs. Magee's Futile Request For An Assessment.**

At the beginning of the 2004-2005 school year, in or about September of 2004, Mrs. Magee spoke with Ms. Ryan about having Erin assessed to attempt to understand the cause of her behavioral problems.  Instead of honoring Mrs. Magee's

---

[6]Erin had just returned from a suspension.

request, Ms. Ryan simply dismissed it with "well, that's special ed." However, she did recommend that Mrs. Magee consider placing Erin on medication. [AR 0521:4-522:17.] Meanwhile, Erin's inappropriate behaviors continued in full force. On September 24, 2004, Erin "pulled another student's hair at recess because my friend was being teased by him." [Ex. S, 1738.] Similarly, on October 8, 2004, Erin "kicked a student twice during P.E. only for my amusement." [Ex. S, 1739.] And again on October 19, 2004, "Erin threw a water bottle at a student in the classroom. Erin felt that the student was making fun of her due to the fact that she did not bring a pencil. The student actually stated 'you forgot your pencil. Erin kicked a student on line for not walking quickly enough'" [Ex. 10, AR 1995]

Since it appeared that the District was not going to assess Erin, Mrs. Magee had to retain David Fox, Ph.D., to assess Erin. [AR 0523:9-21.] Dr. Fox issued a report dated October 22, 2004 [Ex. D, AR 1700-1702], which was promptly shared with both Ms. Ryan and Ms. Guarderras. [AR 0524:6-20, 0939:18-21.] Dr. Fox's opinions placed the District on notice that Erin may have a disability and should be assessed:

> "[T]his is a ten year old White female fourth-grader, an only child, who has been described as precocious and very bright and who has displayed impulsivity and anger outbursts. **She has been in therapy for a number of years and concerns have been raised as to the origin, or meaning, of her temper and social socialization difficulties.** ... Erin appears to be wrestling with **personal identity**. ... **She does not interact or function in many areas at a level commensurate with her fine intellectual level. ... It is important to help her override these patterns through personal and family psychotherapy lest complications of mood and conduct eventuate in more entrenched patterns of unhappiness.**" [Ex. D, AR 1702; emphasis added.]

Dr. Fox ruled out a few diagnoses, but was not entirely clear on a clinical diagnosis. Regardless, he did identify a mood problem for which Erin had been in

therapy "for years" and reached telling conclusions regarding Erin's emerging issues with "personal identity." These conclusions, along with the history of inappropriate behaviors for which Erin was in therapy and Mrs. Magee's request for an assessment, constituted sufficient notice to the District of a need for an assessment. However, the District **did not** assess.

On November 5, 2004, Erin was suspended again for causing, attempting to cause, or threatening to cause physical injury to another person. This time, she "was on the lunch line when another student 'cut' her. She shoved him out of line, he shot back and she puched [sic] him with great force in the stomach." [Ex. N-1, AR 1725.] Similarly, on April 1, 2005, Erin was suspended for ongoing intimidation, harassment and threats directed at another student. The suspension notice stated that "Erin [had] been intimidating and bullying another student **for at least one month**. She [had] tripped, teased, kicked and harassed another student." [Ex. M-1, AR 1723; emphasis added.] A discipline referral form contained the following description of the incident: "Anton has reported that Erin has been bullying Anton. She's been tripping him, teasing him, stepped on his books and ramming her back pack into his legs." [Ex. S. 1736.] Finally, on April 18, 2005, Erin was suspended again. The suspension notice described the incident as follows: "At the end of a kickball game, Erin lost her temper and chased two students down the hall. After catching up to them, she kicked one student in the leg and pulled another student's hair. While still angry, she threw her backpack and hit another child." [Ex. L-1, AR 1721.][7]

_____

[7] The hearing officer correctly found that Erin's inappropriate behaviors were not limited to school. Kathryn Bryan and Navah Becker testified that the similar inappropriate behaviors also exhibited in summer camp and Hebrew school, and Mrs. Magee testitifed to them at home. [AR 0487:17-0504:15, 0690:3-0711:14, 0918:14-0925:11, 0930:19-0938:18, 0940:17-0942:14, 0944:16-0945:8.]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AND
COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGEMENT

E.     **Erin's Truncated Sixth Grade Year And Dr. Liberati's Decision To Expel Her From The District.**

When Erin enrolled at Richardson Middle School, Mrs. Magee advised the District that Erin suffered from an "emotional or mental condition that require[ed] regular medical observation" and that she was taking Zoloft, which is an antidepressant. [Ex. G, AR 1710.][8] Despite this information and the longstanding history of emotional difficulties and inappropriate behaviors, the District still did nothing to assess Erin. Instead, after an incident on September 28, 2005, shortly after the start of her sixth grade, the District first suspended and then expelled her.

The suspension notice described the incident thus: "Victim and three witnesses reported to the assistant principal that Erin had lost her temper in P.E. after an insulting comment was made to her during class. Erin attempted to punch the victim multiple times in the stomach. Her last punch made direct contact with the victim's face and caused swelling of the lip. The incident was reported by the classroom teacher and Erin confessed." [Ex. K-1, AR 1719.] The description of the incident by Erin and Avinash Latchandani, the student who was attacked, showed not only Erin's aggressive reaction to a common place event, but also that her behavior on September 28th was not some isolated event, as the District claimed at the hearing. Quite the contrary: it was related to her perceived difficulties with a fellow student over the previous three years. [Ex. AAA, AR 1896-1896.]

Dr. Liberati recommended that Erin be expelled from the District based on the September 28th incident and her extensive history of suspensions and inappropriate behaviors. He concluded that Erin had significant issues with managing anger and was a danger to other students and to herself. He had a very difficult time believing that Erin could return to a public campus and be able to manage her anger. He believed that Erin needed help with addressing her anger issues. Further, utilizing

---

[8]Erin was placed on Zoloft by Dr. Green who had started treating her during the summer of 2005. [Exs. G and X; AR 1710, 1789.]

the District's "progressive discipline" matrix, he concluded that the District's prior interventions had not been successful, that to provide the same interventions would have been "futile," and that something else needed to be done than what had failed in the past. Indeed, he testified that Erin needed a much more restrictive setting than her general education classroom at Richardson, with fewer kids in the classroom. [AR 0947:13-0953:11.] Richardson's vice principal concurred with Dr. Liberati that Erin posed a danger to other students and "needed to be placed at a school where her behavior could be addressed." [AR 0226:2-0230:23.] Further, by letter dated September 30, 2005, the District's Director of Child Welfare and Attendance, Mark Knox, advised Mrs. Magee of Dr. Liberati's recommendation to expel Erin, extended her five-day suspension indefinitely and threatened to have her arrested if she came on District property. [Ex. BB, AR 1807.]

At the expulsion hearing on December 13, 2005, the hearing panel found that the District had previously attempted different types of interventions, including the Friendship Club and behavior contracts, that those interventions had not worked or caused a change in Erin's behavior, and that Erin's presence on a public campus would be a "continuing danger to the physical safety of [Erin] or others because Erin continues to use physical violence when angry." Therefore, the panel unanimously recommended that Erin be expelled from "all schools and programs of the Torrance Unified School District for the remainder of the 2005/06 school year." The panel also recommended that Erin "remain away from all Torrance Unified School District sites, SCROC, and any activity sponsored by the school or District during the period of expulsion." [Ex. JJ, AR 1860-1861.] The panel's expulsion recommendation was adopted by the District's Board of Education on January 18, 2006. [Ex. 6, AR 1986-1987.]

## F.    The District's Assessment And The October 27, 2005 IEP.

On or about October 6, 2005, Mrs. Magee requested a "full special education evaluation" of Erin. [Ex. PP, AR 1871.] District psychologist Amy Schumaker, M.A.

1   assessed Erin and prepared a report. [Ex. B, AR 1690-1698.] In connection with that
2   assessment, Dr. Akyuz advised the District that Erin was suffering from major
3   depression, DSM IV 296.33, and needed a "non public school with clinical staff who
4   can use consistent behavior modification techniques" with Erin. [Ex. C, AR 1699.][9]
5   Similarly, Dr. Green advised the District that Erin had been diagnosed with
6   Dysthymia and was on antidepressants, and that her "mood disorder significantly
7   interferes with her school performance & ability to function in a regular classroom."
8   Dr. Green opined: "I believe Erin qualifies for ED designation & would benefit from
9   a school setting that is able to address her emotional needs as well as her academic
10  potential. A non-public school may be appropriate if a suitable placement cannot be
11  found within TUSD." [Exs. HH and GGG, AR 1857, 1913-1926.]

12      As part of the assessment, Erin's home room teacher at Richardson, Gail
13  Nowak reported that Erin had "difficulty getting along with her peers due to her bossy
14  and intrusive nature. Peers would complain that Erin would argue with them and get
15  upset with them if Erin could not get her way." She also reported an "odd" situation
16  in her classroom when during a typical thunderstorm, Erin became "afraid" and
17  "proceeded to hide under her desk." Similarly, two of Erin's other teachers, Kim
18  O'Brien and a Ms. Green also reported "that Erin had difficulties getting along with
19  her peers and would frequently argue with and challenge her peers, as well as her
20  teachers. Ms. Green reported that peers complained that Erin would physically kick
21  or hit at a student if she was upset." [Ex. B, AR 1691.]

22      Further, the Achenback Behavior Rating Scales prepared by Ms. Nowak, Ms.
23  O'Brien and another teacher, Lorinda Ryan-Schell, revealed borderline clinically
24  significant elevations in social problems and aggression. The following significant
25  concerns were noted by these teachers: argues a lot; demands a lot of attention;
26
27  
28  [9]In addition to the diagnosis of Dysthymia, Dr. Akyuz diagnosed Erin with Major
Depression because she believed that her "emotional problems were exacerbated
during 2005 as a result of issues arising in the home." [Ex. I, AR 1715.]

1  disturbs other pupils; doesn't get along with other pupils; not liked by other pupils;

2  hot temper; talks too much; hums or makes odd noises in class; fear of certain

3  situations; and inattentive or easily distracted. [Ex. B, AR 1696.][10]

4      Ms. Schumaker also obtained input from Erin and Mrs. Magee. The Conners'

5  Parent Rating Scale Mrs. Magee prepared revealed clinically significant elevations

6  in Oppositionality, Hyperactivity, Anxious-Shy, Psychosomatic, and the Connors'

7  Total Global Index, as well as the Global Indexes for Emotional Lability and

8  Restless-Inpulsive. Further, the Achenback Behavior Rating Scales which Mrs.

9  Magee prepared revealed clinically significant elevations in somatic complaints,

10  social problems, thought problems and aggressive behavior and borderline clinically

11  significant elevations in the area of anxious/depressed behaviors. [Ex. B, AR 1693.]

12  Mrs. Magee indicated the following significant concerns: acts too young for her age;

13  demands a lot of attention; disobedient at home; disobedient at school; fear of

14  squirrels and spiders; fears she might think of something bad; fears she has to be

15  perfect; doesn't get along with other kids; gets teased a lot; gets in many fights; aches

16  and pains; stomach aches; feeling nausea and sick; physically attacks people; picks

17  at skin, knows or other body parts; prefers being with younger children; sleeps less

18  than most kids; stores up things of that she doesn't need; stubborn, solid and irritable;

19  temper tantrums or hot temper; trouble sleeping; and unhappy or depressed. [Ex. B,

20  AR 1696.]

21      Further, the Achenback Youth Self-Report Erin filled out indicated clinically

22  significant elevations in the areas of thought problems, anxious depressed behaviors,

23  social problems and aggressive behaviors. Further, borderline clinically significant

24  _____

25  [10]Erin's sixth grade teachers had only known her for a period of about three weeks.
It is significant that with such limited exposure, they had already become aware of

26  Erin's significant behavioral problems. Erin's teachers from the 4th and 5th grades
were also interviewed and confirmed that she "struggled ... with self-control and peer

27  relationships, ... [would] frequently be bossy and controlling with her peers, ... [and
when] there were significant home/family stressors or small frustrations that would

28  build up over the course of the day, Erin was reportedly more likely to externalize her
anger." [Ex. B, AR 1691.]

elevations were noted in the areas of somatic complaints and attention problems. Erin indicated the following significant concern: "I can't get my mind off of certain unknown thoughts;" "I am afraid of squirrels and my friend's parents;" "I am afraid that I might do something bad;" "I feel that I have to be perfect;" "I get into many fights;" "I get teased a lot;" "I hear sounds her voices that other people don't hear such as people calling my name or music from musicals;" " I would rather be alone that with others;" " I have nightmares;" "I would rather be with younger kids than with kids my own age;" "I see things that other people think is not they are;" "I do things that other people think are strange;" "I have thought that other people think are strange." [Ex. B, AR 1694.]

Despite this wealth of information clearly reflecting clinically significant and borderline significant elevations in social/emotional functioning, Erin's extensive history of inappropriate behaviors and difficulties with peers, as well as her diagnosed depression, Ms. Schumaker amazingly concluded that Erin was not a child with a disability under IDEA, this despite the fact that she been told not to return to any District school because she posed a threat to herself and other students. [Ex. B, AR 1698.] Ms. Schumaker made these determinations herself, prior to any IEP meeting, and without the benefit of a discussion of Erin's emotional difficulties and inappropriate behaviors. In fact, prior to the IEP on October 27, 2005, she called Mr. Benton and advised him of her determination. Every single District member of the IEP team testified that they reached no determination of eligibility on their own, and instead relied on Ms. Schumaker's conclusions. In effect, Erin's eligibility was not determined by an IEP tem, but rather by Ms. Schumaker alone. Remarkably, Dr. Liberati even **admitted** that he believed that Erin met prongs B and C of the ED criteria, but did not share his views with the IEP team, deferring instead to Ms. Schumaker's opinion. [AR 0224:20-0226:6, 0383:8-20; 0717:11-23, 0750:2-0761:16, 0763:25-0766:21, 0865:13-23; 866:20-0867:7, 918:12-920:2; 957:21-959:22.]

### G.     Erin's Enrollment At The Center.

In late November of 2005, Mrs. Magee enrolled Erin at the Center, which is an NPS. Its Director, Virginia Erxleben, Ed.D., BCET, testified at length regarding the behavioral, educational and psychological services Erin received at the Center. [AR 0558-606.]   They were also summarized in a report which was prepared shortly before the hearing. [Ex. DD, AR 1823-1828.]

When Erin first started at the Center, she was not "available for learning" because her behavioral and emotional difficulties were preventing her from being able to receive instruction.   It was quickly observed that Erin "frequently engages others in conflict through negative statements, argument or defiance.   Her social behavior is deeply affected by labile fluctuations in her mood.   Time spent in such conflict is at the expense of her availability for learning, and in particular, her attention to verbal instruction. ... [S]he enjoys the attention of and conversational interaction with other students and teachers in her environment, but these interactions are often unhealthy or hostile.   She can (sic) mentally and behaviorally rigid, insisting that interactions are mostly **on her terms**.   She has been observed openly and dogmatically verbally attacking the conversations or opinions of others when she disagrees with them. ... Erin can be physically assaultive.   Acting out behaviors can erupt in a variety of educational structured or unstructured situations, without observable or predictable environmental triggers.   Erin's behavior has been dangerous enough to herself or to others that physical restraint was required on four occasions during this observation period." [Ex. DD, AR 1823-1828.]

Dr. Erxleben testified that for several months Erin was receiving instruction one to one, with significant interventions by a behaviorist, Tyisha Noise, intended to address her inappropriate behaviors. [AR 0558:6-0562:15.] "Weaknesses were noted with Erin's ability to modulate her emotional reaction to staff and peers, a low frustration tolerance, a tendency to manipulate others for attention, and in her inability to have appropriate conversations with peers in a consistent way.   There

**17**

1   were several episodes during this review period when Erin verbally and physically

2   assaulted others." [Ex. DD, AR 1823-1828.] Dr. Erxleben also testified that with the

3   start of the 2006-2007 school year, Erin's behavioral difficulties had been brought

4   sufficiently under control that she was more "available for learning." However, Erin

5   was not yet ready to move into a less restrictive setting at that time. [AR 0572:19-

6   0575:1.]

7       **H.    Dr. Kaler's Assessment Of Erin.**

8       By letter dated December 1, 2005, Mrs. Magee notified the District of her

9   disagreement with Ms. Schumaker's assessment and requested an independent

10  educational assessment ("IEE") at District expense pursuant to California's Education

11  Code §56329(b). [Ex. KK, AR 1862.] On the same date, the District acknowledged

12  receipt of the request and stated that the request was "under review." [Ex. LL, AR

13  1863-1864.] However, the District never provided any other response to Mrs.

14  Magee's request for an IEE and never agreed to pay for one. Thus, Mrs. Magee was

15  forced to retain Sandra R. Kaler, Ph.D. on her own, who assessed Erin and issued a

16  report dated May 23, 2006. [Ex. A, AR 1681-1689.] Dr. Kaler concluded thus:

17          "Erin has a history of behavioral disturbance. Her behavioral

18          presentation, as well as formal testing are consistent with major

19          depressive disorder. In addition, Erin demonstrates a great deal of mood

20          lability. Testing further reflects her inability to inhibit strong responses

21          in emotional related situations. At the current time, Erin is not making

22          academic progress and is not able to interact with peers. Record review

23          reveals that Erin has had behavioral difficulties throughout her lifetime.

24          At the present time, it is clear that she lacks the ability to understand

25          appropriate social mores, both by her behavior and by her testing. It is

26          inconceivable to this examiner how Erin could be considered as

27          anything other than a 'poster child' for serious emotional disturbance,

28          based on behavior and formal testing. She clearly demonstrates an

**18**

1    inability to maintain satisfactory interpersonal relationships with peers
2    and teachers, inappropriate types of behaviors and feelings under normal
3    circumstances, and a general pervasive mood of unhappiness or
4    depression. This occurs despite medical management, therapy, and
5    placement in a therapeutic school. Erin's family stressors have
6    decreased markedly over the year. Nonetheless, her behaviors persist.
7    Diagnostically, Erin meets criteria for Dysthymia, Major Depressive
8    Disorder, and Identity Disorder, a juvenile precursor to Borderline
9    Personality Disorder. She is emotionally labile and lacks insight into
10   her own behavior."

11   Dr. Kaler recommended "placement in an NPS program with both a therapeutic
12   orientation as well as strong behavioral contingencies", "placement in a social skills
13   group that directly works on social flexibility, as well as anger management", and
14   "individual" and "family" therapy.

15   At the hearing, Dr. Kaler elaborated that Erin has not developed a sense of
16   herself and a stable personality, and that she completely disintegrates when placed in
17   stressful situations, that she is "just fine until she is not" and that she "loves until she
18   does not." Dr. Kaler further opined that if Erin does not receive appropriate
19   interventions, she would be at a very high risk of committing suicide, destroying
20   property and violence toward others, making poor career choices, and having unstable
21   relationships. Finally, Dr. Kaler testified that Erin was eligible for special education
22   at the time of the hearing as a child with ED and had been so eligible during the entire
23   2005-2006 school year, as well as the 2003-2004 and 2004-2005 school years. [AR
24   0406:18-0484:24.] The District presented no expert opinion contradicting Dr. Kaler's
25   opinions. In fact, the District's sole witness, Ms. Schumaker, admitted that she had
26   no opinion as to whether Erin was eligible during the period after her assessment was
27   conducted in October of 2005. [AR 0057:11-24, 0062:8-21.]

28

## IV.     ERIN IS A "CHILD WITH A DISABILITY" UNDER THE IDEA.

ED means a condition exhibiting one or more of the following characteristics **over a long period of time** and to a **marked degree** that **adversely affects a child's educational performance**: (A) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (B) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (C) inappropriate types of behavior or feelings under normal circumstances; (D) a general pervasive mood of unhappiness or depression; and (E) a tendency to develop physical symptoms or fears associated with personal or school problems.   34 C.F.R. §300.8(c)(4)(I). "Read naturally and as a whole, the law and the regulations identify a class of children who are disabled only in the sense that their abnormal emotional conditions prevent them from choosing normal responses to normal situations." *Independent Sch. Dist. No. 284 v. A.C. by C.C.*, 258 F.3d 769, 775-776 (8th Cir. 2001) [Emphasis added.]  It is [the student's] very inability to conform his [or her] conduct to socially acceptable norms that renders him [or her] 'handicapped' within the meaning of the [IDEA]. *Honig v. Doe*, 484 U.S. 305, 320, 108 S.Ct. 592, 595 (1988).

The testimony and documentary evidence introduced at the hearing as well as summarized in section III above make it abundantly clear that Erin exhibits prongs (B), (C) and (D) of the ED criteria, has exhibited them over a long period of time and to a marked degree, and that they adversely affected her educational performance not only during the 2005-2006 school year, when she was expelled, but also the prior school years.[11]

---

[11] The hearing officer correctly found that Erin met prong C, but incorrectly found that Erin did not meet prongs B and D.  Defendants and counterclaimants filed their counter claim to obtain a de novo review of the hearing officer's determinations with regard to prongs B and D.

A.     **Erin's Inappropriate Types of Behavior Or Feelings Under Normal Circumstances.**

In stark contrast to Erin's superior level of intelligence stands her lengthy history of inappropriate behaviors and feelings under normal circumstances. Substantial evidence was presented at the hearing regarding her longstanding behavioral difficulties at school, at home, at summer camp and at Hebrew school. Clearly, these difficulties have impacted every facet of her life, **especially her education.** Erin's pattern of inappropriate behaviors is similar to those of the student in *Fresno Unified School District*, 39 IDELR 28, (SEA CA 2003), where the hearing officer held that a student who had a history of violent and inappropriate behaviors, and was suspended numerous times for profanity, defiance, and physically injuring other students, was eligible as a child with ED. The student was "oversensitive to being evaluated or criticized by others, whether the criticism [was] real or perceived," would "out of the blue ... have an outburst that [was] out of proportion to anything that [had] occurred," had "angry outburst[s] in response to seemingly benign discussion[s]," and "label[ed] himself as bad." Similarly, in *Manhattan Beach Unified School District*, 34 IDELR 249 (SEA CA 2001), instances of a high school student's inappropriate behavior and her clinically diagnosed depression supported her eligibility as a student with ED.

1.     **Erin's Behavior Qualifies Her Under Prong C of the ED Criteria Because She Is Unable To Control Her Behavior And Conform Her Conduct To Socially Acceptable Norms.**

As the hearing officer correctly set forth in Legal Conclusion 8, the standard for meeting prong C of the ED criteria was set out by the Office of Special Education Programs ("OSEP") of the United States Department of Education in *Letter to Anonymous*, 213 IDELR 247 (OSEP 1989). The question posed was whether prong C related only to "psychotic behaviors." 213 IDELR 247 at p.1 of 4. The answer was that the term "as operationally defined by a number of States may include those behaviors which are psychotic or bizarre in nature **or** are atypical behaviors for which no observable reason exists." 213 IDELR 247 at p. 2 of 4. [Emphasis added.] Thus, running away from a stressful situation or taking

**21**

1   alcohol or drugs would not qualify, but "behavior such as assaulting students or teachers for

2   **no apparent reason**" would. 213 IDELR 247 at pp.2-3of 4. [Emphasis in original.] In other

3   words, psychotic behavior would certainly qualify, and assaulting students and teachers "for

4   no apparent reason" would be an example of psychotic behavior.

5           However, OSEP was careful not to limit its exposition to psychotic behaviors and

6   clearly concluded that: "The essential element appears to be the student's inability to control

7   his/her behavior (*Doe v. Maher*, 793 F.2d 1470, 1480 footnote 8, (9th Cir. 1986)) and

8   conform his/her conduct to socially acceptable norms (*Honig v. Doe*, 108 S.Ct. 592, 595

9   (1988)). However, a student exhibiting such behaviors is eligible for special education and

10  related services only if they meet the additional criteria contained in the SED definition (34

11  CFR §§ 300.5(b)(8))."[12]   There is nothing mysterious about it: a student who is unable to

12  control his or her behavior **and** conform his or her conduct to socially acceptable norms

13  (such as not fighting with other students over perceived sleights) may be deemed ED if he

14  or she also meets the elements of having exhibited this characteristic over a long period of

15  time and to a marked degree, and if such characteristic adversely affected the student's

16  educational performance.

17          There is ample evidence in the administrative record to support the hearing officer's

18  findings 61, 62, and 63, that "[t]he sudden and intense aggressive, emotional outbursts that

19  [Erin] displayed over a period of approximately two years by the time of the IEP meeting in

20  October 2005, support a finding of eligibility under this category, especially when considered

21  with the behavioral difficulties that [Erin] has manifested in a variety of settings for many

22  years. [Erin's] reactions to the rather commonplace events in everybody's daily life such as

23  anger, frustration, and disrespectful comments by others, are markedly out of proportion to

24  the significance of these events.  These emotional outbursts occurred not only in the school

25

26  _____

    [12]   Thus, clearly, a student need not exhibit bizarre or dangerous behavior nor be

27  psychotic or delusional in order to exhibit "inappropriate types of behavior or feelings
    under normal circumstances."  *Clint Indep. Sch. Dist.*, 508 IDELR 204 (SEA TX

28  1986).  Indeed, the hearing officers in *Fresno Unified*, *supra* and *Manhattan Beach*,
    *supra*, rejected this very argument.

1  setting, but also at home and camp.  The District and others attempted to control [Erin's]

2  outbursts with various behavioral modification techniques, which were of only limited

3  success. Long-term therapy with Dr. Akyuz to attempt to modify these behaviors, and, more

4  recently, the administration of Zoloft, did not block these intense displays of temper while

5  [Erin] was in attendance at District schools. ... [T]he District's psychoeducational assessment

6  did not place [Erin's] behavior into the broad historical context that it warranted. ... By the

7  time of the District's psychoeducational assessment, ... [Erin's] history from kindergarten

8  onward demonstrated a pattern of unpredictable and aggressive temper tantrums across

9  numerous environments, which caused or threatened to cause physical harm to her or to third

10  parties, and there was no reason to anticipate that they would simply stop.  Rather, their

11  intensity and pervasiveness, in varying degrees, throughout [Erin's] scholastic career and in

12  other settings, despite a variety of attempts at behavioral modification, rather severe

13  disciplinary measures, therapy, and medication, evidence Student's inability to control her

14  behavior." [AR 0023-0024.] These findings by the hearing officer clearly establish that Erin

15  meets prong C of the ED criteria.

16          2.        **The District's Own Witnesses Also Establish That Erin Meets**

17                                 **Prong C of the ED Criteria.**

18        At hearing, Ms. Schumaker testified that in reaching her determination she relied on

19  a one page District document which describes prong C as follows: "To qualify under this

20  characteristic, the behaviors must be psychotic, overtly bizarre **or potentially or actually**

21  **harmful to the student or to others."** [AR 0307:15-0313:8; Ex. J, AR 1717; emphasis

22  added.] Regardless of whether Exhibit J accurately states the qualifications for prong C, Erin

23  meets it.  At least three of the District's witnesses, Dr. Liberati, Ms. Tasker (Sifford) and Mr.

24  Benton testified that they believed that Erin posed a danger to herself and others because of

25  her behaviors. Mr. Benton also testified that if Erin were to return to a public campus today,

26  she could not control her anger sufficiently to escape another expulsion. [AR 0226:13-

27  0230:23, 0879:18-0880:5, 0947:13-0953:11.]  Further, Mr. Knox even threatened to cause

28  Erin's arrest if she were to come on District property, due to the danger she posed to others.

1    [Ex. BB, AR 1807.]

2      Further, the District's IEP team observed on December 17, 2007 that Erin has a

3 "history of extreme withdrawal or relating to people inappropriately and continued

4 impairment in social interaction, from infancy through early childhood; Erin continues to lack

5 social awareness. She does not understand social cue and nuances. At Hebrew school her

6 determination to enforce rules has led to physical altercations. Erin at times appears unaware

7 that her behavior makes others uncomfortable. She can be aggressive with peers. She does

8 not observe conventional personal space and lacks clues with regard to the emotions and

9 feelings of others. As mentioned above, she does not make good social connections." [AE

10 3.]

11      Finally, the District's Dr. Semple concurs that Erin meets prong C of the ED criteria.

12 In her report she states: "**This criteria** [sic] **is also met if the AS label is not applied.**

13 However, for a child [with] AS, aggression in response to the frustration, sensory overload

14 and/or confusion is not atypical. The examiner feels that if this were marked "yes" than most

15 children with ADHD, autism and Asperger's would be dually diagnosed. This examiner

16 feels that the limiting criteria is intended to be applied when another explanation for the

17 behavior is not available. However, this criteria at face value is marked "yes." [AE 49;

18 emphasis added.] Thus, because Dr. Semple diagnosed Erin with AS in December 2007, she

19 viewed the eligibility criteria of Autism to be more appropriate for Erin than ED. However,

20 during the period at issue in the administrative hearing, no one had diagnosed Erin with AS.

21 Thus, in the absence of the "AS label", Dr. Semple concedes that Erin meets prong C of the

22 ED criteria.

23      **B.**    **Erin's General Pervasive Mood Of Unhappiness Or Depression.**

24      Erin has been suffering from severe emotional problems her entire life. She was

25 diagnosed with Dysthymia in 2002 by Dr. Akyuz and Drs. Green and Kaler confirmed that

26 diagnosis in 2005 and 2006, respectively. Erin was also diagnosed with major depression

27 and was placed on antidepressant medication in 2005, when she was experiencing difficulties

28 at home. Finally, in 2006, Dr. Kaler also diagnosed Erin with Identity Disorder which was

1  also noted by Dr. Fox in 2004.[13]   Thus, clearly Erin exhibits a general pervasive mood of

2  unhappiness or depression as required by prong D.  Further, substantial **uncontradicted**

3  evidence from Drs. Kaler, Green and Akyuz showed that Erin's emotional difficulties caused

4  or contributed to her inappropriate behaviors. [AR 0237:4-7, 0406:18-0484:24; Ex. I, AR

5  1713-1716, Ex. HH, AR 1857.]   Thus, the hearing officer's determinations set forth at

6  findings 59 and 60 that Erin did not meet prong D of the ED criteria were contrary to the

7  preponderance of the evidence and therefore should be overturned.

8      **C.**    **Erin Also Meets Prong B of the ED Criteria.**

9      As with prong C, Dr. Semple opined in her December 2007 report that Erin meets

10  prong B of the ED criteria. She writes: "**Erin met this criteria in that she did not establish**

11  **friendships with peers.** However, for children with AS this is part of the disorder." [AE 49;

12  emphasis added.]    Indeed, the administrative record is replete with instances of Erin's

13  difficulties with the development of lasting relationships with peers and teachers, her defiant

14  behavior at school, including the refusal to do school work that did not interest her, her awful

15  citizenship marks, her physical attacks on peers, her throwing of furniture and other objects

16  at teachers, peers and others, and similar episodes.  Mrs. Magee testified that although Erin

17  would love to have friends and declares that she does, she in fact has no friends. [AR 0514:7-

18  0517:11, 0535:1-0537:15, 0924:0925:11, 0934:14-0935:10.] The District IEP team recently

19  made the same observation.[14]  Indeed, given her assaultive behaviors towards her peers it is

20  hard to imagine any child wanting to maintain a "satisfactory" relationship with Erin!

21      This proposition is supported not only by countless episodes of conflict at school, but

22  also by Mrs. Magee's testimony regarding the refusal of Erin's so called "friends" to even

23  spend time with her.  For example, Mrs. Magee testified about the time that Erin wanted to

---

25  [13]At the hearing the District presented no rebuttal evidence in this regard.   The
26  District's sole witness, Ms. Schumaker, admitted that she was not qualified to diagnose Erin and she did not rule in or rule out any of these diagnoses. [AR 0056:11-0057:10.]

27  [14]"It is important to note that while Erin has consistently reported that she had
28  friends, she cannot name any but the two girls in her current class that she has known for a month." [AE 3-4.]

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AND COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGEMENT**

1 go over to the house of a "friend" after school, and the "friend's" mother called to state that

2 her daughter did not want Erin to come over because "Erin hits her all the time." Then there

3 was the time when Mrs. Magee wanted to take a group of kids to Disneyland for Erin's

4 birthday and "no one wanted to come." Similarly, one of Erin's "friends" invited over to

5 spend the night called her mother and asked to be picked up at 1:00 a.m. because she could

6 not "put up" with Erin anymore. In fact, Mrs. Magee testified that she had **never** observed

7 Erin with engaging in **appropriate** interaction with other kids. [AR 0934:14-0935:10.]

8      A few of the District's witnesses testified that on occasion they observed Erin

9 speaking with other kids on the playground. However, this testimony is not sufficient to

10 establish the maintenance of any kind of a satisfactory relationship. In fact, this testimony

11 is refuted by Erin's teachers' universal reports in connection with her assessment that Erin

12 did not get along with other students.

13      Finally, although Erin's relationship with her teachers was markedly better than her

14 relationship with peers, it cannot be said that she maintained a satisfactory relationship with

15 any teacher. Throughout her school years, she has consistently been noted to have

16 unsatisfactory citizenship marks. She has also had episodes of assaultive behaviors against

17 teachers both at District schools and at summer camp when she has not gotten her way.

18     **D.**    **The Origin Or Cause of Erin's Emotional And Behavioral Difficulties Is**

19             **Not A Factor In Determining Eligibility.**

20      Before the hearing officer, the District sought to escape responsibility for addressing

21 Erin's needs by attributing her difficulties to domestic problems in 2005. However, as the

22 hearing officer correctly stated in finding 61, Erin's emotional difficulties and inappropriate

23 behaviors predate and postdate the domestic problems in 2005. Indeed, in her report, Dr.

24 Semple concludes that "many of [Erin's] behaviors appear related to social deficits, difficulty

25 with transitions [and ] poor coping skills", not domestic problems in 2005. [AE 46.] Clearly,

26 the turmoil in the home was bound to exacerbate the difficulties of a child with emotional

27 and behavioral difficulties. However, "neither state nor federal law fixes responsibility based

28 on the causality of an emotional problem but looks to the effect on the student's educational

growth. Thus, while the etiology of a student's emotional disturbance may be important in selecting a treatment modality, it is not a factor in the determination of eligibility for services which the [District] is responsible." *Jeffrey K v. Concord Carlisle High School*, 501 IDELR 205 (SEA Mass. 1979).

*New Paltz Central School District v. St. Pierre*, 307 F.Supp.2d 394 (N.D.N.Y. 2004) is also instructive. The student there was on the honor roll, scored in the 99th percentile on the Comprehensive Test of Basic Skills, was recommended for accelerated math and received glowing comments from his teachers. However, after his parents began divorce proceedings he started exhibiting uncontrollable behavior at home, was often angry and upset, and his academic performance substantially declined. The district court affirmed the hearing officer's determination that the student exhibited several of the characteristics of a child with ED even though his behavioral and emotional problems were caused by his parents' divorce. *Id* at 399.

Similarly, in *Muller v. Committee on Special Education of the East Islip Union Free School District*, 145 F.3d 95 (2nd Cir. 1998), in finding a student ED eligible, the 2nd Circuit held that the fact that her emotional problems were unrelated to school was of little, if any, relevance as to whether she had ED entitling her to benefits under IDEA, so long as those problems had a significant effect on her ability to learn. *Id.* at 104. See, also, *In re East Side Union High School District*, 502 IDELR 374 (SEA CA 1981): "it does not matter whether Pupil's emotional disturbance is caused by non-school factors, in whole or in part, because all that matters is that her condition makes her unable to learn."

E.    **Erin's Emotional Difficulties And Inappropriate Behaviors Adversely Affected Her Educational Performance.**

"Neither the federal statute and regulations nor the [California] statute and regulations define 'adversely affect.' Ordinary usage suggests that any negative effect should be sufficient. The phrase has no qualifier such as 'substantial,' 'significant,' or 'marked,' unlike the language in other portions of the same regulation." *Mr. and Mrs. I. v. Maine School Administrative District 55*, 416 F.Supp.2d 147, 160 (D. Me, 2006). Here, there can be no

1  question but that Erin's emotional and behavioral difficulties have in fact adversely affected

2  her educational performance.  As the hearing officer correctly found, that Erin's behaviors

3  "resulted in numerous suspensions from school, as well as, eventually, expulsion from

4  school, demonstrates that [Erin's] emotional disturbance was adversely impacting her

5  education. [Erin's] inappropriate behaviors had been manifested over a long period of time,

6  to a marked degree, and adversely affected her educational performance. [Erin] requires

7  special education services to enable her to learn to control her behavior so that she can

8  remain in a classroom and in school."  Even Dr. Liberati and the District's Carl Borders, III,

9  admitted that when a student is expelled from school  her educational performance is

10  adversely effected. [AR 0749:21-0750:1, 0961:25-0962:8.]

11        The District's position fails because it does not come to grips with the fact that Erin's

12  emotional difficulties and inappropriate behaviors prevented her from being able to go to

13  school. *Johnson v. Metro Davidson County School System*, 108 F.Supp.2d 906 (M.D.Tenn

14  2000).   In *Johnson*, a student with a history of inappropriate behaviors at school and

15  numerous conflicting diagnoses, was unable to remain in school due to her behavioral

16  difficulties.  In finding the student eligible as a child with ED, the district court reasoned:

17  "The problem, therefore, is not so much Tiffiney's lack of performance but that she has been

18  unable to remain in school. ... She has been expelled from both Goodpasture and Benton

19  Hall.  This inability to remain in school while in a regular school environment - or even the

20  more controlled environment of Benton Hall - indicates that Tiffiney's needs were not

21  accommodated within the regular education system.  Thus, Tiffiney was eligible for special

22  education services under the IDEA due to her Emotional Disturbance." *Id.* at 918-919.

23        Similarly, in *In re: Burton Valley School District*, 503 IDELR 256 (SEA CA 1982),

24  a bright, articulate 13 year old with severe conduct disorder and depressive disorder was

25  found to be IDEA eligible after he was expelled even though he had been performing at or

26  close to grade level work in all academic areas.   The hearing officer reasoned thus:

27  "Petitioner's emotional difficulties affect his very ability to be in a classroom.  His poor

28  behavior is not remediable by the usual discipline controls available in the regular program.

1   Petitioner gets out-of-control, unreachable and violent at minor provocations.  Revocation

2   of privileges and suspension from school do not influence him.  He needs special programs

3   and services to enable him to meet even a threshold level of educational performance, i.e.,

4   attendance at school. ... **It is self evident that the inability to be present in a classroom**

5   **adversely affects one's educational performance."** [Emphasis added.]

6          Finally, this rationale was accepted by the hearing office in *Los Gatos-Saratoga Joint*

7   *Union High School District*, 41 IDELR 227 (2004), as follows:

8

9          "STUDENT's condition was serious enough to require treatment with

10         medication, but the medication had limited effectiveness.  Her condition was

11         affected her to such a degree that she was missing school nearly as often as she

12         was able to attend school.  The Hearing Officer notes that such a deficiency in

13         school attendance, **persisting over a period of one or more months** from the

14         outset of eleventh grade for a high-achieving student taking accelerated classes

15         in preparation for college, was virtually certain to have an adverse affect on

16         that student's academic performance." [Emphasis added.]

17  In fact this is confirmed by Erin's teachers who issued a progress report on October 11, 2005,

18  a mere ten days after she was told not to return to school, stating that Erin's grades were

19  being affected by her absence from school. [Ex. BBB, AR 1901.] See, also, *Board of*

20  *Education of Montgomery County v. S.G.*, 2006 WL 544529 (D.Md. 2006); and, *Oxnard*

21  *Union High School District*, 102 L.R.P. 19526 (2002) ("[I]t is certain that a pupil cannot

22  receive educational benefit if he cannot attend classes.")

23         **F.     Erin Is Eligible Even Though She Has Been Academically Successful.**

24         As the hearing officer observed, the District's argument that Erin is not IDEA eligible

25  because she continued to do well academically despite her emotional problems and

26  inappropriate behaviors is likewise misplaced.  "The expulsion demonstrates that [Erin's]

27  education has been adversely impacted by her behavior.  To over-emphasize [Erin's] high

28  level of academic performance and ability in considering her for ED eligibility is to,

**29**

1  essentially, penalize her for being very bright.  The ED criteria do not require that a very

2  bright child be so emotionally devastated that she is no longer capable of generally

3  maintaining her grades and performing well on achievement tests." [AR 0023.]

4          In fact, the Supreme Court has clearly repudiated the proposition that grades can serve

5  as the IDEA's litmus test.  In *Rowley* it stated: "We do not hold today that every handicapped

6  child who is advancing from grade to grade in a regular public school system is automatically

7  receiving a 'free appropriate public education'".  *Rowley*, *supra* at 203.  The court in

8  *Corchado v. Board of Education*, 86 F.Supp.2d 168, 176 (W.D.N.Y. 2000) reiterated this

9  point in the context of eligibility:

10         "The [hearing officer's] reasoning also signals what this Court believes is a

11         fundamental error in determining eligibility for special education services.

12         The [hearing officer's] reasoning, in effect, precludes a child whose academic

13         achievement can be described as 'satisfactory' from being able to demonstrate

14         that documented disabilities adversely affected the student's academic

15         performance.  This should not and cannot be the litmus test for eligibility

16         under the IDEA.  The fact that a child, despite a disability, receives some

17         educational benefit from regular classroom instruction should not disqualify

18         the child from eligibility for special education benefits if the disabilities are

19         demonstrated to 'adversely affect the child's educational performance.'" *Id.*

20

21         Thus, e.g., in *Westchester Area School District v. Bruce and Suzanne C.*, 194

22  F.Supp.2d 417, 421-423 (E.D. Penn. 2002), the court held that passing grades should not be

23  the "litmus test' to determine the need for special education, and added that the hearing panel

24  "erred in focusing on [the student's] grades while disregarding [her] potential." *Id.*

25         In fact, academic achievement is hardly the only measure of the appropriateness of a

26  child's education.  *Yankton School District v. Schramm*, 93 F.3d 1369, 1374-75 (8th Cir.

27  1996).  "Education as understood today, connotes all those processes cultivated by a given

28  society as a means for the realization in the individual of the ideals of the community as a

**30**

whole. It has for its aim the development of the powers of man (1) by exercising each along its peculiar line, (2) by properly coordinating and subordinating them, (3) by taking advantage of the law of habit, and (4) by appealing to human interest and enthusiasm. IT INCLUDES NOT ONLY THE NARROW CONCEPTION OF INSTRUCTION, TO WHICH IT WAS FORMERLY LIMITED BUT EMBRACES ALL FORMS OF HUMAN EXPERIENCE, owing to the recognition of the fact that every stimulus with the corresponding reaction has a definite effect upon character. ( Emphasis added where capitalized.)" *In re Kristopher H.*, 507 IDELR 183 (SEA WA 1985), quoting from Funk and Wagnall's New Standard Dictionary, page 790 (1946).

Indeed, "'[e]ducational performance' means more than a child's ability to meet academic criteria. It must also include reference to the child's development of communication skills, social skills, and personality...." *Mary P. v. Illinois State Board of Education*, 919 F.Supp. 1173 (N.D. Ill. 1996); see, also, *Student v. Oakland Unified School District*, 507 IDELR 191 (SEA CA 1985) ("educational performance" also includes peer interactions). Further, Erin's entitlement to IDEA services "must be gauged in relation to [her] potential." *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 185 (3rd Cir. 1988).

The case of *Venus Independent School District v. Daniel S.*, 36 IDELR 185 (N.D.Tex. 2002) is on point. In *Daniel S.*, a 7th grader was intellectually gifted, with a performance IQ of 137. He earned good grades, did well on standardized and group tests, participated in class, was on the honor roll, and even performed well in school activities. However, he had behavioral problems. Very much like [Erin], he was oppositional, defiant, engaged in misconduct and had various verbal and physical peer altercations. The District denied him special education based on his good grades, honor roll status, diminished incidents in the new program (**with a behavior plan**) and overall academic success. However, the court affirmed the hearing officer's determination that the student was eligible, holding: "It is undisputed here that Daniel's academic performance was well above average, however, a true measure of a child's educational performance is not strictly limited to an evaluation of his

1    performance in academics." The Court found that his behavior problems "clearly affected

2    his overall educational performance at school, and were sufficient to warrant a finding of a

3    'child with a disability' under the IDEA."

4    **V.    THE DISTRICT VIOLATED ITS "CHILD FIND" OBLIGATIONS DURING**

5    **THE 2003-2004 AND 2004-2005 SCHOOL YEARS.**

6            Although not necessary to the relief being sought, at the hearing before OAH,

7    Defendants and Countercalimants also argued that during the 2003-2004 and 2004-2005

8    school years, the District violated the "child-find" provisions of the IDEA, which require

9    school districts to identify, locate and evaluate disabled children. See 20 U.S.C. §

10   1412(a)(3)(A); *Handberry v. Thompson*, 219 F.Supp.2d 525, 540 (S.D.N.Y.2002). These

11   provisions require that children be identified and evaluated within a reasonable time after

12   school officials notice behavior likely to indicate a disability. *W.B. v. Matula*, 67 F.3d 484,

13   501 (3d Cir.1995). Moreover, the provisions apply not only to children with disabilities but

14   also to children suspected of being disabled and in need of special education services. See

15   20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. §300.125(a)(2)(ii) (2000). Thus, the "duty 'is triggered

16   when the [District] has reason to suspect a disability, and reason to suspect that special

17   education services may be needed to address that disability.'" *Cari Rae S.*, *supra* at 1194

18   (citations omitted). The threshold for suspecting that a child has a disability is relatively low.

19   *Id*. at 1195.

20           Here, the record is replete with behaviors which should have placed the District on

21   notice that Erin may have a possible disability. The District clearly understood that Erin had

22   certain needs and proceeded to attempt to address it in the general education setting.

23   However, it never sought to assess Erin to determine the cause of Erin's behaviors and

24   whether its interventions were sufficient to address her needs, this despite the fact that Mrs.

25   Magee asked for an assessment at the start of the 2004-2005 school year, and Dr. Fox

26   highlighted Erin's emotional and behavioral difficulties.

27

28

## VI.    MRS. MAGEE IS ENTITLED TO REIMBURSEMENT OF THE COSTS SHE INCURRED IN ENROLLING ERIN AT THE CENTER AND IN RETAINING DR. KALER TO CONDUCT AN IEE.

Because the District denied Erin a FAPE, Mrs. Magee is entitled to "such relief as the court determines is appropriate" in light of the purposes of the IDEA.  20 U.S.C. §1415(i)(2)(C)(iii); *School Committee of Town of Burlington v. Department of Education*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002 (1985); *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361 (1993).  "The ordinary meaning of these words confers broad discretion on the court, and the type of relief is not further specified, except that it must be 'appropriate.'" *Id.* at 369.  For example, parents are entitled to retroactive reimbursement for "appropriate" services they have procured for their child when the school district fails to provide FAPE. *Burlington, supra* at 370.[15]  The rationale behind *Burlington* is that parents who elect to risk shouldering the costs of what they perceive to be a more appropriate placement, and whose judgment is wholly or in part vindicated by the court, should receive more than an "empty victory." *Alamo Heights Independent School Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986).

The evidence presented at hearing established that the program that Erin has been receiving at the Center was, in all material respects, an appropriate placement for her during the period at issue in this case.  Dr. Erxleben's testimony and summary report show that the education provided by the Center was proper under IDEA. *Carter, supra* at 364-366.

Further, when Mrs. Magee requested an IEE at public expense, the District was required to "without unnecessary delay" either initiate a due process hearing to show that its evaluation was appropriate to provide the IEE.  34 C.F.R. §300.502(b)(2); California Education Code §56329(c).  Because the District did neither, the hearing officer correctly ruled that Mrs. Magee was entitled to be reimbursed for the expenses she incurred to retain

---

[15/]This right to reimbursement exists even though Erin had never received special education services from the District. *Frank G. v. Board of Education of Hyde Park*, 459 F.3d 356 (2nd Cir. 2006).

1    Dr. Kaler to perform the IEE.

2          The evidence at the hearing established that Mrs. Magee paid $21,020 for Erin to

3    attend the Center during the 2005-2006 school year and $1,600 to Dr. Kaler for the IEE. [AR

4    0508:21-0511:13, 0575:4-0576:14; Ex. Y, AR 1790-1798; Ex. Z, AR 1799-1804; and Ex.

5    AA, AR 1805-1806.] Thus, as set forth in hearing officer's Orders 3 and 4, Mrs. Magee is

6    entitled to reimbursement of $21,020 for expenses of the Center and $1,600 for expenses of

7    Dr. Kaler.

8    **VII.    CONCLUSION.**

9          For the foregoing reasons, it is respectfully requested that the Court issue a decision

10   finding that (a) the District's IEP of October 27, 2005 failed to provide FAPE to Erin because

11   it did not find her IDEA eligible under ED; (b) the District failed to meet its "child find"

12   obligations during the 2003-2004 and 2004-2005 school years; and (c) affirming the hearing

13   officer's orders (a) through (d) as recited in the introduction.

14         Respectfully submitted.

15   Dated: February 19, 2008              **NEWMAN AARONSON VANAMAN**
                                           George D. Crook
16                                         Henry Tovmassian

17

18                                    By   _____
19                                         Henry Tovmassian
                                           Attorneys for Defendants and
20                                         counterclaimants ERIN MAGEE, by
                                           and through her guardian ad litem
21                                         MARYL MAGEE, and MARYL
                                           MAGEE

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS AND
COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGEMENT**