1  **GEORGE D. CROOK, SBN #60889**
   **HENRY TOVMASSIAN, SBN #140388**
2  **NEWMAN.AARONSON.VANAMAN**
   14001 Ventura Boulevard
3  Sherman Oaks, CA 91423
   Telephone: (818) 990-7722
4  Facsimile: (818) 501-1306

5  Attorneys for Defendants and Counterlaimants
   ERIN MAGEE, by and through her guardian
6  ad litem MARYL MAGEE, and MARYL MAGEE

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  TORRANCE UNIFIED SCHOOL          ) CASE NO. CV 07-2164 CAS (RZx)
    DISTRICT,                        )
12                                   )
                                     ) **DEFENDANTS AND**
13          Plaintiff/Counterdefendant, ) **COUNTERLAIMANTS' APPENDIX**
                                     ) **OF AUTHORITIES WITHOUT**
14  vs.                              ) **OFFICIAL CITATIONS**
                                     )
15  ERIN MAGEE, a minor, MARYL       )
    MAGEE, and CALIFORNIA            ) **[Motion for Summary Judgment**
16  OFFICE OF ADMINISTRATIVE         ) **Filed Concurrently Herewith Under**
    HEARINGS,                        ) **Separate Cover]**
17                                   )
                                     ) DATE:  March 31, 2008
18          Defendants/Counterclaimants. ) TIME:  10:00 a.m.
                                     ) CTRM: 5
19  _____ )         312 N. Spring Street
    AND CONSOLIDATED ACTION          )         Los Angeles, California 90012
20  _____ )

21

22

23       Filed herewith are non-federal authorities cited in Defendants and

24  Counterclaimants' Memorandum of Points and Authorities in Support of their

25  Motion for Summary Judgment.

26       •    *Board of Education of Montgomery Coounty v. S.G.,* 2006 WL

27            544529 (D.Md. 2006)

28

                                    1
─────────────────────────────────────────────────────────

1  • 41 IDELR 227 (SEA CA 2004) *Los Gatos-Saratoga Joint Union*

2    *High School District*

3  • 39 IDELR 28 (SEA CA 2003) *Fresno Unified School District*

4  • 36 IDELR 185; 102 LRP 9294 (N.D. TX 2002) *Venus Independent*

5    *School District, v. Daniel S.*

6  • 102 LRP 19526 (SEA CA 2002) *Oxnard Union High School District*

7  • 34 IDELR 249 (SEA CA 2001) *Manhattan Beach Unified School*

8    *District*

9  • 213 IDELR 247; 213 LRP 9338 (OSEP 1989) *Letter to Anonymous*

10  • 508 IDELR 204; 508 LRP 8650 (SEA TX 1986) *Edward A.F. v. Clint*

11    *Independent School District*

12  • 507 IDELR 183; 507 LRP 8364 (SEA WA 1985) *In re Kristopher H.*

13  • 507 IDELR 191; 507 LRP 8367 (SEA CA 1985) *Oakland Unified*

14    *School District*

15  • 503 IDELR 256; 503 LRP 7615 (SEA CA 1982) *In re:  Burton Valley*

16    *School District*

17  • 502 IDELR 374; 502 LRP 7411 (SEA CA 1981) *In re:  East Side*

18    *Union High School District*

19  • 501 IDELR 205; 501 LRP 6881 (SEA MA 1979) *Jeffrey K. v.*

20    *Concord Carlisle High School*

21

22 DATED:  February 19, 2008   Respectfully submitted,

23           **NEWMAN AARONSON VANAMAN**

             George D. Crook

24            Henry Tovmassian

25

26        By

27            Henry Tovmassian

             Attorneys for Defendants and

28            Counterclaimants

Not Reported in F.Supp.2d, 2006 WL 544529 (D.Md.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
BOARD OF EDUCATION OF MONTGOMERY COUNTY
v.
S.G., a minor by her guardian and next friend, N.G.
No. Civ.A. DKC 2005-0323.
March 6, 2006.

Jeffrey A. Krew, Jeffrey A. Krew, Attorney at Law, Ellicott City, MD, for Board of Education of Montgomery County.

Mark B. Martin, Law Offices of Mark B. Martin, Baltimore, MD, for S.G.


MEMORANDUM OPINION


CHASANOW, J.

**\*1** Presently pending and ready for resolution in this case brought under the Individuals with Disabilities Education Act are (1) the motion of Plaintiff Board of Education of Montgomery County for summary judgment ("Plaintiff") (paper 12); and (2) the cross-motion of Defendants S.G. and her foster parent/legal guardian N.G. for summary judgment ("Defendants") (paper 13). The issues are fully briefed and the court has reviewed the administrative record in its entirety. The court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court will deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment.


I. The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and accompanying regulations, 34 C.F.R. § 300 et seq., require all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free and appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found at Md.Code Regs. 13A.05.01.

The term "child with a disability" means a child with:

(i) mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3); see also 34 C.F.R. § 300.7(a); Md.Code Regs. 13A.05.01.03(70). Emotional disturbance is further defined as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, that adversely affects a student's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general, pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance.

34 C.F.R. § 300.7(c)(4); see also Md.Code Regs. 13A.05.01.03(20).

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process. See Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 192, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child, and includes the provision of individualized special education services along with related services, as needed.[FN1] See id. at 207. To the extent that a child needs only a related service and does not also require special education, the child is not considered to be a "child with a disability" under the statute. 34 C.F.R. § 300.7(a); Md.Code Regs. 13A.05.01.03(70).

> FN1. Special education is defined as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401. It includes "instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." Id. "Related services" are defined as "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education," and may include, among other things, psychological services, counseling services, and social work services. 34 C.F.R. § 300.24(a); see also Md.Code Regs. 13A.05.01.03(58).

*2 The benefit must be provided in the least restrictive environment appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); see also 34 C.F.R. § 300.550. The IDEA does not require that a school district provide a disabled child with the best possible education, Rowley, 458 U.S. at 192, or that the education maximize each child's potential, s ee Hartmann v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir.1997). The benefit conferred, however, must amount to more than trivial progress. See Reusch v. Fountain, 872 F.Supp. 1421, 1425 (D.Md.1994) ( Rowley's " 'some educational benefit' prong will not be met by the provision of de minimis, trivial learning opportunities.") (citing Hall v. Vance County Bd. of Educ., 774 F.2d 629, 635 (4th Cir.1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be disabled. 20 U.S.C. § 1414 (d). The IEP is formulated by a team ("IEP Team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of the child, and, when appropriate, the child himself or herself. 20 U.S.C. § 1414(d)(1)(B); Md.Code Regs. 13A.05.01.07(A).

If parents are not satisfied with the school's response, they may present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f). In Maryland, the Maryland Office of Administrative Hearings conducts the due process hearing. Md.Code Ann., Educ. § 8-413; Md.Code Regs.

<u>13A.05.01.15(C)(1)</u>. Any party can then appeal the administrative ruling to federal or state court. <u>Md.Code Ann., Educ. § 8-413(h)</u>.

II. Background

A. Factual Background

The facts presented are derived from the administrative record of the due process hearing including the transcript and admitted exhibits, and are uncontested unless otherwise noted. S.G. was born on April 1, 1992. She has lived with her foster parents/legal guardians N.G. and R.G. since she was six days old. S.G. was diagnosed as HIV positive at the age of four months. Prior to the fifth grade, S.G. performed well in school; she was highly motivated and well-organized. S.G. had many friends and enjoyed social activities. Sometime during the summer of 2002, prior to her fifth grade school year, S.G. found out that she was HIV positive.

During the 2002-2003 school year, S.G. attended fifth grade at Cashell Elementary School ("Cashell"). N.G. testified that S.G.'s behavior began to change during this year. (Paper 10, Tr., at 106-13). N.G. stated that S.G. began to withdraw from friends and seemed distracted. She began stealing money from her guardians, shoplifting, and lying. In addition, N.G. found disturbing writings by S.G. stating that she didn't deserve to live, and that she felt like someone had taken over her body and was commanding her to do bad things. S.G.'s fifth grade teacher indicated that S.G. misplaced work and was unorganized, and also missed assignments. (Paper 10, Bd. ex. 1, at 2). Despite these issues, S.G. was able to maintain her grades and complete the school year at Cashell.

**\*3** In September 2003, S.G. began sixth grade at Redland Middle School ("Redland"). She was enrolled in general education classes with an honors course in English. Her classes typically had 25-30 students in them. N.G. testified that in September 2003, S.G. inexplicably began to wet her pants and had to wear diapers.[FN2] (Paper 10, Tr., at 117-21). During the fall of 2003, S.G. wrote in her journal that she believed she was a witch and a CIA agent, could read her sister's mind, and predict things. N.G. stated that S.G.'s writings and artwork became hyper-sexual and violent. (Paper 10, Tr., at 122-23). In November 2003, S.G. told her foster mother that she was hearing voices that were telling her to do bad things, and telling her that she should die and how to do it. Because of S.G.'s erratic behaviors and her reports of hearing voices, N.G. sought the help of a psychiatrist, Dr. Hayes, who began a clinical trial of the medication Celexa.[FN3]

> FN2. No Redland school official testified to observing S.G. wet her pants, although Kathy Shellabarger, resource counselor for Redland, testified that the Redland school nurse told her she had to call N.G. to request a change of clothes for the child on one occasion. (Paper 10, Tr., at 515). Lynn Washington, Cashell's school counselor, testified that she observed S.G. wet her pants on one occasion, when S.G. came back to visit her at Cashell in the fall of 2003. (Paper 10, Tr., at 388).

> FN3. Although, Dr. Hayes initially treated S.G., Dr. Sontag began treating her in December of 2003.

By December 2003, S.G.'s behavior had worsened. N.G. testified that S.G. told her daily that she was hearing voices, said she saw ghosts, and stated that she was having tactile sensations, such as a hand on her guiding her to do bad things. (Paper 10, Tr., at 128). On December 21, 2003, S.G. approached N.G., and said that the voices told her to stab herself and put pins in her ears. (Paper 10, Tr., at 128). S.G.'s legs were streaming with blood, and she had sewing pins stuck through her earlobes. S.G. also told her foster mother that the voices told her to "hurt mother, strangle, or stab her." (Paper 10, Bd. ex. 20). Although the cuts were superficial, N.G. maintained that they were not the sort that a person gets from trying to shave one's legs.[FN4]

> FN4. Plaintiff disagrees with Defendants' characterization of this incident and asserts that the child's behavior was normal because a lot of teenage girls try to shave their legs and

pierce their ears, which is what Plaintiff maintains S.G. was attempting. In her findings of fact, the ALJ adopted N.G.'s description of the incident. (ALJ decision, at 6).

The next day, on December 22, 2003, S.G. was admitted to the inpatient psychiatric unit at Children's National Medical Center Hospital ("Children's Hospital"). The trial of Celexa was discontinued at this time. S.G. remained hospitalized for approximately one week, and was discharged on December 30, 2003. She was diagnosed as having a psychotic disorder, not otherwise specified ("NOS"). (Paper 10, Bd. ex. 20, at 4). During this hospitalization, S.G. missed only two days of school, December 22-23, 2003, because the school was on winter break for the remainder of the month.

From December 30, 2003 through January 2, 2004, S.G. stayed at the Second Chance Group Home. On January 2, 2004, S.G. was admitted to Georgetown University Hospital, and remained there through January 9, 2004. Her diagnosis at discharge was Bipolar Affective Disorder, Type I, Manic, with Psychotic Features.[FN5] Immediately following her evaluation at Georgetown University Hospital, S.G. was admitted to Johns Hopkins Hospital. N.G. told doctors at the hospital that S.G. had recently stated she heard voices telling her to slice off her own ear. While in the hospital, S.G. denied having suicidal or homicidal ideas, and did not report hearing voices. She was discharged on January 22, 2004. Her diagnosis upon discharge was psychotic disorder, NOS; rule out bipolar disorder, NOS; rule out learning disorder, NOS. (Paper 10, Bd. ex. 20, at 9).

> FN5. The ALJ found that neither the foster parents nor the school were informed of this diagnosis at the time. (ALJ decision, at 7).

*4 From January 23, 2004, through February 16, 2004, S.G. was admitted to the partial hospitalization program at Potomac Ridge Behavioral Health Center. Potomac Ridge is a day treatment program where children attend school as well as group and individual therapy. At Potomac Ridge, S.G. was diagnosed as mood disorder NOS, psychotic disorder, NOS. (Paper 10, Bd. ex. 5). S.G.'s treatment team recommended the following with regard to S.G.'s return to Redland:

1. Upon [S.G.]'s return to school her make-up work needs to be presented in a fashion that is not overwhelming and she should be provided with a reasonable amount of time to complete it. Any work that is not a necessity should be excused.

2. The school should consider holding an IEP meeting to develop accommodations that can meet [S.G.]'s complete emotional and physical needs.

3. [S.G.] should follow up with weekly individual therapy as well as medication management by a psychiatrist.

(Paper 10, Bd. ex. 5).[FN6]

> FN6. N.G. provided these recommendations to school officials on or around the time S.G. returned to school on February 17, 2004.

S.G. missed all fifteen school days in January 2004 due to her hospitalizations, as well as seven school days in the first half of February 2004. During the second quarter, S.G.'s grades dropped from a B to a D in Math and from a B to an E (failing) in Honors English. S.G. received a C in Reading and As or Bs in all other subjects. (Paper 10, SG ex. 22).

On February 11, 2004, N.G. met with school officials for an Educational Management Team ("EMT") summary meeting to prepare for S.G.'s return to Redland. N.G. informed the school representatives that the child believes she is a witch, hears voices, has anxiety, and that she is affected by short-term memory loss and moves slowly. N.G. noted that S.G. may appear to "blank-out" in class. N.G., along with the school officials, developed the following strategies to help with S.G.'s transition back to Redland:

6

1) Class notes will be given to [S.G.]

2) Monitor assignment notebook

3) Increased time allowance for homework and tests by 50%

4) Adjusted work load

5) Flash pass to Health Room [FN7]

> FN7. The flash pass allowed S.G. to leave the classroom immediately without having to tell her teacher why she needed to go to the health room.

(Paper 10, SG ex. 8).

On February 17, 2004, S.G. returned to Redland. N.G. testified that S.G. used the flash pass on February 24, 2004, because she was hearing voices, feeling shaky, and having trouble focusing. She went home early that day. The next day, February 25, 2004, S.G. again used the flash pass because she was hearing voices and was upset. She again went home early.[FN8]

> FN8. N.G.'s testimony conflicts with the testimony of Christine Will, Redland's health room technician, and with the health room records Ms. Will maintained, as to which days S.G. used the flash pass, and whether S.G. went home early on certain days. However, the ALJ expressly stated that she found N.G.'s testimony to be more credible. Accordingly, the court's statement of facts will reflect N.G.'s testimony on this issue. *See* discussion *infra* pp. 20-24; *Justin G. v. Bd. of Educ.,* 148 F.Supp.2d 576, 588 (D.Md.2001) (" '[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." ') (quoting *Bd. of Educ. of Montgomery County v. Hunter ex rel. Hunter,* 84 F.Supp.2d 702, 706 (D.Md.2000)).

In March 2004, S.G. continued to report hearing voices, and used the flash pass on multiple occasions. On March 8, 2004, S.G. used the flash pass because she heard voices, felt scared, and thought she may harm herself; she went home early. On March 9, 2004, S.G. again used the flash pass because she heard voices and had a plan to stab herself in the eye; she had to be picked up early. On March 11, 2004, S.G. used the flash pass because she was hearing voices, but returned to class after speaking with Ms. Shellabarger, the resource counselor at Redland. S.G. did not miss any days in April 2004, nor did she use her flash pass. S.G.'s grades for the third quarter were improved: she received a C in Math and Reading, and As or Bs in all other subjects. However, the grades were based only on the work S.G. actually completed and did not reflect the work S.G. missed while not in class.

**\*5** S.G.'s problems heightened in May. On May 5, 2004, she used the flash pass because she heard voices commanding her to kill herself; she had to leave school early that day. On May 6, 2004, S.G. returned to school and again used the flash pass because she was hearing voices. She had to be picked up early that day as well. On May 10, 2004, toward the end of the school day, S.G. again used the flash pass because she was hearing voices. Although she stayed in the health room until the end of the day, the school would not permit her to ride the bus home for safety reasons. Finally, on May 11, 2004, S.G. used her flash pass and reported that she was hearing voices. N.G. testified that when the child called her from the health room she was hysterical, and told N.G. that she was going to stab herself in the heart and that she had already located scissors within the school.[FN9] She was picked up from school early that day. Ms. Shellabarger, Redland's resource counselor, called N.G. and asked her to take S.G. for a psychiatric evaluation as soon as possible. In addition, both Ms. Shellabarger and Redland's Assistant Principal informed N.G. that the child could not return until a mental health professional certified that she would not be a danger to anyone. On May 12, 2004, S.G. was admitted to Johns Hopkins Hospital.

FN9. Plaintiff disputes that S.G. ever was "hysterical" when she reported hearing voices at school.

Shortly after S.G. was readmitted into the hospital, N.G. requested that the school complete a special education screening. On May 18, 2004, an EMT meeting was held. At this meeting, N.G. stated that she felt that S.G.'s mental health issues were impacting her ability to attend class, she was not performing at her former level, and that S.G.'s grades did not accurately reflect this impact. N.G. stated that she continued to have hygiene concerns about S.G. and that S.G. was wearing diapers because of her incontinence. She also told the team that S.G.'s current diagnosis was psychosis with schizophrenic tendencies. The team determined that an IEP educational screening meeting should be scheduled.

An IEP educational screening meeting was held on May 25, 2004. The team listened to the foster parent's concerns, and reviewed information from multiple sources, including teacher reports, the child's educational history, a parent questionnaire, and a functional behavioral assessment ("FBA") completed by Cheryl Hershberger, a special education resource teacher at Redland. In the reports, S.G.'s teachers indicated that she was a very capable student, and listed various strengths, including listening comprehension, academic potential, and participation. The teachers expressed concerns that S.G. had trouble focusing and that she "zoned out" a lot during class. (Paper 10, Tr., at 495; Bd. exs., 9, 11, 13). When the teachers completed the reports, they were not aware of her diagnoses of psychotic disorder, NOS, and had not observed S.G. demonstrating behaviors related to her mental disorder in the classroom. The FBA described S.G.'s emotional and behavioral issues, and recommended strategies for managing the problems, such as confronting S.G. in private, being consistent in the response to inappropriate behavior, supporting S.G. in accepting responsibility for her actions, etc.

*6 At or around this time, N.G. also provided school officials with the discharge summaries from January 2004, (paper 10, Bd. ex. 20), and a brief discharge summary from Dr. Ahmed at Johns Hopkins, dated May 24, 2004, (paper 10, Bd. ex. 21).FN10 The latter document diagnosed S.G. as schizophrenic, rule out psychosis due to general medical condition. In the recommendations section of this summary, Dr. Ahmed stated, among other things, that S.G. should be placed in a small classroom with a low student-to-teacher ratio and that she needed constant supervision to attend to her emotional needs and to facilitate her learning. At the May 25, 2004, meeting, the team agreed that both a psychological and an educational assessment should be performed, as well as a review of private evaluations.

FN10. Despite the title of this latter document, it was written two or three days before S.G. was discharged from the hospital.

S.G. remained hospitalized at Johns Hopkins through June 14, 2004, and missed the remainder of the school year at Redland.FN11 On June 15, 2004, S.G. began attending the Children's Hospital Day Treatment Program, where she stayed until June 30, 2004. This program is a partial hospitalization program that includes group and individual therapy. While at the program, S.G. participated in a school setting for three hours per day. The class size was very small, and various supports were in place for children with mental disturbances. Denise Mitchell, S.G.'s teacher at the program, provided Redland with a report that included recommendations for ensuring S.G.'s smooth transition back to school. Ms. Mitchell stated, both in her report and at the administrative hearing, that S.G. needed to be evaluated prior to any placement, but that based on her observations she felt that placement in a therapeutic program would address the child's needs. Ms. Mitchell recommended that S.G.'s class size be limited to no more than eight students, and that the classroom environment be highly structured and predictable. (Paper 10, SG ex. 16).

FN11. Around May 26, 2004, S.G. was released from Johns Hopkins but returned to Potomac Ridge because she was not ready to return to Redland. However, on the same day she began at Potomac Ridge, she reported hearing voices, and was immediately

rehospitalized at Johns Hopkins.

Redland school officials visited S.G. at the Day Treatment Program to conduct both psychological and educational assessments. Clarissa Cangelosi, a school psychologist for Redland, performed the psychological assessment. (Paper 10, Bd. ex. 23). Ms. Cangelosi reviewed S.G.'s educational history, Redland teacher reports, the parent questionnaire, and reports of professionals working outside of the Montgomery County public school system (i.e., non-MCPS reports). [FN12] In addition, Ms. Cangelosi observed and interviewed S.G., and administered various assessments. As part of these assessments, S.G. indicated that she heard voices that tell her to do bad things, and that she felt she could not control what happens to her. None of her scores on the assessments fell within a range to indicate an area of concern. Ms. Cangelosi also gathered parent and teacher ratings of S.G.'s behaviors over the previous six months. The parent ratings suggested a high level of maladjustment, but the teacher ratings did not note any clinically significant difficulties.

> FN12. Ms. Cangelosi does not reference Ms. Mitchell's report and it does not appear to have been part of the psychological assessment.

*7 Ms. Hershberger completed the educational assessment. She administered a set of achievement tests to measure S.G.'s academic performance in relation to her peer group, based on age. When compared to her peers, S.G.'s academic skill levels were in the high-average range, and her fluency with academic tasks and ability to apply academic skills were in the average range. (Paper 10, Bd. ex. 24).

On June 22, 2004, an IEP meeting was held. N.G. requested that S.G. be coded for special educational services on the basis of her emotional disturbance. N.G. based this request on input from the child's psychiatrist, the child's diagnosis, and Ms. Mitchell's report. At the time of the meeting, S.G.'s fourth quarter grades were not yet available, but the IEP team indicated that her grades were good.[FN13] The IEP team stated that S.G. was only being graded on work she turned in, and was not penalized for any work that she did not complete. At the meeting, the IEP team reviewed the non-MCPS reports and the psychological and educational assessments. The IEP team determined that there was evidence that S.G. had an emotional disturbance because she exhibited "inappropriate types of behavior or feelings under normal circumstances" for a "long period of time and to a marked degree." (Paper 10, SG ex. 20). However, the IEP team found that S.G. did not fully meet the definition of emotionally disturbed under the IDEA, because she did not suffer an adverse educational impact directly related to her condition.

> FN13. A report card was issued after the June 22, 2004 meeting. S.G. received a C in Reading and As and Bs in all other subjects.

After S.G. was discharged from the Children's Hospital Day Treatment Program, the Department of Health and Human Services for Montgomery County ("DHHS") arranged for a care giver to supervise the child in the home, help her with hygiene, and assist her in completing school work, but this arrangement was not effective in meeting S.G.'s needs. In July 2004, Carolyn Rose, S.G.'s social worker, contacted Redland's guidance counselor to determine what the plan was for S.G.'s return to school; she was told that the child would be placed in the regular classroom, but would continue to have a flash pass in case she had an episode. If she could not return to class, a parent or other emergency person would have to pick her up. Ms. Rose testified that she was concerned about S.G. returning to Redland because the suggested accommodations had not worked the previous school year. (Paper 10, Tr., at 325). Because of these concerns, on August 16, 2004, DHHS placed S.G. at the Arrow Project, a residential program that accepts children for ninety days. At this program, S.G. attended school six hours a day, and received group and individual therapy. The program offered one-on-one attention and quiet "re-grouping" places if the children had problems during school. The class consisted of approximately seven students, two aides, one teacher, and a residential counselor. At the time of the administrative hearing, S.G. remained at the Arrow Project, and was doing well. She did not report hearing voices, and missed class only one time, due to a stomach illness.

9

B. Procedural Background

**\*8** On August 19, 2004, N.G. filed a request for a due process hearing. On October 5, 6, 29, and November 12, 2004, a due process hearing was held before ALJ Eileen Sweeney. N.G. alleged that the school failed to identify the child as a child with a disability despite her diagnosis of schizophrenia, failed to provide a FAPE to S.G. during the 2003-2004 school year, and failed to offer her an appropriate educational program for the 2004-2005 school year. N.G. also maintained that S.G. is not able to receive an educational benefit outside of a setting that can support her emotional needs, which Redland cannot offer. N.G. asked that S.G. be identified as a student with a disability, and provided with an appropriate educational placement. N.G. did not seek relief for any alleged violations during the 2003-2004 school year.

On December 13, 2004, the ALJ rendered a decision. She found that the school system did not commit any procedural or substantive violations for the 2003-2004 school year.[FN14] With regard to the 2004-2005 school year, the ALJ found that although the school system complied with the IDEA's procedural requirements, it committed a substantive violation when it failed to identify S.G. as being eligible for special education services. The ALJ concluded that S.G. met the definition of emotionally disturbed because she was diagnosed with schizophrenia, had inappropriate ideation and feeling over a prolonged period of time and to a marked degree, and suffered an educational impact as a result. The ALJ ordered the school system to identify S.G. as eligible for special education services under the IDEA and to create an IEP placing her in a therapeutic school.[FN15] (ALJ decision, at 57). In January 2005, an IEP meeting was held and, as a result of this meeting, S.G. was placed at the Lodge School, where she currently remains.

> **FN14.** Moreover, ALJ Sweeney noted that N.G. did not seek any compensatory relief for the 2003-2004 school year. The relief sought was prospective.

> **FN15.** The ALJ found that because S.G. had been making educational progress at the Arrow Project since September 2004, the school system's denial of eligibility had not yet denied her of a FAPE. Thus, she granted only prospective relief.

On February 3, 2005, Plaintiff appealed to this court. (Paper 1). Plaintiff asks this court to reverse the ALJ decision, deny N.G.'s request for a due process hearing, and grant attorneys' fees and costs. On June 15, 2005, Plaintiff filed a motion for summary judgment. (Paper 12). On July 15, 2005, Defendants filed a cross-motion for summary judgment. (Paper 13). Defendants ask this court to uphold the administrative decision and issue such other relief the court finds is warranted.

III. Motions for Summary Judgment

A. Standard of Review

In *MM ex rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523 (4th Cir.2002), the Fourth Circuit stated the standard of review for motions for summary judgment in IDEA cases:

In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified *de novo* review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities....

**\*9** 303 F.3d at 530-31 (citations omitted). General standards of review for summary judgment motions also apply in IDEA cases, as illustrated in *Bd. of Educ. of Frederick County v. I.S. ex rel. Summer,* 325 F.Supp.2d 565 (D.Md.2004):

In addition, the Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial." ' _White v. Rockingham Radiologists, Ltd.,_ 820 F.2d 98, 101 (4th Cir.1987) (quoting _Celotex Corp. v. Catrett,_ 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. _Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,_ 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care [ ... ] to draw all reasonable inferences against the party whose motion is under consideration." _Mingus [ Constructors ], Inc. v. United States,_ 812 F.2d 1387, 1391 (Fed.Cir.1987).

325 F.Supp.2d at 578.

The party initiating the due process hearing is required to carry the burden of proof in the administrative hearing. _Schaffer ex rel. Schaffer v. Weast,_ 546 U.S. 49, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005). On appeal, the party challenging the administrative decision bears the burden of proof. _I.S.,_ 325 F.Supp.2d at 27; _Cavanagh v. Grasmick,_ 75 F.Supp.2d 446, 457 (D.Md.1999). "If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered _prima facie_ correct." _Cavanagh,_ 75 F.Supp.2d at 457 (citing _Doyle v. Arlington County Sch. Bd.,_ 953 F.2d 100, 103 (4th Cir.1991)). Moreover, in giving due weight to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses. " '[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." ' _Justin G. ex rel. Gene R. v. Bd. of Educ.,_ 148 F.Supp.2d 576, 588 (D.Md.2001) (quoting _Bd. of Educ. of Montgomery County v. Hunter ex rel. Hunter,_ 84 F.Supp.2d 702, 706 (D.Md.2000)); _see also Doyle,_ 953 F.2d at 104.

## B. Analysis

**\*10** The key issue in this case is whether S.G. is eligible to receive special education services under the IDEA. Defendants assert that S.G. meets the definition of "emotionally disturbed," and therefore is eligible for special education and related services. Plaintiff contends that although S.G. may be suffering from a medical condition affecting her mental state and may require psychological services, the disorder is not causing an educational impact, S.G. does not need special _education_ services, and therefore the child does not meet the IDEA's definition of a child with a disability. Plaintiff additionally argues that even if S.G. previously was eligible for services, she is no longer in need because her symptoms have abated. Finally, Plaintiff asserts that the ALJ erred in ordering a specific placement for S.G. at RICA or the Lodge School because there was no evidence that such placement was appropriate. As noted, Plaintiff, as the party challenging the administrative decision, bears the burden of proof.[FN16] _I.S.,_ 325 F.Supp.2d at 27.

> FN16. Plaintiff maintains that the ALJ failed to address the fact that Defendants bore the burden of proof at the administrative level. However, the transcript shows that the specific issue was brought up at the hearing and that the ALJ acknowledged that the burden was placed on Defendants. (Paper 10, Tr., at 791).

## 1. ALJ reliance on Defendants' experts

Plaintiff asserts that the ALJ committed reversible error when she based her eligibility determination on the testimony of Defendants' experts who Plaintiff maintains knew nothing about S.G.'s educational needs, and gave no deference to Plaintiff's experts, who are school officials who actually worked with S.G. [FN17] For example, Plaintiff notes that the ALJ gave great weight to the testimony of S.G.'s psychiatrist, Dr. Sontag, and that she cited at length the testimony of Denise Mitchell, the educational coordinator at the Children's Hospital Day Treatment Center. Plaintiff states: "The

testimony of the members of the team at Redland was largely ignored by the ALJ. The team members consistently testified that the Student was completely capable of accessing successfully her academic program and that she did not require specially designed instruction." (Paper 12, at 25). In its opposition memorandum, Plaintiff also criticizes the ALJ for not devoting enough of her opinion to discussing the testimony of Plaintiff's witnesses.

FN17. The court notes, however, that all of Defendants' experts worked with the student.

The record indicates that the ALJ heard and considered extensive testimony from both Plaintiff's and Defendants' witnesses. At the close of the hearing, Plaintiff's attorney praised the ALJ for taking "copious notes" during the hearing. (Paper 10, Tr., at 807). In her opinion, the ALJ summarized the testimony of all eight of Plaintiff's witnesses. Moreover, the ALJ discussed in detail her reliance as well as her rejection of particular testimony and evidence. For example, with regard to her reliance on Dr. Sontag, the ALJ stated:

In reaching my decision, I have placed great weight on the testimony of the child's psychiatrist, Dr. Sontag. Her credentials indicate that she is thoroughly qualified to render an opinion on the child's ability to access her education under the circumstances. She also presented as a competent and professional expert witness. I found her testimony to be extremely persuasive.

*11 Although Dr. Sontag did not review grades, teachers' reports, or review or perform educational testing, I find that that information, particularly the grades and the teachers' reports, does not outweigh her professional opinion about the child's inability, due to her [emotional disturbance], to function in and benefit educationally in a regular classroom without support services. The child's "true" grades, some of the teachers' comments and attendance records support Dr. Sontag's conclusion that the child's condition adversely affects her educational performance.

(ALJ decision, at 54-55). Likewise, in explaining her consideration of Plaintiff's evidence regarding whether the child suffered an educational impact, the ALJ noted:

I find [Plaintiff's] reliance on the student's grades to be inappropriate under the circumstances. The evidence is clear that those grades are skewed because the child was graded only on what she actually did. Had the child been given grades which reflected her missed work, she clearly would have had substantially lower grades. It is not surprising that the child, who is bright, did well on standardized tests; however those results are only one factor to be considered. Furthermore, the school's formal assessments relied, at least in part, on those skewed grades. As Parent indicated, the child's true grades would have told a different story.

(ALJ decision, at 54).

Plaintiff has not shown that the ALJ's findings were not regularly made and therefore deserve no deference. Instead, Plaintiff essentially argues the merits of the testimony of various witnesses, and that the ALJ was incorrect in according weight to certain testimony. Plaintiff stresses that the ALJ failed to give proper deference to the school's educational experts.

As the Fourth Circuit noted in *Doyle, 953 F.2d at 104,* "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Moreover, although an ALJ generally should defer to the judgment of school officials, the rule is not absolute and its application is not appropriate in this case. This was not a battle of *educational* experts where the ALJ sided with the parents' experts. Instead, a comprehensive analysis of S.G.'s needs required an evaluation of the interaction between S.G.'s psychiatric issues and the problems she was having at Redland, and the school's *educational* experts were not as qualified to make judgments about S.G.'s needs as were, for example, her psychiatrist. Hence, the ALJ was not mistaken when she failed to defer to the school's educational experts. *See also County Sch. Bd. of Henrico County, Va. v. Z.P. ex rel. R.P.,* 399 F.3d 298, 307 (4th Cir.2005) ("[T]he mere fact that the hearing officer accepted the evidence of the parents over that of the School Board is not a reason to reject the hearing officer's findings."). The court will therefore consider the ALJ's findings *prima facie* correct. *Cavanagh,* 75 F.Supp.2d at 457;

12

*see also* <u>County Sch. Bd. of Henrico County, Va.</u>, 399 F.3d at 307 ("The respect and deference that must be accorded to [the] professional opinions [of educators], however, does not give a district court license to ignore the requirements of *Rowley* and *Doyle* that the findings of the *administrative proceeding* must be given due weight.") (emphasis in original).

## 2. Eligibility Determination
***12** Plaintiff also maintains that the ALJ erred in finding that S.G. was eligible for services under the IDEA when all of the evidence demonstrated that the student did not suffer an adverse educational impact and did not require special education services. Plaintiff first asserts that the ALJ failed to consider all of the relevant implementing regulations, because if she had done so, she would have recognized that if a child needs only a related service, but not special education, the child is not a child with a disability under the IDEA. *See* 34 C.F.R. § 300.7. Plaintiff maintains that the evidence shows that S.G.'s condition is medical and that she only requires psychological services (i.e., a related service), and does not need special education. Plaintiff further asserts that the ALJ was wrong in rejecting "the undisputed evidence of the Student's ability to access the general education curriculum in favor of the testimony of Dr. Sontag, who knew nothing about the Student's performance in an educational setting." FN18 (Paper 12, at 29).

> FN18. To the extent that Plaintiff maintains that the ALJ incorrectly weighed the testimony of various witnesses, as noted *supra,* the court will defer to the ALJ's credibility determinations.

Plaintiff's arguments are unconvincing. In order to be eligible, S.G. must: (1) suffer from a condition as defined under the IDEA and its implementing regulations and (2) be in need of special education services and not only related services, such as psychological counseling. Both criteria have been met in this case.

## (a) Qualifying Condition
Defendants assert that S.G.'s emotional disturbance qualifies her for special education and related services under the IDEA. In *Springer v. Fairfax County School Board,* 134 F.3d 659, 663 (4th Cir.1998), the Fourth Circuit outlined the requirements a child must meet to qualify for special education and related services on the basis of an emotional disturbance: "The student must demonstrate that [she] has (1) exhibited one of the five listed symptoms, (2) 'over a long period of time,' and (3) 'to a marked degree,' and (4) that this condition adversely affects [her] educational performance." The ALJ first concluded that S.G. exhibited one or more of the symptoms for emotional disturbance set forth in the implementing regulations. The ALJ found that hearing voices is an inappropriate ideation and feeling and that S.G. had exhibited this characteristic over a long period of time and to a marked degree. *See* 34 C.F.R. § 300.7; Md.Code Regs. 13A.05.01.03(20). Moreover, the ALJ pointed out that the IEP team made the same determination during the June 22, 2004, meeting. The ALJ noted that the key disagreement centered on the fourth element, whether S.G. suffered an educational impact as a result of her disturbance.

After thoroughly considering the evidence, the ALJ found that S.G. had suffered an adverse educational impact. She first noted that S.G.'s "true grades" would have been much lower had they reflected the work she missed when she could not attend or remain in class due to her condition, and that S.G.'s achievement test scores, while informative, were only one factor to be considered. The ALJ found persuasive the teacher reports, which noted that S.G. was often dazed, answered monosyllabically, had trouble staying organized and focused, and appeared withdrawn. The ALJ concluded:

***13** The preponderance of the evidence indicates that the child's disability impacts her education: she cannot learn if she is hearing voices telling her to kill herself while she is in class. In addition, the more stress she is under because of her inability to cope with the voices because her fear in the halls or disorganization from transitions, the more likely it is that her symptoms will surface, interfering with her education.

13

(ALJ opinion, at 55).

The ALJ expressly found, and this court agrees, that S.G. met the requirements for an emotional disturbance articulated in *Springer*. There is ample evidence that S.G. exhibited one of the symptoms of an emotional disturbance—she heard voices telling her to harm herself on a regular basis. With regard to educational impact, there is no question that S.G.'s grades were not representative of her true performance; had she not been graded only on the work that she managed to turn in, her grades would have been lower. *See* (Paper 10, Tr., at 608-611) (indicating that if the missed assignments were counted in the science grade calculation it would have fallen from an "A" to below a 50%). Thus, any attempt by Plaintiff to rely on S.G.'s grades to demonstrate a lack of educational impact is flawed. Conversely, there is testimony and corroborating teacher reports that S.G. would daze out during class, and had trouble staying organized and focused. Moreover, the evidence shows that S.G. could not remain in class because of her psychotic episodes; she heard voices during school which required her to use her flash pass to leave class, and, on almost every occasion when this occurred, to leave school early.

(b) Need for Special Education Services
Plaintiff argues that S.G.'s needs were purely medical and that she did not require special education services. The ALJ rejected this argument, finding that S.G. required special education services in the form of specially designed instruction in order to learn.[FN19] The ALJ stated:

> FN19. Specially designed instruction means:
>
> [A]dapting, as appropriate to the needs of an eligible child under this part, *the content, methodology, or delivery of instruction*-
>
> (i) To address the unique needs of the child that result from the child's disability; and
>
> (ii) To ensure access of the child to the general curriculum, so that he or she can meet the educational standards within the jurisdiction of the public agency that apply to all children.
>
> 34 C.F.R. § 300.26. (emphasis added). *See also* Md.Code Regs. 13A.05.01.03(64).

I reject [Plaintiff's] argument that the requested services are medical, for a medical condition, and not educationally based. The evidence establishes that the child needs therapy integrated into her school day in order to be able to function and learn. Without it, she is unlikely to even be able to remain in class as evidenced by her frequent use of her flash pass from February through May 2004. There is no indication that such integrated therapy is available at Redland. Based on Dr. Sontag's testimony, I further find that the preponderance of the evidence indicates that [the Regional Institute for Children and Adolescents ("RICA") ] or the Lodge School would be the least restrictive environment.

(ALJ decision, at 55-56).[FN20] *See also* (paper 10, Tr., at 35-36) (Dr. Sontag's testimony that S.G. needs a therapist who works with her at school, small classrooms, and teachers experienced with psychiatrically impaired children, all of which can be provided at a therapeutic school, such as RICA or the Lodge School).

> FN20. In both the administrative transcript as well as the ALJ opinion, RICA is mistakenly referred to as "REIKA."

**\*14** Plaintiff's arguments regarding the lack of educational impact and S.G.'s need only for related services appear to be intertwined. That is, Plaintiff seems to assert that S.G. did not suffer an educational impact, and that this shows that she does not need special education services to learn,

14

even though she may need psychological counseling (i.e., a related service). [FN21] As noted, however, the ALJ found and this court agrees that S.G. suffered an educational impact because of her emotional disturbance.

> FN21. In support of its assertion that S.G. does not require special education services, Plaintiff primarily relies on an unpublished decision, *Katherine S. v. Umbach*, No. 00-T-982-E, 2002 U.S. Dist. LEXIS 2523, at *27-35 (M.D.Ala. Feb.1, 2002). This case is distinguishable in several regards. The child in *Katherine S.* never demonstrated an inability to learn in the classroom and her behavior problems were not present at school. Instead, the evidence showed the child's inability to learn while being home-schooled. Moreover, the child's therapist never identified her as needing special education services. *Id.* Conversely, in this case S.G. manifested behavior problems at school-while she was in the classroom she heard voices telling her to harm herself and could not remain in the classroom setting. There is also evidence that the school environment itself caused S.G. stress that triggered her psychotic episodes. In addition, multiple experts testified that S.G. required special education services in the form of a therapeutic school setting.
>
> Likewise, the other cases on which Plaintiff relies also can be distinguished. *See Norton v. Orinda Union Sch. Dist.,* 168 F.3d 500 (9th Cir.1999) (unpublished decision) (noting that the ALJ found that the student could be successful with adaptations to the regular classroom); *Sylvie M. v. Bd. of Educ. of Dripping Springs Indep. Sch. Dist.,* 48 F.Supp.2d 681, 697-698 (W.D.Tex.1999) (finding that the child's issues were primarily in the home environment and she was obtaining an educational benefit at school); *Doe v. Bd. of Educ.,* 753 F.Supp. 65, 70 (D.Conn.1990) (noting that during the administrative hearing there was testimony from multiple individuals, including the child's own psychiatrist, that he did not suffer an educational impact because of his depression).

Although it is not entirely clear, Plaintiff also appears to argue that "special education" services must include changes to the content or the direct delivery method of instruction (e.g., providing instruction in braille), and not just changes to the learning environment, (e.g., providing general education instruction in a therapeutic setting).[FN22] Because S.G. successfully accesses general education instruction albeit in a therapeutic setting (e.g., at the Arrow Project), Plaintiff asserts she does not require special education services, as Plaintiff would define it.

> FN22. It is unclear whether Plaintiff takes this "absolutist" position, or, alternatively, whether Plaintiff asserts only that S.G.'s condition was not serious enough to warrant any adaptation, whether to content, specific delivery method, or the overall learning environment.

Plaintiff's proposed definition of special education is too narrow. First, the statutory definition of special education includes instruction conducted, "in the home, in hospitals, and institutions." 20 U.S.C. § 1401. The definition does not include any requirement that the instruction administered in these alternative settings must be altered in either content or form to constitute "special education services." Second, the IDEA's implementing regulations specifically include schizophrenia within the definition of emotional disturbance. The inclusion of children with schizophrenia contemplates that a child with psychotic symptoms may need special education services other than changes to the content of the learning materials or adaptations to the specific delivery method. Special education services must be broadly defined to include instruction in a therapeutic setting for a schizophrenic child who needs greater support services in his or her learning environment, but who is otherwise intellectually capable of mastering a general education curriculum through the delivery method used in a regular classroom.

Case law also supports this understanding of special education services. For example, in *Johnson v. Metro Davidson County School System,* 108 F.Supp.2d 906, 918-19 (M.D.Tenn.2000), the court found that a child was eligible for and in need of special education services where she maintained satisfactory grades in a general education setting but was unable to remain in that setting due to her

http://web2.westlaw.com/result/documenttext.aspx?service=Find&rs=WLW8.02&cnt=DO...   2/19/2008

emotional disturbance. *See also Weixel v. Bd. of Educ., 287 F.3d 138, 150* (2nd Cir.2002) (noting that the scope of the IDEA is not limited to students with learning disabilities, and finding that "special education" services included home instruction, where a child's illness prevented her from attending classes); *Seattle Sch. Dist., No. 1. v. B.S., 82 F.3d 1493, 1500* (9th Cir.1996) (citing legislative history from the Education of the Handicapped Act, the IDEA's predecessor, which recognized that although special education must address a child's unique *educational* needs, such needs must be " 'broadly construed to include [the] handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." ' (quoting H.R.Rep. No. 98-410, at 19 (1983), 1983 U.S.C.C.A.N.2088, 2106)); *Babb v. Knox County Sch. Sys., 965 F.2d 104, 109* (6th Cir.1992) (noting that the concept of education under the IDEA encompasses more than just academic instruction but also includes services traditionally thought of as "treatment").

**\*15** Hence, the ALJ found and this court agrees that S.G. needs special education services. Testimony from multiple experts and the discharge summary from Dr. Ahmed show that in order to learn S.G. requires instruction delivered to her in a therapeutic environment that minimizes her stress and provides the necessary structure and support for her to deal effectively with her condition. S.G.'s stability and successful performance at the Arrow Project, which provides a therapeutic setting, comport with this finding. Moreover, general education instruction provided in a therapeutic setting constitutes "special education" under the IDEA. Accordingly, Plaintiff has not satisfied its burden of showing that the ALJ erred in finding that S.G. is eligible for special education and related services under the IDEA.

3. Prospective Relief
Plaintiff also contends that the ALJ erred by ordering prospective relief because the evidence indicates that S.G. did not suffer from psychotic symptoms after August 16, 2004, the date she was admitted to the Arrow Project. Plaintiff reasons that even assuming S.G. was eligible to receive special education services, "the undisputed facts demonstrated that the Student was no longer in need of those services." (Paper 12, at 31).

Plaintiff's argument is unpersuasive. First, Dr. Sontag, whom the ALJ found to be highly credible, testified that schizophrenia is generally an episodic condition and that S.G.'s symptoms would wax and wane over time. (Paper 10, Tr., at 26). Second, there was testimony from multiple witnesses that Redland's school setting was at least a partial trigger for S.G.'s psychotic episodes. For example, Dr. Sontag testified that she believed S.G. required a therapeutic school setting and if S.G. returned to Redland the child would likely hear voices again within a month. (Paper 10, Tr., at 36). Likewise, Ms. Kuhlman, of the Arrow Project, testified that S.G. told her that the stress of going home and going to regular school causes her to hear voices. Ms. Kuhlman further stated that S.G. did well at the Arrow Project because of its therapeutic nature, small classroom size, and enhanced support services in the classroom. (Paper 10, Tr., at 341-42). Plaintiff fails to address this testimony, let alone establish that "the undisputed facts" show that S.G. was no longer suffering from a psychotic condition. Plaintiff has not satisfied its burden of showing that the ALJ erred in finding that S.G. was still in need of special education services and thus that the ALJ erred in granting prospective relief.

4. Appropriateness of Placement
Finally, Plaintiff asserts that the ALJ erred in ordering Plaintiff to fund S.G.'s placement at either RICA or the Lodge School because there was no evidence that either was appropriate or the least restrictive environment. Plaintiff maintains that Dr. Sontag's testimony on the issue was brief, vague, and based on pure speculation because S.G. had never attended either RICA or the Lodge School, and thus there was no empirical data available to show whether either school was a proper placement.

**\*16** First, although the ALJ stated in her decision that based on Dr. Sontag's testimony RICA or the Lodge School would be the least restrictive environment, the ALJ neither concluded, as a matter of law, that the appropriate placement for S.G. was at either school, nor did she order Plaintiff to make a particular placement. (ALJ opinion, at 57). In her Order, the ALJ stated: "[Plaintiff] shall immediately prepare an IEP which identifies the child as [emotionally disturbed] and in need of

special education services, and which provides for the placement of the child in a therapeutic educational program *such as [RICA] or the Lodge School."* (ALJ decision, at 57) (emphasis added). Defendants point out that it was the IEP team who determined that the Lodge School was a proper placement for S.G. following a January 2005 IEP meeting.

Second, there was ample evidence on the record that a therapeutic environment was an appropriate placement for S.G. Both Dr. Sontag and Ms. Mitchell testified that S.G. needed the supports of a therapeutic environment in light of her emotional disturbance; both had extensive experience with therapeutic educational placements. Dr. Ahmed's discharge summary also recommended that S.G. should be placed in a small classroom and that she needed constant supervision to meet her emotional needs and facilitate her learning. Moreover, S.G.'s inability to remain in class at Redland shows that she could not succeed in a general education environment. Finally, S.G.'s report card from the Lodge School indicates that she is performing very well, thus providing the "empirical data" that Plaintiff initially deemed was lacking. (Paper 13, ex. 1).[FN23] Hence, Plaintiff has not shown that the ALJ's decision should be overturned because she made an improper placement decision.

> FN23. Plaintiff's assertion that the report card is improper supplemental evidence is unfounded. *See Justin G., 148 F.Supp.2d at 576* (finding that it was proper to consider a child's placement following an administrative hearing to determine if the recommended placement was correct).

IV. Conclusion

For the foregoing reasons, summary judgment will be entered against Plaintiff and in favor of Defendants. A separate Order will follow.

ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 6th day of March, 2006, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Plaintiff Board of Education of Montgomery County for summary judgment (paper 13) BE, and the same hereby IS, DENIED;

2. The cross-motion of Defendants for summary judgment (paper 13) BE, and the same hereby IS, GRANTED;

3. Judgment BE, and the same hereby IS, ENTERED in favor of Defendants and against Plaintiff; and

4. The Clerk will transmit copies of this Memorandum Opinion and this Order to counsel for the parties, and CLOSE this case.

D.Md.,2006.
Board of Educ. of Montgomery County v. S.G.
Not Reported in F.Supp.2d, 2006 WL 544529 (D.Md.)

Motions, Pleadings and Filings (Back to top)

• 2005 WL 2863690 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum (Sep. 2, 2005)
• 2005 WL 2455425 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum In Opposition to Defendants' Motion for Summary Judgment and Reply to Opposition to Motion for Summary Judgment (Aug. 15, 2005)
• 2005 WL 2097005 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary

17

Judgment (Jul. 15, 2005)
- 8:05cv00323 (Docket) (Feb. 03, 2005)
- 2005 WL 692023 (Trial Pleading) Complaint (2005) Original Image of this Document (PDF)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**41 IDELR 227**
104 LRP 36045

## *Los Gatos-Saratoga Joint Union High School District*

### California State Educational Agency

### SN04-00743

### June 1, 2004

## Related Index Numbers

**175.050 Serious Emotional Disturbance**
**445.005 Definition and Application**
**445.010 Eligibility Criteria**

## Case Summary

From October 2003 through the December 2003 team meeting, the student exhibited a general pervasive mood of unhappiness or depression, to a marked degree, that adversely affected her educational performance. Information available to the district in October showed that the longevity of her depression would be at least several months and could continue indefinitely. The student also had unique educational needs arising from her condition that could not be met through regular education interventions. She should have been found eligible for services by the January 2004 date when the district was required to conduct an IEP meeting and was denied FAPE through the date of the hearing. Since the child received tutoring before the period in which FAPE was denied and since the parent said she would continue such services, the IHO rejected her reimbursement request. Additionally, the IHO was persuaded that the parent would have obtained the same private treatment and counseling regardless of whether the district had offered appropriate services. Accordingly, she denied reimbursement for therapy and psychiatric care costs. Finally, the evidence did not demonstrate that the student lost educational opportunity to a degree that would warrant compensatory education.

## Judge / Administrative Officer

Vincent L. Pastorino, Hearing Officer

## Full Text

### Decision

This matter was heard before Vincent L. Pastorino, Hearing Officer of the California Special Education Hearing Office (Hearing Office), University of the Pacific's McGeorge School of Law, on April 22 and 23, 2004, in Riverside, California, and the hearing was concluded by telephone conference on April 26, 2004.

Petitioner STUDENT (STUDENT or Petitioner) was represented by attorney Valerie J. Mulhollen. Also present on STUDENT's behalf was her mother, MOTHER. Respondent Los Gatos-Saratoga Joint Union High School District (Respondent or District) was represented

by attorney Laurie E. Reynolds from the office of Lozano Smith, Attorneys at Law. Also present on the District's behalf was Kathleen Eaton, assistant principal at Los Gatos High School (LGHS).

The Petitioner called the following witnesses: Ms. Eaton; MOTHER; Dan Fowler, assistant principal in charge of attendance and discipline at LGHS; Trudy McCulloch, principal at LGHS; Geraldine K. Watanabe, academic advisor at LGHS; Sharon Trattner, Ph.D., LGHS school psychologist; and Tonja Krautter, Ph.D., clinical psychologist. The District called the following witnesses: Ms. Eaton and Kurt Croesche, regular education teacher at LGHS.

Oral and documentary evidence was received. Closing briefs were received on May 11, 2004, and the matter was submitted for decision.

### Issues

Issue 1: From October 2003 through the present, did the District deny STUDENT a free appropriate public education (FAPE) by (A) failing to conduct a timely assessment for special education in accordance with "child find" requirements, and (B) failing to find STUDENT eligible for special education?

Issue 2: If the District denied STUDENT a FAPE, is STUDENT entitled to reimbursement for tutoring costs, reimbursement for counseling and psychiatric therapy, and compensatory education?

### Background Facts

STUDENT, born January 6, 1987, is a 17-year-old student who has resided within the District at all times pertinent to this case. She is currently in the eleventh grade at LGHS. Until the initiation of a still-pending assessment that commenced in April 2004, she had never been assessed for special education. She also has never been found eligible by the District for special education.

STUDENT's mother testified that beginning in December 2002 or early January 2003, she noticed that STUDENT was unusually quiet, had some "issues" with clothing style, had difficulty sleeping, and was being affected by nightmares. She brought STUDENT to pediatrician Sandra Morse, M.D., who diagnosed STUDENT as having depression. After the commencement of treatment with medications, STUDENT's moods "evened out" and her sleeplessness resolved. STUDENT's mother further testified that because STUDENT was performing well in school during that period, she did not report STUDENT's condition to the District.

STUDENT started her eleventh-grade school year in September 2003. At the end of September or early in October 2003, STUDENT reported to her mother that the depression symptoms were returning. MOTHER brought STUDENT back to Dr. Morse, and medications were increased. By email dated October 7, 2003, MOTHER notified the District and STUDENT's LGHS teachers that STUDENT " ... has not been feeling well lately and is on medication for depression. We are working with her physician and a counselor. Currently, the physician is adjusting STUDENT's medication. If she appears not quite engaged in class or a little slow with her work, it is not because she doesn't care and is negligent. It will take a little while for her to get adjusted ... If there is anything I can do to

help support STUDENT and the work she is doing in your classes, then please, by all means, let me know."

Dr. Morse submitted a letter to the District on October 28, 2003, stating that STUDENT was "under medical care for conditions that may require she miss school from time to time. She should be allowed to participate in classes and activities as able. We will hopefully stabilize her situation over the next few months. Her mother may need to obtain her assignments and tutoring to continue her school work when she is unable to attend school."

According to MOTHER, the symptoms that arose in October 2003 were substantially worse than STUDENT's symptoms in the previous winter. STUDENT became physically ill, suffering from nausea, severe headaches, bodyaches, and light sensitivity and other vision problems. She acquired self-injurious behaviors, including physically cutting herself. By late October or early November, Dr. Morse had referred STUDENT's care to Sharon Paley, M.D., a psychiatrist. Dr. Paley treated STUDENT with various medications.

STUDENT's symptoms caused her to miss significant amounts of school in the fall of 2003. STUDENT's mother testified that she would often find STUDENT "curled up in a ball" and wanting to stay in a dark room. LGHS attendance records show that STUDENT was absent from school during all or major portions of two days in September, ten days in October, fourteen days in November, and eight days in December. From October through December, MOTHER attempted to help STUDENT by arranging to have school assignments either picked up from school or otherwise sent home, and by providing a tutor. The evidence was unclear as to how STUDENT actually received her assignments during that period.

A "student study team" (SST) meeting was convened by the District on December 12, 2003, to address STUDENT's depression and difficulties with school attendance. According to the SST meeting notes, STUDENT's grades for each class through that point in the first semester were three "A's," one "B," two "C's, and one "Pass." Written input solicited from teachers mentioned STUDENT's excessive absences, incomplete assignments, and, in at least one instance, declining grades. Because STUDENT was not remaining current in her work, STUDENT's accelerated-algebra 2 teacher suggested that STUDENT drop and then retake the class. The meeting notes summarize STUDENT's treatment for depression, specifically that medications were being changed, that she was being monitored by a psychiatrist, that she was receiving therapy from a licensed clinical social worker, and that she would begin receiving group therapy in January 2004.

The SST report contains no mention of whether or how the District or LGHS intended to assist STUDENT. However, according to LGHS assistant principal Kathleen Eaton, who attended the meeting, the SST determined that STUDENT did not have a mental or physical impairment that was substantially limiting a major life activity and, therefore, STUDENT did not meet the criteria for a "504 plan."[1] Considered in making that determination, according to Ms. Eaton, were the facts that STUDENT was "receiving all college qualifying grades in a schedule of mostly honors, AP, and accelerated classes"; that she "was attending her field hockey practices daily while, on many occasions, not attending some or all of her academic classes"; and that although she was diagnosed with depression, she was taking medications for her depression and was receiving therapy. Among the interventions suggested by the District at that meeting were: (1) relieve stress on STUDENT by having her move from "one, some, or all of her AP and accelerated

21

classes to the regular college prep level class(es)"; (2) have STUDENT participate in daily tutorial and afternoon tutoring programs to try to "catch up"; (3) have STUDENT receive counseling through the "Teen Counseling Center" on campus; (4) assist STUDENT to "catch up and prepare for finals" by having MOTHER "email her daughter's teachers to get a list of work that STUDENT could complete over the Winter Break"; and (5) have LGHS waive its attendance policy "in light of STUDENT's condition." MOTHER reportedly sent such emails to STUDENT's teachers on December 15.[2]

STUDENT did not change or drop her classes. With the aide of a tutor hired by MOTHER, by performing significant amounts of her school work at home, and by virtue of the fact that her symptoms subsided in December and January, STUDENT was able to finish the first semester on January 20, 2004, with grades of "A-" in comparative literature, "Pass" in advanced placement U.S. history, "C+" in accelerated algebra 2, "A" in varsity field hockey, "B" in accelerated chemistry, "C" in honors Spanish, and "A" in teacher/office assistant. Her "weighted" GPA for that semester was 3.00, dropping her overall weighted GPA to 3.385.[3]

Throughout January and February 2004, STUDENT was participating in weekly group-therapy sessions and was also seeing a therapist on an individual basis. Attendance records show that she missed only one day of school in January. She missed six days in February, although not necessarily for reasons related to depression. During the week of March 8, her symptoms of depression worsened, and she resumed missing school.[4] On or about March 15, MOTHER and Ms. Eaton met to discuss the situation. Options offered by the District included a home teacher, changing the level of one or more of her classes while not going below college preparatory level, waiving the attendance policy, dropping one or two of her current classes and taking them during the summer to allow her to concentrate during the current semester on her remaining classes, and having the District write explanatory letters to the colleges of STUDENT's choice. MOTHER suggested that STUDENT have two classes at school and the other three at home with a teacher, and she stated that she would consider the District's proposal during the next few days.

On March 17, 2004, by email to LGHS and all of STUDENT's teachers, MOTHER stated her specific requests for accommodations. Those requested accommodations were that (1) STUDENT would attend AP history and accelerated chemistry daily; (2) for English, accelerated algebra 2, and Spanish 4, a "tutor would need to be engaged," the class lectures would be tape recorded, and the tapes would be obtained daily by STUDENT at the LGHS guidance office; (3) at the end of the school day, every assignment would be emailed to MOTHER; and (4) progress reports by phone, voice mail, or email, would be sent to MOTHER on a "bi-weekly basis." Ms. Eaton replied with an email stating that the District would waive the attendance policy, that the family would be responsible for tutoring assistance, that a friend of STUDENT would record lectures in the three classes pending the permission of the teachers and communicate to STUDENT all of the assignments, and that MOTHER would communicate by email to STUDENT's teachers weekly to ask if STUDENT had completed her work for the week. However, two of STUDENT's teachers subsequently refused to have their lectures taped, and the entire plan was reconsidered.

An email by LGHS principal Trudy McCulloch, dated March 18, 2004, purportedly summarizes Ms. McCulloch's conversations on that date with MOTHER. The email states that as soon as Ms. McCulloch receives a note from STUDENT's medical doctor requesting assistance, the District would place a home teacher with STUDENT for accelerated algebra, comparative literature, and Spanish 4. The home teacher would work with

STUDENT three hours each week and be the teacher of record for those classes. The Spanish 4 home-teaching situation would be closely monitored due to STUDENT's inability to participate in classroom activities. STUDENT would continue to attend AP U.S. history, accelerated chemistry, and teacher assistant classes on campus at LGHS. Because STUDENT would be attending fewer than four classes per day at LGHS, she would be prohibited from participating in field hockey.[5]

By March 24, 2004, MOTHER's opinion of the District had severely deteriorated. From her perspective, as set forth in her March 24 email to the District, she had repeatedly asked the District to provide a home teacher who would bring STUDENT's assignments from school to STUDENT's home, and she had arranged for tutors who would supplement activities of the home teacher. However, according to MOTHER, the only strategy offered to STUDENT by the District from the fall of 2003 through March 2004 was "to recommend STUDENT drop her classes and get a friend to bring her her assignments." She demanded in her March 24 email that the District perform a "formal 504 evaluation" and provide a home school teacher by the end of that week, or at least provide assignments from STUDENT's teachers so that the private tutors she had reserved could begin working with STUDENT. On that date, MOTHER also submitted a current letter by Dr. Paley stating that STUDENT was in treatment for depression, that she needed to be on a modified school schedule, and that a home teacher was medically necessary. The District, from its perspective, had accommodated STUDENT by, among other things, waiving the school attendance policy and repeatedly suggesting that STUDENT reduce her stress levels by dropping some of her accelerated classes and taking other classes in their place that were still considered college-preparatory level.

On March 29, 2004, a home teacher was retained by the District. Home teaching started at the end of March. The present request for due process hearing was filed by the Petitioner on March 31. At or about that time, the District arranged for a section 504 assessment. In addition, the District submitted a special education assessment plan to MOTHER on April 5, and she signed her consent on that same date. On April 7, 2004, following a conversation between MOTHER and LGHS school psychologist Sharon Trattner, Ph.D., MOTHER reportedly decided that STUDENT was not well enough to attend her classes at LGHS and that STUDENT should move from AP U.S. history to the regular, college preparatory version of U.S. history. Thereafter, the parties have been working toward additional adjustments of STUDENT's class schedule, including the option of summer school classes and preferential placement in certain classes during the 2004-2005 school year. The proposed adjustments are intended to reduce STUDENT's current workload while keeping STUDENT on track toward four-year-college eligibility.[6]

### Findings of Fact and Conclusions of Law

**Issue 1: From October 2003 through the present, did the District deny STUDENT a FAPE by (A) failing to conduct a timely assessment for special education in accordance with "child find" requirements, and (B) failing to find STUDENT eligible for special education?**

Children with disabilities have the right to a "free appropriate public education." 20 U.S.C. ? 1400(d), Cal. Educ. Code ? 56000.[7] The term "free appropriate public education" (FAPE) means special education and related services that are available to the student at no charge to the parent or guardian, meet the State educational standards, and conform with the student's individualized education program (IEP). 20 U.S.C. ? 1401(8). Under the

Individuals with Disabilities Education Act (IDEA) and the decision of the Supreme Court in *Board of Education of the Hendrick Hudson School District, et al. v. Rowley,* 458 U.S. 176 (1982), an appropriate educational program must be designed to meet the student's unique needs and reasonably calculated to provide the student with some educational benefit.

Assessment must be performed before action is taken with respect to the initial placement of an individual with exceptional needs. Cal. Educ. Code ? 56320. Moreover, "a pupil shall be referred for special education instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized." Cal. Educ. Code ? 56303. For purposes of a child's special education eligibility under federal law, 20 U.S.C. ? 1401(3)(A)(ii) defines "child with a disability" as meaning a child with at least one of the several conditions listed in ? 1401, and who, by reason thereof, needs special education and related services. Those conditions include, among others, "emotional disturbance" (ED) and "other health impairment" (OHI). *See also* Cal. Code Regs. tit. 5, ? 3030.

STUDENT asserts that because of her depression she should have been assessed for special education in October 2003, and the District should have found her eligible for special education under the criteria for ED and OHI at all times from October 2003 through the date of this Decision. According to the District, STUDENT's academic progress from the beginning of the 2003-2004 school year through mid-March 2004 confirms that she should neither have been assessed nor found eligible for special education during that period. The Hearing Officer will now address those contentions.

### (A) Failing to conduct a timely assessment for special education in accordance with "child find" requirements.

State law provides that "all individuals with disabilities ... who are in need of special education and related services, shall be identified, located, and assessed ... " Cal. Educ. Code ? 56301. This responsibility, for what is commonly referred to as "child find," rests with school districts, special education local plan areas (SELPAs), and applicable county offices. Similar provisions concerning child find are contained in federal law. *See* 20 U.S.C. ? 1412(a)(3). Referral for assessment of a student may be made by the student's parent or guardian, teacher or other service provider, or foster parent. Cal. Educ. Code ? 56029.

Whenever an assessment for the development or revision of an IEP is to be conducted, the parent of the pupil shall be given, in writing, a proposed assessment plan within 15 days of the referral for assessment (with certain exceptions for school vacations). The parent shall have at least 15 days from receipt of the proposed assessment plan to arrive at a decision. No assessment shall be conducted unless the written consent of the parent is obtained or the district prevails in a due process hearing related to the assessment. Cal. Educ. Code ?? 56321(a), 56321(c), and 56506(e). Except for tolling of the timeline due to "pupil school vacations," an IEP "required as a result of an assessment of a pupil shall be developed within a total time not to exceed 50 days ... from the date of receipt of the parent's written consent for assessment." Cal. Educ. Code ? 56344(a).

In the present case, the evidence showed that STUDENT was first treated for depression in the spring of 2003. By the end of September or beginning of October 2003, her depression worsened to the degree that she was frequently unable to attend school. The District became aware of STUDENT's condition of depression when the District received

MOTHER's above-referenced October 7, 2003 email. STUDENT then proceeded to miss all or portions of 10 school days in October due to depression. Dr. Morse's October 28, 2003 letter to the District stated that STUDENT's condition "will hopefully stabilize ... over the next few months," thus indicating that STUDENT's condition could well persist through the end of the school year and beyond. On the basis of these facts, the Hearing Officer finds that by the end of October 2003, the District should have reasonably suspected that STUDENT was a child with a disability and initiated a referral for assessment.

The Hearing Officer further finds that in accordance with the above-referenced statutory timelines, the District was required to submit a written proposed assessment plan to STUDENT's parent by on or about November 15, 2003 (not later than 15 days after the referral for assessment). MOTHER would have had not later that 15 days from receipt of the proposed assessment plan, or until on or about November 30, to consent to the proposed plan. MOTHER's testimony concerning her desire to help STUDENT in any appropriate manner, corroborated by the history of MOTHER's consistent efforts to procure assistance from the District, persuades the Hearing Officer that MOTHER likely would have given timely consent to a proper assessment plan. Accordingly, the District would have been required to convene an IEP meeting, discuss the assessments, and develop an IEP within 50 days from the date of receipt of MOTHER's written consent for assessment (i.e., 50 days from November 30, 2003). The evidence showed that a winter break "pupil school vacation" occurred for approximately two weeks in December 2003. Thus, adding an estimated 9 school vacation days for the winter break, the IEP meeting would have been due to convene by on or about January 24, 2004.

### (B) Failing to find STUDENT eligible for special education

STUDENT asserts that, because of her depression, she should have been found to meet the special education eligibility criteria under the categories of emotional disturbance (ED) and/or other health impairment (OHI). The District asserts that from October 2003 through mid-March 2004, the degree and effect of STUDENT's depression was not such that STUDENT required special education or related services. Instead, according to the District, STUDENT's educational needs could be and were met through modification of the regular instruction program. Because a current assessment is in progress, the District has taken no position with respect to STUDENT's prospective eligibility. In any event, STUDENT's prospective eligibility for special education is not an issue to be decided in this hearing.[8]

To determine whether STUDENT met the eligibility criteria for special education at some time during the period at issue, the Hearing Officer will first examine whether STUDENT exhibited the characteristics of either ED or OHI as set forth in 34 C.F.R. ?? 300.7(c)(4)(i) and 300.7(c)(9), or the equivalent provisions of Cal. Code Regs. tit. 5, ?? 3030(i) and 3030 (f), respectively, and then examine whether, because of the degree thereof, STUDENT needed special education and related services. 20 U.S.C. ? 1401(3)(A)(ii); Cal. Code Regs. tit. 5, ? 3030.

### 1) Did STUDENT exhibit the characteristics of ED?

Federal regulations define ED as a condition whereby the student is "exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems."[9] 34 C.F.R. ? 300.7(c)(4)(i).

The testimony of MOTHER and the notes from STUDENT's physicians established that commencing in early October 2003, STUDENT exhibited "a general pervasive mood of unhappiness or depression." 34 C.F.R. ? 300.7(c)(4)(i)(D).

With regard to whether STUDENT exhibited the general pervasive mood of unhappiness or depression to a "marked degree that adversely affects a child's educational performance," MOTHER testified that STUDENT's symptoms and behavior included physical illness, light sensitivity, engagement in self-injurious behaviors, and wanting to remain curled up in a dark room instead of going to school. STUDENT's condition was serious enough to require treatment with medications, but the medications had limited effectiveness. Her condition was affecting her to such a degree that she was missing school nearly as often as she was able to attend school. The Hearing Officer notes that such a deficiency in school attendance, persisting over a period of one or more months from the outset of eleventh grade for a high-achieving student taking accelerated classed in preparation for college, was virtually certain to have an adverse affect on that student's academic performance. This was confirmed by STUDENT's teachers who, in December 2003, expressed concern that STUDENT was missing time in class, including vital participatory time in Spanish and chemistry lab. Her grades and work output in accelerated algebra were declining to such an extent her algebra teacher suggested that STUDENT consider dropping and retaking the class. STUDENT's algebra teacher also wrote in December 2003 that STUDENT appeared to be withdrawn, had erratic moods, and, with regard to following directions, "seems lost" and "often off-task." Moreover, STUDENT's licensed clinical psychologist, Tonja Krautter, Ph.D., testified that STUDENT's depression was adversely affecting STUDENT in school by causing lack of motivation, inability to concentrate, distraction (i.e., listening but not assimilating the information), and difficulty getting to school. She also stated that STUDENT's problems were compounded by STUDENT's anxiety about falling behind in her classes and her resultant feelings of hopelessness.[10]

Thus, the degree of STUDENT's condition was such that she was missing excessive amounts of classroom time, she was unable to stay current with her assignments, she had difficulty remaining on task while at school, and she was in danger of having to drop classes. Accordingly, the Hearing Officer finds that in the fall of 2003, STUDENT exhibited the general pervasive mood of unhappiness or depression to a "marked degree that adversely affects a child's educational performance," within the meaning of 34 C.F.R. ? 300.7(c)(4)(i) and Cal. Code Regs, tit. 5, ?? 3030(i).

The Hearing Officer next examines whether the general pervasive mood of unhappiness, was exhibited "over a long period of time" within the meaning of 34 C.F.R. ? 300.7(c)(4)(i).

The regulations do not define "long period of time." Dr. Trattner, LGHS school psychologist, testified that, under her view of District policy, the threshold for "long period of time" is generally six months. The Hearing Officer considers that to be an arbitrary number. By not defining "long period of time," the respective lawmakers showed an intent that "long period of time" should be determined on a case-by-case basis in accordance with a child's circumstances and individual needs.

In the present case, STUDENT's symptoms of depression arose as early as December 2002. The symptoms temporarily subsided with the use of medications, but then worsened in October 2003. Dr. Morse's October 28, 2003 letter stated that "we will hopefully stabilize her situation over the next few months." Thus, Dr. Morse's letter indicated that STUDENT's condition was likely to prevent STUDENT from attending school for a major portion of the school year. Following Dr. Morse's October 28 letter, STUDENT continued to miss classes. She missed school on all or parts of fourteen days in November and five days in December before the District took the action of convening an SST meeting on December 12, 2003. The cycling of STUDENT's depression, dating back to December 2002, was consistent with testimony by STUDENT's clinical psychologist, Tonja Krautter, Ph.D., who stated that "although depression can remit, it often resurfaces."[11] Thus, during the fall of 2003, there was no reason to expect that STUDENT's problems with depression would be short-lived. To the contrary, by that time STUDENT's depression had either been present or had been a threatening to recur as a "major episode" for almost an entire year.[12]

In summary, the evidence showed that from October 7 through the date of the December 12, 2003 SST meeting, STUDENT consistently exhibited a general pervasive mood of unhappiness or depression, to a marked degree, that was adversely affecting her educational performance. There was no information to indicate that the depression would be short-lived. To the contrary, the information available to the District as early as October showed that the longevity of STUDENT's depression would at least be for several months and could continue indefinitely. Under these circumstances, the Hearing Officer finds that by the fall of 2003, STUDENT exhibited the characteristics of ED "over a long period of time" within the meaning of 34 C.F.R. ? 300.7(c)(4)(i)(D) and Cal. Code Regs. tit. 5, ? 3030 (i)(4).

### 2) Did STUDENT exhibit the characteristics of ED to such a degree that she needed special education and related services?

With the Hearing Officer having found that STUDENT exhibited a general or pervasive mood of unhappiness or depression over a long period of time and to a marked degree that adversely affected STUDENT's educational performance, the final question for determining eligibility under the criteria for ED is whether, because of the degree of that condition, STUDENT needed special education and related services. 34 C.F.R. ? 300.7(c)(4)(i) and Cal. Code Regs. tit. 5, ? 3030(i).

STUDENT asserts that she needed special education and related services in the nature of a comprehensive behavioral assessment and behavior plan, collaboration among teachers and mental health professionals, tutoring or home instruction, flexible scheduling, note taking, taping of classroom lectures, and psychological services. The District asserts that accommodations and modifications within the regular instruction program were sufficient to meet the Petitioner's needs and special education and related services therefore were not required, in addressing these contentions, it will be helpful to first take a closer view of what

is meant by the term "special education." The Hearing Officer will then review and discuss the applicable evidence.

As discussed above, State law defines "special education" as meaning "specially designed instruction, at no cost to the parent, to meet the unique needs of individuals with exceptional needs, whose educational needs cannot be met with modification of the regular instruction program, and related services, at no cost to the parent, that may be needed to assist these individuals to benefit from specially designed instruction." Cal. Educ. Code ? 56031.

Although the core element of special education is "specially designed instruction," there is no direct definition of that term in State law. However, a workable definition of the term is derived from Cal. Code Regs. tit. 5, ? 3030. Section 3030 states that a pupil shall qualify for special education if "the degree of the pupil's impairment as described in Section 3030 (a through j) requires special education in one of the program options authorized by Section 56361 of the Education Code." Section 56361 states that the continuum of program options shall include, but not be limited to, a resource specialist program pursuant to ? 56362, designated instruction and services pursuant to ? 56363, special classes pursuant to ?? 56364 or 56364.2, itinerant instruction in classrooms and other settings, instruction using telecommunication, and instruction in the home, hospitals, or other institutions. Thus, the program options listed in ? 56361 can be construed as comprising "specially designed instruction."[13] Finally, "a pupil shall be referred for special education instruction and related services only after the resources of the regular education program have been considered and, where appropriate, utilized." Cal. Educ. Code ? 56303.

In the present case Dr. Trattner, District school psychologist, testified that, in general, special education assessment occurs for students such as STUDENT (i.e., high school students with depression) when all regular education options have been exhausted. She testified that before referring a student for a special education assessment, the procedures at LGHS may first include having an SIT meeting and plan to determine if a student can function in a regular education program with regular education interventions. Dr. Trattner, a participant in STUDENT's December 12, 2003 SST meeting, further testified that the SST decided to first try regular education modification strategies for STUDENT. The SST had hoped that implementation of those strategies, in conjunction with Dr. Paley's plan to change STUDENT's medications, would result in STUDENT's succeeding at school. The specific strategies suggested by Dr. Trattner at that time included the relief of stress by changing her advanced placement (AP) classes to less academically challenging college preparatory classes, providing site-based counseling at school by a marriage and family therapist (MFT) intern, waiving the school attendance policy, and receiving "afterschool" or "private faculty" tutoring. Dr. Trattner testified that such an approach would help to keep STUDENT engaged in school, and that such engagement was important for keeping STUDENT out of the depression "cycle" (i.e., staying at home because she was depressed yet becoming more depressed because she was staying at home and missing her classes).

Dr. Krautter, STUDENT's licensed clinical psychologist, testified that as of March 2004, helpful accommodations for STUDENT would include (1) having a modified school day whereby she would be at school for some classes and taught at home, by a home teacher, for other classes, (2) having teachers email assignments to her home, as she was too distracted at school to reliably record her assignments, and (3) possibly having a note taker in class. As noted above, Dr. Krautter testified that depression can often remit and resurface, and she believed that it would be preferable to have intervention plans already in

place for such recurrences. She noted that having STUDENT physically at school was important, referring to the "cycle" issues as mentioned by Dr. Trattner. She stated that although home teaching could help STUDENT stay current in certain classes, having STUDENT at home for an extended period could "feed into" her depression.[14]

The testimony of Dr. Trattner and Dr. Krautter, along with the other evidence recited above concerning STUDENT's absence from school and the adverse effects of those absences, established that, because of STUDENT's fragile condition and the academic and emotional consequences of her inability to attend class, accommodations were required to meet STUDENT's unique educational needs. Accommodations such as providing home teaching for certain classes, switching to less demanding classes, waiving the attendance policy, emailing assignments, and notetaking were recommended by Dr. Trattner and/or Dr. Krautter. Although the statutes and regulations referenced above show that such accommodations could, under appropriate circumstances, be part of a special education student's IEP, testimony of District witnesses showed that such accommodations could also be made available to STUDENT independently from a special education program. Because those accommodations were available as regular education interventions, their appropriateness or lack thereof is not determinative of the eligibility issue.

The evidence also established, however, that STUDENT had unique educational needs arising from her depression which could not be met through regular education interventions. Specifically, the Hearing Officer is persuaded that psychological and/or counseling services were among the services required to address STUDENT's educational needs. In that regard, Dr. Trattner had recommended the on-campus counseling services of a marriage and family therapist (MFT) intern. Dr. Krautter had counseled STUDENT for depression, thus also demonstrating her belief that counseling was necessary. Both experts were in agreement that keeping STUDENT engaged in school was and would continue to be important for combating her depression, and combating her depression was, in turn, important for STUDENT's ability to attend school. Accordingly, the Hearing Officer finds that counseling or psychological services specifically designed to assist STUDENT in being able to productively attend and remain at school for some portion or the entirety of each school day was among STUDENT's unique educational needs.[15]

Although on-campus counseling was available to LGHS students as a regular education intervention or service, the evidence demonstrated that STUDENT's receipt of such counseling services solely as a regular education intervention would not be sufficient to meet STUDENT's unique educational needs. The reasons are several. First, as described by District witnesses, the counseling services offered within the regular education program were from an MFT intern and were available only on the campus. Thus, the on-campus MFT services were not specifically designed to serve students so affected by depression as to be unable to attend school. Also, STUDENT's accessability to on-campus MFT services would have been problematic by requiring her presence at school when she was unable to attend school.

Furthermore, STUDENT was already receiving private treatment and therapy directed at trying to resolve, or at least stabilize, her condition. More of such counseling through an MFT intern would not necessarily have addressed STUDENT's educational needs. What STUDENT needed from the District was counseling specifically directed at enabling STUDENT to productively attend and remain at school. Those services foreseeably would include counseling at home, counseling in a clinic-based setting, counseling at the LGHS

29

campus, or a combination of all the above.

Finally, an effective counseling program would likely have required some coordinated involvement among STUDENT's counselor, teachers, parents, and STUDENT herself. Consequently, what STUDENT ultimately needed was the formulation and execution of a plan that delineated a) the type of counseling services required to meet her unique educational needs in that area, b) who would administer those services and where, c) how frequently those services would be given, d) the goals to be achieved through those services, and e) how her progress toward those goals would be measured. Such a plan is, in fact, a special education student's written IEP.[16] Under STUDENT's circumstances as described above, the District's proffered approach of providing counseling solely as a regular education intervention would have been inappropriate as an alternative to the formal elements of an IEP. As an example, the December 12, 2003 SST meeting yielded no plan, written or otherwise, for coordination of effort, monitoring, accountability, or goals with respect to counseling services. Also, there was no indication from the evidence that access to the on-campus MFT services would have provided such structure, coordination, and accountability.[17]

Accordingly, the Hearing Officer finds that commencing in the fall of 2003, STUDENT exhibited the characteristics of ED to such a degree that she need special education and related services. As found above that the District was not required to conduct STUDENT's initial IEP meeting until January 24, 2004. Thus, by January 24, 2004, with STUDENT having met the eligibility criteria for special education as a child with ED, the IEP team should have found her eligible. These findings are made notwithstanding the evidence that STUDENT's condition temporarily improved in January 2004. At that time, the strong likelihood of STUDENT's depression being cyclical or episodic had been established, and a program should have been formulated to address her condition.[18] Accordingly, with April 26 being the last date that evidence was presented in this hearing, the Hearing Officer finds that STUDENT was denied a FAPE from January 24, 2004, through April 26, 2004.[19]

### 3) Did STUDENT meet the eligibility criteria for OHI?

With the Hearing Officer having found that STUDENT was eligible under the criteria for ED, the OHI analysis is unnecessary.

### Issue 2: If the District denied STUDENT a FAPE, is STUDENT entitled to reimbursement for tutoring costs, reimbursement for counseling and psychiatric therapy, and compensatory education.

When a school District denies a student a FAPE, the student is entitled to relief that is appropriate in light of the purposes of the IDEA. Equitable considerations may be weighed in granting relief, and courts have broad discretion in granting such relief. *School Comm. of Burlington v. Department of Education,* 471 U.S. 358 (1985). Among the factors to consider is the conduct of the parties. *W.G. v. Board of Trustees of Target Range School Dist.,* 960 F.2d 1479, 1486 (9th Cir. 1992). Included in the available relief, is reimbursement for privately procured educational services and compensatory education.

The Hearing Officer has found that STUDENT was denied a FAPE from January 24, 2004, through April 26, 2004. As remedies for the denial of a FAPE, MOTHER has requested reimbursement for tutoring costs, reimbursement for therapy and psychiatric care, and

compensatory education for STUDENT.

### 1) Tutoring costs.

Parents may be entitled to retroactive reimbursement of the services they have procured for their children when the school district failed to provide an appropriate placement or services and the services provided by the parents were appropriate under the IDEA. *Burlington,* 471 U.S. at 370.

With regard to tutoring costs, MOTHER testified that she paid about $1000.00 for private tutoring expenses from late October 2003 through the end of the first semester on January 20, 2004. However, the denial of FAPE did not occur until January 24, 2004. Consequently, the tutoring costs incurred by MOTHER through January 24, 2004, proceeded the period where FAPE was denied. For the period after January 24, 2004, MOTHER testified that she intended to retain tutoring services upon commencement in-home teaching services by the District at the end of March 2004. However, there was no specific showing as to the cost of tutoring, the nature or frequency of the tutoring, benefit derived by the tutoring, or whether the tutoring was necessary to address the denial of FAPE. Accordingly, MOTHER's request for reimbursement of tutoring expenses is denied.

### 2) Reimbursement for therapy and psychiatric care.

MOTHER also requests reimbursement for private therapy and psychiatric care provided to STUDENT from October 2003 through the present. However, many of those services were obtained prior to the period that denial of FAPE commenced. Moreover, there was no evidence to suggest that the failure of the District to provide a FAPE led to MOTHER's decision to obtain those services for STUDENT. To the contrary, the evidence showed that MOTHER had already commenced treatment for STUDENT starting in the late winter or early spring of 2003, when STUDENT's educational performance was not a concern. The treatment and counseling subsequently obtained in October 2003 and thereafter was intended to address STUDENT's depression, but it was not necessarily designed to address STUDENT's educational needs or provide STUDENT with educational benefit. Specifically, the psychiatric care obtained by STUDENT in the fall of 2003 and continuing thereafter was primarily focused upon the provision and adjustment of medications, and districts are not responsible for medical services other than for certain diagnostic and evaluation purposes. Cal. Code Regs. tit. 5, ? 3001(z). With regard to group and individual services provided by or through Dr. Krautter's office, Dr. Krautter first counseled STUDENT in January 2004 in a focus group for teenage girls, addressing various topics not necessarily related to education or school. The individual therapy provided by Dr. Krautter was focused upon STUDENT's self-injurious behaviors, and there was no evidence that the self-injurious behaviors occurred at school.

Thus, the Hearing Officer is persuaded that substantially the same private treatment and counseling would have been obtained by MOTHER irrespective of whether the District had offered appropriate and accessible psychological services or counseling to address STUDENT's unique educational needs arising from her disability. Additionally, the private services did not specifically address STUDENT's educational concerns. Accordingly, the request for reimbursement of therapy and psychiatric care costs is denied.

### 3) Compensatory education.

Court decisions subsequent to *Burlington* have extended relief in the form of compensatory education to students who have been denied a FAPE. *See Lester H. v. K. Gilhool and the Chester Upland School District,* 916 F.2d 865 (3d. Cir. 1990); *Miener v. State of Missouri,* 800 F.2d 749 (8th Cir. 1986). There is no obligation to provide day-for-day or hour-for-hour compensation for missed services. "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Student W. v. Puyallup School District,* 31 F.3d 1489, 1496 (9th Cir. 1994).

In the present case, STUDENT completed her first semester on January 20, 2004, several days prior to the date (January 24) the District should have found her eligible for special education. With regard to the period from the end of the first semester through April 26, 2004, STUDENT asserts that she is entitled to compensatory education to overcome lost educational opportunity. The Petitioner presented no specific evidence as to the degree of lost educational opportunity, if any, or what form of compensatory education would be required to address lost educational opportunity. STUDENT's depressive symptoms had improved and she had been attending school regularly during January and February. In March 2004, STUDENT's depression worsened, and she again was missing school. However, the District provided a home-teaching program commencing on or about March 30. Hence, the evidence demonstrated no loss of educational opportunity to a degree that would merit compensatory education, and there is no basis for ordering compensatory education for the denial of FAPE from January 24, 2004, through April 26, 2004. The request for compensatory education is therefore denied.

### Orders

1. The Petitioner has been found eligible for special education for the period from January 24, 2004, through April 26, 2004. No findings are reached with regard to the Petitioner's eligibility thereafter.

2. All of the Petitioner's remaining requests for relief are denied.

### Prevailing Party On Each Issue

Pursuant to Cal. Educ. Code ? 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issue 1: From October 2003 through the present, did the District deny STUDENT a FAPE by (A) failing to conduct a timely assessment for special education in accordance with "child find" requirements, and (B) failing to find STUDENT eligible for special education? STUDENT prevailed on subpart A. STUDENT prevailed in subpart B to the extent the Hearing Officer found that STUDENT was eligible for special education from January 24, 2004, through April 26, 2004.

Issue 2: If the District denied STUDENT a FAPE, is STUDENT entitled to remedies including, but not limited to, reimbursement for tutoring costs, reimbursement for counseling and psychiatric therapy, and compensatory education? The District prevailed on this issue.

[1]The term "504 plan" arises from Section 504 of the federal Rehabilitation Act of 1973. *See* 29 U.S.C. ? 794 and 34 C.F.R. ? 104.1. In certain situations, a child with learning difficulties may be ineligible for special education because the learning difficulties fit within none of the

32

special education eligibility categories or because the degree of the learning difficulties is insufficient to qualify the child for special education. However, such a child may be eligible for accommodations at school under Section 504. Eligibility for Section 504 accommodations arises from a child's having a physical or mental condition which substantially limits a major life activity.

[2]The quoted portions are taken from a March 30, 2004 email from Ms. Eaton to LGHS principal Trudy McCulloch. Other information concerning that meeting is derived from that email and from documents and testimony presented by both parties. Ms. Eaton stated in her March 30 email that, after the December 15 email, she had no further communication with MOTHER during the first semester. The first semester ended on or about January 20, 2004.

LGHS has an attendance policy which provides, generally, that if a student misses fifteen days of a particular class, the class is considered as either dropped or failed.

[3]"Weighted" GPA arises from added-weight given to advanced placement, accelerated, and/or honors courses.

[4]Attendance records ending March 18, 2004, show that STUDENT was absent on eleven school days during March.

[5]The content of this email was consistent with testimony by both parties.

[6]These latter facts involving events from April 7 through the present were derived from an April 9 letter by Ms. McCulloch to MOTHER and from testimony presented by both parties.

[7]Federal special education law uses the term "child with a disability." The corresponding provisions of State law use the term "individuals with exceptional needs."

[8]As stated under Background Facts, the worsening of STUDENT's depression-like symptoms in mid-March 2004 led to the District's submitting a special education assessment plan to STUDENT's parents on April 5, 2004. The plan was signed and approved by MOTHER on April 5. The assessment had not been completed as of the date of the hearing, and thus an IEP team had not yet met to discuss the assessment information or consider eligibility.

[9]The term "emotional disturbance" includes schizophrenia but "does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance." 34 C.F.R. ? 300.7(c)(4)(ii). A nearly identical definition of ED is set forth under State law in Cal. Code Regs. tit. 5, ? 3030(i), except ? 3030(i) specifies, in a somewhat circular fashion, that for a student to qualify under the category of ED, one or more of the five specified characteristics of ED must be exhibited by the student "because of a serious emotional disturbance."

[10]Dr. Krautter testified that she first met STUDENT in January 2004 when STUDENT began attending a focus group for female teenage students coping with anxiety and depression-related issues. She became STUDENT's individual therapist in March 2004

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=104+LRP+3...    2/14/2008

after STUDENT's symptoms had worsened, and she subsequently has met individually with STUDENT on a weekly basis for six or seven sessions through April 6, 2004. Her testimony described in the main text above was primarily intended by Dr. Krautter to be applicable to STUDENT's condition during and after March 2004, but overall testimony showed that the same considerations were applicable to STUDENT in the fall of 2003.

[11]Indeed, the symptoms again subsided in January 2004, but worsened in March 2004.

[12]Witnesses referred to STUDENT's "first major episode of depression" as having commenced in October 2003, and her "second major episode of depression" as having commenced in March 2004.

[13]"Resource specialist programs" pursuant to ? 56362 include, but are not limited to (1) instruction for students whose needs have been identified in an IEP and who are assigned to regular classroom teachers for a majority of the school day, (2) provision of information and assistance to individuals with exceptional needs and their parents, (3) provision of consultation, resource information, and material regarding individuals to with exceptional needs to parents and regular staff members, (4) coordination of special education services with the regular school programs for each student enrolled in the resource specialist program, (5) monitoring of student progress on a regular basis and participation in the review and revision of IEPs, and (6) emphasis at the secondary school level on academic achievement, career and vocational development, and preparation for adult life. Cal. Educ. Code ? 56362(a).

"Designated instruction and services" pursuant to ? 56363 shall be available when "necessary for the pupil to benefit educationally from his or her instructional program." Cal. Educ. Code ? 56363(a). Designated instruction and services (DIS) may include, but are not limited to (1) language and speech development and remediation services, (2) audiological services, (3) orientation and mobility instruction, (4) instruction in the home or hospital, (5) adapted physical education, (6) physical and occupational therapy, (7) vision services, (8) specialized driver training instruction, (9) counseling and guidance, (10) psychological services other than assessment and development of the IEP, (11) parent counseling and training, (12) health and nursing services, (13) social worker services, (14) specially designed vocational education and career development, (15) recreation services, and (16) specialized services such as readers, transcribers, and vision and hearing services for children with low incidence disabilities. Cal. Educ. Code ? 56363(b).

"Related services" include but are not limited to: "transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that medical services shall be for diagnostic and evaluation purposes only) as required to assist an individual with exceptional needs to benefit from special education." Related services include, but are not limited to, designated instruction and services. Cal. Code Regs, tit. 5, ? 3001(z).

[14]Dr. Krautter and Dr. Trattner both testified that STUDENT's diagnosis of depression was subject to change, noting that Dr. Paley reportedly was beginning to consider that some form of bipolar disorder might be indicated.

34

[15]Such additional services as mentioned above would be equivalent to "counseling and guidance," "psychological services," and/or "social worker services," all listed as designated instruction and services under Cat. Educ. Code ? 56363(b)(9), (10), and (13), respectively. Such services would also be equivalent to "psychological services," listed as a related service in Cal. Code Regs. tit. 5, ? 3001(z).

[16]The necessary components of an IEP for a special education student are specified in Cal. Educ. Code ? 56345.

[17]An IEP designed to meet STUDENT's unique educational needs would not only provide appropriate counseling services, it would also incorporate and coordinate the provision of other potentially appropriate services or accommodations, including some of the District-recommended services and accommodations such as in-home teaching and attendance policy waivers, that would otherwise be available as regular education interventions.

[18]The program could have included for example, strategies for reducing the likelihood of a recurrence, reducing the severity of a recurrence, and promptly addressing a recurrence.

[19]Because no evidence was presented after April 26, 2004, the Hearing Officer does not know the results of the current assessment and does not know whether an IEP team has met to determine eligibility. Accordingly, instead the Hearing Officer makes no findings in this Decision with regard to STUDENT's eligibility after April 26, 2004.

## Statutes Cited

**20 USC 1401(8)**
**20 USC 1400(d)**
**20 USC 1401(3)(A)(ii)**
**20 USC 1412(a)(3)**

## Regulations Cited

**34 CFR 300.7(c)(4)(ii)**
**34 CFR 300.7(c)(4)(i)**
**34 CFR 300.7(c)(4)(i)(D)**

## Cases Cited

**458 U.S. 176**
**916 F.2d 865**
**800 F.2d 749**

## Copyright 2008 © LRP Publications

**39 IDELR 28**
103 LRP 8400

*Fresno Unified School District*

**California State Educational Agency**

**SN02-02700**

**January 16, 2003**

### Related Index Numbers

**50.010 Development of Plan**
**175.050 Serious Emotional Disturbance**
**265.010 Development of IEP**
**365.020 Behavioral Disorder**
**365.140 Serious Emotional Disturbance**
**445.010 Eligibility Criteria**

### Case Summary

The IHO ruled the district failed to assess the student for ED eligibility, which amounted to a denial of FAPE. The undisputed evidence established the 10-year-old, fourth-grader had a history of violent and inappropriate behavior. The district suspended him numerous times for profanity, defiance, and physically injuring other students. From the second term of first grade to the end of second grade, the child was in an alternative setting where he continued to exhibit inappropriate behavior. His mother and mental health providers stated he expressed an unnatural fascination with death and dead people and animals. According to his mother, in as early as kindergarten, her son had limited interaction with other children due to his contentious behavior, he had fantasies of his pit bulls killing people, and had morgue photos of famous dead people tacked to his bedroom walls. Therapists indicated the student had outbursts and was a danger to himself and other people, and two of them recommended placement in a mental health facility. The district, however, claimed the student's behavior was learned from home, but presented no evidence to support this position. It maintained the student could be controlled with the Section 504 plan. The IHO disagreed, determining that over the years, the Section 504 plans did little to address the student s needs. Finding the student eligible for special education, the IHO ordered the district to immediately convene an IEP team to develop a plan and properly place the student.

### Judge / Administrative Officer

Mary L. Cote, Hearing Officer

### Full Text

### Decision

This matter was heard before Mary L. Cote, Hearing Officer of the California Special Education Hearing Office, McGeorge School of Law, University of the Pacific, in Fresno,

36

California, on December 19 and 20, 2002.

Petitioner STUDENT was represented at the hearing by attorney Dale Mentink of Protection and Advocacy, Inc. Also present on behalf of STUDENT was his mother. Respondent Fresno Unified School District was represented by attorney Christopher Fernandes from the law firm of Lozano Smith. Also present on behalf of the District was Mark Alien, interim SELPA director.

Oral and documentary evidence was received. Following receipt of written closing arguments, the case was closed and the matter was submitted for decision.

### Issues

(1) As of October 1, 2002, did Petitioner STUDENT meet eligibility criteria for special education as (a) emotionally disturbed (ED) and/or (b) other health impaired (OHI)?

(2) If STUDENT was eligible for special education as of October 1, 2002, has Respondent Fresno Unified School District offered him a free appropriate public education (FAPE)?

### Background Facts

Petitioner STUDENT will turn ten years old in March of 2003. He is in the fourth grade and attends Lincoln Elementary School in the Fresno Unified School District. STUDENT has a history of behavioral difficulties resulting in multiple suspensions from school. He has been diagnosed with attention deficit/hyperactivity (ADHD) and oppositional defiant disorders (ODD). STUDENT has never been determined eligible for special education. However, he currently has a Section 504 Accommodation Plan to address behavioral difficulties. The District provides a classroom aide to monitor STUDENT'S behavior. STUDENT receives weekly individual and group therapy from Children's Community Mental Health Services of Fresno County.[1]

During the 1998-1999 school year, STUDENT attended kindergarten at Kirk Elementary School in the District on an interdistrict transfer from the West Fresno School District. In the fall of 1999, STUDENT began the first grade at Lincoln Elementary School. Following many behavioral incidents, STUDENT was placed for the second semester of his first grade year in the District's Alternative Learning and Behavior Adjustment (ALBA) program. STUDENT'S teacher in the ALBA program was Laura DeBenedetto.

STUDENT returned to the ALBA program for the second grade. The ALBA program relocated to Konkel School for the 2000-2001 school year. STUDENT continued to have behavioral problems while in the ALBA program. A behavioral plan dated September 30, 2000, describes STUDENT'S behavior as follows: "STUDENT runs from class, refuses to follow directions of staff, yells profanities and demands one on one supervision when he is throwing a tantrum." The plan called for STUDENT'S receiving points and tickets with which he could purchase rewards for good behavior. A quiet place was made available for him to regain control over his behavior.

In October 2000, MOTHER requested that the District assess STUDENT for special education. A multidisciplinary team consisting of school psychologist Lisa Vasquez, speech and language therapist S. Goertzen, special education teacher E. Johnson, regular

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=103+LRP+8...   2/14/2008

classroom teacher Ms. DeBenedetto, nurse E. Callahan, and principal V. Westburg undertook the assessment of STUDENT in December 2000. The following assessments were administered to STUDENT: Test of Auditory-Perceptual Skills-Revised (TAPS-R), Developmental Test of Visual-Motor Integration (VMI), Vineland Adaptive Behavior Scales, Wechsler Individual Achievement Test (WIAT), Test of Visual Perceptual Skills-Revised (TVPS-R), Connors' Teacher Rating Scale-Revised, and Behavior Assessment Scale for Children (BASC).[2] The assessment also included observations of STUDENT at school and a review of his educational records. The assessors concluded that STUDENT had average ability and was functioning within the expected range as measured by academic, speech and language assessments. The report of the assessment, dated December 11, 2000, indicates that the assessment team concluded that STUDENT did not meet special education eligibility criteria because of a specific learning disability, emotional disturbance, or other health impairment.

The IEP team met on December 11, 2000, to discuss the assessment. The team reached consensus that STUDENT was not eligible for special education and agreed to develop 504 and positive intervention plans to address STUDENT'S ADHD and behavioral problems. A 504 plan was put in place following the meeting. Although STUDENT'S teacher and social worker identified concerns regarding STUDENT'S emotional status, the team also agreed to consider returning STUDENT to a comprehensive elementary school. Ms. DeBenedetto reported alarming conversations with STUDENT regarding his fascination with dead people and his deriving pleasure from his pit bulls hurting someone. She also reported that STUDENT told her he would laugh if someone he loves died. The social worker noted that STUDENT may require placement in a mental health facility. STUDENT was suspended for at least 10 days during the 2000-2001 school year for causing injury to another person, engaging in an obscene act, using profanity, and being defiant.

During 2001, MOTHER again expressed concern to the District regarding the difficulty she was having managing STUDENT'S behavior. The District referred her to an agency for students who are suicidal or who have severe emotional problems, which then referred her to Community Mental Health Services. In August 2001, STUDENT began receiving services from Mental Health. David Hellwig, Ph.D., provides weekly individual therapy in sessions of approximately one hour each. Paul Phipps, marriage and family therapist (MFT), leads a weekly small social skills group in which STUDENT participates.

STUDENT returned to Lincoln Elementary School for the third grade in the fall of 2001. A behavioral plan was revised several times during the school year with the goal of improving STUDENT'S inappropriate school behavior, which included his being out of his seat, roaming around the classroom, engaging in angry outbursts, being aggressive, and using profanity. During the school year, STUDENT continued to be suspended many times for behaviors similar to those resulting in suspension during the prior school year. MOTHER also testified to being asked to pick up STUDENT from school before the end of the school day on multiple occasions. STUDENT'S report card for the third grade reflects below-expected achievement. STUDENT received grades of D, D-, D+, and C in reading, D, D, B-, and D- in mathematics, B-, D-, D-, and F in social science, and F, D-, C+, and D in science.

In July 2002, the District agreed to conduct a second assessment to determine whether STUDENT met special education eligibility.[3] As part of the assessment, on August 10 and 12, 2002, John Goodfellow, a registered occupational therapist (OTR) in private practice, conducted an occupational therapy (OT) assessment of STUDENT at the request of the

38

District. Mr. Goodfellow's assessment consisted of clinical observations and administration of standardized tests. The assessment revealed that STUDENT had strengths in visual processing, body awareness, gross-motor skills, and manual dexterity. Areas of concern included auditory distractibility, tactile processing, self-regulation, and motor control and accuracy. Mr. Goodfellow also noted that STUDENT seeks movement, especially while seated, and requires extra time to complete tasks, especially tasks involving writing. Mr. Goodfellow recommended accommodations at school for STUDENT related to timed tests and homework. He also suggested that STUDENT be exposed to the computer and typing skills and that his teacher should be aware of his auditory distractibility and cue him as needed to return to task. Mr. Goodfellow recommended that STUDENT receive OT services at school consisting of at least 18 consultations or direct visits in 30-minute sessions to evaluate the ergonomics of STUDENT'S desk and the benefits of a disc-o-sit at the desk, to consult with STUDENT and his teacher regarding strategies to regulate behavior, and to work on writing skills and copying from the board.

In September 2002, Howard J. Glidden, Ph.D., a developmental neuropsychologist in private practice, assessed STUDENT on behalf of the District. Dr. Glidden administered the Wechsler Intelligence Scale for Children-III (WISC-III), WIAT, Knox's Cube Test, Developmental Test of Visual-Motor Integration (Fourth Revision), Tests of Apraxia, Motor-Free Visual Perception Test-Revised, Auditory Discrimination Test, Test of Auditory Analysis Skills, Sentence Memory Test, Cancellation of Rapidly Recurring Figures Test, Burks' Behavior Rating Scale, and Conners' Behavioral Rating Scale. Dr. Glidden also reviewed educational records, obtained information from STUDENT'S prior teacher, Sharon Walker, and interviewed MOTHER. Dr. Glidden diagnosed STUDENT with ADHD and stated that ODD should be ruled out. Dr. Glidden's report includes many suggestions for dealing with STUDENT's behavior resulting from his ADHD but does not offer any opinion regarding STUDENT'S eligibility for special education.

STUDENT entered the fourth grade in the fall of 2002. His teacher is Rebecca Moler. STUDENT has continued to have behavioral problems at school for which he has been suspended. During the first two weeks of October, STUDENT was suspended for four separate incidents for a total of nine and one-half days. On October 1, 2002, STUDENT engaged in a pushing incident on the playground with another student. He was suspended for one day. On October 3, 2002, STUDENT threatened another student, used profanity, and was defiant towards his teacher, resulting in a one-half day suspension. On October 7, 2002, STUDENT was suspended for three days for refusing to leave the class when asked, walking off campus, and using profanity with the principal. When STUDENT returned to school on October 11, 2002, from his suspension, he threatened two female students in his class, left class without permission, and used profane language. As a result, STUDENT was suspended for five days and expulsion has been recommended.

On October 17, 2002, District psychologist Gerald Christensen reviewed STUDENT'S educational records and recent assessments. Mr. Christensen completed a report analyzing whether the information led to STUDENT'S being eligible for special education because of a specific learning disability (SLD), emotional disturbance (ED), or other health impairment (OHI).[4] Mr. Christensen concluded that STUDENT did not qualify for special education and offered his opinion that STUDENT meets DSMIV criteria for the diagnosis of conduct and oppositional defiant disorders.

The IEP team met on October 17, 2002, to discuss the results of the assessments and to determine STUDENT'S eligibility for special education. District members of the IEP team

concluded that STUDENT did not meet special education criteria of SLD, ED, or OHI. A 504 manifestation determination meeting followed the IEP meeting. The District members of the 504 team concluded that STUDENT'S recent behavior for which he was suspended was not a direct manifestation of his identified disability, ADHD, and was not a result of inappropriate accommodations or modifications. STUDENT'S Section 504 Accommodation Plan dated October 17, 2002, was drafted to address certain inappropriate behaviors including inattention, impulsivity, fighting, and use of profanity.

Concerns regarding STUDENT'S failing to turn in homework were also noted. The 504 Plan lists 17 accommodations and includes a behavioral plan with the goal of STUDENT'S remaining calm and maintaining his behavior within acceptable limits when he is frustrated or angry. Neither the IEP nor 504 documents are signed by MOTHER.

On November 8, 2002, a due process hearing was requested on behalf of STUDENT by his prior counsel, Eulalio Castellanos (SN02-02473). When the hearing convened on November 25, 2002, Mr. Castellanos withdrew as legal counsel. The hearing was continued to December 3, 2002. STUDENT's mother and advocate Janet Sconiers appeared on behalf of STUDENT when the hearing reconvened on December 3, 2002. The hearing officer who convened the hearing on that date denied their request to further continue the hearing. Petitioner's case SN02-02473 was then withdrawn. On the following day, December 4, 2002, the Hearing Office received Petitioner's second request for a due process hearing (SN02-02700). The matter proceeded to hearing on December 19 and 20, 2002.[5]

STUDENT'S grades for the first quarter of the 2002-2003 school year were C in mathematics, C- in spelling, D in written language and science, D- in reading, and F in social studies. STUDENT received N (Needs improvement) in four of seven areas related to work habits and all Ns related to social skills.

### Findings of Fact and Conclusions of Law

### Issue No. 1: As of October 1, 2002, has Petitioner STUDENT Met Eligibility Criteria for Special Education as (a) Emotionally Disturbed (ED) and/or (b) Health Impaired (OKI)?

Under the Individuals with Disabilities Education Act (IDEA) and state special education law, a student with a disability meets eligibility criteria for special education services by satisfying the following: (1) a student must have a disability as defined by federal law, (2) because of the disability, the student must require instruction, services, or both which cannot be met by modification of the regular school program. 20 U.S.C. ? 1401(3)(A) Cal. Educ. Code ? 56026. Petitioner alleges he meets special education eligibility as emotionally disturbed and other health impaired, both of which are included in the federal definition of a disability.

### (a) Does STUDENT Meet Eligibility Criteria For Special Education As Emotionally Disturbed?

Petitioner alleges that the District should have determined that he met special education eligibility as emotionally disturbed (ED) pursuant to the second and third criteria set forth in Title 5, California Code of Regulations section 3030(i). The second criterion states that a student qualifies as ED when he/she exhibits an inability to build or maintain satisfactory

40

interpersonal relationships with peers and teachers over a long period of time and to a marked degree, which adversely affect his educational performance. A student qualifies as ED under the third criterion when he/she exhibits inappropriate types of behavior or feelings under normal circumstances in several situations over a long period of time and to a marked degree, which adversely affect his educational performance. The District contends that STUDENT does not meet special education eligibility criteria as ED. The specific contentions of the parties related to each of the criteria are set forth below.

### (1) Does STUDENT Exhibit an Inability to Build or Maintain Satisfactory Interpersonal Relationships With Peers and Teachers?

Petitioner asserts that his relationships with peers and teachers are both troubled and shortlived. The District asserts that STUDENT is able to make friends and has good relationships with both his current teacher and principal.

STUDENT'S mother, MOTHER, and his mental health therapists, Dr. Hellwig and Mr. Phipps, testified that STUDENT meets the above criterion. MOTHER testified that STUDENT'S involvement with other children in the neighborhood is short-lived because their interactions quickly become contentious. As an example, MOTHER related that when she put a basketball standard in front of her house, the neighborhood children initially came to play basketball with STUDENT. However, after a short period of time, the children did not want to play with STUDENT because he was not able to get along with them. MOTHER testified that no one calls or visits STUDENT. She further testified that STUDENT has difficulty getting along with cousins and with peers at church.

Dr. Hellwig testified that STUDENT does not have friends. Dr. Hellwig reached this conclusion because of conversations with STUDENT during therapy, discussions with MOTHER, feedback from Mr. Phipps, and information contained in Dr. Glidden's assessment of STUDENT. Dr. Hellwig testified that although STUDENT claims to have a set of friends, he does not talk about any of the friends during therapy. Dr. Hellwig pointed to the following comments by one of STUDENT'S teachers, which are contained in Dr. Hellwig's report: "In the classroom, various behavior problems include: Excessive aggressiveness to peers and defiance. Serious behavior problems include ... not making friends." Dr. Glidden also commented that "peer relationships are viewed as short-lived and conflictual in nature." Petitioner's Exhibit 8, pages 3 and 4.

Mr. Phipps testified that STUDENT was referred to his group therapy to learn to deal with peers and adults in an appropriate manner. He stated that STUDENT participates in the group but that his participation is facilitated by adults.

STUDENT'S current teacher, Rebecca Moler, and Lincoln principal, Mike Jones, testified that STUDENT has formed friendships at school. Ms. Moler testified that she has observed STUDENT playing with four particular students at school. Mr. Jones described an emerging friendship with a boy in his class who shares STUDENT'S interest in sports. According to Mr. Jones, when STUDENT returned to school the boys had an initial verbal exchange, then spent some time with Mr. Jones in his office, and now have been observed playing soccer and sitting together at lunch.

Both Ms. Moler and Mr. Jones testified regarding a former Lincoln student's recent visit to Lincoln for the express purpose of visiting STUDENT. Both observed their relationship to be one of friends.

41

Gerald Christensen, school psychologist, reviewed recent assessments of STUDENT and compiled a report analyzing STUDENT'S eligibility for special education. Mr. Christensen testified that STUDENT is able to interact appropriately with peers and teachers when he chooses to do so.

Alissa Vasquez, District school psychologist, assessed STUDENT when he was in the third grade. Ms. Vasquez testified that STUDENT was then able to make friends. In support of her conclusion, Ms. Vasquez testified that MOTHER'S responses on the socialization subdomains of the Vineland Adaptive Behavior Scales placed STUDENT'S social skills in the adequate range. His standard score was 100.[6] (Petitioner's Exhibit 6.)

District witnesses do not dispute that at times STUDENT has difficulty getting along with peers and behaves defiantly toward adults in authority. However, the Hearing Officer finds that the testimony of the District's witnesses, in particular, Ms. Moler and Ms. Jones, establishes that STUDENT has friendships at school. Both Ms. Moler and Ms. Jones have observed STUDENT at school during the current school year, whereas neither Dr. Hellwig nor Mr. Phipps has. Dr. Hellwig and Mr. Phipps also have not spoken with anyone from STUDENT'S school regarding whether he has friends at school. Dr. Hellwig's expressed belief that STUDENT does not have friends was contradicted by some of his own testimony. In particular, Dr. Hellwig stated that STUDENT has told him that he has friends and that he likes his teacher. Moreover, the fact that STUDENT does not talk about them during therapy does not undermine his assertion to Dr. Hellwig. Additionally, Ms. Moler and STUDENT concur that they have a good relationship despite STUDENT'S having some behavioral difficulties in class. Dr. Hellwig and Mr. Phipps work with STUDENT in a clinical setting, which perhaps should not be categorized as a "normal relationship." However, both Dr. Hellwig and Mr. Phipps testified that they have established appropriate therapeutic relationships with STUDENT.

As to comments in Dr. Glidden's assessment regarding STUDENT'S difficulty making friends, it should be noted that Dr. Glidden's assessment was completed at the beginning of the school year, whereas Ms. Moler and Mr. Jones testified regarding their observations of STUDENT at school during the three months following Dr. Glidden's assessment. The testimony of Laura DeBenedetto, one of STUDENT'S teachers in the ALBA program during the 2000-2001 school year who was called to testify on behalf of STUDENT, also is not persuasive as to STUDENT'S present ability to build relationships. Ms. DeBenedetto could not recall STUDENT'S having friends in her class. However, the fact that STUDENT may not have had friends in her class during the 2000-2001 school year is not determinative of his ability to establish friendships two school years later. Additionally, Ms. DeBenedetto testified that STUDENT worked most of the day individually with his aide so she had limited opportunities to view STUDENT'S interactions with other students.

In summary, for STUDENT to meet the above criterion, he must have an inability to build or maintain relationships with peers and teachers. This is a high standard to meet as it requires STUDENT'S difficulties with relationships to be both with peers and teachers. While the facts present a close call, because the evidence establishes that STUDENT has a satisfactory relationship with Ms. Moler and has been observed to build relationships with several peers during the current school year, the Hearing Officer concludes that STUDENT does not meet ED eligibility under this criterion.

**(2) Does STUDENT Exhibit Inappropriate Types of Feelings or Behavior Under Normal**

42

### Circumstances?

Petitioner asserts that he exhibits inappropriate types of feelings and behavior under normal circumstances. MOTHER and STUDENT'S Mental Health therapists testified that STUDENT exhibits inappropriate types of behavior and feelings under normal circumstances. Their testimony was supported by Ms. DeBenedetto.

As to inappropriate feelings under normal circumstances, several of Petitioner's witnesses testified that STUDENT has an abnormal interest in death. MOTHER testified that STUDENT has recently been accessing websites of dead people. Although he primarily has shown interest in Aliyah and Tupac Shakur, entertainers who met untimely deaths, MOTHER testified that it is their morgue photographs that are of interest to STUDENT. MOTHER stated that STUDENT has downloaded these photos to hang on his bedroom walls. MOTHER testified that STUDENT once told her to hit a dog in the road rather swerve the car to avoid the dog. Dr. Hellwig testified that STUDENT has told him he wishes someone would kill him or that he wishes he were dead.

Through her testimony, Ms. DeBenedetto confirmed her concerns regarding STUDENT, which she had memorialized in a letter dated September 29, 2000. Ms. DeBenedetto listed multiple behaviors that she believed were dangerous to STUDENT or other students. Ms. DeBenedetto also observed a pattern of defiant and disrespectful behavior. However, Ms. DeBenedetto stated that what disturbed her most were things that STUDENT told her. Ms. DeBenedetto stated "once he laughed as he told me that he wanted to draw a picture of him putting nails in dead people. He visibly enjoyed telling me about his pet pit bulls and how they hurt people. He said he would laugh if someone he loves dies." In Ms. DeBenedetto's opinion, STUDENT'S emotional responses were alarmingly inappropriate. Ms. DeBenedetto stated that none of the recent assessors obtained information from her regarding STUDENT.

STUDENT'S therapists testified that STUDENT also exhibits inappropriate types of behavior under normal circumstances. Dr. Hellwig and Mr. Phipps testified that STUDENT is oversensitive to being evaluated or criticized by others, whether the criticism is real or perceived. Mr. Phipps testified that seemingly "out of the blue," STUDENT will have an outburst that is out of proportion to anything that has occurred. For example, Mr. Phipps testified that during a group session, STUDENT had an angry outburst in response to a seemingly benign discussion related to what the participants had done over the prior weekend.

Dr. Hellwig and Mr. Phipps opined that STUDENT'S behavior emanates from an underlying and profound sense of shame. They testified that STUDENT believes his "core" is a failure and that he is unacceptable. Dr. Hellwig also stated that STUDENT "labels himself as bad." As an example, Dr. Hellwig related that STUDENT believed the reason for his father's failure to come to his football practice after saying that he would was that there is something wrong with him. Another example of STUDENT'S belief that he is unacceptable occurred in response to his mother's speaking with a new neighbor regarding STUDENT'S taking medication for attentional problems. STUDENT had an outburst and stated that he "just wished someone would kill him." Dr. Hellwig testified that when STUDENT'S sense of shame is triggered, he acts out to protect himself. Dr. Hellwig testified that STUDENT is more vulnerable in a group, for example, at school, because he is dealing with multiple people.

The opinions of Dr. Hellwig and Mr. Phipps are memorialized in a letter to the District dated October 30, 2002. The letter is also signed by Stephen Fretz, LCSW, clinical supervisor, and Edgar Castillo, M.D., chief psychiatrist of Children's Community Mental Health. The letter reads in pertinent part that "it is also our impression that he does have underlying emotional issues, which seem to interfere at school, resulting in multiple suspensions. We do believe that these issues fall under ... 'inappropriate types of behavior or feelings under normal circumstances ... .'" Petitioner's Exhibit I, page 1.

The District asserts that STUDENT'S behavior at school, including aggression, defiance, and use of profanity, are learned behaviors that are supported by an environment embracing and rewarding such behavior. The District also asserts that STUDENT is socially maladjusted, which excludes him from special education eligibility. All of the District's witnesses testified that STUDENT does not meet special education criteria as ED. Mr. Jones and Ms. Moler testified that STUDENT can go through periods when he does not lose his temper. They described STUDENT as "very pleasant" at times when he is not being disciplined or questioned about his behavior. In support of the District's position that STUDENT'S behavior is learned, Ms. Moler testified that on one occasion MOTHER came to school and cursed at her in front of STUDENT and other students.

Mr. Christensen, who reviewed Dr. Glidden's assessment and analyzed STUDENT'S eligibility for special education, testified that STUDENT exhibits socially maladjusted behavior and is not ED. Mr. Christiansen testified that there are several aspects of STUDENT'S behavior that distinguish him from a student who is ED. First, there is a consistent trigger for STUDENT'S behavior. STUDENT wants to maintain control and, if he cannot, he acts out. Second, Mr. Christensen testified that most students identified as ED are likely to engage in excessive crying or withdrawal behavior. Finally, Mr. Christensen testified that STUDENT'S defiant and aggressive behavior and use of profanity are learned in an environment where those behaviors are "shared and rewarded."

Ms. Vasquez, who assessed STUDENT in 2000, also testified that STUDENT'S behaviors are related to social maladjustment and oppositional defiant behavior. Ms. Vasquez reviewed Dr. Glidden's assessment conducted in 2002 and testified that his findings are consistent with her conclusions. She testified that aggressive, destructive, and disrespectful behavior are learned and should be treated with parent training and implementation of a behavioral management system. Ms. Vasquez testified that she concluded STUDENT'S behaviors are learned because STUDENT externalizes rather than internalizes his emotions.

The District called Richard Morriss, Ph.D., as an outside expert witness. Dr. Morriss has been employed as a school psychologist for 38 years by the Monterrey Peninsula School District. Dr. Morriss reviewed assessments undertaken by Dr. Glidden, Mr. Christiansen, and Ms. Vasquez. Dr. Morriss concluded that STUDENT does not met ED criteria. Dr. Glidden testified that to meet the criterion related to inappropriate behavior, the student must exhibit bizarre, hallucinatory, delusional, or paranoid behavior, have crying or laughing jags, or experience severe mood swings. Dr. Morriss testified that STUDENT does not exhibit any of these behaviors. He also concluded that STUDENT'S behavior is not evidence of an emotional disturbance because it is consistently triggered by the same antecedents. Dr. Morriss testified that the diagnosis of ODD has clearly been established by STUDENT'S learned maladaptive behavior. Dr. Morriss testified that ODD "is excluded from special education criteria." Dr. Morriss further testified that the District has an obligation to not place ODD students in special education. Dr. Morriss testified that shame

44

is a normal emotion and does not rise to the level of an emotional disturbance.

The District's witnesses were uniform in their opinion that STUDENT is not ED. However, their testimony and results of assessments support finding that STUDENT does meet ED criteria. As to STUDENT'S disproportionate sensitivity and outbursts, STUDENT'S teacher, Ms. Moler, related several recent incidents that support the testimony of STUDENT'S therapists regarding STUDENT'S overreaction to normal activities. Ms. Moler testified that STUDENT had an outburst when he saw her speaking with Mr. Jones and mistakenly assumed that they were talking about him. STUDENT also has become upset after mistakenly assuming that conversations between Ms. Moler and another student were regarding STUDENT. Ms. Moler testified that STUDENT's last suspension began when he learned that two female students in his group had caused the group to lose several points. The classroom groups were engaged in a competition with the group earning the most points winning the competition. Ms. Moler stated that she tried to reassure STUDENT that the group already had earned sufficient points to win and that the loss of points would not result in any change to the outcome. Rather than listen to Ms. Moler, STUDENT called the students names, left, the class and the campus, and was described by Mr. Jones as being "out-of-control." Mr. Jones testified that STUDENT is "impossible to talk to while in one of his moods."

Dr. Glidden performed the most recent comprehensive assessment of STUDENT. He did not testify. The DSMIV diagnosis Dr. Glidden gave to STUDENT is limited to ADHD. However, some of Dr. Glidden's findings corroborate the testimony of Dr. Hellwig and Mr. Phipps regarding STUDENT'S core sense of shame. As reported by Dr. Glidden, the results of the Burks' Behavior Rating Scale using STUDENT'S mother and Ms. Walker, as informants, revealed similar areas of concern. They both identified significant elevations on subtests reflecting excessive sense of persecution, poor sense of identity, and poor ego strength.[7] Petitioner's Exhibit 8, page 13; Petitioner's Exhibit 18.

STUDENT'S teacher in the third grade, Sharon Walker, ranked STUDENT'S over sensitivity to criticism as a "serious problem." Petitioner's Exhibit 19, page 4. She also described him as "likeable until he loses control ... ." Petitioner's Exhibit 19, page 5. STUDENT'S social worker from the ALBA program wrote the following:

STUDENT appears to have severe emotional and behavioral problems coping with his low self-esteem.... Considering all the variable multiple behavior problems, this student may not be suitable for any school at this time and may require additional structure in a clinical mental health setting.

Petitioner's Exhibit 9, page 5.

Finally, Ms. Vasquez wrote in her report of December 2000 that "[STUDENT'S] high scores in the area of Emotional lability indicated STUDENT is prone more to emotional response than are normal such as crying or anger." Petitioner's Exhibit 6, page 7.

As to the District's assertion that STUDENT'S inappropriate behavior is learned rather than the result of emotional problems, the District's witnesses had very little, if any, information regarding STUDENT'S family life and none had visited his home. The only testimony in support of this assertion was that STUDENT'S mother had used inappropriate language at school on one occasion when she was upset. MOTHER testified that none of her other

children, including STUDENT'S twin, experience the same behavioral problems STUDENT does.

The District's assertion that STUDENT'S behavior must either be bizarre (or withdrawn) to meet the ED criteria also fails. First, neither federal nor State special education law imposes this requirement. Second, there was credible testimony regarding STUDENT'S unusual interest, feelings, and conversations related to death and dying. STUDENT is in the fourth grade, and no one refuted testimony that STUDENT'S serious interest in death and his expressed desire that someone kill him constitute aberrant behavior and feelings for a fourth-grade student.

In summary, the testimony of STUDENT'S mental health therapists that STUDENT exhibits inappropriate feelings and behavior under normal circumstances was persuasive and is supported by the testimony and written documentation discussed above. Petitioner's witnesses also testified persuasively that STUDENT has an underlying emotional basis for both his inappropriate feelings and behavior. The Hearing Officer finds persuasive the testimony of Dr. Hellwig and Mr. Phipps. Both have provided STUDENT'S therapy consistently for the last year and one-half. They have gleaned information from weekly sessions with STUDENT over that entire period of time. Both formerly were employed by the District in a program for students with emotional disturbances and are familiar with students meeting ED criteria.

On the other hand, Ms. Vasquez assessed STUDENT two years ago and last saw him in the spring of 2001. Thus, while her assessment provides information as to STUDENT'S status at that time, Dr. Hellwig and Mr. Phipps have more contemporary information regarding STUDENT'S emotional status. Mr. Christiansen reviewed recent assessments but has not worked with STUDENT this school year. Mr. Christiansen has not assessed STUDENT. Dr. Morriss has extensive experience as a school psychologist. However, the Hearing Officer does not find Dr. Morriss's testimony persuasive. Dr. Morriss has never met STUDENT. Additionally, Dr. Morriss relied heavily on his expressed bias that children with ODD rarely, if ever, are eligible for special education, apparently irrespective of any other qualifying diagnosis. His testimony was based less on information regarding STUDENT, special education definitions, or research-supported studies than on his self-published editorial articles. *See* Respondent's Exhibit 12.[8]

Regarding the District's assertion that STUDENT is precluded from special education eligibility for special education as ED because he has an ODD or is socially maladjusted, the federal definition of ED does not exclude a student who is socially maladjusted as eligible for special education if the student is determined also to have an emotional disturbance. 34 C.F.R. ? 300.7 (c)(4)(ii). Thus, STUDENT is not excluded from meeting ED criteria.

In conclusion, the Hearing Officer finds that STUDENT meets ED criteria because of inappropriate feelings and behavior under normal circumstances. To be eligible for special education, STUDENT must also exhibit the ED characteristics to a marked degree and for a long period of time, his education must be negatively affected, and he must require instruction or services that cannot be met with modification to the regular education program.

**Has STUDENT Exhibited ED Characteristics to a Marked Degree and For a Long Period of**

**Time?**

MOTHER and Dr. Hellwig testified regarding the extent of STUDENT'S emotional difficulties. Dr. Hellwig stated that STUDENT'S difficulties affect his interpersonal relationships at home and with his extended family. Dr. Hellwig testified that he suggested MOTHER arrange for STUDENT to spend time in activities with his cousins. These get-togethers proved to be difficult as STUDENT could not get along with the others. MOTHER testified that STUDENT'S emotional and behavioral problems have affected the home. The family split up and STUDENT constantly is in turmoil with his siblings. MOTHER testified that STUDENT'S behavior affects him in the community. She testified that STUDENT'S participation in various community activities including PAL football as "short-lived" because of STUDENT'S outbursts and inability to control himself or get along with peers and leaders. MOTHER testified that she has been told by her church that she must be with STUDENT at all times or he cannot attend. Additionally, as discussed above, STUDENT has exhibited difficulties at school that have resulted in his being placed in a special program, ALBA, and in his being suspended multiple times. Therefore, the Hearing Officer concludes that STUDENT exhibits ED characteristics to a marked degree.

Special education law does not specify the period of time that constitutes a "long period." Mr. Christiansen testified that a long period is at least two years.[9] STUDENT'S problematic behavior and feelings have been evident at home and at school for several years. MOTHER testified that STUDENT has exhibited the behavioral problems described above since at least 2000. Ms. DeBenedetto's concerns were expressed in 2000, as well. Finally, STUDENT'S therapists identified him as eligible for Mental Health services because of his emotional difficulties and behavioral problems in August 2001. Therefore, the evidence establishes that STUDENT has exhibited inappropriate feelings and behavior for a long period of time.

**Have STUDENTS ED Characteristics Adversely Affected His Education?**

Petitioner asserts that his ED characteristics have resulted in multiple exclusions from school, thereby, adversely affecting his education. The District asserts that STUDENT has received average scores on measures of academic achievement demonstrating that he is benefitting from his education. Dr. Morriss testified that STUDENT is making appropriate achievement despite not being productive in class and does not demonstrate any skills deficits. Ms. Moler testified that STUDENT is a little behind in writing and has some difficulty putting words on paper. He passed level-four reading and is functioning at the mid-third-grade level in mathematics.

At one point, STUDENT was excluded from the general education class at the comprehensive elementary school and placed in ALBA. STUDENT'S recent behavior at school, as well as his behavior the prior school year, has resulted in multiple suspensions. *See e.g.* Petitioner's Exhibits 23 and 24. STUDENT'S mother has also been asked to pick him up from school before the end of the school day. Thus, STUDENT has been excluded from school because of his ED characteristics. He presumably is missing valuable instruction in subject areas while he has been suspended. There is no dispute that STUDENT is of average intelligence. Yet his grades, which were discussed in the background facts above, are very poor and he is failing or in danger of failing multiple subjects this current school year. His grades last year also consisted of many Ds and Fs. Petitioner's Exhibit 13. Additionally, STUDENT is missing out on opportunities to develop

social skills when he is not in school. It is well documented that STUDENT'S social skills are deficient. The Hearing Officer finds that the above evidence establishes that STUDENT'S ED characteristics adversely affect his education.

A finding that STUDENT meets ED criteria is insufficient to designate him eligible for special education. STUDENT must also require instruction, services, or both, which cannot be provided with modification of the regular school program.

### Does STUDENT Require Instruction or Services that Cannot Be Met with Modification to the Regular Education Program?

Petitioner asserts that he requires instruction and services that cannot be met with modification to the regular education program. The District asserts that STUDENT'S 504 Plan sufficiently address his needs.

For the past two years, the District has attempted to address STUDENT'S needs with a 504 Plan. The District has also implemented multiple behavior plans that have not been successful, as evidenced by STUDENT's ongoing difficulties at school. Notwithstanding implementation of the 504 Plan and multiple behavioral plans, the evidence establishes that STUDENT has poor grades and has been excluded from school multiple times. It should be noted that STUDENT'S 504 Plan significantly reduces the amount of homework STUDENT is required to do, so his grades are not a result of the failure to complete homework assignments. According to Ms. Moler, she has lessened or reduced his homework to almost nothing.

Additionally, no one persuasively disputed Dr. Hellwig's testimony that STUDENT requires a structured class with a small student-to-teacher ratio. Dr. Hellwig stressed the importance of, first, undertaking a comprehensive behavioral assessment of STUDENT, second, developing a comprehensive behavioral plan based on the assessment, and finally, increasing interagency collaboration. Dr. Hellwig also testified persuasively that it is important for Mental Health, the District, and STUDENT'S mother to collaborate to address STUDENT'S needs consistently across home, school, therapy, and community environments. STUDENT also requires someone to assist him at school to assess what externally triggers his actions and to process with STUDENT after an incident to help him understand internal antecedents. The Hearing Officer finds Dr. Hellwig's recommendations are necessary for STUDENT to access his instruction and that his recommendations constitute more than mere modifications to the regular education program.

To summarize, STUDENT meets eligibility criteria for ED because he has exhibited unusual feelings or behaviors under normal circumstances to a marked degree and for a long period of time. Additionally, STUDENT'S education has been adversely affected and he requires special education.

### (b) Does STUDENT Meet Eligibility Criteria For Special Education as Other Health Impaired (OHI)?

Petitioner contends that he meets special education eligibility under the category of other health impaired (OHI) because he has a attention deficit hyperactive disorder (ADHD) that results in limited alertness. Because it has been determined above that STUDENT is eligible for special education as ED, it is unnecessary to determine whether he also meets eligibility criteria as OHI. The District is responsible for developing an IEP and providing

instruction and services designed to meet all of STUDENT'S needs arising from his disability. *See e.g.* Cal. Educ. Code ?? 56345 and 56363.

## Issue No. 2: If STUDENT Was Eligible For Special Education as of October 1, 2002, Has Respondent Fresno Unified School District Offered Him a Free Appropriate Public Education (FAPE)?

Under both State law and the federal Individuals with Disabilities Education Act (IDEA), students with disabilities have the right to a free appropriate public education (FAPE). 20 U.S.C. ? 1400(d); Cal. Educ. Code ? 56000. The term "free appropriate public education" means special education and related services that are available to the student at no charge to the parent or guardian, that meet the State educational standards, and that conform with the student's individualized educational program (IEP). 20 U.S.C. ? 14018. In *Board of Education of the Hendrick Hudson Central School District, et.al v. Rowley* (1982) 458 U.S. 175, the United States Supreme Court determined that to receive a FAPE, the student's individualized educational program (IEP) must be designed to meet the unique needs of the student and reasonably calculated to provide the student with some educational benefit.

It has been determined above that STUDENT is eligible for special education as ED and that because of his ED, he requires special education instruction and services. STUDENT does not have an IEP and the District has not offered special education services to him. Thus, the District has not offered STUDENT a FAPE. The District must convene an IEP meeting to develop an appropriate IEP and to determine STUDENT'S necessary special education program, placement, and services.

## Order

Within 15 calendar days of the date of this decision, the District shall (a) convene an IEP team to develop an individualized educational program (IEP) for STUDENT and (b) offer STUDENT a FAPE, including special education services and placement. The District shall invite STUDENT'S current mental health providers to participate in the IEP meeting.

## Prevailing Party on Each Issue

Pursuant to Education Code section 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this statute: Petitioner prevailed on the issues heard and decided.

## Right to Appeal this Decision

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety (90) days of receipt of this Decision. Cal. Educ. Code ? 56505(i).

[1]The services STUDENT receives from Mental Health are not provided pursuant to the interagency agreement between the California Departments of Education and Mental Health.

[2]The District employed alternative means to evaluate STUDENT'S cognitive functioning

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=103+LRP+8...   2/14/2008

because the District does not administer intelligence tests to its African-American students pursuant to the decision in *Larry P. v. Riles* (N.D.Cal 1979) 459 F. Supp. 926 *aff'd in part, rev'd in part,* (9th Cir. 1986) 793 F.Supp. 969, and by State policy.

[3]MOTHER waived timelines for completion of the assessment.

[4]Mr. Christensen's report is entitled "Psycho-Educational-Report Addendum."

[5]The hearing was designated as "expedited " because the District has proposed to expel STUDENT and it was determined that the District is deemed to have a basis of knowledge that STUDENT was a child with a disability under 20 U.S.C. ? 1415(k)(8). Therefore, he is entitled to the procedural protections of the IDEA.

[6]Socialization subdomains measured by the Vineland include interpersonal relationships, play and leisure time, and coping skills.

[7]The similarly identified concerns related to poor academics, poor attention, poor impulse control, poor anger control, excessive resistance, excessive withdrawal, and poor social conformity.

[8]Dr. Morriss testified that he is the sole employee of Village Press Publications. His resume identifies many articles published by Village Press. The article contained in Respondent's Exhibit 12 provides no factual basis or research study in support of conclusions he makes in the article such as " [if an ODD student is placed in a special education class], the parent and child are nonprotected under the guidelines of state and federal Special Education law. Discipline often becomes a central issue, especially for the student with ODD who lives with a hostile parent who made him that way. The ODD student who becomes dangerous to himself and others can figuratively, and in some cases literally be given permission 'to load their gun' under the cover of Special Education.'"

[9]There is no basis in the law for requiring a student with emotional problems to wait for such a long period of time to establish special education eligibility. To so require would likely result in irreparable harm to the student.

**Statutes Cited**

**20 USC 1401(3)(A)**
**20 USC 1415(k)(8)**
**20 USC 1400(d)**
**20 USC 1401(8)**

**Cases Cited**

**459 F.Supp. 926**
**458 U.S. 176**

**Copyright 2008 © LRP Publications**