**36 IDELR 185**
102 LRP 9294

### VENUS INDEPENDENT SCHOOL DISTRICT, Plaintiff, v. DANIEL S., b/n/f RON and PATRICIA S., Defendants.

## U.S. District Court, Northern District of Texas

### 3:01-CV-1746-P

### April 11, 2002

## Related Index Numbers

27. ATTENTION DEFICIT DISORDERS (ADD/ADHD)
175.002 Attention Deficit Disorders
175.040 Other Health Impairment
175.050 Serious Emotional Disturbance
445.010 Eligibility Criteria

## Case Summary

The court affirmed an IHO's decision that the student was IDEA-eligible under the categories of SED and OHI. Although his academic performance was well above average, evaluations completed by his teachers revealed significant levels of oppositional behavior and problems with hyperactivity, restlessness and impulsivity. The behavioral difficulties clearly affected his overall educational performance at school, the court stated. When the district received results of an evaluation diagnosing ADHD, it should have realized the student's emotional and attention issues had risen to clinically significant levels. With over 20 in- and out-of-school suspensions, the student's behavior was a constant challenge to himself, his teachers and his parents. His persistent refusal to do his homework and his disrespectfulness toward the school staff ultimately led to an IAES placement. Despite the student's academic success, he could benefit for special education services in the form of counseling, social skills training and a BIP to address the types of persistent misbehavior that resulted in his removal from the classroom.

## Judge / Administrative Officer

Jorge A. Solis, U.S. District Judge

## Full Text

COUNSEL:

For VENUS INDEPENDENT SCHOOL DISTRICT, plaintiff: William M Buechler, Attorney at Law, Cynthia S Buechler, Attorney at Law, Buechler & Associates, Austin, TX USA.

For RON S., and Patricia S., defendants: Myrna B Silver, Attorney at Law, Law Office of Myrna B Silver, Dallas, TX USA.

## Opinion and Order

51

Now before the Court are the following:

1. Plaintiff Venus Independent School District's Motion for Judgment as a Matter of Law, with an appendix, filed January 30, 2002;

2. Defendants' Response to Plaintiff's Motion for Judgment as a Matter of Law and Brief in Support, with an appendix, filed February 19, 2002;

3. Plaintiff Venus Independent School District's Reply to Defendant's (sic) Response to Plaintiff's Motion for Judgment, filed March 11, 2002;

4. Defendants' Motion for Summary Judgment, with brief in support and appendix, filed January 30, 2002;

5. Plaintiff Venus Independent School District's Response to Defendants' Motion for Summary Judgment, with brief in support and appendix, filed February 19, 2002;

6. Defendant's (sic) Reply to Plaintiff's Response to Defendant's (sic) Motion for Summary Judgment and Brief in Support, with appendix, filed March 6, 2002; and

7. Defendant's (sic) Motion to Strike Plaintiff's Late Filed Reply Brief and Memorandum in Support, filed March 28, 2002.

After a thorough review of the entire case file, the administrative record, the parties' briefs, and the applicable law, for the reasons set forth below, the Court is of the opinion that Plaintiff's Motion for Judgment as a Matter of Law should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED. Further, the Court is of the opinion Defendants' Motion to Strike Plaintiff's Reply should be DENIED.

### Background

This case arises under the Individuals with Disabilities Education Act ("IDEA" ), 20 U.S.C. 1400*et seq.* (2000 & Supp. 2001). In this action Plaintiff Venus Independent School District ("VISD") seeks declaratory and injunctive relief, as well as an order reversing the decision of a State of Texas Special Education Hearing Officer ("Hearing Officer"), finding that Defendant Daniel S. should have been classified as a student with other health impairment and/or serious emotional disturbance, and was a student in need of special education within the meaning of the IDEA.

Daniel S. is currently a seventh grade student residing within the VISD, and during the 2000-2001 school year attended the sixth grade at the Venus Middle School. PL's Orig. Compl. at 2. Daniel lives with his parents Ron and Patricia S., both full time computer consultants who served as next friends of Daniel during the administrative proceedings, as well as an older sister who also attends a VISD school. *Id.*

By all accounts, Daniel is an intellectually gifted student with a full performance IQ level of approximately 137. *Id.* Unfortunately, Daniel is also a student with a history of behavior problems at school. Before he and his family moved to Venus, Daniel attended a school in Arlington, Texas. *See* Decision of Hearing Officer ("Hr'g Order") at 3 (Administrative Record "AR," Vol. I at 6). A 1995 evaluation performed by the Arlington Independent School District

("AISD") found Daniel to have anxiety and Attention Deficit-Hyperactivity Disorder ("ADHD"). *Id.* Daniel's pediatrician, Dr. Carlson, placed him on Ritalin to address those problems. *Id.* However, the use of Ritalin was discontinued when Daniel entered VISD, due to longstanding issues of appetite and afternoon "drug wash out." *Id.*[1]

The record in this case reflects that Daniel had a number of behavioral problems and discipline referrals during the fifth grade. *Id.* In September 2000, Daniel's parents initiated a referral under Section 504 of the Americans with Disabilities Act, for behavior he had exhibited during the 1999-2000 school year. *Id.* The "504 Committee" at VISD determined that Daniel was not eligible for services under Section 504 because he did not demonstrate an "educational need" in that he was making good grades and did not appear to have learning problems *per se. Id.*

Discipline records also show that during the fall semester of the 2000-2001 school year, Daniel engaged in a number of disruptive behaviors at school, including: he picked up another student by the ears; blew drool through his pen onto an art table; talked or acted out during classes; stood up and danced during class; made noise during class; ran through the hall; talked and ran around the room; told a substitute teacher "I hate teachers"; used profanity in a note; used offensive language toward school personnel; refused to follow directions; wadded up a discipline referral note following a conference with the principal; laughed out loud in class; and read a magazine instead of doing schoolwork. *See* Hr'g Order at 4 (AR, Vol. I at 7); *see also* generally Petitioner's Hearing Exhibits (AR, Vol. III at 109-164). In addition, Daniel also painted his nose with black paint; yelled at a teacher; refused to follow bus driver directions; poured salt and pepper into another student's milk; failed to remain in his assigned seat; wandered around the classroom without permission; goofed off and failed to complete work; stood up in his chair; dropped books; and used a rubber band to shoot a pencil at another student. *See* Hr'g Order at 4 (AR, Vol. I at 7). In all, from August 2000 to January 2001, Daniel had five referrals for insubordination, three for gross acts of disrespect, two for mild acts of disrespect, one for excessive conduct marks, and one for fighting with another student. *Id.* Moreover, his conduct report show Daniel was given five one-to-three day suspensions and twelve in school suspensions ("ISS") during this time period. *Id.; see also* Petitioner's Hearing Exhibits (AR, Vol. III at 152-154).

Thereafter, sometime in October of 2000, Daniel's parents requested that Daniel be referred for special education. The VISD initiated a comprehensive individual assessment ("CIA") of Daniel on October 5, 2000, collecting various sociological, health, and behavioral-type information. Hr'g Order at 4 (AR, Vol. I at 7). In addition, a multi-disciplinary team from the Johnson County Special Education Co-op ("Co-op") conducted an educational evaluation and found that Daniel did not qualify for special education as a student with a learning disability. *Id.; see also* AR, Vol. III at 554-565 (Comprehensive Individual Assessment Report).[2]

Also as part of this CIA examination, Dr. Robert Hansen, a licensed psychologist, conducted a psychological evaluation of Daniel on November 28, 2000. Hr'g Order at 4 (AR, Vol. I at 7); *see also* generally AR, Vol. III at 198-209 (Hanson Report). In his analysis, Dr. Hanson concluded that Daniel did not meet IDEA eligibility for special education support services as a "seriously emotionally disturbed student," or that there was an "academic need" for such support services. *See* AR, Vol. III. at 200. However, in reaching this conclusion, Dr. Hanson did find that Daniel readily endorsed the symptom cluster established in the DSM-IV for ADHD, though he stated also a provisional diagnosis of

53

Oppositional Defiant Disorder ("ODD") seemed warranted. See Id.

Dr. Hanson emphasized that Daniel was currently obtaining passing grades but with occasional and short-lived failure experiences in varied classes as a result of homework noncompliance. See Id. As such, Dr. Hanson recommended a need for organizational instruction from both school personnel and family members in order to develop academic self-reliance. See Id.

Dr. Lisa Elliot, together with her assistant Lance Garrison, also evaluated Daniel sometime in December of 2000 at the request of Daniel's parents and upon recommendation from Dr. Carlson, Daniel's pediatrician. Hr'g Order at 4 (AR, Vol. I at 7); see also generally AR, Vol. III at 187-191 (Elliot Report). In her report, Dr. Elliot found that Daniel was a child with mild to moderate deficits in attention, as well as peer relational and school difficulties, characterized by verbal and at times physically aggressive behavior. See AR, Vol. III at 189. These problems, she concluded, led to significant difficulties functioning effectively in school and with peer relations. Id. Dr. Elliot also stated that: "although Daniel exhibits some deficits in attention, they are not such that they can adequately explain his current behavioral difficulties. Daniel appears to be a very bright child as was evident in his ability to converse at a high level with the examiner and was his teacher's impressions. This, with his statement of schoolwork being hard to get into, may suggest he is not being adequately challenged." Id.

In her findings, Dr. Elliot also suggested that Daniel appeared to experience considerable anxiety and intrusive ideation regarding his difficulties at school, noting that "the lack of sufficient remedy provided by the school, his impulse control difficulties, and poor peer relations have made adequate adjustment emotionally and behaviorally difficult. Such ongoing difficulties put him at risk of developing clinically significant level of depression and more severe anxiety problems, which could further impair him socially, emotionally, and academically." Id. Nevertheless, Dr. Elliot concluded that, though the results of the various tests performed were consistent with and supported the observations of Daniel's parents that he had attention deficits, multiple teacher reports and the behavioral observations made during her evaluation suggested no significant attention deficits. See AR, Vol. III at 190. As such, "the results suggest that while he likely has some difficulty sustaining attention, these difficulties do not meet necessary criteria to consider a diagnosis of Attention Deficit Hyperactivity Disorder." Id. Dr. Elliot noted that likely remedies included a combination of social skills training, short-term individual psychotherapy, and the collaborative development of a clearly defined behavior management plan based on principles of positive reinforcement. Id.

Thereafter, an Admission, Review, and Dismissal ("ARD") Committee meeting was held on January 10, 2001, to review the results of the various assessments and to discuss Daniel's eligibility for special education services. Hr'g Order at 5 (AR, Vol. I at 8); see generally AR, Vol. III at 514-517 (January ARD Committee Brief). The ARD meeting was later reconvened to January 23, 2001. See generally AR, Vol. III at 518-521.[3] The Committee found that Daniel had passed his TAAS test with academic recognition in reading, and though he had made one or two C's each reporting period, he normally made mostly A's and B's. AR, Vol. III at 518. Thus, school personnel found that Daniel did not qualify for special services under either the Other Health Impaired ("OHI") or Serious Emotional Disturbance ("SED") categories, nor that Daniel exhibited an " educational need" for such services. Hr'g Order at 5 (AR, Vol. I at 8). Daniel's parents felt otherwise.

54

Meanwhile, during this time period, Daniel's pediatrician provided the necessary documentation to support Daniel's classification as an OHI student based upon a diagnosis of ADHD. *Id.*; *see also* AR, Vol. III at 192. However, Dr. Carlson neglected to list any of the "functional implications" listed on the school district's OHI form. *Id.* As such, the Hearing Officer found this was a factor in the ARD Committee's decision that Daniel did not "need" special education services as a student with OHI. *Id.*

On January 5, 2001, Daniel was placed in the school district's Alternative Education Placement ("AEP") for persistent misconduct and violations of the VISD's code of conduct.[4] *Id.* The AEP placement basically arose out of Daniel's persistent refusal to do his schoolwork, and for speaking disrespectfully to authority figures during the fall semester. *Id.*; *see also* AR, Vol. II at 512-513 (Angela Bailey Testimony).[5] Daniel's parents vigorously protested the implementation of this AEP placement.

At first, Daniel challenged his AEP teacher and the classroom limits, and was initially oppositional, defiant, and resistant to doing his school work. Hr'g Order at 5 (AR, Vol. I at 8). However, after the first two weeks, his behavior began to improve. *Id.* Ultimately, he did very well in the AEP, with a few minor infractions here and there. *Id.* In fact, by the end of his AEP term, Daniel was completing assignments and behaving appropriately, his attitude had improved, and his AEP teacher described him as "cooperative." *Id.* Also at this time, Daniel had resumed a medication regimen (a daily dose of 36 milligrams of Concerta), similar to Ritalin but without the attendant side effects. Hr'g Order at 5-6 (AR, Vol. I at 8-9).

Upon his return from the AEP after 30 days in the program, Daniel's teachers reported that he appeared to make an extra effort to cooperate and stay out of trouble. Hr'g Order at 6 (AR, Vol. I at 9). Though he continued to be "rambunctious" and "free spirited," he now appeared to be more respectful and better able to "catch himself" in order to comply with school rules and understand the consequences for not following them. *Id.* There was also a significant decrease in the number of discipline referrals made by his teachers after Daniel's return from the AEP -- a total of only three. *Id.* In her decision, the Hearing Officer noted that although Daniel continued to exhibit some noncompliant behavior, such as failing to turn in work and/or refusing to complete assigned work, his parents were supportive and very helpful in ensuring that Daniel's work was turned in when they were notified. *Id.*

Meanwhile, as a result of the disagreements between school personnel and Daniel's parents over Daniel's placement in the AEP and their disagreements at the January ARD meetings, Daniel's parents filed a request for hearing. Hr'g Order at 7 (AR, Vol. I at 10). While the hearing was pending, the Hearing Officer ordered the parties to collaborate and design a Behavior Intervention Plan ("BIP") which the school district would implement upon Daniel's return to middle school from the AEP. *Id.* Unfortunately, the parties could not agree on a BIP as Daniel's parents rejected the VISD officials' first draft for being primarily punitive. *Id.* However, after a few modifications were made, a BIP plan was approved and presented to Daniel's teachers, who then implemented it for the remainder of the spring semester of his sixth grade. *Id.*

In addition, also while the case was still pending, the parties agreed to submit Daniel to an independent educational evaluation ("IEE"), conducted by Dr. Ray Austin and Mary Crouch in March of 2001. *See* Hr'g Order at 7 (AR, Vol. I at 10); *see also* generally AR, Vol. III at 500-509 (Ray Report). In his findings Dr. Austin noted that, at the time of his examination, Daniel was exhibiting "significant symptoms of both an anxiety and depressive disorder."

*See* AR, Vol. III at 508. Among the indicators were Daniel's psychosomatic symptoms, his worry about school, his significant mood fluctuations, difficulties with sleep, increase in weight, loss of interest in daily activities, ruminative thinking, decreased energy level, and crying spells. *Id.* Dr. Austin also found Daniel to display significant difficulties with attention and concentration, as well as restless and impulsive behavior, representing a longstanding history that varied from the "at risk" to "clinically significant" ranges. *See* AR, Vol. III at 507-508.

According to Dr. Austin, Daniel was also found to have difficulties with organization throughout the sixth grade. AR, Vol. III at 507. Several events took place within the past year and a half that appeared to have taxed Daniel's capacity to cope, among these his best friend moving away, the move to a new town and school, the departure of a significant care giver, and the transition to the more complex environment of middle school. *Id.* Thus, in Dr. Austin's opinion, these attention deficits, as well as the difficulties with processing complex or ambiguous situations, made Daniel particularly vulnerable to psychological distress and made him exhibit significant difficulty with impulsive control and perceiving social situations in a realistic fashion. *Id.* In all, making it more difficult for Daniel to develop and maintain appropriate peer relationships and to avoid and resolve conflicts when they occurred. AR, Vol. III at 508.

Dr. Austin concluded that, based on the results of the rating scales completed by Daniel's parents and teachers, as well as other qualitative observations made during the examination, Daniel's problems with attention, concentration, restlessness and impulsive behavior, though they did not concisely fit within all of the characteristics for the inattentive and combined types of ADHD, were nonetheless of clinically significant levels and had elements of each. *See* AR, Vol. III at 508. As such, Dr. Austin recommended that Daniel receive more emotional support at school; specifically, the availability of a school counselor whom he could rely on when stressful situations arose at school. *Id.* He also recommended individual psychotherapy, implementation of a behavior plan in school to address Daniel's problems with compliance, oppositionality and aggression, as well as modifications in his academic environment to reduce the amount of stimuli cognitively and socially. AR, Vol. III at 509.

Following this evaluation, the ARD Committee met again on May 11, 2001, to review the report submitted by Dr. Austin as an IEE recommendation. *See* AR, Vol. III at 524-527 (May ARD Committee Brief). The Committee, however, once again found no educational need for Daniel to receive special education. AR, Vol. III at 525. Among its findings, the Committee noted that the general teacher reports stated that Daniel was participating in class and adding a great deal to the classroom discussions, though occasionally he still did fail to turn in work assignments. *Id.* at 524. Daniel also was making good grades in his classes, was on the A/B honor roll, and had recently performed very well in a talent show in front of 400 students (the only sixth grader to perform). *Id.*

The ARD Committee minutes reflect that Daniel's parents were primarily concerned, not with Daniel's academic performance at the time, but that his learning was being affected by his inconsistent behavior in class. *See Id.* at 525. The Committee, however, found Daniel's behavior tended to be typical of his age appropriate peers, and that he was easily redirected to appropriate conduct. *Id.* at 524-525. Moreover, since returning from AEP, his principal had reported only two office referrals. *Id.* at 524. Thus, the ARD found that if Daniel could be successful in the general student population and remain educationally successful, he would not be able to be served in the special education population. *Id.* at

525. The Committee also held that Daniel was already receiving counseling and a behavior plan as part of the regular education process, and his maturity was being credited by the school staff for his most recent successes. *Id.*

Daniel's father disagreed with the Committee's findings, believing that recent changes noted in Daniel's behavior were due to the fact that the school had removed much of the pressure placed on him by simply ignoring many of his negative behaviors. *Id.* at 527. He also alleged that Ms. Bailey had told him the day Daniel returned from suspension that she had instructed the teachers to "back off" on making Daniel complete his work at school, a statement which she denied before the ARD Committee. *Id.* Mr. S also disagreed that Daniel was put in isolation to facilitate completing his homework, as Ms. Bailey had alleged, but because of his disruptions. *Id.*

Thereafter, Daniel's parents filed for an administrative due process hearing under the IDEA. The hearing was held on June 14-15, 2001. *See* AR, Vol. II at 1-564 (Hearing Transcript). On July 26, 2001, the Hearing Officer rendered her decision in this case, holding that the VISD should have classified Daniel as a student with other health impairment and/or serious emotional disturbance beginning in March 2001 as a student in need of special education within the meaning of IDEA. *See* Hr'g Order at 14 (AR, Vol. I at 17). The Hearing Officer also held that the school district's disciplinary action in placing Daniel in AEP was appropriate under IDEA, and that the BIP implemented in the spring 2001 was appropriate and provided Daniel with the requisite educational benefit within the meaning of the Act. *See* Hr'g Order at 14-15 (AR, Vol. I at 17-18).

The VISD now appeals the Hearing Officer's Order, seeking a reversal of these findings -- namely that Daniel did not qualify for services under the IDEA. *See* Pl's Mot. for Judg. as Matter of Law at 7. Daniel's parents, meanwhile, ask this Court to sustain the administrative officer's decision that Daniel qualified for services under IDEA. *See* Def.'s Br. Supp. Mot. Summ. J. at 19.[6] Each of these arguments will be considered in turn.

### Discussion

### I. Standard of Review

The standard of review under which this Court must consider the Plaintiff's challenge to the administrative officer's decision differs from that governing the typical review of summary judgment outlined in *Anderson v. Liberty Lobby,*477 U.S. 242, 249 (1986) and *Celotex Corp. v. Catrett,*477 U.S. 317, 322 (1986). *See Heather S. v. State of Wisconsin,*125 F.3d 1045, 1052 (7th Cir. 1997); *see also Sylvie M. v. Bd. of Ed. of Dripping Springs Indep. Sch. Dist.,*48 F.Supp. 2d 681, 694 (W.D. Tex. 1999). Under the IDEA, "any party aggrieved by the finding and decision made [by a hearing officer following an impartial due process hearing], shall have the right to bring a civil action with respect to the complaint presented ... without regard to the amount in controversy." 20 U.S.C. ? 74/5(i)(2)(A), (3) (2000). In any such action, the court shall (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request of a party; and (iii) grant such relief as it determines appropriate based upon the preponderance of the evidence. *See*20 U.S.C. ? 1415(i)(2)(E) (2000).

The provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notion of sound

educational policy for those of the school authorities which they review. *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., v. Westchester Cty. v. Rowley,* 458 U.S. 176, 206 (1982) . This is so because the requirement that the court also "receive the records of the [state] administrative proceedings" carries with it the implied requirement that "due weight" be given to these proceedings. *Id.* This "due weight" which the court must give to the hearings below is not to the testimony of witnesses or to the evidence -- both of which the court must independently evaluate -- but to the decisions of the hearing officer. *See Heather S.,* 125 F.3d at 1053.

The IDEA, however, does not require that the district court defer to the administrative officer's findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts. *See Teague Indep. Sch. Dist. v. Todd L,* 999 F.2d 127, 131 (5th Cir. 1993). The court must ultimately reach an independent decision based on a preponderance of the evidence. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 252 (5th Cir. 1997) (emphasis added). Therefore, the district court's review of a hearing officer's decision is one "virtually *de novo*." *See Teague,* 999 F.2d at 131; *see also Cypress-Fairbanks,* 118 F.3d at 252 ("Given its adducing of new evidence, even evidence of matters that have occurred since the administrative hearing under review, the district court proceeding under the IDEA is a hybrid, akin to a 'trial *de novo'*").

Within this framework, the burden of proof remains on the Plaintiff as the party challenging the ruling of the administrative hearing officer. *See Natchez-Adams Sch. Dist. v. Searing,* 918 F.Supp.1028, 1032 (S.D. Miss. 1996) (citations omitted).

## II. Defendants' Motion to Strike Plaintiff's Late Filed Reply

As a preliminary matter, the Court considers Defendants' Motion to Strike Plaintiff's Reply filed on March 11, 2002. Defendants argue that under Local Rule 7.1(f), "unless otherwise directed by the presiding judge, a party who has filed an opposed motion may file a reply brief within 15 days from the date the response is filed." *See* Mot. to Strike PL's Reply at 2. Having filed their Response to Plaintiffs Motion for Judgment as a Matter of Law on February 12, 2002, Defendants assert that Plaintiff's deadline to file a reply brief in this case was March 6, 2001, thus exceeding the deadline by five (5) days. VISD did not submit a response to Defendants' motion in order to provide a reason for its tardiness.

A decision to allow a party to supplement the record is within the court's discretion. *See Nat'l Gypsum Co. v. Prostok,* No. CIV. A. 3:98-CV-0869-P, 2001 WL 1499345 (N.D. Tex. Oct. 5, 2000) (Solis, J.); *see also Rollins v. Fort Bend Indep. Sch. Dist.,* 89 F.3d 1205, 1222 (5th Cir. 1996) (applying this discretion in the context of supplementation under Rule 59(e) or 60(b)). Finding Plaintiff's Reply to be useful in this case, and that Defendants have suffered no prejudice as a result of Plaintiff's late filing, the Court exercises its discretion to allow VISD to supplement the record. As such, the Court shall DENY Defendants' Motion to Strike Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Judgment.

## III. What is Required under the IDEA

Originally codified as the Education for All Handicapped Children Act ("EAHCA") of 1975, the IDEA was designed to encourage state and local education agencies to extend services to those children deemed learning disabled. *See Houston Indep. Sch. Dist. v. Booby R.,* 200 F.3d 341, 345 (5th Cir. 2000). Being a local education agency responsible for complying

with the IDEA as a condition of the State of Texas' receipt of federal funding, the statute requires the VISD (1) to provide each disabled child within its jurisdictional boundaries with a "free appropriate public education," and (2) to assure that such education is offered, to the greatest extent possible, in the education mainstream; that is, side by side with non-disabled children, in the least restrictive environment, consistent with the disabled student's needs. *See Cypress-Fairbanks,* 118 F.3d at 245 (citing 20 U.S.C. ?? 1400(c), 1412(a)(1), (5)); *see also Teague,* 999 F.2d at 128.

The "free appropriate public education" that a disabled student is entitled to receive under the IDEA must be tailored to his particular needs by means of an individualized educational program ("IEP"), prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and when appropriate, the child himself. *Cypress-Fairbanks,* 118 F.3d at 245.[7] In Texas, the persons charged with preparing the IEP are known collectively as an Admissions, Review and Dismissal Committee ("ARD Committee"). *Id.*

The "free appropriate public education" tailored by an ARD Committee and described in an IEP, however, need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction. *Id.* (citing *Rowley,* 458 U.S. at 188-189). In order words, the IDEA guarantees only a "basic floor of opportunity" for every disabled child, consisting of "specialized instruction and related services which are individually designed to provide educational benefit." *Id.* (citing *Rowley,* 458 U.S. at 201). Thus, the educational benefit that an IEP is designed to achieve must simply be "meaningful." *Id.*

A federal court's review of a special hearing officer's decision requires a two-part inquiry. First, the court must decide whether the State, through its local education agency or intermediate educational unit, complied with the procedures set forth in the IDEA. *Rowley,* 458 U.S. at 206-207. Second, the court must determine whether the IEP developed for the disabled child was "reasonably calculated to enable the child to receive educational benefits." *Id.* Because there is no challenge to the procedures used in this case, the Court proceeds to examine the second prong of the test. *See Buser by Buser v. Corpus Christi Indep. Sch.,* 51 F.3d 490, 492 (5th Cir. 1995).

## IV. Eligibility for Special Education Under the IDEA

The term "child with disability" means a child --

(i) with mental retardation, hearing impairments (including deafness), speech or language impairments (including blindness), serious emotional disturbance (hereinafter "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services.

*See* 20 U.S.C. ? 1401(3)(A)(i)-(ii) (2000) (emphasis added). Under the regulations promulgated by the Department of Education, "emotional disturbance" is defined as a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) an inability to learn that cannot be explained by intellectual, sensory, or health factors;

(B) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) inappropriate types of behavior or feelings under normal circumstances;

(D) a general pervasive mood of unhappiness or depression; and

(E) a tendency to develop physical symptoms or fears associated with personal or school problems.

*See* 34 C.F.R. ? 300.7(c)(4) (2001) . Similarly, the term "other health impairment" means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that --

(i) is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and (ii) adversely affects a child's educational performance.

*See* 34 C.F.R. ? 300.7(c)(9) (2001) (emphasis added).

The Hearing Officer in this case determined that "it was not unreasonable for the school district to conclude that Daniel did not meet IDEA eligibility as a student with SED or OHI at the time of the January ARD meetings. However, by March [2001], the school district had more information (specifically Dr. Austin's evaluation) which confirmed that Daniel did indeed have both attentional and emotional deficits that qualified him for special education." *See* Hr'g Order at 10 (AR, Vol. I at 13). The Hearing Officer based this conclusion on the finding that, although VISD had early reason to suspect Daniel was both OHI (on the basis of ADHD) and/or suffered from emotional disturbance because of his disruptive and often inappropriate behavior during the fall semester of 2000 (as well as the number of disciplinary referrals and disciplinary measures involving him), there was sufficient confusion in the conflicting expert opinions which warranted the earlier findings of ineligibility under the IDEA. *See* Hr'g Order at 9 (AR, Vol. I at 12). That is, although Drs. Carlson, Hanson and Elliot had all agreed that Daniel had exhibited some attentional deficits, the evidence also showed that (1) Dr. Carlson had submitted the required OHI form but had not described any functional implications; (2) Daniel was not taking any medication for ADHD at the time of the CIA; (3) Dr. Hanson, accepting the presence of ADHD, also made a diagnosis of ODD, which fell within the class of emotional disorders classified as a social maladjustment and thus outside the SED classification; and (4) Dr. Elliot, finding Daniel had a number of emotional issues, including being "at risk" for depression and anxiety, could not say in early December that the symptoms were "clinically significant" for purposes of a SED classification or that there was sufficient clinical data to meet ADHD classification. *See* Hr'g Order at 9-10 (AR, Vol. I at 12-13). Nonetheless, the Hearing Officer found that when VISD received the evaluation performed by Dr. Austin, at that point it should have realized Daniel's emotional and attentional issues had risen to clinically significant levels, and thus the school district should have identified Daniel as a student with OHI (arising from his ADHD) and as a student with SED. *See* Hr'g Order at 11 (AR, Vol. I at 14).

The Court agrees with the Hearing Officer's findings that by the time the January ARD Committee meetings took place, VISD was not obligated to find Daniel met IDEA eligibility as a student with either SED or OHI, based on the conflicting psychological evaluations available to the parties up to that point. The Court also agrees with the Hearing Officer that by March of 2001, VISD had sufficient information to find Daniel had both attentional and emotional deficits which qualified him for special education. More specifically, Dr. Austin's conclusions after his IEE examination were that Daniel exhibited "significant symptoms of both an anxiety and depressive disorder," as well as "difficulties with attention and concentration ... restlessness and impulsive behavior ... at clinically significant levels." *See* AR, Vol. III at 506-508. The evidence also establishes that by March 2001, VISD had sufficient knowledge of Daniel's disruptive and inappropriate behavior history, in addition to the diagnosis of clinically significant levels of ADHD, to suspect both SED and OHI. Under the regulations of the Department of Education, "emotional disturbance" or SED status specifically includes such behavioral manifestations as "an inability to build or maintain satisfactory interpersonal relationships with peers and teachers," "inappropriate types of behavior or feeling under normal circumstances," and "a tendency to develop fears associated with personal of school problems," which Daniel exhibited during the fall 2000 semester, and to a lesser extent during the spring semester. *See* 34 C.F.R. ? 300.7(c)(4). Moreover, the evaluations performed of Daniel, specifically that of Dr. Austin, demonstrated conclusive findings of significant symptoms characteristic of an ADHD diagnosis, a listed disorder under the Department of Education's definitions for OHI. *See* 34 C.F.R. ? 300.7(c) (9)(i).

It is undisputed here that Daniel's academic performance was well above average,[8] however, a true measure of a child's educational performance is not strictly limited to an evaluation of his performance in academics. As the Hearing Officer noted, "behavior scales completed by Daniel's teachers showed he continued to exhibit significant levels of oppositional behavior as well as lability in a majority of his classroom environments. Teacher feedback showed problems with hyperactivity, restlessness, and impulsivity. Anxiety and social interaction problems at school were also suggested by the data. A comparison of teacher rating scales from the fall of 2000 to those compiled in the spring showed that although Daniel displayed less aggressive behavior by the spring he was still significantly oppositional. Daniel continued to demand frequent attention from teachers and displayed many negative behaviors to obtain it." Hr'g Order at 7 (AR, Vol. at 10). Therefore, the Court finds that Daniel's behavioral problems clearly affected his overall educational performance at school, and were sufficient to warrant a finding of a "child with a disability" under the IDEA.

To qualify under the IDEA the student must also be "in need of special education and related services." *See* 20 U.S.C. ? 1401(3)(A.)(ii) (emphasis added). As the Hearing Officer correctly noted," educational need" is not strictly limited to academics, but also includes behavioral progress and the acquisition of appropriate social skills as well as academic achievement. *See Matthew D. b/n/f Pauline D. v. Goliad Indep. Sch. Dist.,* Docket No. 059-SE-1098 at 6 (Decision of Hearing Officer Mar. 12, 1999) (finding that a lack of satisfactory interpersonal relationships and inappropriate types of behavior in an eight-year old, in addition to 17 disciplinary referrals in a single year, adversely affected his educational performance). Here, the Hearing Officer found that with over 20 in- and out-of- school suspensions, the documentary evidence showed that Daniel's behavior was a constant challenge to himself, his teachers (particularly in the first half of the 2000 school year) and his parents; and thus required some sort of attention. *See* Hr'g Order at 10 (AR, Vol. at 13).

And although there was a significant decrease in the number of discipline referrals made by his teachers between the fall and the spring semesters during the 2000-2001 school year (from more than twenty to three), *see* Hr'g Order at 4, 6 (AR, Vol. I at 7, 9), the evidence also shows that Daniel continued to have problems in the spring term with completing his homework assignments and with his misbehavior. In fact, Daniel's persistent refusal to do his work and disrespectful behavior toward the school staff is what led him to the AEP for six weeks in the first place.

A hearing officer in a case involving similar circumstances to those present here noted that, "the decision of whether a student who is advancing from grade to grade has an impairment for which he or she need special education and related services must be determined on an individual basis." *Richard N. R. b/n/f Cynthia G. v. Corpus Christi Indep. Sch. Dist.,* Docket No. 349-SE-799 at 7 (Decision of Hearing Officer Nov. 29, 1999) (citing 25 IDELR 634 (OSEP, Oct. 29,1995)). In *Richard N. R.,* the child was a 12-year old sixth grader who the school district, through successive ARD Committees, determined did not need special education services because he demonstrated no academic need, despite the fact that he was qualified for such services as a student with OHI (attention deficit disorder). *Id.* at 1, 6. The ARD Committees' decisions were based primarily on the child's academic achievement during the fifth and sixth grades, including making the A-B honor roll and passing the fifth grade TAAS test. *Id.* at 6. The hearing officer, however, found that the ARD Committees erred in refusing to provide special education services by ignoring the child's other educational needs (i.e., his needs within the behavioral and social skills domains). *See Id.* at 7. In reaching this decision, the hearing officer found significant that (1) the child had attempted to avoid tasks and that his misbehavior had disrupted his education and that of his peers; (2) an independent psychologist's evaluation had confirmed that the child had behavioral and social problems along with some academic weaknesses and that he could benefit from special education services; and most significantly, (3) the child had been recently removed from his regular education placement to an alternative school for persistent misbehavior. *Id.* Thus, after finding that the child qualified for special education services as an OHI and that he could benefit from special education and related services, the hearing officer ordered that such services be provided by the school district in the nature of counseling, social skills training and an individual behavior management plan to address the types of persistent misbehavior that resulted in his removal from class in the first place. *Id.* at 7-8.

Here, the Court also finds that Daniel is not only qualified for special education and related services as an student with OHI and SED, but that there is an "academic need" for such support services. As the Supreme Court noted, the achievement of passing marks and the advancement from grade to grade is an important factor in determining educational need, *see Rowley,* 458 U.S. 207 n.28, but it is only one factor in this analysis.

### Conclusion

For the reasons stated above, having considered the entire case file, the administrative record, the parties' briefs, and the applicable law, the Court is of the opinion that Plaintiff's Motion for Judgment as a Matter of Law shall be and is hereby DENIED and Defendants' Motion for Summary Judgment shall be and is hereby GRANTED. Further, the Court is of the opinion Defendants' Motion to Strike Plaintiff's Reply shall be and is hereby DENIED.

The Court thereby AFFIRMS the Hearing Officer's decision, and further ORDERS that Plaintiff comply with the Hearing Officer's directives in designing an appropriate Individual

Education Plan for Daniel in accordance with her previous orders.

Defendants have also moved for an award of attorney's fees incurred in defending this suit. The Court thereby directs Plaintiff to file a Response to Defendants' request for attorney's fees within 20 days from the signing of this Order. The Court further directs Defendants to file a reply, if any, within 15 days of Plaintiff's Response.

IT IS SO ORDERED.

### Final Judgment

Pursuant to the Memorandum Opinion and Order filed April 11, 2002, the Court enters judgment as follows:

1. The decision of the State of Texas Special Education Hearing Officer is in all things AFFIRMED;

2. Costs are assessed against Plaintiff. IT IS SO ORDERED.

[1]The Hearing Officer also found there is history for both ADHD and depression in Daniel's Family. *See* Hr'g Order at 3 (AR, Vol. I at 6).

[2]The CIA report concluded that:

Testing results from the Differential Ability Scales ("DAS") indicate that Dan functions overall in the superior range. He had some scatter between the cluster scores. All cluster scores remained in the superior range. Dan's strongest area appears to be his verbal skills, especially verbal comprehension. Dan's weakest areas appear to be in fluid reasoning and spatial understanding. Dan may have difficulty learning new tasks and trouble with his abstract reasoning. However, Dan's level of functioning clearly exceeds the average range of functioning, and these weaknesses will have little impact in the general classroom. These weaknesses can also be associated with Dan's ADHD and limited impulse control, which cause him to make hasty decisions before full thought can be used to make his decision. ... [However,] Dan does not qualify for special education as a student with a learning disability at this time ... [since he] does not demonstrate significant educational/ development deficits ... [and] does not demonstrate significant emotional/behavioral deficits ... to meet eligibility for special education services based on ... 'Learning Disabled.' *See* AR, Vol. III at 564.

[3]The Hearing Officer found there was dispute amongst the parties in this case as to whether Dr. Elliot's assessment of Daniel was adequately discussed or reviewed by the ARD Committee -- noting that Daniel's parents felt school district personnel relied strictly on Dr. Hansen's assessment and failed to seriously consider Dr. Elliot's findings. Hr'g Order at 5 (AR, Vol. I at 8).

[4]AEP is a state mandated disciplinary program designed for students who engage in certain types of misconduct as outlined in a school district's student code of conduct. *See* PL's Mot. Judg. Matter of Law at 5-6.

63

[5]Angela Bailey was the Venus Middle School principal for the 2000-2001 school year. Subsequent to the administrative proceedings in this case, the school district promoted Ms. Bailey to the position of assistant superintendent. *See* PL's Mot. Judg. Matter of Law at 5 n.2.

[6]As neither party raised any issues with regard to the Hearing Officer's findings that the disciplinary action in placing Daniel in AEP was appropriate under IDEA, or that the BIP implemented in the spring 2001 was appropriate the Act, the Court shall not address those issues in this order.

[7]The term "individualized education program" or "IEP" is defined under the Act as a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) and that includes --

(i) a statement of the child's present levels of education performance;

(ii) a statement of measurable annual goals, including benchmarks or short term objectives;

(iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child;

(iv) an explanation of the extent, if any, to which the child will not participate with non-disabled children in the regular class;

...

(vii) (I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or avocational education program); and

(viii) a statement of --

(I) how the child's progress toward the annual goals described in clause (ii) will be measured; and (II) how the child's parents will be regularly informed (by means such as periodic report cards).

*See* 20 U.S.C. ?? 1401(11), 1414(d).

[8]The Hearing Officer found that at the end of his first semester in the sixth grade, Daniel's grades ranged from a 75 in social studies to an 89 in reading, with grades in the 90's for art and physical education, and in the mid and high 80's for the rest of his academic subjects. Hr'g Order at 8 (AR, Vol. at 11). At the end of the second semester, Daniel's grades ranged from an 85 in math to a 92 in study skills, with a 90 in social studies, an 87 in English, an 88 in community problem solving, and also made a 96 in PE. *Id.* In fact, Daniel was promoted to the seventh grade and placed in the advanced seventh grade math class. *Id.* Daniel also passed both portions of the TAAS test and received an Academic Recognition in reading. *Id.*

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=102+LRP+9...   2/14/2008

## Statutes Cited

**20 USC 1415(i)(2)(A)**
**20 USC 1415(i)(3)**
**20 USC 1400(c)**
**20 USC 1412(a)(1)**
**20 USC 1401(11)**
**20 USC 1414(d)**
**20 USC 1401(3)(A)(i)-(ii)**
**20 USC 1401(3)(A)(ii)**

## Regulations Cited

**34 CFR 300.7(c)(4)**
**34 CFR 300.7(c)(9)**
**34 CFR 300.7(c)(9)(i)**

## Cases Cited

**458 U.S. 176**
**999 F.2d 127**
**118 F.3d 245**
**200 F.3d 341**
**89 F.3d 1205**
**51 F.3d 490**
**25 IDELR 634**

**Copyright 2008 © LRP Publications**

102 LRP 19526

## *OXNARD UNION HIGH SCHOOL DISTRICT*

### California State Educational Agency

### SNO 1 -2403

### March 18, 2002

**Judge / Administrative Officer**

Hearing Officer: Trevor Skarda

**Full Text**

### Decision

This matter was heard before Trevor Skarda, Hearing Officer for the California Special Education Hearing Office (Hearing Office), McGeorge School of Law, University of the Pacific, in Oxnard, California, on November 28, December 6 and 7, 2001 .

STUDENT (STUDENT) was represented at the hearing by attorney Rene Thomas Folse. Also present on behalf of STUDENT was her mother, MOTHER. The Oxnard Union High School District (District) was represented by attorney John E. Hayashida. Also present on behalf of the District was Peggy Nadin, the District's director of special education.

Oral and documentary evidence was received. The parties provided written closing arguments, the last of which was received by the Hearing Officer on January 10, 2001 . Thereafter, the record was closed and the matter was submitted for decision.

### Issues[1]

1 . Was STUDENT eligible for special education from December 5, 2000, to the present because of an emotional disturbance?

2. During the 1998-1999 and 1999-2000 school years, did the Oxnard Union High School District (District) meet its obligation to seek and serve STUDENT, i.e., to identify her alleged disability and to provide a program to address her needs?

3. Is MOTHER entitled to reimbursement for the cost of the assessment conducted by Marilyn M. Evenson, Ph.D., in October 2001?

4. Is MOTHER entitled to retroactive reimbursement for the costs of the Cross Creek Manor placement from October 2000 through the date of this decision, including expenses incurred for tuition, travel, parent training services, and related costs?

5. Is STUDENT entitled to compensatory education services?

### Contentions of the Parties

66

STUDENT contends that the District members of the IEP team were incorrect when they determined on December 5, 2000, that she was not eligible for special education under the category of emotionally disturbed (ED). STUDENT argues that she should have been found eligible as ED because, in pertinent part, she exhibited "a general pervasive mood of unhappiness or depression" to a marked degree, over a long period of time, and that this condition adversely affected her educational performance. STUDENT also contends that the District failed in its child find obligations during the 1998-1999 and 1999-2000 school years. MOTHER, STUDENT'S mother seeks reimbursement for the costs of STUDENT'S private placement at Cross Creek Manor from October 2000 to the present. STUDENT also contends that she is entitled to reimbursement for a private assessment procured by the family in October 2001 because Judy Greycloud's assessment of November 2000 was not appropriate. Finally, STUDENT also requests compensatory education.

The District contends that STUDENT was not eligible for special education as of December 2000. In that regard, the District contends that STUDENT'S grades had improved during the ninth and tenth grades (1998-1999,1999-2000), she had a boyfriend, she was a member of the basketball team, and she held a job (until she was sexually assaulted by a coworker). The District acknowledges that STUDENT was hospitalized for emotional problems in December 1998 and again in the beginning of her eleventh grade school year (2000-2001). Nonetheless, the District argues, she did not meet the ED criteria because she did not suffer from "a general pervasive mood of unhappiness or depression" to a marked degree and over a long period of time. Regardless, contends the District, her condition did not aversely affect her educational performance.

With regard to the Petitioner's request for reimbursement for Marilyn Evenson's assessment, the District argues that Judy Greycloud's assessment was appropriate and therefore Petitioner is not entitled to reimbursement. Regarding Petitioner's request for reimbursement for the costs associated with her stay at Cross Creek Manor, the District contends that Ms. PARENT is not entitled to reimbursement because (1) STUDENT was not eligible for special education, and (2) Ms. PARENT failed to provide sufficient evidence regarding the appropriateness of her placement.

## Background Facts

STUDENT has never been found eligible for special education services. Her parent has resided within the boundaries of the District at all relevant times. STUDENT attended school in the Oxnard Union High School District during her ninth and tenth grade school years (1998-1999, 1999-2000). STUDENT was also enrolled in the District during the first part of the eleventh grade (2000-2001), although she missed a significant amount of school during that school year because of three consecutive hospitalizations following a sexual assault by a co-worker in the summer of 2000. Immediately after the last of the three hospitalizations (at the end of October 2000), STUDENT'S mother sent STUDENT directly to Cross Creek Manor in Utah via an escort service. STUDENT has attended Cross Creek Manor since that time. After STUDENT was placed at Cross Creek Manor, the District assessed her and found her to be ineligible for special education.

STUDENT was adopted by MOTHER and FATHER in August of 1984. Her biological mother, BIOLOGICAL MOTHER, was chronically mentally ill. She suffered from paranoid schizophrenia, bipolar disorder and obsessive-compulsive disorder. BIOLOGICAL MOTHER died from injuries sustained when she fell off of a cliff not long after STUDENT was born. Testimony of MOTHER.

In the first grade STUDENT allegedly tried to change another student's diaper; it was interpreted by STUDENT'S school that she had inappropriately touched the other student in a sexual manner. For the remainder of the school year, STUDENT was required to go to the bathroom accompanied by an adult.[2] Testimony of MOTHER.

In the second grade (1991-1992 school year), while attending the Santa Rosa School in the Pleasant Valley School District, STUDENT and other students were told a graphic story ("the Bloody Mary incident") by a young male student. STUDENT and the other students who were traumatized by the story were sent home for the day. The other children returned the following day to school. STUDENT did not immediately return and reportedly suffered from hallucinations and other symptoms, such as difficulty sleeping, because of the boy's story. Her physician, Dr. Mary Moebius, referred STUDENT to Dr. Barry C. Barmann for six individual psychotherapy sessions. After three sessions with Dr. Barmann, who used techniques similar to those used to deprogram cult members, STUDENT experienced a "complete recovery." According to Ms. MOTHER, STUDENT was doing well in school and she was "at the top of her class" after Dr. Barmann's therapy. Testimony of MOTHER and Petitioner's Exh. J, pp. 1-9.

In the fifth grade (the 1994-1995 school year), STUDENT was evaluated by Mark Heller, Ph.D, because of "concerns about school difficulties and suspected attention disorder." Petitioner's Exh. A 1-45. Dr. Heller performed multiple assessments and prepared a report of his findings. He found, in pertinent part, that STUDENT had low-average to average intelligence and attention-deficit/hyperactive disorder, inattentive type. He noted that there "are some mild to moderate emotional and behavioral problems" that he recommended be "monitored closely." Dr. Heller also found that "other diagnoses to consider in future re-evaluations" should include dysthymia, oppositional defiant disorder, generalized anxiety and bipolar disorder.

In February 1996, the second semester of STUDENT'S sixth grade school year, STUDENT was first prescribed Zoloft for depression by Dr. Laila Malad. Petitioner's Exh. F, p. 5. STUDENT has been prescribed Zoloft in varying quantities to control her depression since that time.

During the seventh grade (1996-1997), STUDENT attended a private catholic school, La Reina High School. In November 1996, her parents were legally separated (although they lived together until April 1997). Also in November 1996, STUDENT was treated by Dr. Herbert Goldin for "shingles." Petitioner's Exh. J, p. 11. STUDENT's mother testified that STUDENT developed shingles because she was stressed about midterm examinations.

In April 1997, STUDENT was assessed by the Pleasant Valley School District, at the suggestion of the staff at La Reina. Kenneth Locke, a resource specialist with Pleasant Valley School District, conducted an assessment and prepared a report. The only assessment tools used by Mr. Locke were the Woodcock Johnson (WJ) assessment in the areas of reading and broad written language and the Wide Range Achievement Test (WRAT) in the area of mathematics. Mr. Locke concluded that because STUDENT scored generally in the average to low-average range on the achievement tests, "STUDENT'S academic skills are sufficient to handle the curriculum in a regular public school system." Petitioner's Exh. F, p. 1.

STUDENT was placed on academic probation during the seventh grade at La Reina. In

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=102+LRP+1...   2/14/2008

June 1997, after receiving two grades of D, one B and three C's (a second semester GPA of 1.83), STUDENT was not allowed to return to La Reina High School. Petitioner's Exh. G, p. 1.

In September 1997, STUDENT returned to public school in the Pleasant Valley School District, where she attended the eighth grade at Los Altos Intermediate School. Also in September of 1997, STUDENT was involved in a serious incident involving two boys. It is unclear what actually occurred. STUDENT initially stated to her mother that she was threatened by the boys. She subsequently stated to an assessor that she was raped by one of the boys. Petitioner's Exh. A, p. 50, Petitioner's Exh. B, p. 1.

In December 1997, STUDENT was physically abused by her adoptive father. MOTHER witnessed the incident and called the police. After STUDENT returned home late from the mall one evening, her father assaulted her (i.e., hit and kicked her multiple times and picked her up by her ponytail). She missed ten days of school as a result of severe bruising and pain. Mr. PARENT was asked to leave the house for one week after the incident, and he later returned without consequence, according to Ms. PARENT. STUDENT also told mental health professionals that her father had threatened her and had called her names such as "bitch" and "selfish brat." Petitioner's Exh. A, p. 50.

STUDENT began attending Camarillo High School within the Respondent District beginning in the ninth grade (1998-1999 school year). On December 1, 1998, STUDENT was hospitalized at Anacapa Hospital for severe depression and post traumatic stress disorder after she had been physically abused by her father.[3] The hospital report indicates that upon admission STUDENT exhibited "depressed mood, flat affect, isolation, withdrawal, poor attention and concentration, lack of motivation, decreased energy, guardedness, poor self-esteem, suspiciousness, psychomotor retardation, disheveled appearance, anxiety and sadness." While at Anacapa, STUDENT was prescribed Mellaril and her Zoloft dosage was increased. A drug screen was negative.[4] Against medical advice, she was discharged on December 6,1998 after five days. Upon discharge, STUDENT was diagnosed with "major depression, severe, without psychotic features" and post traumatic stress disorder. STUDENT'S mother removed her against medical advice because STUDENT had allegedly been hit by another patient with a brush. Petitioner's Exh. B, pp. 1-6 and Testimony of PARENT.

STUDENT received poor grades for the first semester of the ninth grade, and no credit in one course (reading).5 In addition to a grade of F in reading, STUDENT received D's in health education, P.E. and math, and C's in English and Spanish. She also was absent numerous days during the semester. Her second semester grades showed some improvement: she received C's in math, Spanish and agriculture, B's in geography and English, and one D in P.E. Her absences decreased slightly during the second semester. District's Exh. 1.

STUDENT'S mother had her assessed by clinical psychologist Tracy S. Bennett, Ph.D., beginning in May of 1999. Dr. Bennett assessed STUDENT on May 25 and 31, and June 7 and 10, 1999. She prepared a report of her findings in which she states that the reason for the assessment was as follows:

STUDENT is a 15-year-old Caucasian female referred by Dr. Daniel Flynn, psychiatrist, for a psycho diagnostic assessment to clarify psychological issues that may be interfering with

69

her academic and social functioning. Reported difficulties include increasing defiance and oppositionality across contexts, lying, truancy, drinking alcohol, smoking marijuana (resulting in a recent school suspension), and peer rejection. Problems of conduct have escalated since 9/97 following an incident where she was threatened and held at knife point by a male peer and later physically assaulted by her adoptive father . . .

Petitioner's Exh. A, p. 46.

Dr. Bennett developed STUDENT'S background history, conducted a clinical interview with Ms. PARENT and STUDENT, reviewed records and administered multiple psychological and attention assessment. She concluded, in pertinent part, as follows:

STUDENT demonstrates behaviors characteristic of a comorbid presentation of reactive attachment disorder, conduct disorder, and mild depressive symptomatology with escalations after trauma incidences involving her father and a male peer. Ms. PARENT'S persistent research in understanding STUDENT is consistent with this conclusion.

More specifically, STUDENT has demonstrated markedly disturbed and developmentally inappropriate social relatedness in most contexts since infancy, despite her adoptive mother's consistent attempts to provide a warm and stable environment. ... STUDENT'S adoptive father was also rarely present in her life, with the exception of two physical abuse incidents which likely contributed to her confusion and distrust of others ... Social deficits have been consistently impairing in peer relationships, resulting in peer rejection and isolation. As she gains insight into her *differentness* in combination with the critical nature of peer attachment in adolescence, STUDENT appears to have become increasingly depressive and desperate in her attempts at making friends and has become increasingly provocative in her expression of anger. She also has become more opportunistic, deceptive, and manipulative with others which only puts her at greater risk for victimization and fails in providing her with peer affection that she craves. Poor social skills have contributed to social isolation both with family members and peers, resulting in an impoverished emotional support system and a tendency to vacillate between externalized and internalized anger and disappointment. Considering her recent impulsivity and desperation to seek affection, STUDENT appears to be at high risk for victimization by others and in seeking escape through dangerous means such as substance abuse, self-harm, and escalating risk.

Petitioner's Exh. A, at p. 52. [Emphasis in original].

Dr. Bennett diagnosed STUDENT with reactive attachment disorder of infancy, disinhibited type, conduct disorder, and depressive disorder NOS. She recommended continued medication management with Dr. Flynn, individual psychotherapy "with an integrated parent- training component... with a supportive and educational focus on social skills" and diagnosed STUDENT with "impulsive, oppositional, and depressive symptoms; and with a strong consideration for substance-abuse proneness." Dr. Bennett also recommended that Ms. PARENT participate in a community-based parenting group for support and education, and a neurological consultation to rule out a seizure disorder. Petitioner's Exh. A, at p. 52.

STUDENT continued at Camarillo during the tenth grade (the 1999-2000 school year). At the beginning of the year, STUDENT got pregnant. She had a surgical abortion in October 1999 at Planned Parenthood in Ventura.[6] Testimony of MOTHER. She was also arrested

70

for shoplifting in approximately January of 2000, for which she was placed on probation and drug tested. Testimony of MOTHER, District's Exh. 2, and Petitioner's Exh. D, p. 9.

STUDENT had a boyfriend who also attended Camarillo High School. At some point during the tenth grade, STUDENT allegedly became upset at her boyfriend and attempted to enlist the services of some "Hispanic" students to beat him up. The boyfriend told the police but did not press charges. Testimony of MOTHER.

Ms. PARENT testified that STUDENT began making obsessive phone calls during the tenth grade and that she continued this behavior into the eleventh grade. According to Ms. PARENT, STUDENT would make multiple phone calls to other students, her ex-boyfriend and his relatives, to the point that other parents called Ms. PARENT and asked her to stop STUDENT from harassing their children. Ms. PARENT indicated that she was forced to disconnect all of the phones in her house to stop STUDENT from making multiple unwanted phone calls. At one point, STUDENT borrowed a friend's calling card and used it excessively; the young girl's father brought the bill to Ms. PARENT. Testimony of MOTHER.

STUDENT'S grades for the first semester of tenth grade improved slightly, as did her attendance. She received an A in Advanced Girls Basketball, B's in Biology Lab and World Civilization, C's in Floriculture and English and a D in math. The second semester of tenth grade was STUDENT'S best academically. She received A's in international cuisine, P.E., biology lab and world civilization and B's in math and English. STUDENT also had the fewest absences during this semester. District's Exh. 1.

STUDENT obtained a job at a local restaurant in approximately January 2000, where she worked for about six months. In July 2000, STUDENT was involved in an incident at work. A coworker allegedly locked her in a storeroom and sexually assaulted her. STUDENT did not return to her job at the restaurant. Following the incident, STUDENT experienced a significant weight loss, which resulted in a hospitalization at Vista del Mar Hospital in September of 2000.[7]

On September 7, 2000, STUDENT was admitted to Vista del Mar Hospital. Her therapist at Vista del Mar attributed the hospitalization to the sexual molestation. Testimony of Patricia Myers. A report was prepared by the physician who treated STUDENT, Dr. Howard Glick, who wrote, in pertinent part as follows:

This is the first psychiatric admission for this young woman who was admitted after a 15-20 lb. weight loss over the past month, not eating, and not taking care of herself. She was taken to a local emergency room where electrolytes were drawn and found to be normal but she had lost a great deal of weight. She also left home after an argument with her mother to visit her friend, was becoming increasingly disobedient in that area. Mother contacted the crisis team who placed her on a 5150 as being dangerous to herself.

Petitioner's Exh. C, at p. 1.

Dr. Click's admission history states that STUDENT'S diagnosis upon admission was "Major Depressive Disorder Recurrent, Moderate, Rule Out Anorexia Nervosa." STUDENT was discharged on September 15, 2000, with a fair prognosis, with aftercare which was to include both psychiatric and outpatient counseling services. Petitioner's Exh. C, at p. 2. At the time of her discharge, STUDENT'S diagnosis remained the same, "Major Depressive

71

Disorder, Recurrent, Rule Out Anorexia Nervosa." *Id.* at p. 7.

On September 17, 2000, STUDENT was re-admitted to Vista del Mar; this was essentially a continuation of her previous admission. Her admitting diagnosis remained the same, major depressive disorder, recurrent, moderate to severe. The staff at Vista del Mar suspected that STUDENT'S return was related to another young man whom she had met on her previous stay. They felt that she was malingering. The admission history states in that regard as follows:

Subsequent [to the previous discharge on September 15, 2000] she did fairly well [on] Saturday. However, on Sunday she became increasingly depressed with feelings of hopelessness but without suicidal ideation, because, "I'm a bad person for having done all those things." *The staff here are somewhat suspicious that her return has something to do with a gentleman that she met while here on the unit before, although she denies that.*

Petitioner's Exh. C, p. 8. [Emphasis added].

During STUDENT'S second stay at Vista del Mar, Dr. Glick was again STUDENT'S attending psychiatrist. His discharge summary notes that Ms. PARENT agreed to give STUDENT "one last chance" at home and that she had arranged for outpatient follow-up with STUDENT'S private psychiatrist, as well as counseling. The summary additionally states that STUDENT and her mother had agreed that if she was unable to function at home, she would return to the hospital and from there she would be sent to a "residential placement." Petitioner's Exh. C,p. 11.

STUDENT was discharged from Vista del Mar on September 28, 2000, after a stay of 13 days. At the time of her discharge from Vista del Mar, STUDENT'S diagnosis remained the same, Major Depressive Disorder, Recurrent, Moderate to Severe. Petitioner's Exh. C, p. 12.

On October 11, 2000, not long after her discharge from Vista del Mar, STUDENT was hospitalized at Anacapa Hospital. The hospitalization was the result of her expressed suicidal ideation to her counselor.[8] She had run away from home and had taken the car late at night to go to a boyfriend's residence. It was felt that she was at risk, and for that reason she was hospitalized at Anacapa. STUDENT'S admission diagnosis was Major Depression, Moderate in Severity, and the admission evaluation notes that STUDENT'S "insight and judgement" and her "impulse control" were poor.

Approximately 8 days into her stay, STUDENT was placed on "one to one observation" because she presented a high AWOL risk. She remained at Anacapa until October 28, 2000, when she was discharged to a transport service and transported to Cross Creek Manor in Utah. Petitioner's Exh. B, p. 21. The discharge summary states that STUDENT exhibited the following symptoms during her 17-day stay:

The patient exhibited the following symptoms and behaviors during the course of treatment: depressed mood, suicidal ideation, rapid speech, anger, impaired insight and judgement, labile mood, poor hygiene, mood swings, tearfulness, anxiety, agitation, isolation, withdrawal, anergia, anhedonia, irritability, poor impulse control, poor response to re-direction. The patient's attendance and participation in program groups and activities was fair.

Petitioner's Exh. B, p. 25.

The discharge summary also states that "STUDENT responded well to the combination of the structured program, psychotherapy, and psychopharmacology, and showed improvement by the time of discharge." It further states as follows:

The patient was discharged in improving condition with a good prognosis with ongoing continued aftercare and medication compliance. The patient was oriented

Ms. PARENT testified that STUDENT wrote what was deemed to be a suicide note to time, place and person. Attention span and memory were intact. There were no speech or motor abnormalities noted. Mood remained depressed and irritable with angry affect. Thought processes were linear. She denied auditory and visual hallucinations, paranoid ideation, and other psychotic symptoms. She denied suicidal and homicidal ideation. Other mental status parameters were within normal limits.

Petitioner's Exh. B, p. 26.

Because of the three hospitalizations during September and October, STUDENT essentially did not attend Camarillo High School during the eleventh grade. She received no credit in any of her classes at Camarillo High School. However, she did receive credit for two hospital courses she attended during her 17-day stay at Anacapa, U.S. History and an elective. She received an A in U.S. History and a B in the elective. District's Exh. 1.

On November 14 and 15, 2000, STUDENT was assessed by Judy Greycloud in Utah. Ms. Greycloud is a school psychologist employed by the District. She used a number of evaluation instruments, including the Wechsler Intelligence Scale for Children - III (WISC III); Wechsler Individual Achievement Test (WIAT); Bender Visual Motor Gestalt (Bender); Beck Depression Inventory; Devereux Scale of Mental Disorders (DSMD); Draw-A-Person: Screening Procedure for Emotional Disturbance (DAP:SPED); Personality Inventory for Youth (PIY); Revised Children's Manifest Anxiety Scale (RCMAS); and a sentence completion test. She also collected teacher reports, interviewed STUDENT, her mother, her therapist at Cross Creek, and her therapist who treated her between her last two hospitalizations in the fall of 2000. She also reviewed STUDENT'S voluminous assessments and hospital records. Petitioner's Exh. F, p. 4.

Ms. Greycloud concluded in her assessment report that STUDENT'S learning ability was in the low average to average range, her adaptive skills were within normal limits, and her academic skills were within expected performance levels. She concluded that STUDENT did not meet the eligibility criterion as an emotionally disturbed student. In particular, Ms Greycloud noted that STUDENT did not meet the criteria, "a general pervasive mood of unhappiness or depression" to a marked degree, and over a long period of time. She explained that while "STUDENT has a history of depression dating back several years, for which she takes medication," STUDENT has nonetheless "managed to make satisfactory progress in school despite this condition." Petitioner's Exh. F, p.13.

On December 5, 2000, the District held an IEP team meeting for the purpose of determining whether STUDENT was eligible for special education services under the category of emotionally disturbed. No regular education teacher was present at the meeting. The team determined that STUDENT was not eligible. STUDENT'S mother did not consent to the IEP. Petitioner's Exh. F.

73

STUDENT received no educational services at Cross Creek for the first several weeks of her stay. Testimony of MOTHER and Greycloud.

In February 2001, Kenneth L. Seely, Ph.D., a licensed clinical psychologist, assessed STUDENT in Utah. The reason for the referral was as follows:

STUDENT was referred to Cross Creek Manor by her mother, MOTHER. Specific concerns at the time of admission were her oppositional behaviors, sexual activity and acting out. A psychological evaluation was specifically requested to assess her current level of psychological and intellectual functioning and to address any treatment and/or placement recommendations.

Petitioner's Exh. D, p. 1.

Dr. Seely administered the Rorschach Inkblot Test and the Minnesota Multi phasic Personality Inventory-Adolescents (MMPI-A). He also conducted a mental status examination, a clinical interview, and reviewed past reports. Dr. Seely found, in pertinent part, as follows:

It is noted that although this testing did not address her cognitive functioning, her previous testing indicated she is currently functioning in the "below average" range of intelligence. Her achievement testing showed in most areas average ability, with an area of below average ability in her mathematics skills. She did not appear to have any cognitive deficits that would preclude problems in maintaining average levels of performance, but the significance of her depression, adjustment and conduct disordered presentation is such that it is likely to cause significant difficulties during times of stress. She reported that during 8th and 9th grades her academic performance was significantly lower and she had more problems in maintaining her grades. She reported A grades for part of 10th grade, which suggests that she is capable of attaining average levels of performance, *but during times of distress she appears to be less capable of maintaining this performance.* Her current level of distress is likely to contribute to difficulties in her concentration, energy, and her attitude toward academic achievement.

Petitioner's Exh. D, p. 7. [Emphasis added].

Dr. Seely diagnosed STUDENT with "Major Depressive Disorder, Recurrent, Severe, (possibly with Interepisode Recovery); Conduct Disorder, Mild; Adjustment Disorder with Disturbance of Conduct; and, Cannabis Dependence." He recommended continued residential placement, with emphasis on addressing STUDENT'S conduct disorder, drug addiction, and depression. Petitioner's Exh. D, p. 8.

In October 2001, STUDENT'S mother obtained an assessment from Dr. Marilyn Evenson. Dr. Evenson flew to Utah and assessed STUDENT at Cross Creek Manor. Dr. Evenson did not draft a report of her assessment. Dr. Evenson's assessment was limited to STUDENT'S psychological functioning.

The Hearing in this matter convened on November 28, 2001, and ended on December 7, 2001. As of the last day of hearing, STUDENT was still attending Cross Creek Manor.

### Findings of Fact and Conclusions of Law

74

ISSUE NO. 1: Was STUDENT eligible for special education from December 5, 2000,

to the present because of an emotional disturbance?

The primary issue in this matter is whether STUDENT should have been found eligible for special education as emotionally disturbed at the IEP team meeting held on December 5, 2000. Petitioner's Exh. E.

To qualify for special education under the category of ED,[9] a student must.. . exhibit one or more of the following characteristics over a long period of time and to a marked degree, which adversely affect educational performance:

(1) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(2) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(3) Inappropriate types of behavior or feelings under normal circumstances exhibited in several situations;

(4) A general pervasive mood of unhappiness or depression; or

(5) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. ? 300.7(c)(4)(i) (1996); Cal. Code Regs. tit. 5, ? 3030(i). The term ED does not, however, apply to students who are socially maladjusted, unless it is determined that they have a serious emotional disturbance. 34 C.F.R. ?300.7(c)(4)(ii) (1996); see Cal. Educ. Code ? 56441.11 (c)(C). The primary disputed characteristic was whether STUDENT exhibited "a general pervasive mood of unhappiness or depression" to a marked degree and for a long period of time.

Did STUDENT exhibit a "general pervasive mood of unhappiness or depression," to a marked degree and over a long period of time?

Judy Greycloud's assessment, which she conducted shortly before the District members of the IEP team found STUDENT ineligible for special education, states as follows:

This category was formerly known as "seriously emotionally disturbed. " *See* 20 U.S.C. ? 1401(3)(A)(i) (1997).

STUDENT has a history of depression dating back several years, for which she takes medication. She has managed to make satisfactory progress in school despite this condition. She does not appear to meet this [criterion].

District's Exh. 4.

Ms. Greycloud testified that her assessment revealed that STUDENT exhibited this characteristic "over a long period of time" and that "at times over the past few years [ninth and tenth grades], it was marked."

75

The District, nonetheless, argues that STUDENT'S depression was not "marked" in degree and exhibited over a long period of time. The District points out that Dr. Heller's assessment in 1995 found that STUDENT had "mild to moderate emotional and behavioral problems" and Dr. Bennett's assessment in the summer of 1999 found that STUDENT displayed "mild depressive symptomatology."[10] The significance of this, argues the District, is that both Dr. Bennett and Dr. Heller's assessments were conducted during times when STUDENT was not suffering from the effects of one of the many significant traumas in her life (rape, physical abuse by her father, abortion and another sexual assault). The District also argues that STUDENT did well (this is not seriously disputed) in school during the second semester of her tenth grade year, the semester that preceded the three successive hospitalizations during the summer/fall of 2000.

The District's focus is misplaced. The question is whether STUDENT, as of December 2000, had exhibited the qualifying characteristic over a long period of time and to a marked degree, not whether she experienced a period or periods of remission during her educational career.

Focusing on December 2000, the Hearing Officer finds that STUDENT'S depression had been exhibited both to a marked degree and over a long period of time. The evidence established that following the sexual assault, STUDENT was hospitalized three times over a period of two months (the beginning of September through the end of October of 2000). The unanimity of all of the healthcare providers during this period is persuasive on several points: STUDENT was severely depressed. STUDENT had suicidal ideation. STUDENT exhibited extremely risky behaviors because of her depression. Because of STUDENT'S severe depression, suicidal ideation and other symptoms, she did not attend school at Camarillo High School for most of the period beginning in August to the end of October, when she was transferred to Cross Creek Manor. After she was transferred to Cross Creek Manor, she was still unable to attend classes for the next several weeks because her serious depression-related symptoms continued. She was also accompanied by a staff person everywhere she went for the first several weeks because it was discovered that she had made plans to run away. The Hearing Officer additionally notes that Dr. Seely's assessment, in February 2001, about eight months after the sexual assault, determined that STUDENT still required residential placement and counseling and that she still suffered from major depression. Because STUDENT exhibited serious depressive symptoms over a period of several months, the Hearing Officer finds that STUDENT met the characteristic "to a marked degree and over a long period of time."

Did STUDENT'S condition adversely affect her educational performance?

To summarize, the Hearing Officer has determined above that STUDENT exhibited a "general pervasive mood of unhappiness or depression," to a marked degree and over a long period of time. The primary question, indeed, the crux of the dispute between the parties, is whether this qualifying characteristic had an "adverse affect" on STUDENT'S "educational performance." To resolve this question, it is necessary to know what degree of adverse affect is legally required for ED eligibility.

No witness called provided persuasive testimony about the appropriate legal interpretation. There is no federal statutory or regulatory interpretation of "adverse affect." In 1989, the Office of Special Education Programs (OSEP) was asked to provide guidance on what the term "adversely affects educational performance" means in the context of identifying ED

76

students. In its administrative interpretation, OSEP indicated that this term is subject to a variety of interpretations by the states. "In reference to SED[11] children and youth, States typically include within the parameters of educational performance those elements which are of specific educational concern to the school, which are reflected in the school's curriculum and which generally receive some type of formal rating. While some States do provide additional procedures and guidance related to [this term] ... [its] application to a particular child continues to be based largely on the unique facts, and circumstances of the particular case."

While some states have enacted specific regulations defining "adverse affect on educational performance," California has not done so. In California, it has been noted that "there is no qualifying language to indicate that any more than some adverse effect is needed to satisfy this criterion .... However, there is reason to believe that the adverse effect required by the regulation must have a significant impact on the student's educational standing." *Student v. Hemet Unified School District and Riverside County Mental Health Department,* SN 550-91 [interpreting identical federal language].

The Hearing Officer concludes that a "significant impact" on a student's educational standing must be present to demonstrate "adverse affect." That impact must be determined in light of the unique facts of each case.

In examining whether STUDENT'S depression adversely affected her educational performance, the District (and the District members of the December 2000 IEP team), focused on STUDENT'S progression during the ninth and tenth grades. As developed above, STUDENT did progressively better after her first semester of her ninth grade year at Camarillo. STUDENT did very well during the second semester of the tenth grade. She received the best grades of her educational history during this period. She also participated in a team sport (basketball) during this period. Finally, she successfully obtained and held a job at a local restaurant for about six months while succeeding academically in school.

However, the focus of both the December 2000 IEP team and the District at the instant Hearing is misplaced. The focus should have been the eleventh grade, when STUDENT'S depressive symptoms became so severe following the sexual assault that she was hospitalized three times over a period spanning two months. The Hearing Officer is aware of one California administrative decision which concluded that "it is certain that a pupil cannot receive educational benefit if he cannot attend classes." *Berkeley Unified School District (1987)* EHLR 509:197. The Hearing Officer in that case determined that, although the student had demonstrated that he could perform well academically, his condition had nonetheless adversely affected his educational performance because the student had run away from home and stopped attending school altogether due to an emotional disturbance. As a result, his grades had deteriorated from A's and B's to receiving no credits due to nonattendance. At the time of the hearing, the student should have been advancing to the twelfth grade, but had received only a portion of his tenth grade credits.

A review of STUDENT'S educational performance during eleventh grade reveals that STUDENT'S depression, indeed, had a significant impact on her education during the eleventh grade: she received no credits from Camarillo High School because she was unable to attend school. In fact, the only credits she received during this period were for two courses that she took during her 17-day stay at Anacapa, a structured, protected hospital environment where she was held against her will and where she received counseling and

77

other mental health services on almost a daily basis.[12]

Did STUDENT require instruction, services, or both which could not have been provided with modification of the regular school program?

In summary, STUDENT exhibited a pervasive mood of depression to a marked degree and over a long period of time, and this condition adversely affected her educational performance. The next question is whether STUDENT required instruction, services, or both, which could not have been provided with modification of the regular school program.

The Hearing Officer finds that STUDENT did require instruction and services beyond modification of the regular school program. During September and October 2000, she tried to attend the regular education program at Camarillo, but failed. During part of this time, she was receiving some counseling services from Ventura County. Testimony of MOTHER. Her academic success at Anacapa, despite her severe depression, shows that STUDENT required a controlled, structured environment in order to make academic progress. The evidence further established that her need for a controlled, structured environment continued long after STUDENT was placed at Cross Creek Manor. Dr. Seely's report in February 2001 found, in pertinent part, as follows:

STUDENT is currently receiving treatment in the form of a long-term residential treatment center, and this is recommended to continue. She is receiving a regimented behavioral program, which will help with seeing that her choice of adjusting socially through conduct-disordered behaviors does not help with life. She will also benefit from the artificial social environment that is provided in her placement, and she can challenge her beliefs about others and social interactions, and if placed back into her previous environment, she would have a high likelihood of returning to old behaviors of her peers and social contacts. Her depression is significant enough to include suicidal ideation, and past problems with suicidal ideation were reported. She can be monitored in her current environment for this and her means of self-harm reduced.

Petitioner's Exh. D, p. 7.

In sum, the Hearing Officer has found that (1) STUDENT exhibited the qualifying characteristic of a "pervasive mood of unhappiness or depression, (2) she exhibited this characteristic over a long period of time and to a marked degree, (3) her pervasive mood of unhappiness or depression had an adverse affect on her educational performance, and (4) she required instruction and services which could not have been provided with modification of the regular school program. She was therefore eligible for special education as a child with an emotional disturbance as of December 5, 2000, determination by the District IEP team members that she was not eligible at that time was incorrect.[13]

ISSUE NO. 2: During the 1998-1999 and 1999-2000 school years, did the District meet its obligation to seek and serve STUDENT, i.e., to identify her alleged disability and to provide a program to address her needs?

The IDEA and State law impose an affirmative duty on school districts to ensure that all disabled children who are in need of special education and related services are "identified, located, and evaluated." 20 U.S.C. ? 1412(a)(3); Cal. Educ. Code ? 56300 (Deering Supp. 1999). This duty is not dependent on any request by the parent for special education testing

78

or referral for services. The duty arises with the district's knowledge of facts tending to establish a suspected disability and the need for IDEA special education services. Under State law, a child may be referred for special education only after the resources of the regular education program have been considered and, where appropriate, utilized. Cal. Educ. Code ? 56303 (Deering 1987).

The Petitioner provided little evidence at hearing regarding any failure on the part of the District to seek out and serve STUDENT prior to the District's assessment and IEP meeting in the fall of 2000. The Petitioner generally argued at the hearing that STUDENT'S failing grade and numerous absences during the ninth grade should have alerted the District that STUDENT was a child with an emotional disturbance. Additionally, Ms. PARENT testified that she spoke to a counselor about STUDENT'S problems at some point before STUDENT'S final decompensation in July 2000.

The Hearing Officer finds that STUDENT'S F grade during her ninth grade year and her frequent absences should not have alerted the District that she may have been a child with a disability. Many students receive failing grades and are frequently absent; in fact, failing grades and frequent absences are often closely correlated. The question is whether there was some unique fact that was known to the District that should have prompted a further inquiry culminating in an assessment and, eventually, special education services. The Petitioner presented no such distinguishing fact.

With regard to Ms. PARENT'S statement regarding a conversation with a counselor, the Hearing Officer finds Ms. PARENT'S recollection of events to be generally unreliable. After contradicting (and correcting) herself during cross-examination, Ms. PARENT revealed that her memory was unreliable because she has taken the drug "Phen Phen" at some point in the past. Given that her statement was not corroborated by any evidence, the Hearing Officer affords her testimony no weight on this critical point.

In sum, the District did not fail in its child find obligation to STUDENT during her ninth and tenth grade years at Camarillo.

ISSUE NO. 3: Is MOTHER entitled to reimbursement for the cost of the assessment conducted by Marilyn M. Evenson, Ph.D., in October 2001?

Petitioner seeks reimbursement for an evaluation that was obtained from Marilyn M. Evenson, Ph.D. Pursuant to State and federal law, a parent may obtain an independent educational evaluation from a qualified specialist if the parent disagrees with the assessment conducted by the local educational agency. If the educational agency establishes at a due process hearing that its assessment was appropriate, it is not required to pay for the independent evaluation. Cal. Educ. Code ?56329(b). Thus, the first question is whether Judy Greycloud's assessment was appropriate.

Petitioner argues that Judy Greycloud's assessment of November 2000 was inappropriate and therefore Ms. PARENT should be reimbursed for the costs of a private assessment she obtained from Marilyn M. Evenson. The thrust of Petitioner's arguments in that regard are that, while the assessment tools, behavioral scales, interviews, and documents reviewed during her comprehensive assessment were appropriate, her assessment does not state with sufficient detail every behavior or mishap that befell STUDENT since the first grade. Petitioner also argues that because STUDENT failed to interview Mr. PARENT, her

79

assessment was inadequate. Petitioner's arguments are not persuasive.[14]

The sole omission in Ms. Greycloud's assessment, that her failure to interview STUDENT'S adoptive father, does not render her assessment inappropriate.[15] Ms. Greycloud conducted a thorough interview of MOTHER, the only parent that STUDENT lived with during her entire stay at Camarillo High School. Moreover, the Hearing Officer finds that Ms. Greycloud's assessment report contained sufficient detail regarding STUDENT'S relevant educational history, including significant behavioral events and educationally related problems. As such, both her assessment and the resultant report were appropriate.

Assuming arguendo that Ms. Greycloud's assessment was inappropriate, Ms. PARENT is still not entitled to reimbursement for the assessment conducted by Dr. Evenson. Petitioner presented no persuasive evidence that Dr. Evenson's assessment was procured because Ms. PARENT disagreed with the District's assessment. Because Ms. PARENT did not procure the private assessment because she disagreed with the District's assessment, she is not entitled to reimbursement.

ISSUE NO. 4: Is MOTHER entitled to retroactive reimbursement for the costs of the Cross Creek Manor placement from October 2000 through the date of this decision, including expenses incurred for tuition, travel, parent training services, and related costs?

When a school district denies a student a FAPE, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. *School Comm. of the Town of Burlington v. Dept. of Educ.*. 471 U.S. 359, 369,105 S. Ct. 1996 (1985); *see also* 20 U.S.C. ? 1415(i) (1997). Thus, parents may be entitled to retroactive reimbursement for the services they have procured for their child when the school district failed to provide an appropriate placement or services and the services provided by the parents were appropriate under the IDEA. *Burlington*. 471 U.S. at 370. However, the *Burlington* rule is not so narrow as to permit reimbursement only when the placement or services chosen by the parent are found to be the exact proper placement or services required under the Act. *Alamo Heights Independent Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986). The *Alamo* court stated the following about the rationale behind the Court's decision in *Burlington*:

The rationale behind *Burlington*'s holding is that parents who elect to risk shouldering the costs of what they perceive to be a more appropriate placement, and whose judgment is wholly or in part vindicated by the district court, should receive more than an "empty victory." [Footnote omitted.] As stated by the Court, if "appropriate relief in the form of reasonable reimbursement is not allowed, "the child's right to a free appropriate public education, the parent's right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete." [Footnote omitted.]

*Id*

In *Florence County School Dist. Four v. Carter*. 510 U.S. 7. 13, 114S.Q. 361 (1993), the Supreme Court specifically exempted parents from having to meet certain requirements of the IDEA in their unilateral placements. For example, parents are not required to conform their unilateral placement to the content of the student's IEP or provide a placement that is certified by the state. *Id*. at 13-14. Although the Court has recognized that the parents' placement does not have to meet a standard as high as a school district's must meet, the

80

parents' placement must still meet other requirements of the IDEA, such as providing a placement that addresses the student's needs and provides the student educational benefit. *Id.*

As developed above, the District failed to offer STUDENT a FAPE beginning in December 2000 when if failed to find STUDENT eligible for special education as emotionally disturbed. Accordingly, Ms. PARENT may be entitled to retroactive reimbursement for the private educational services she obtained after December 5, 2000, if they were appropriate.[16]

The remaining question is whether the services that Ms. PARENT procured after December 5, 2000, were appropriate for STUDENT. Petitioner seeks reimbursement for (1) the costs associated with STUDENT'S placement at Cross Creek Manor (including tuition, room and board, academic services, counseling/therapy services, incidentals and parent transportation and lodging), and (2) the costs associated with parent education. Each will be discussed below.

(1) The Costs Associated with STUDENT'S Placement at Cross Creek Manor

The District argues generally that Ms. PARENT is not entitled to reimbursement because there was insufficient evidence that Cross Creek was appropriate for STUDENT.[17] No witness from Cross Creek testified at the Hearing. Nonetheless, as discussed below, there was sufficient evidence that STUDENT'S residential placement at Cross Creek appropriately met her academic and her emotional/behavioral needs.

With regard to the academic appropriateness of Cross Creek, Ms. PARENT testified that there was not "much" of an academic component for the first couple of weeks and that the initial focus was on STUDENT'S urgent emotional/behavioral needs. When Ms. Greycloud assessed STUDENT in mid-November (at that point, STUDENT had been there for about two weeks), STUDENT was not yet attending classes so she did not have the opportunity to observe STUDENT receiving instruction at Cross Creek/Browning Academy. She did, however, look at some of the materials, which she felt were appropriate, and she observed some of the classes. Ms. Greycloud explained that the students whom she observed were essentially on independent study; they were placed in classes of 10-12 students, and the teacher would walk around and answer questions posited the teacher by the students. She felt that this was inappropriate for STUDENT because this teaching model assumes a student is self-motivated and disciplined, and those characteristics were not generally associated with STUDENT. Testimony of Greycloud.

STUDENT started attending classes before the December 5, 2000 IEP meeting, and by that time, her teachers reported that she was making progress. Ms. Greycloud obtained teacher rating scales and other information from most of STUDENT'S teachers at Cross Creek during her assessment. STUDENT'S U.S. History teacher indicated that STUDENT was average in behavior, class work, participation, cooperation, and social relationships with "excellent attendance and quality of work." The same teacher noted that STUDENT worked slowly and sought perfection. STUDENT'S math teacher did not have much to report except that she was "slow in the pretest." STUDENT'S English teacher reported that STUDENT was receiving a "B"; he also noted that her attendance, homework and cooperation were above-average. Finally, STUDENT'S Business teacher generally rated STUDENT to be average, and noted that she required reassurance.

81

STUDENT'S academic progress continued through July 2001. Petitioner submitted into evidence a transcript, dated July 2001, that tracks her progress after a little over one semester in the Browning Academy. STUDENT received excellent grades and received substantial credits in all reported courses by July, STUDENT had attained "B" grades in the following classes: introduction to business (.5 credits), U.S. History (.5 credits[18]) Math 87 (.5 credits), and Study Skills (.5 credits). She had also received "A" grades in the following classes: Physical Education (1.0 credits), Skills Development (.5 credits), and Fine Arts (.5 credits). She was also enrolled in Eleventh Grade English (1.0 credits), but had not yet completed the course. Petitioner's Exh. D, pp. 10-11.

STUDENT continued to make academic progress through the end of September 2001. STUDENT'S "educational plan," dated October 1, 2001, indicates that STUDENT was winding up her eleventh-grade-required courses by that time. She was completing the second semester of 11 English,[19] the second semester of U.S. History, and she was completing the graduation requirements in the area of mathematics. She was also taking several twelfth grade classes by that time, including physical education, physical science and American government. *Id.* at 11.

The Hearing Officer finds that STUDENT'S Cross Creek/Browning Academy placement appropriately addressed her academic needs. STUDENT'S teachers reported that STUDENT was performing adequately in their classes, both behaviorally and academically. By July 2001, STUDENT had earned grades of A and B in all reported subjects. By the beginning of October 2001, she had completed most of her eleventh grade requirements and was working towards completing the eleventh grade/second-semester requirements in English and U.S. History and graduation requirements in the area of mathematics.[20] By that time, STUDENT was also taking three twelfth-grade courses. Considering all of the above, STUDENT'S program at Cross Creek/Browning Academy met her educational needs.

The Hearing Officer similarly finds that Cross Creek Manor appropriately addressed STUDENT'S most important and urgent needs, her emotional/behavioral needs, including her needs for residential treatment and substantial individual and group therapy. First, the evidence established that STUDENT required a residential placement, and Cross Creek (a residential placement) met this need. Patricia Meyer, who was STUDENT'S therapist at Vista Del Mar in September/October 2000, testified that STUDENT required residential treatment because of her serious depression, suicidal ideation, and risky behaviors. STUDENT'S risky behaviors continued after she was placed at Cross Creek; STUDENT was placed on "staff buddy," which means she had to be accompanied by a staff member everywhere she went, because she had tried to run away. STUDENT'S need for a residential placement continued in February 2001. Dr. Seely, who assessed STUDENT in February 2001, recommended that STUDENT continue her placement at a "long-term residential treatment center." Dr. Evenson, who assessed STUDENT in October 2001, concurred with Dr. Seely's recommendation that long-term residential treatment was still necessary for STUDENT. Testimony of Evenson. There was no persuasive evidence that STUDENT'S need for residential treatment changed during her stay at Cross Creek.

Second, it is not seriously disputed that STUDENT required extensive therapy because of her serious, ongoing major depression, suicidal ideation and risky behaviors, and that this need has been appropriately met by Cross Creek. Dr. Seely recommended continuing group and individual therapy to address STUDENT'S emotional/behavioral needs in

82

February 2001. Dr. Evenson testified that this need continued in October 2001. There was documentary evidence presented that STUDENT has consistently received such therapy during her stay at Cross Creek, including both individual and group therapy, from a licensed clinical social worker named Brent Hall. District's Exh. 4 and Petitioner's Exh. H, pp. 15-20. Because STUDENT'S placement at Cross Creek met her most urgent and extensive emotional/behavioral need for a structured, residential placement and provided her with substantial group and individual therapy, it appropriately met those needs.[21]

In sum, because STUDENT'S Cross Creek/Browning placement met STUDENT'S emotional/behavioral needs, as well as her academic needs, it was appropriate. Ms. PARENT is therefore entitled to reimbursement for the services provided by Cross Creek/Browning Academy after December 5, 2000 through the date of this decision, as well as for the cost of transporting STUDENT to Cross Creek in October 2000.[22]

(2) The Costs associated with Parent Education

Petitioner also seeks reimbursement for "parent education." These services, which were provided in the form of seminars in Arizona and San Diego, were allegedly recommended by the staff at Cross Creek. The Petitioner failed to provide any persuasive (or nonhearsay) evidence that the parent seminars were either an appropriate or a necessary part of STUDENT'S Cross Creek placement, or were otherwise necessary to provide STUDENT with a FAPE. As such, Ms. PARENT is not entitled to reimbursement for the costs associated with the two parent seminars.

In sum, Ms. PARENT is entitled to reimbursement for the following services: (1) the cost of transporting STUDENT to Cross Creek in October 2000 and (2) all costs related to her placement at Cross Creek incurred after December 5, 2000 up to the date of this decision, including tuition, the costs of therapy provided by Brent Hall, incidentals, uniforms, and parent transportation and lodging during parental visits to Cross Creek, up to the date of this decision.

ISSUE NO. 5: Is STUDENT entitled to compensatory education services?

When a school district denies a special education student a FAPE, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. *School Comm. of the Town of Burlington v. Dept. of Educ..* 471 U.S. 359, 374, 105 S. Ct. 1996 (1985); *see also* 20 U.S.C. ? 1415(i) (1997). Based on the principle set forth in Burlington, federal courts have held that compensatory education is a form of equitable relief that may be granted for the denial of appropriate special education services to help overcome lost educational opportunity. *See, e.g., Parents of Student W. v. Puvallup Sch. Dist.* 31 F.3d 1489, 1496 (9th Cir. 1994).

It has been found above that STUDENT was denied a FAPE from December 2000 up to the date of this decision. It also has been found above that the program provided by STUDENT'S mother beginning in the fall of 2000 was appropriate. Because her Cross Creek private placement appropriately addressed STUDENT'S needs, STUDENT is not entitled to compensatory education.

**Order**

83

1. Within 30 calendar days after receipt of proof, the District shall reimburse MOTHER for the following: (1) the cost of transporting STUDENT to Cross Creek in October 2000 and, (2) all costs related to her placement at Cross Creek incurred after December 5, 2000, up to the date of this decision, including tuition, costs of therapy provided by Brent Hall, incidentals, uniforms, and parent transportation and lodging during parental visits to Cross Creek. The District is not required to reimburse Ms. PARENT for the cost of Dr. Seely's assessments or parent education costs.

2. Within 30 calendar days of the date of this decision, the IEP team shall, in conformity with this decision, develop a program that is designed to provide STUDENT with a FAPE and that otherwise conforms with the law.

3. All other requests for relief are denied.

[1]The issues have been framed to reflect the discussions with the parties and for proper analysis.

[2]There is no school record or any other document that reflects that this actually occurred.

[3]STUDENTreported to Dr. Bennett in May and June 1999 that her father had physically abused her in November 1998. He choked her and slapped her with the back of his hand, according to STUDENT. Petitioner's Exh. A, at p. 50.

[4]STUDENT began abusing drugs, including marijuana and alcohol, during the ninth grade. Apparently her marijuana abuse began at some point after her first hospitalization, because she tested negative for all drugs at this time.

[5]STUDENT was five credits behind at the time she left the District and was placed at Cross Creek Manor in Utah by her mother. Those five credits, which have not yet been made up, were lost because she received an F in Reading during the first semester of ninth grade at Camarillo High School in the District.

[6]Ms. PARENT testified that she did not find out about the pregnancy or the abortion until approximately October 2000, when STUDENT'S former boyfriend and his parent visited Ms. PARENT because STUDENT was harassing the young man. During the conversation, it was related to Ms. PARENT that STUDENT had been pregnant and that she had undergone an abortion the previous fall.

[7]STUDENT found another job at a coffee house after she quit her restaurant job. She worked at the coffee house for a couple of weeks, according to Ms. PARENT.

[8]Ms. PARENT testified that STUDENT wrote what was deemed to be a suicide note.

[9]This category was formerly known as "seriously emotionally disturbed" See 20 U.S.C. ? 1401 (3)(A)(i) (1997).

[10]Dr. Bennett's assessment, as developed above, diagnosed STUDENT with depressive disorder NOS (not otherwise specified). Dr. Bennett noted that STUDENT'S otherwise mild

symptoms escalated after the "Bloody Mary Incident" and after she was physically abused by her father. Petitioner's Exh. A, p. 52.

[11]ED is the same as SED; this category was formerly known as "seriously emotionally disturbed " See 20 U.S.C. ? 1401(3)(A)(i) (1997).

[12]The Hearing Officer notes that STUDENT'S condition likely contributed to her failing grade in reading during the first semester of her ninth grade year. STUDENT was hospitalized for several days during this period after being abused by her adoptive father. The five credits she did not receive because of the F have not yet been made up.

[13]Petitioner also objected to the composition of the December 5, 2000 IEP team, stating that, because no regular education teacher was present, the meeting was procedurally inappropriate. It is not necessary to determine if this alleged procedural violation resulted in a denial of FAPE because it has already been determined that the decision of December 5, 2000 IEP team, i.e., that STUDENT was not eligible, was incorrect. Because STUDENT was not found eligible, and was offered no special education services, she was necessarily denied a FAPE.

[14]Petitioner's attorney argues that Judy Greycloud's assessment report lacked sufficient detail, while Dr. Evenson never managed to successfully reduce her assessment to writing.

[15]It is unclear whether Dr. Evenson interviewed Mr. PARENT, either.

[16]Ms. PARENT is not entitled to reimbursement for services STUDENT received prior to December 5, 2000 (other than the cost of transporting STUDENT), because there was no denial of FAPE prior to that date and no other basis for reimbursement. It was not alleged, for example, that the assessment and IEP were untimely. Ms. PARENT is entitled to reimbursement for the cost of transporting STUDENT (this cost was incurred before December 5, 2000), because this cost would have been incurred by Ms. PARENT whether STUDENT was placed at Cross Creek before or after December 5, 2000.

[17]The District made additional arguments, including that Ms. PARENT never informed the District that she was going to place STUDENT in Cross Creek before she actually placed her there in October 2000 and that "county mental health" was never consulted regarding the need for a residential placement or if one was available in California. The first argument is inapplicable in light of the determination that Ms. PARENT is not entitled to reimbursement for the Cross Creek placement for services incurred before December 5, 2000--as of that date, the District had been on notice for some time that STUDENT was in Cross Creek. The argument that county metal health was never consulted is also unavailing; it was the District's responsibility to consult with county mental health, not the parent's.

[18]Each half credit is the equivalent to one semester worth of work, according to the Browning Academy transcript and the Educational Plan. Petitioner's Exh. D, pp. 10-11.

[19]While it is not known what grade she received for the first semester of 11 English (eleventh grade English), by October 1, 2001, STUDENT had completed the first semester of 11 English and was working on the second semester. Thus, she had made progress

85

since July 2001 when she had not received credits for the first semester of 11 English. Petitioner's Exh. D, pp. 10-11.

[20]In light of the fact that she received no credit for all of her work at Camarilla during the period from August 2000 through the end of October 2000 (essentially one-half of a semester), the fact that STUDENT had not, as of October 1, 2001, completed her eleventh grade/second semester required courses, is not surprising.

[21]STUDENT'had made enough emotional/behavioral progress by the fall of 2001 that she was allowed to visit home. Testimony of MOTHER.

[22]Ms. PARENT is not entitled to reimbursement for the cost of Dr. Seely's assessment (which was not at issue in the hearing).

**Copyright 2008 © LRP Publications**

**34 IDELR 249**
34 LRP 249

## *Manhattan Beach Unified School District*

### California State Educational Agency

### SN 1313-99

### March 14, 2001

## Related Index Numbers

175.050 Eligibility Criteria, Serious Emotional Disturbance
445.010 Serious Emotional Disturbance, Eligibility Criteria

## Case Summary

Instances of a high school student's inappropriate behavior and her clinically diagnosed depression supported her eligibility as a student with an emotional disturbance. The IHO ruled that the district's denial of eligibility to the student denied her FAPE and justified reimbursement for the parents' private placement. Evidence indicated the student exhibited both inappropriate types of behavior under normal circumstances and a general, pervasive mood of unhappiness or depression for a long period of time and to a marked degree. The student's education had been affected by her condition and she required services that could not be provided with modifications to a regular school program.

The parents requested the district to assess their daughter for special education after she had experienced behavior problems. Three months earlier, following an apparent suicide attempt, the student was unilaterally placed in a residential treatment facility. The district's IEP team concluded the student did not meet special education eligibility criteria as ED. The parents disagreed and requested due process. They claimed the district incorrectly refused to provide the student with services and sought reimbursement for two years of private placement costs.

*HELD*: For the parents.

The student qualified for special education as a student with ED since the 1997-98 school year, the IHO concluded. Evidence indicated the student exhibited both inappropriate types of behavior under normal circumstances and a general, pervasive mood of unhappiness or depression for a long period of time and to a marked degree. Because the district erroneously concluded the student did not meet special education eligibility criteria, the IHO ruled it denied her FAPE. He awarded reimbursement to the parents for the costs of the student's placement at a residential facility. The IHO also granted reimbursement for one-half of the parents' tuition costs at a college-preparatory boarding school.

## Judge / Administrative Officer

Mary L. Cote, Hearing Officer

**Full Text**

Counsel for Student: Jodi F. Ossen Brynder

Counsel for District: Sharon Watt, Nancy Stephens

### Decision

This matter was heard before Mary L. Cote, Hearing Officer of the California Special Office, McGeorge School of Law, University of the Pacific, in Manhattan Beach, California, on April 27 and 28, August 16, September 14, and December 12 and 13, 2000.

Petitioner STUDENT was represented at the hearing by attorney Jodi F. Ossen Bynder. Also present on behalf of Petitioner were STUDENT's parents. Respondent Manhattan Beach Unified School District (District) was represented on the first four days of hearing by attorney Sharon Watt. On the last two days of hearing, the District was represented by attorney Nancy Stephens. Also present on behalf of the District at the beginning of the hearing was Linda Jones, director of pupil personnel services.

Oral and documentary evidence was received. Following receipt of written closing arguments, the case was closed, and the matter was submitted for decision.

### Issues

(1) Has STUDENT met special education eligibility as a student with an emotional disturbance since the 1997-1998 school year?

(2) Are Petitioner's parents entitled to reimbursement for the costs of private placements they procured for STUDENT beginning in July 1998 and continuing to the date of the decision?[1]

### Background Facts

Petitioner STUDENT is a 16-year-old student in the eleventh grade. She has never been found eligible for special education. At the time of the hearing, STUDENT was attending the Oakley School, a private therapeutic college preparatory boarding school in Utah. STUDENT's parents enrolled STUDENT in the Oakley School following a stay of 17 months at Sorenson's Ranch, a residential treatment program, also in Utah.

PARENTS adopted STUDENT when she was two days old. STUDENT's developmental history is unremarkable. From kindergarten through the third grade, STUDENT attended American Martyrs School, a private parochial school. From grades four through six, STUDENT attended Grand View Elementary School in the District. STUDENT's parents described her as "loving, bright, articulate, and socially involved" while in elementary school. She also received good grades commensurate with her above-average cognitive abilities. STUDENT transitioned to Manhattan Beach Intermediate School for the seventh and eighth grades.

STUDENT's parents report that STUDENT changed remarkably while in the eighth grade during the 1997-1998 school year. Following the death of a friend's mother in October 1997

and her grandmother's diagnosis and ultimate death from cancer, STUDENT began sleeping excessively. On other occasions, she would stay up all night. STUDENT would not follow limit-setting at home. She acted defiantly toward her parents and stayed out all night. STUDENT engaged in promiscuous behavior with boys unknown to her parents. At school, STUDENT's grades fluctuated and she had many conflicts with her physical education (PE) teacher. She also was disciplined for wearing provocative clothing and being tardy to school. STUDENT had emotional outbursts at school that on at least one occasion, resulted in MOTHER's having to pick up STUDENT from school because she was unconsolable.

In February 1998, STUDENT told her parents that she had a drug problem. The PARENTS sought counseling from Barbara Stapleford, LCSW. The adoption agency referred the PARENTS to Ms. Stapleford. Matthew Wunder, Manhattan Beach Middle School advisor, also referred the PARENTS to the South Bay Youth Project, where STUDENT saw Alarm Dingle, Ph.D., for counseling. In April 1998, while in the girl's restroom at school, STUDENT took an unknown quantity of Zoloft, an antidepressant, in an apparent suicide attempt. When confronted by her parents, she ran away from home for the entire weekend. Mr. Wunder then recommended that the PARENTS take STUDENT to Peninsula Recovery Center for substance abuse treatment. STUDENT participated in treatment with Michael Ballue from May to July 1998. However, STUDENT apparently took drugs and again ran away from home. Her parents found her four days later at a house with four boys. Thereafter, the PARENTS hospitalized STUDENT at Del Amo, a psychiatric facility. STUDENT remained at Del Amo for 11 days. On the advice of Del Amo, STUDENT was discharged on July 25, 1998, to Sorenson's Ranch in Utah. Sorenson's Ranch is a working ranch that provides a residential treatment program for students who have not been successful in their comprehensive high school programs.

In October 1998, STUDENT's parents requested that the District assess STUDENT for special education. The District prepared an assessment plan for the parents' approval and requested a concurrent assessment by Los Angeles County Mental Health (Mental Health). On November 19, 1998, the parents consented to the District's proposed assessment plan and, in December 1998, Jack Schnel, Ed.D., assessed STUDENT at Sorenson's Ranch. Dr. Schnel is a clinical and educational psychologist in private practice. He also holds a part-time position with the Palos Verdes Peninsula Unified School District. In December 1998, the parents obtained an independent assessment from Teri Solochek, Ph.D.[2]

On January 15, 1999, the individualized educational program (IEP) team met and reviewed the results of Dr. Schnel's assessment. District members of the IEP team concluded that STUDENT did not meet eligibility criteria for special education as emotionally disturbed (ED). Also on January 15, 1999, Mental Health notified the District that it would not be assessing STUDENT because she was not then eligible for special education. The PARENTS disagreed with the findings of the District members of the IEP team and requested a due process hearing to resolve the issue of STUDENT's eligibility for special education.

In August 1999, STUDENT's parents obtained a second independent assessment from Dr. Solochek. Dr. Solochek continued to recommend that STUDENT receive therapeutic intervention. However, she concluded that STUDENT would benefit from placement in a "transitional boarding program" rather than returning to her home upon release from Sorenson's Ranch. In January 2000, STUDENT transferred from Sorenson's Ranch to Oakley, a private therapeutic college preparatory boarding school in Utah. At the time of the hearing, STUDENT's parents continued to fund STUDENT's attendance at Oakley.

89

Petitioner contends that during the 1997-1998 school year the District should have identified her as eligible for special education because of an emotional disturbance. Petitioner asserts that her parents repeatedly contacted school personnel regarding STUDENT's declining school performance and worsening emotional state. However, the District neither referred her for special education nor assessed her until November 1998. Petitioner asserts that because the District failed to identify her as eligible for special education and to provide her with a special education placement and services, her parents have had to procure private placements to address her special education needs. Petitioner further asserts that her parents are entitled to reimbursement for the costs of her placement at Sorenson's Ranch and Oakley as compensatory educational services.

The District contends that at no time has Petitioner met eligibility criteria for special education because of an ED. The District asserts that Petitioner has always done well in school and does not have social or emotional problems that rise to the level of an ED. For this reason, the District asserts that Petitioner's parents are not entitled to reimbursement for the costs of Petitioner's attending private placements.

## Findings of Fact and Conclusions of Law

### Issue No. 1: Has STUDENT met special education eligibility as a student with an emotional disturbance (ED) since the 1997-1998 school year?

Under both State law and the federal Individuals with Disabilities Education Act (IDEA), children with disabilities have the right to a free appropriate publice ducation(FAPE).[3] 20 U.S.C. ? 1400(d) (1997) (formerly found at 20 U.S.C. ? 1400(c)); Cal. Educ. Code ? 56000. A "child with a disability" is a child with mental retardation, hearing impairments, speech or language impairments, visual impairments, emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities. 20 U.S.C. ? 1401(3)(A)(1997)(formerly found at 20 U.S.C. ? 1401(a)(1)(A)). A student is eligible for special education and services when, as a result of the student's disability, the student requires instruction, services or both which cannot be provided with modification of the regular school program. Cal. Educ. Code ? 56026(a) and (b).

### Serious Emotional Disturbance (ED) Eligibility Criteria

A student meets eligibility criteria as ED when he/she exhibits one or more of the following characteristics over a long period of time and to a marked degree, which adversely affect educational performance:

(1) An inability to learn which cannot be explained by intellectual, sensory, or health factors.

(2) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(3) Inappropriate types of behavior or feelings under normal circumstances exhibited in several situations.

(4) A general pervasive mood of unhappiness or depression.

(5) A tendency to develop physical symptoms or fears associated with personal or school

problems.

34 C.F.R. ? 300.7(b)(9)(i); Cal. Code Reg. Tit.5 ? 3030(i).

The student does not meet special education eligibility criteria as ED if the student is socially maladjusted, unless it is determined that the student has a serious emotional disturbance. 34 C.F.R. ? 300.7(b)(9)(ii).

Petitioner contends that she meets ED eligibility under three of the categories above because she has an inability to build or maintain satisfactory interpersonal relationships with peers and teachers, exhibits inappropriate types of behavior or feelings under normal circumstances in several situations, and exhibits a general pervasive mood of unhappiness or depression.

### Does STUDENT exhibit an inability to build or maintain satisfactory interpersonal relationships with peers and teachers?

Petitioner asserts that her relationships with other students and staff at Manhattan Beach Middle School, Sorenson's Ranch, and the Oakley School have been unsatisfactory. The District asserts that Petitioner is able to make and sustain friendships with peers, and is able to get along well with teachers.

Petitioner's parents testified that STUDENT's peer group changed during the eighth grade and that the people she "hung out" with were not known to the family. For example, on one occasion when STUDENT ran away, MOTHER found her with people STUDENT described as friends although they were unknown to MOTHER. However, MOTHER testified that she picked up STUDENT from a familiar friend's house on another occasion. MOTHER expressed concern about the quality of STUDENT's new friends who apparently were involved in taking illegal drugs. MOTHER testified that STUDENT also had difficulty getting along with her teachers. MOTHER recalled a number of conversations with school personnel regarding STUDENT's difficulties, particularly with the physical education (PE) teacher. MOTHER stated that she also met with STUDENT's Spanish teacher because of concerns regarding her school performance. Dr. Solochek, who assessed STUDENT at the request of her parents, concurs with STUDENT's parents that STUDENT's selection of friends has been questionable and not always in her best interest.

The picture of STUDENT while attending Manhattan Beach Middle School is that of a social student with friends. The testimony of Manhattan Beach teachers establishes that STUDENT had friends at school and maintained satisfactory relationships with at least some of her teachers. Matthew Wunder, STUDENT's school advisor in the eighth grade, testified that friends and having a "social life" were important for STUDENT. STUDENT's seventh and eighth grade teachers (Melinda Decker, physical education, Ro Schreiner, social science, Kevin Post, English, and Ralph Ford, computers) testified that STUDENT was social and got along well with peers in their classes. They also observed STUDENT to have friends outside of the classroom during nutrition break, lunch, and after school. As to relationships with teachers, Mr. Wunder testified that if STUDENT liked a teacher, they got along wonderfully. However, if STUDENT did not like a teacher, she would engage in a power struggle with the teacher. In particular, numerous witnesses testified that STUDENT had ongoing difficulties with her physical education teacher in the eighth grade. Mr. Post stated that STUDENT "tolerated" him. The remaining teachers generally described STUDENT's relationships with them as "normal."

91

Andrea Fuller, marriage family therapist (MFT), formerly served as Sorenson's Ranch clinical director and as STUDENT's primary therapist.[4] Ms. Fuller described STUDENT's relationships with female students at Sorenson's Ranch as "contentious" and her relationships with male students as "sexualized and self-destructive." On the other hand, Shane Sorenson testified while he questioned STUDENT's selection of friends, she did have peer relationships and established some positive relationships with teachers while at Sorenson's Ranch. Mr. Sorenson is the director of Sorenson's Ranch and holds a Master's degree in psychology.

As to STUDENT's relationships at Oakley, Arch Egbert, STUDENT's advisor, generally characterized STUDENT's peer and teacher relationships as "poor."[5] However, it is reported that STUDENT presently has a boyfriend.

The testimony of STUDENT's teachers and others who have worked with STUDENT establishes that she does not have an inability to build or maintain satisfactory interpersonal relationships with peers and teachers. STUDENT's friends may not be in STUDENT's best interest from the perspective of her parents or therapists. However, the fact that STUDENT has developed peer relationships while attending school at Manhattan Beach, Sorenson's Ranch, and Oakley, presently has a boyfriend, and also has had positive relationships with some teachers establishes that she does not meet ED eligibility under category one.

### Does STUDENT exhibit inappropriate types of behavior or feelings under normal circumstances in several situations?

Petitioner asserts that running away, engaging in sexually provocative behavior, using drugs, arriving at school late, and failing to complete school work are examples of inappropriate behavior she engaged in while at Manhattan Beach Middle School and Sorenson's Ranch. Additionally, she also exhibited inappropriate behavior including outbursts of profanity and excessive anger, defensiveness, and highly emotional responses to normal circumstances while attending Manhattan Beach Middle School, Sorenson's Ranch, and Oakley. The District asserts that STUDENT has not engaged in any bizarre or outrageous behavior that would make her eligible under the ED category above.

Petitioner's witnesses, including her parents and therapists, described the following inappropriate types of behavior or feelings that STUDENT has exhibited under normal circumstances: excessive emotional responses, highly sexually provocative behavior, inappropriate sexual relations, perceptions of rejection, and impulsivity. As to STUDENT's excessive emotional responses, witnesses including MOTHER, described STUDENT's loss of emotional control during the 1997-1998 school year. MOTHER recounted being called to pick up STUDENT from Manhattan Beach Middle School because STUDENT was sobbing and unconsolable. Other witnesses who treated STUDENT in a therapeutic setting supported STUDENT's assertion that she demonstrated inappropriate behavior or feelings under normal circumstances while attending Manhattan Beach Middle School. A letter from Alann D. Dingle, Ph.D., clinical psychologist, states that STUDENT had chronic feelings of emptiness and abandonment. (Petitioner's Exhibit 6.) Dr. Dingle treated STUDENT in the spring of 1998. A letter from Michael Ballue of the Peninsula Recovery Center describes STUDENT's lack of self-control. Mr. Ballue treated STUDENT from May to July 1998. (Petitioner's Exhibit 8.) During testimony, Dr. Solochek described STUDENT's behavior when STUDENT was required to wait in the doctor's office prior to testing. Dr. Solochek first spoke with MOTHER. When she called STUDENT to begin testing, STUDENT was

described as "extremely" upset and unable to participate in testing on that date. Dr. Solochek's testing supported observations made by teachers and parents of STUDENT's difficulty responding to feelings and coping, and tendency to be impulsive. STUDENT's scores on the Thematic Apperception Test (TAT) showed STUDENT to be emotionally reactive, sensitive to criticism, and lacking in solid resolution skills. (Petitioner's Exhibit 7.)

When testifying, STUDENT's teachers and advisor in the District did not recall STUDENT engaging in bizarre or unusual behavior. However, their answers to questions contained in a teacher's response form used by Dr. Schnel in his assessment of STUDENT indicated several areas of concern. Areas marked by teachers or Mr. Wunder as "very true or often true" included the following: demands a lot of attention; feels worthless or inferior; apathetic or unmotivated; feels hurt when criticized; stubborn, sullen, or irritable; temper tantrums or hot temper; seems preoccupied with sex; and overly anxious to please (boys). (Petitioner's Exhibits 17-21.) Additionally, Mr. Wunder was so concerned about STUDENT that he recommended that the parents seek personal counseling for STUDENT outside the school environment. Mr. Wunder testified that he first referred STUDENT for personal counseling and then recommended her for addiction counseling. Mr. Wunder, testified that while STUDENT was attending Manhattan Beach Middle School, she wore sexually provocative clothing. Her clothes were tight and revealing. She also engaged in sexual relations with older boys. STUDENT was then thirteen years old. Mr. Wunder testified that STUDENT's engaging in unsafe sexual activity constituted inappropriate behavior. He also was aware of STUDENT's strong emotional responses.

Dr. Schnel, who assessed STUDENT on behalf of the District while she was attending Sorenson's Ranch, testified that STUDENT has not exhibited odd, strange, or unusual behavior. She also has not exhibited signs of hallucinations or delusions. Dr. Schnel testified that STUDENT does not meet the above ED criteria because her behavior is "societally inappropriate but not bizarre or unusual." Ms. Fuller also testified regarding STUDENT's behavior while attending Sorenson's Ranch. Ms. Fuller stated that STUDENT removed her clothing in public areas and in the boys' restroom, and aggressively sought sexual contact. Ms. Fuller testified that STUDENT later would cry and say that she had not planned her behavior and would not do it again. Ms. Fuller concluded that STUDENT's sexual behavior was to gain acceptance and to connect with another person. Ms. Fuller testified that STUDENT has a strong perception of rejection. Ms. Fuller stated that even in therapeutic situations, STUDENT perceived discussions of her behavior as a rejection of her. According to Ms. Fuller, STUDENT also viewed setting limits as an attack on her. Ms. Fuller testified that while at Sorenson's Ranch, STUDENT would burst into tears and have angry outbursts. She also would withdraw, sulk, and pout. Ms. Fuller and others testified that STUDENT's actions were not volitional.

Mr. Egbert described another concern regarding STUDENT's emotional status while at Oakley. He testified that when STUDENT speaks of events that would normally evoke tears or sadness, such as the death of her grandmother, she has a flat affect.

There was no persuasive evidence that to satisfy the ED criterion number two-inappropriate types of behavior or feelings under normal circumstances-STUDENT must manifest bizarre, hallucinatory, psychotic, or delusional behavior, as Dr. Schnel testified. In concluding that STUDENT does not meet this criterion, Dr. Schnel apparently relied on interpretation of the ED criterion and improperly gave the interpretation the effect of law. Thus, Dr. Schnel drew conclusions based on erroneous requirements. Moreover, when compared to that of Ms. Fuller, in particular, Dr. Schnel has relatively limited knowledge of STUDENT. Dr. Schnel's

conclusions were based on testing, observations for a brief period, and discussions with some of STUDENT's teachers, whereas Ms. Fuller was engaged in an ongoing therapeutic relationship with STUDENT. Ms. Fuller also had the opportunity to observe STUDENT in her therapeutic environment and to discuss her functioning with teachers at Sorenson's Ranch. For these reasons, the Hearing Officer finds Ms. Fuller's testimony more persuasive as to STUDENT's meeting the ED criterion above. Additionally, Ms. Fuller's testimony is supported by Dr. Solochek's testing and the observations of those treating STUDENT the prior school year. Therefore, it is concluded that STUDENT meets criterion for ED because of behavior or feelings that are inappropriate under normal circumstances. The observations of STUDENT's teachers and treating mental health therapists establish that these behaviors existed while attending Manhattan Beach Middle School and the testimony of Ms. Fuller establishes that the inappropriate behaviors continued at Sorenson's Ranch.

### Does STUDENT exhibit a general pervasive mood of unhappiness or depression?

Petitioner asserts that she meets ED criteria because of a general pervasive mood of unhappiness or depression. The District asserts that Petitioner's sadness is situational and is not pervasive.

As to Petitioner's assertion that she was depressed while attending Manhattan Middle School, Petitioner relied on the testimony of MOTHER, Dr. Solochek, and on reports prepared by therapists STUDENT saw during the 1997-1998 school year. MOTHER testified that STUDENT was depressed following the death of a friend's mother. She also exhibited depression following her grandmother's death in the spring of 1998. STUDENT's depression was manifested by extended periods of sleeping at home. MOTHER testified that STUDENT also exhibited signs of depression at school and attempted suicide by taking an unknown quantity of Zoloft, an antidepressant. MOTHER further testified that she found a letter written by STUDENT on January 9, 1998, in which STUDENT expressed her feelings of depression. In pertinent part, STUDENT's letter reads as follows:

I feel really depressed. I don't know so many bad things are happening to me I feel so used by everyone I feel like someone could say one more mean thing to me and I would just go off and not be able to take it . . . Its not just like I have one bad day anymore its like every day I have a bad day. I just sit down and cry for no reason I mean I could break a pencil and cry. I don't know sometimes I feel like I don't want to go on . . .

(Petitioner's Exhibit 29.)

MOTHER's testimony regarding STUDENT's depression is supported by documents submitted by the mental health therapists who treated STUDENT in the spring and summer of 1998. In a letter dated October 7, 1998, Alann Dingle, Ph.D., clinical psychologist, stated that during the course of therapy he provided for STUDENT, her "symptoms of depression intensified." (Petitioner's Exhibit 7.) Dr. Dingle saw STUDENT for 15 individual therapy sessions and three family sessions in the spring of 1998. In July 1998, STUDENT was hospitalized at Del Amo. Medical records from STUDENT's 11-day stay at Del Amo are contained in Petitioner's Exhibits 2-4. Peter Ampudia, M.D., gave STUDENT the diagnosis of depression. The Del Amo records contain the following insightful statements made by STUDENT at the time of her admission to Del Amo:

She has been depressed since she was a small child. She cannot recall the last time that she has felt happy. She states that she feels depressed, sad, worthless, hopeless, helpless

and has been having suicidal ideation. She stated that about two months ago she took an overdose of 15 to 20 Zoloft capsules in a suicide attempt, but received no treatment for it. She states that she has been having poor sleep and poor eating, as well. She states that she has been using drugs to try to make herself feel better. She feels estranged from the family and unloved.

(Petitioner's Exhibit 2.)

Petitioner asserts that her depression persisted at both Sorenson's Ranch and Oakley despite treatment with medication to alleviate depression. Ms. Fuller testified that STUDENT exhibited signs of depression, helplessness, irritability, and hopelessness while attending Sorenson's Ranch. Mr. Sorenson additionally testified that STUDENT's sexually acting out was also a sign of her depression.

In her report completed in August 1999, Petitioner's witness, Dr. Solochek, concluded that STUDENT no longer was experiencing significant symptoms of depression. However, because of Ms. Fuller's ongoing therapeutic relationship with STUDENT at Sorenson's Ranch, Ms. Fuller's testimony is more persuasive on this issue than Dr. Solochek's testimony.

W. Dean Belnap, M.D., testified as to whether STUDENT exhibited depression at Oakley. Dr. Belnap is a child psychiatrist and behavioral pediatrician. Dr. Belnap also is the medical director of Oakley and has met with STUDENT monthly since she entered Oakley. Dr. Belnap testified that STUDENT's acting out is related to an attentional problem and an underlying psychological disorder of depression. Dr. Belnap's conclusions were based on reports by Del Amo, Dr. Schnel's testing (in particular, the results of the Auchenbach and Mellon), and on his own mental status examination of STUDENT. Dr. Belnap, as well as Mr. Egbert, testified that while attending Oakley STUDENT has continued to exhibit signs of depression. According to Mr. Egbert, STUDENT is withdrawn, moody, irritable, lethargic, depressed, exhibits a general mood of unhappiness, and shows a lack of interest in activities in which other students are involved. Mr. Egbert testified that STUDENT's teachers have reported similar types of behavior.

The District asserts that STUDENT has not and does not suffer from pervasive sadness or depression. Staff at Manhattan Beach Middle School testified that STUDENT does not meet ED criteria because of pervasive depression. However, several teachers noted that STUDENT appeared sad in class. For example, Ms. Post testified that STUDENT appeared unhappy and moody. She noted that she never saw STUDENT smile. Ms. Doll testified that STUDENT appeared quiet on some days. She further stated that "STUDENT's mood swings were a concern to me. She seemed really up-happy, excited or she seemed down-quiet, almost sullen." (Petitioner's Exhibit 18.) One teacher described STUDENT's pulling her knees up to her chest in what could be described as a "fetal position" while seated at her desk on days when she appeared "down." Mr. Wunder testified that STUDENT at times appeared unhappy and irritable during their discussions.

As to the opinion of District personnel that STUDENT did not appear depressed *all* of the time and, hence, would not meet ED criteria, the Hearing Officer notes that persons without significant education and training in the field of psychology are not particularly suited to diagnosing depression and may not be aware of the ways in which depression is manifested by adolescents. Ms. Fuller testified that symptoms of depression in adolescents typically are manifested by sleeping difficulties, changes in eating patterns, irritability, acting

out behavior and experiencing a sense of helplessness, hopelessness, or worthlessness. Adolescents may also express suicidal ideation. Dr. Solochek also testified that adolescent depression is manifested by irritability anger, moodiness, and an "I don't care attitude." No one disputed the testimony of Drs. Fuller and Solochek as to symptoms of depression in adolescents or that STUDENT has exhibited these characteristics to some extent. Therefore, the testimony of teachers and their comments made as part of Dr. Schnel's assessment establish that STUDENT manifested many of the above characteristics while attending Manhattan Beach Middle School.

Dr. Schnel, who is a mental health professional, also testified that STUDENT did not meet ED criteria because of depression. He testified that STUDENT's sad periods were situational. For example, she was sad when her grandmother was ill and ultimately died. Dr. Schnel testified that it also was expected that STUDENT would feel somewhat depressed while hospitalized at Del Amo since she was attempting sobriety or that she would feel unhappy when she had to pay the consequences for inappropriate behavior.

The Hearing Officer does not find Dr. Schnel's testimony persuasive, given the testimony of Ms. Fuller, Dr. Solochek, and Dr. Belnap. Ms. Fuller and Dr. Belnap reviewed STUDENT's medical and educational records and treated STUDENT for extended periods of time. Their testimony is supported by anecdotal records of STUDENT's behavior while she was attending Manhattan Beach Middle School and the diagnosis of depression by mental health professionals treating STUDENT beginning in the spring of 1998 and continuing to the date of the hearing. The treating mental health professionals based their testimony on their respective ongoing relationships with Petitioner. Dr. Schnel, on the other hand, saw STUDENT for relatively brief periods of testing and observation at Sorenson's Ranch.

In summary, witnesses persuasively testified to STUDENT's sadness and depression while she attended Manhattan Beach Middle School, Sorenson's Ranch, and Oakley. STUDENT herself commented in a letter she wrote in January 1998 and to Del Amo staff that she has been depressed since childhood. Therefore, it is concluded that STUDENT's depression is not situational. The Hearing Officer finds that since 1998, STUDENT has suffered from a general mood of sadness or depression that satisfies the ED criterion set forth above.

### Has STUDENT exhibited characteristics of an ED over a long period of time?

Special education law does not specify a period of time that is necessary to establish a "long period of time." Some witnesses have testified that a "long period of time" is at least six months. As discussed above, STUDENT wrote a letter expressing her ongoing feelings of depression in January 1998. STUDENT's impulsivity, provocative dress and sexual activity, and explosive behaviors were documented in the second semester of the 1997-1998. Mental health therapists treating STUDENT in March 1998 clinically identified depression, and in July 1998 STUDENT was hospitalized at Del Amo and given the diagnosis of depression. Additionally, therapists treating STUDENT at Sorenson's Ranch and Oakley concluded after a review of the records that STUDENT exhibited *significant* depression at least as early as July 1998. Using six months as a general guideline as to what constitutes a "long period of time," it is concluded that STUDENT met the two criteria above by July 1998.

### Has STUDENT exhibited these characteristics of an ED to a marked degree?

To meet eligibility criteria as a student with an emotional disturbance, STUDENT must have

96

exhibited ED characteristics to a "marked degree." That is to say, the characteristics must be pervasive and exhibited in more than one environment. STUDENT's parents testified regarding STUDENT's defiant and explosive behavior at home in the spring of 1998. They also described her running away from home and not returning for several days. The parents testified that STUDENT's emotional problems were so severe that she required a residential placement to address her needs because they could not be met in the community where STUDENT was at risk to run away. At school, STUDENT engaged in behavior evidencing an emotional disturbance. Her school attendance and grades were negatively affected. For example, her grade point average (GPA) decreased significantly from the beginning to the end of the 1997-1998 school year. For the first trimester, STUDENT's GPA was 3.29, which is better than a "B" average. Her GPA for the final trimester was 1.87, which is lower than a C average.[6] (See also the following section below regarding STUDENT's school performance.)

The evidence establishes that STUDENT's ability to benefit from therapy was affected by the severity of her behavior. For example, therapy provided while STUDENT attended school in Manhattan Beach ended when she ran away from home and engaged in drug use Ms. Fuller testified that STUDENT's "intense inner world made it difficult to deal with the outer world" even six months after arriving at Sorenson's. As a result, STUDENT stayed longer than expected at Sorenson's Ranch. The average stay at Sorenson's Ranch is 10-12 months, whereas STUDENT stayed 17 months.

The District attributes STUDENT's problems to either differing parenting styles of her mother and father, conflicts with her parents, or drug use. Ms. Fuller and Dr. Solochek testified that STUDENT's behavior was too extreme to solely be a result of her home environment. In fact, STUDENT's depression was so severe that she expressed suicidal ideation and reportedly took excessive amounts of Zoloft in a suicide attempt. Additionally, STUDENT's problems resulted in an 11-day hospitalization at a psychiatric facility. The difficulties STUDENT continued to experience while in residential placements away from her parents are well documented and also support Petitioner's assertion that her emotional problems are not solely based on difficulties in the home environment. Dr. Solochek, Dr. Belnap, Ms. Fuller and Mr. Egbert testified that adolescents may abuse drugs in an effort to self medicate. Dr. Schnel did not disagree with Petitioner's witnesses on this issue. Moreover, drug use does not preclude a finding of eligibility for special education under the category of ED.

Because the evidence establishes that STUDENT exhibited characteristics of an ED in a number of enviromnents---home, school, and therapy---it is concluded that the characteristics were exhibited to a marked degree.

### Has STUDENT's condition adversely affected her educational performance?

To qualify for special education as ED, STUDENT's inappropriate types of behavior and feelings under normal circumstances and depression must adversely affect her educational performance. 34 C.F.R. ? 300.7(b)(9)(i); Cal. Code Reg. tit.5 ? 3030(i).

The Hearing Officer finds that STUDENT's emotional condition has adversely affected her educational performance. There is no dispute that STUDENT possesses above average cognitive potential and that she was not achieving to her potential during the 1997-1998 school year. STUDENT's parents testified that STUDENT did not experience difficulty in

school until the eighth grade. It is undisputed that up to the 1997-1998 school year, STUDENT performed as expected and received "A" and "B" grades. She also did not have significant behavioral problems. As discussed more fully above, STUDENT's grades dropped significantly during the 1997-1998 school year, particularly following the death of two people in her life. Her marks in citizenship and work habits also deteriorated. For the first trimester of the school year, STUDENT received three each satisfactory ("S") and outstanding ("O") marks in citizenship. By the third trimester, STUDENT received some "S" marks. However, she also received marks of needs improvement ("N") and unsatisfactory ("U") in other classes. STUDENT's marks in work habits also declined over the 1997-1998 school year. In the fall, she received Two "O" marks, four "S" marks, and one "N." For the final trimester, STUDENT received one "N" mark, and two marks of "U." (See Petitioner's Exhibit 24.) STUDENT's school attendance and tardies increased during the 1997-1998 school year.

Additionally, Ms. Fuller testified that STUDENT's education was affected at Soreason's Ranch by her emotional problems. At Sorenson's Ranch, students do not receive credit for classes until they have achieved mastery. Ms. Fuller testified that scores of 90% are necessary to achieve mastery. Ms. Fuller testified that STUDENT did not achieve mastery and, hence, did not earn credits at the expected rate. Ms. Fuller stated that it was difficult for STUDENT to work on academics because of her emotional turmoil. The testimony by Oakley staff that STUDENT's class work is affected by her difficulty maintaining focus also was undisputed.

### Does STUDENT require instruction, services, or both which cannot be provided with modification of the regular school program?

STUDENT received counseling from a qualified mental health therapist during the spring of 1998 when she was experiencing difficulty with depression and her school grades were declining. She also participated in a drug rehabilitation program. Mr. Wunder informally counseled STUDENT at school. None of these interventions were sufficient to ameliorate STUDENT's depression or to improve her school performance. Moreover, mental health services must be provided by an appropriately credentialed or licensed mental health professional. There is no evidence that STUDENT's mental health needs could be met by a regular education teacher or by modification to her regular education program.

### Conclusion

It has been concluded above that STUDENT met two of the ED characteristics above. She exhibits both (1) inappropriate types of behavior or feelings under normal circumstances and (2) a general pervasive mood of unhappiness or depression. She has exhibited these characteristics for a long period of time and to a marked degree. STUDENT's education has been affected by her condition and she requires services which cannot be provided with modification to the regular school program. Therefore, STUDENT meets special education eligibility because of an emotional disturbance.

### Issue No. 2: Are Petitioner's parents entitled to reimbursement for the costs of private placements they procured for STUDENT beginning in 1998 and continuing to the date of the decision?

A district may be required to reimburse parents for the costs of private placements they procured if it is concluded that the district failed to provide the student a free appropriate

public education (FAPE) in a timely manner prior to enrollment at the private school and the private placement is appropriate. 20 U.S.C. ? 1412(a)(10)(C)(ii); 34 C.F.R ? 300.403(c).

Because the District did not find STUDENT met eligibility for special education, it did not provide a FAPE to STUDENT. STUDENT's parents may be entitled to reimbursement for the costs of STUDENT's attending Sorenson's Ranch and/or Oakley if it is determined that the private placements were appropriate under the IDEA. In addition, equitable considerations may be considered in granting relief. *School Committee of the Town of Burlington v. Department of Education* (1985) 471 U.S. 359; *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489, 1496. To be appropriate, the services provided by a parent must be designed to meet the student's unique needs and to provide the student with educational benefit. *Rowley* 458 U.S. 176,200. However, parents are not required to provide the "perfect" placement for their children when a school district has failed to provide a FAPE. *Alamo Heights Independent School District v. Texas Board of Education* (5th Cir. 1986) 790 F.2d 1153, 1161. For purposes of reimbursement, the placement provided by the parent also need not meet every requirement to be appropriate. For example, the placement need not be state-certified as a nonpublic school. *Florence County School District Four v. Carter* (1993) 510 U.S. 7, 14.

### Sorenson's Ranch Residential Treatment Center

STUDENT had not been referred to the District for a special education assessment nor had the District undertaken an assessment of STUDENT prior to her parents enrolling her in Sorenson's Ranch. Nonetheless, Petitioner's parents contend that they are entitled to reimbursement for the costs of STUDENT attending Sorenson's Ranch for the period beginning on July 25, 1998, because the District failed to fulfill search and serve obligations. The parents assert that the District should have assessed and identified Petitioner as a student eligible for special education because of an emotional disturbance when her grades declined and she exhibited emotional problems at school during the 1997-1998 school year. Additionally, the parents assert that a residential placement was necessary following STUDENT's hospitalization because she was at risk to run away and other less restrictive therapy had been unsuccessful.

The District contends that it did not have an obligation to assess Petitioner prior to its receipt of a referral for special education from Petitioner's parents in October 1998. The District asserts that Petitioner did not exhibit behavior or other signs at school warranting a referral for a special education assessment during the 1997-1998 school year.

California Education Code ?? 56300-56302 set forth the responsibility of local educational agencies (LEAs) including school districts, county office of educations (COEs), and special education local plan areas (SELPAs), to systematically seek out and identify students with disabilities.[7] LEAs must identify, locate, and assess students with disabilities ages 0 through 21 years including children not enrolled in public school programs who are in need of special education and related services. Identification procedures include referrals from teachers, parents, professional persons, and other members of the public.

The evidence discussed in more detail above establishes that the District was aware that STUDENT was experiencing emotional difficulties and that her grades were declining during the 1997-1998 school year. It is concluded that the District had sufficient knowledge to warrant a special education referral. To reiterate, during the course of the school year,

MOTHER met with several of STUDENT's eighth-grade teachers to discuss STUDENT's fluctuating grades and lack of academic achievement. MOTHER and Mr. Wunder met multiple times (as frequently as two to three times each month.) Additionally, on at least six occasions, STUDENT voluntarily came to Mr. Wunder to discuss various matters of concern to her. On many other occasions, STUDENT and Mr. Wunder met because of STUDENT's conflicts with her teachers and for other disciplinary matters. It also should be noted that STUDENT attempted suicide at school by ingesting an unknown quantity of Zoloft. Mr. Wunder apparently was so concerned about STUDENT's mental health that he referred STUDENT and her parents to the South Bay Youth Project for counseling. However, Mr. Wunder did not refer STUDENT to the student study team, which addresses concerns raised by school staff regarding the educational performance or behavior of individual students. He also did not refer STUDENT for a special education assessment. Given the information that was available to the District, it is concluded that the District failed in its search and serve obligations as they related to STUDENT.

To determine whether Sorenson's Ranch offered an appropriate placement for STUDENT, it is first necessary to have a general understanding of STUDENT's needs. The evidence discussed above establishes that STUDENT is bright and can benefit from instruction in the regular education curriculum. She requires mental health services to address depression, impulsivity, excessive emotional outbursts, provocative and sexual behavior, and feelings of inadequacy and rejection. STUDENT also has issues related to drug use. The evidence establishes that STUDENT had received private counseling, family counseling, and drug treatment. These treatments were not successful and she was at risk to run away. She already had run away on several occasions from her parents' home. While hospitalized in July 1998, STUDENT had "poor insight, continued social isolation and withdrawal and avoidance of her issues. . . . The patient continued to have poor insight and would be superficial and have poor participation." (Petitioner's Exhibit 5.) The recommendations of Dr. Ampudia upon discharge was a residential placement. Dr. Solochek concurred. She testified that a residential treatment center was necessary to provide STUDENT with 24-hour containment, firm boundaries, and consistency with known consequences for inappropriate behavior. Ms. Solochek testified that if STUDENT were not contained, she would not go to school. Ms. Solochek further testified that STUDENT initially needed a placement that was out of the area in which she lived because she was at risk to run away to where friends could harbor her. The Hearing Officer is persuaded by Dr. Solochek's testimony and the recommendations of Del Amo that STUDENT required a residential placement upon her release from Del Amo in July 1998.

Turning to the appropriateness of the placement provided by the parents, Ms. Fuller, Mr. Sorenson, and Elizabeth Cazier, registrar and academic advisor, testified regarding Sorenson's Ranch. Their testimony establishes that Sorenson's Ranch is a for-profit residential treatment center in Utah. It is a member of the Northwestern Association of Schools and Colleges. Sorenson's Ranch is not certified by the state of California as a nonpublic school. Sorenson's Ranch previously held California certification. However, its recent application for certification was denied. The student population includes 90-100 students in grades 7-12 who require a structured, therapeutic mileau to address behavioral and emotional difficulties. The program consists of educational, behavioral, and therapeutic components. Monthly reports are issued to monitor the students' progress in each component. The students at Sorenson's ranch participate in all aspects of the working ranch. They grow hay, care for the farm animals, and are responsible for typical ranch chores. The ratio of student-to-staff is five to eight students per staff person.

100

The students participate in an educational program from 8:30 a.m. to 3:00 p.m. The students are required to achieve mastery in each subject to earn credits toward graduation. Upon graduation, they earn diplomas from the state of Utah. Some of the teachers at Sorenson's Ranch are credentialed and others are in the process of receiving certification. STUDENT participated in the educational program at Sorenson's Ranch and was able to earn units toward graduation. Thus, placement at Sorenson's Ranch addressed STUDENT's educational needs.

A range of therapy and counseling services was available to STUDENT at Sorenson's Ranch. There was a five-level behavioral system in place to address STUDENT's behavioral needs. Her behavior was evaluated in academic, therapeutic, and behavioral components of the program. Students move from one level to the next based on the points they earn. Privileges are earned as the levels progress from one to five. STUDENT was placed on a contingency-based modification program that provided her with positive rewards such as participating in an art class or a shopping trip. The program included negative consequences such as loss of privileges, writing assignments, and removal from the student body. To address emotional needs, STUDENT received individual counseling from Ms. Fuller and met daily with a lay counselor. Ms. Fuller is a licensed MFT in California and Utah. During the course of STUDENT's stay at Sorenson's Ranch, sessions with Ms. Fuller ranged from a few minutes to several hours and occurred from one to three times per week. STUDENT's emotional needs were also addressed through participation in the following groups: chemical dependency, peer, adoption, abuse, and anger. The peer group addressed relevant daily living issues. The adoption group addressed feelings of abandonment, rejection, and adjustment issues. The abuse group addressed sexuality and male-female relations. Family and relationship counseling were also available, as was medication management. Antidepressants were prescribed for STUDENT.

It is concluded that the combination of therapy, counseling, behavioral systems, and medication provided to STUDENT at Sorenson's Ranch was designed to address her social, emotional, and behavioral needs.

As to whether STUDENT derived benefit from attending Sorenson's Ranch, the testimony of Ms. Fuller established that STUDENT's progress was slow. However, Ms. Fuller also testified that STUDENT made progress both academically and emotionally. For example, STUDENT was able to participate in an off-campus program. Ultimately, following her stay of 17 months at Sorenson's Ranch, STUDENT had made sufficient growth to allow her to move to a less restrictive educational environment. Therefore, it is concluded that Sorenson's Ranch provided an appropriate program for STUDENT and the parents are entitled to reimbursement for the costs associated with STUDENT's attending Sorenson's Ranch.

FATHER testified regarding the costs of STUDENT's stay at Sorenson's Ranch. His calculations are contained in Petitioner's Exhibit 32. FATHER testified that the total cost of board, tuition, and services at Sorenson's Ranch is $59,470. FATHER testified that Sorenson's required parental visits and that the costs of five required visits totaled $2,902.77. STUDENT made a home visit as well for a total of $500.00. FATHER's testimony establishes that the amount of reimbursement to which the parents are entitled is $62,872.77. Because FATHER did not provide copies of invoices or canceled checks, the amount of reimbursement is subject to proof. The evidence was not persuasive as to the parents' reimbursement for other costs during the period STUDENT attended Sorenson's Ranch.

101

### The Oakley School

In January 2000, STUDENT entered the Oakley School. Her parents seek reimbursement for the costs they have incurred in STUDENT's attendance at Oakley from December 1999 through the date of the decision.

In Dr. Solochek's report of her assessment of STUDENT in August 1999, Dr. Solochek concluded that STUDENT did not then "demonstrate symptoms of a disorder in mood or thought. She no longer appears to be experiencing significant symptoms of depression as were reported prior to her stay at Sorenson's Ranch. STUDENT appears to have made significant gains over the last year and demonstrates increased psychological insight." (Petitioner's Exhibit 7.) Dr. Solochek went on to note that STUDENT continued to have problems with impulsivity and poor coping skills.

Dr. Solochek testified that STUDENT was not then ready to return home because she continued to lack behavioral controls and coping skills. Dr. Solochek testified that Oakley offered STUDENT a "step down" program to help her transition home. However, during testimony Dr. Solochek also acknowledged that by December 1999, STUDENT had completed her treatment program at Sorenson's. It also should be noted that STUDENT remained in the Sorenson's program four months following Dr. Solochek's report and that during that period, she successfully lived off campus while continuing to participate in the therapy, educational, and counseling sessions offered by Sorenson's Ranch.

There is no dispute that STUDENT continued to require mental health support upon her release from Sorenson's Ranch. However, neither Ms. Fuller's nor Dr. Solochek's supports a finding that an out-of-state residential boarding school placement was necessary for STUDENT to benefit from her education. As noted, STUDENT had been living off campus from Sorenson's Ranch since September 1999. She had been making educational progress and home visits had been successful.

However, the District did not offer STUDENT special education services or placement. Therefore, the parents are entitled to some reimbursement for the expenditures they undertook in attempting to address STUDENT's needs. As to Oakley's ability to address STUDENT's needs, James Meyer testified regarding Oakley. His testimony establishes that Oakley serves 76 students in grades 9-12. There are nine teachers who are certified or are in the process of obtaining certification. There are no special education teachers on staff. Mr. Meyers described Oakley as a "college preparatory boarding school with strong counseling and recreational components." Oakley is not a state-certified special education school. Students served by Oakley require a structured environment and counseling. The students participate in a classroom educational environment from 8:00 a.m. to 4:00 p.m. Monday through Thursday. From Friday through Sunday, the students engage in recreational activities. To address social/emotional needs, the students receive 30 minutes weekly of individual counseling and one hour per week of group counseling. Some students, including STUDENT, receive medication management. Mr. Meyer testified that the students receive a traditional college preparatory education. Honors and advanced placement classes are available.

The Hearing Officer finds that the parents are entitled to partial reimbursement for the costs of mental health services provided at Oakley. The Hearing Officer has balanced the fact that the evidence was not persuasive as to STUDENT's need for an out-of-state placement in a college preparatory boarding school with the District's failure to offer any program to

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=34+LRP+24...   2/14/2008

address STUDENT's mental health needs. In reaching an equitable resolution, the Hearing Officer concludes that the parents are entitled to one-half of the cost of Oakley. This amount is based on the evidence that Oakley provided an educational program that would also have been available in the District. However, Oakley also provided counseling and medication management that STUDENT required.

Consistent with FATHER's testimony and his calculations contained in Petitioner's Exhibit 32, the amount of reimbursement shall be one-half of the actual costs of placement or $965 monthly for the period of January 2000 to the date of this decision. Because FATHER's testimony was based on his calculations, reimbursement shall be subject to proof in the form of receipts or canceled checks presented to the District.

### Order

(1) Within 20 days of the date of this decision, the District shall convene an IEP team to reflect the findings of this decision that STUDENT meets special education criteria because of an emotional disturbance.

(2) The IEP team shall develop a legally sufficient IEP including present levels of performance, annual goals, and benchmarks or objectives. The IEP team shall make an offer of placement and services designed to meet STUDENT's current needs. The IEP team shall develop a plan to transition STUDENT to an appropriate placement and services within the District.

(3) Within 20 days of receipt of proof from the parents, the District shall reimburse the parents for the costs of STUDENT's placement at Sorenson's Ranch including tuition and parent visits and home visits for STUDENT that were required by Sorenson's Ranch. The amount shall not exceed the calculations by FATHER contained in Petitioner's Exhibit 32.

(4) Within 20 days of receipt of proof from the parents, the District shall reimburse the parents for one-half of the costs of tuition at the Oakley School from January 2000 to the date of this decision.

### Prevailing Party on Each Issue

Pursuant to Education Code ? 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this statute:

### Issue NO. 1: Has STUDENT met special education eligibility as a student with an emotional disturbance since the 1997-1998 school year?

Petitioner prevailed on this issue.

### Issue NO. 2: Are Petitioner's parents entitled to reimbursement for the costs of private placements they procured for STUDENT beginning in 1998 and continuing to the date of the decision?

Petitioner prevailed as to reimbursement for the costs of Sorenson's Ranch. Petitioner substantially prevailed as to reimbursement for the costs of the Oakley School.

[1] The issues have been framed to reflect discussions between the parties at the hearing and for the purpose of facilitating analysis.

[2] Dr. Solochek did not prepare a report following her assessment.

[3] In 1997, the IDEA was amended. Most of the provisions became effective on June 4, 1997. Other provisions became effective January 1, 1998, or July 1, 1998. Petitioner's claim of special education eligibility arose during tile 1997-1998 school year. Under the 1997 amendment to IDEA, the disability category at issue in this case is known as "emotionally disturbed (ED)" whereas it previously was known as "seriously emotionally disturbed (SED)." The criteria that must be satisfied to meet special education eligibility as either ED or SED are similar.

[4] Ms. Fuller presently is director of the Crater Lake School.

[5] Mr. Egbert meets weekly with STUDENT for individual and group counseling. He also provides biweekly family counseling.

[6] Some school districts in California require that students earn a minimum GPA of 2.0 to advance to the next grade. No testimony was given as to the requirements for advancement in the Manhattan Beach Unified School District.

[7] This requirement commonly is referred to as the need to "search and serve."

**Statutes Cited**

**20 USC 1400(d)**
**20 USC 1401(3)(A)**
**20 USC 1401(a)(1)(A)**
**20 USC 1412(a)(10)(C)(ii)**

**Regulations Cited**

**34 CFR 300.7(b)(9)(i)**
**34 CFR 300.403(c)**

**Copyright 2008 © LRP Publications**