### 213 IDELR 247
213 LRP 9338

*Letter to Anonymous*

**Office of Special Education Programs**

**August 11, 1989**

**Related Index Numbers**

175.050 Eligibility Criteria, Serious Emotional Disturbance
365.080 Placement, Learning Disability

**Case Summary**

What do the terms "long period of time," "to a marked degree," and "adversely affects educational performance" mean as they pertain to the identification of SED students?

EHA and its regulations do not specifically define these terms. Individual states usually adopt administrative regulations and/or guidelines to operationalize these terms. A number of states define "long period of time" by a range of time during which the behavior must have been present, usually two to nine months. Only a few states define "to a marked degree." Those who do generally refer to the frequency, duration and/or intensity of the behavior in comparison to the student's peers and/or school and community norms. States generally interpret "adversely affects educational performance" in light of curriculum and grading.

**Judge / Administrative Officer**

Judy A. Schrag, Director

**Full Text**

Inquirer's Name Not Provided

Thank you for your letter regarding requirements under Part B of the Education of the Handicapped Act (EHA-B) for classifying children as seriously emotionally disturbed and developing Individualized Education Programs (IEPs) for children with specific learning disabilities (SLD). Specifically you requested:

1. Clarification of the terms "long period of time," "to a marked degree," and "adversely affects educational performance" as they pertain to the identification of students as seriously emotionally disturbed (SED).

2. Determination as to whether the third characteristic within the federal SED definition (i.e., inappropriate types of behavior or feelings under normal circumstances) relates only to psychotic behaviors.

3. Determination as to whether the Wyoming Department of Education's interpretation of

"adversely affects educational performance" is congruent with this office and case law.

4. Clarification as to whether the characteristics set forth in the SED definition must be exhibited in both the school and home environment.

5. Determination as to the legality of qualifying a student with an Attention Deficit Disorder (ADD) as seriously emotionally disturbed.

6. Determination as to the legality of including non-written language objectives on the IEP of a student determined to have a specific learning disability only in the area of written language and provision of instruction for those objectives within the special education resource room.

In response to your first question, the terms "long period of time," "to a marked degree" and "adversely affects educational performance" of the federal SED definition have not been specifically defined within EHA-B and its regulations. Operational definitions for the purpose of assisting public agencies (e.g., local school districts) with the identification of SED children and youth are generally outlined within individual state administrative regulations and/or accompanying guidelines. The following provides a sampling of State practices which we have seen and generally feel are workable. However, such practices are individually adopted by States and are not requirements outlined in EHA-B.

Because of the variation in the type and intensity of behaviors which may be exhibited by SED children and youth, a number of States have elected to operationalize "long period of time" by providing a range of time during which the behavior must have been present, generally two to nine months. Although regulations and guidelines vary from State to State, typically included within that timeframe is some provision which requires the application of preliminary interventions and the documentation of their effectiveness. *See also In re: Los Angeles Unified School District,* 1982-83 Education for the Handicapped Law Report (EHLR) DEC. 504:149,150. Few State Education Agencies (SEAs) define "marked degree." Those States which do offer specific guidelines with regard to this term generally refer to the frequency, duration and/or intensity of the behavior in comparison to the student's peers and/or school and community norms. Terms such as acute, continuous, and/or pervasive are sometimes employed for clarification purposes. *See Conejo Valley Unified School District,* 1985-86 EHLR DEC. 507:213,215; *Berkeley Unified School District,* 1985-86 EHLR DEC. 507:435,438; *Oakland Unified School District,* 1985-86 EHLR DEC. 507:191,193. The term "adversely affects educational performance" is subjected to a variety of interpretations by States. In reference to SED children and youth, States typically include within the parameters of educational performance those elements which are of specific educational concern to the school, which are reflected in the school's curriculum and which generally receive some type of formal rating. While some States do provide additional procedures and guidance related to the aforementioned terms, their application for a particular child continues to be based largely on the unique facts, and circumstances of the particular case. *See Lapides v. Coto,* 1987-88 EHLR DEC. 559:387.

In response to your second question, EHA and its regulations do not provide an operational definition or interpretation of the specific characteristics set forth in the SED definition. The third characteristic, "inappropriate behaviors under normal circumstances" as operationally defined by a number of States may include those behaviors which are psychotic or bizarre in nature or are atypical behaviors for which no observable reason exists. For example:

Running away from a stressful situation, whether at home or at school, is not characteristic of the type of behavior this definition contemplates. Nor is the taking of alcohol or drugs, however harmful, such an inappropriate act under normal conditions as to come within this definition. This definition might include behavior such as assaulting teachers or students for *no apparent reason.* (emphasis in original).

*In re: Sacramento County Office of Education,* 1981-82 EHLR DEC. 503:314, 316.

*See also Sequoia Union High School District,* 1985-86 EHLR DEC. 507.495.

The essential element appears to be the student's inability to control his/her behavior *(Doe v. Maher,* 793 F.2d 1470, 1480 footnote 8, (9th Cir. 1986)) and conform his/her conduct to socially acceptable norms *(Honig v. Doe,* 108 S.Ct. 592, 595 (1988)). However, a student exhibiting such behaviors is eligible for special education and related services only if they meet the additional criteria contained in the SED definition (34 CFR ?? 300.5(b)(8)).

In response to your third question, as mentioned above, the term "adversely effects educational performance" is interpreted differently by States. In *In re: Burton Valley School District,* 1981-82, EHLR DEC. 503:256, although a child with behavioral problems was performing at or close to grade level in all academic areas, the hearing officer ruled that "the term 'educational performance' in 34 CFR ? 300.5(B)(8) includes more than the acquisition of basic academic skills." The hearing officer ordered "special services in order [for the child] to learn to control his behavior to a sufficient degree to enable him to remain in a classroom [and found it to be] . . . self-evident that the inability to be present in a classroom adversely affects one's education performance." Id. at 258. *See also In re: Kristopher H.,* 1985-86 EHLR DEC. 507:183

Because a "discrepancy between ability and achievement" is not specified in the eligibility criteria for SED at 34 CFR ? 300.5(b)(8), we find Wyoming's interpretation to be consistent with Federal standards. However, in order for a child to be classified as SED, he or she must meet all of the eligibility criteria for SED.

As mentioned previously, the application of the SED definition to a particular child is greatly dependent upon the unique circumstances concerning that child. Your question as to whether it is legal to qualify as SED a student with a particular assessment would only be answerable if more information regarding that particular case were available. Such information could include the period of time the condition has been experienced, the degree to which the condition has been experienced, and whether educational performance has been adversely affected. Furthermore, this evaluation must be made by a "multidisciplinary team" as specified in 34 CFR ? 300.352(e).

With regard to your fourth inquiry concerning whether the SED characteristics must be exhibited in both the school and home environment, EHA's primary focus is education of children with handicaps. Its general provisions and requirements relate to the educational environment. However, care should be taken with regard to SED students to insure through appropriate evaluation that the behaviors are occurring across a number of instructional settings (both academic and nonacademic). While for eligibility purposes, the student must meet the parameters of the SED definition within the educational environment, knowledge of the student's continuation/discontinuation of such behaviors in other settings (e.g., home, community) may be helpful in program planning.

With regard to your fifth inquiry concerning the eligibility of ADD students, EHA under 20 USC 1400(a)(1) and its regulations at 34 CFR ?? 300.5(a) defines "handicapped children." Children and youth exhibiting conditions and/or assigned labels not included within the Act or its regulations (34 CFR ?? 300.5(a), 300.5(b)) are not eligible for special education and related services. Therefore, a student exhibiting an Attention Deficit Disorder would not be eligible for services as SED unless he/she also met the requirements of the SED definition as described in 34 CFR ?? 300.5(b)(8).

The sixth issue as to whether the IEP objectives and subsequent services afforded to a student with an identified learning disability in written language can include objectives and instruction within the special education program related to nonwritten language is a programmatic rather than an eligibility concern. EHA-B requires that each child's education needs be individually determined and not be based on the category of the child's handicapping condition (34 CFR ?? 300.340-33.349). EHA-B requirements include the provision of an IEP for each handicapped student designed to meet his/her individual needs. The determination of educational programming must be pursued through the implementation of the IEP process (EHLR 203.03). The decision as to whether the instruction of those nonwritten language objectives can occur within the special education resource room requires consideration of the fundamental issues specified by the least restrictive environment provisions of EHA-B. An educational program for a child with a handicap should insure to the maximum extent appropriate that he/she is educated with nonhandicapped children (34 CFR ?? 300.550(b)(1)). The child study team will need to determine if, in fact, the nonwritten language objectives can be accomplished only through specially-designed instruction or within the framework of the general education program.

In addition to the specific questions discussed, you requested a copy, if available, of a federal booklet which lists publications, videotapes and films on exceptional children. The National Information Clearinghouse for Children and Youth with Handicaps should be able to assist you with this request. Enclosed is a resource list which includes the contact information for the State of Wyoming.

We appreciate your inquiry and trust this response provides some clarification of the issues. Please feel free to contact our office should you have additional questions.

Judy A. Schrag

Director

Office of Special Education Programs

**Copyright 2008 © LRP Publications**

**508 IDELR 204**
508 LRP 8650

*Edward A.F. v. Clint Independent School District*

**Texas State Educational Agency**

**284-SE-586**

**September 22, 1986**

**Related Index Numbers**

175.050 Eligibility Criteria, Serious Emotional Disturbance
200.035 Free Appropriate Public Education (FAPE), Procedural Violations as Denial
265.020 Individualized Education Program (IEP), In General
285.090 Least Restrictive Environment (LRE), Serious Emotional Disturbance
365.010 Placement, Appropriate Placement
365.140 Placement, Serious Emotional Disturbance
445.010 Serious Emotional Disturbance, Eligibility Criteria
445.020 Serious Emotional Disturbance, Placement

**Case Summary**

District's interpretation of eligibility criteria for SED was more restrictive than that intended by Federal regulation because it focused solely on term "seriously" and, in effect, would only enable students requiring isolated placements to qualify for special education.

Despite documentation from Headstart program and prior school district regarding child's speech and behavioral problems and placement in self-contained special education class, district placed student in regular classroom without special education referral. Student began pattern of disruptive and aggressive behavior toward teachers and peers. Parent's request for district evaluation was denied on basis that "student was too intelligent to qualify for special education." District's refusal to evaluate child continued for five years despite his uncontrollable disruptive behavior, failing grades, and two retentions. Finally, district agreed to evaluation, on condition that parents bear burden of its cost. As a result of that evaluation, district determined student was learning disabled and emotionally disturbed. IEP provided for placement in regular classroom with resource room services and counseling. The next year, however, district decided to drop student's classification as emotionally disturbed and to reduce time spent in resource room. Parent requested hearing.

Requiring parents to assume responsibility for initial evaluation was a "blatant and glaring" violation of Federal and state regulations, hearing officer ruled. Facts revealed student exhibited necessary characteristics to support emotionally disturbed as well as learning-disabled classification. Moreover, student's IEP was inadequate because it did not include goal of recovering educational benefits lost due to district's past inaction. He rejected district's contention that student must be placed in regular classroom to meet LRE requirement, ruling that proposed placement was "not restrictive enough" to permit student to benefit from special education services. District was ordered to develop new IEP to conform to decision.

109

**Judge / Administrative Officer**

Howell, Hearing Officer

**Full Text**

STATEMENT OF THE CASE

Edward A. F., Petitioner, brings this appeal by next friend, Mrs. Edward F., under the Education for All Handicapped Children Act (EAHCA), 20 U.S.C., Sec. 1401 et seq., alleging that the Clint Independent School District (CISD), Respondent, has failed to provide Petitioner, an eligible handicapped child within the meaning of the EAHCA, a free appropriate education in the least restrictive environment.

A hearing on the merits in this cause was conducted on June 19 and 20, 1986, from which this Decision is entered.

THE EVIDENCE

Edward is a Caucasian male born November 6, 1913. He is a resident of CISD and Clint, Texas, a small agricultural community bordering the city limits of El Paso. Edward is the younger of two children. He presently resides with his father, stepmother, and his stepmother's younger daughter by a previous marriage. Edward's father is confined to a wheelchair and is totally disabled as a result of multiple sclerosis. Edward's older sister, Angela Dawn, fifteen years of age, resides with her mother in Marshall, Texas.

Prior to the divorce of his natural parents, it appears that Edward's early years were unhappy ones. Although the record is unclear as to the precise nature and extent thereof, the children apparently suffered physical and emotional abuse at the hands of their mother. It is strongly inferred that this abusive conduct on the part of the natural mother has had a detrimental effect on the emotional development of her children and was a major factor in the divorce court's decision to place the children in the custody of their father.

Nine years ago, when Mr. F. and Edward's stepmother, hereinafter referred to as Mrs. F., were married, Angela and Edward were six and four years of age, respectively. At that time, Angela had begun to display behavior consistent with a serious emotional disturbance. In addition to evidencing advanced sexual tendencies, shortly after the wedding she attempted to kill her father by setting fire to their home. As a result of such behavior, the family determined that it was unsafe for Angela to continue to reside with the family and enrolled her in a private custodial facility. Angela has since moved to Marsball where she lives with her natural mother and continues to undergo psychotherapy and neurotherapy.

Edward also evidenced early signs indicating the possibility of emotional disturbance. He was not vocal for the first four years of his life and rarely made guttural sounds. Although medical examinations discovered that Edward had an inappropriately developed voice box, it was determined that the condition was not such as would explain his inability to speak.

110

In 1978, at age four, Edward was enrolled in the early childhood Headstart program conducted on the CISD campus where he remained for the entire year. While there, Edward was very aggressive toward the other children and found himself in constant and continuing disciplinary trouble. A month into the Headstart program, Edward's behavior prompted his teacher to write a note to the Headstart diagnostician, one Ms. Locha, citing his explosive behavior as well as a mild speech impediment. The note went on to strongly recommend speech therapy and a psychological evaluation. The teacher also noted that Edward had little self-confidence, exhibited no self-esteem, and required constant reassurance. The note also indicated that the teacher felt it necessary to utilize behavior modification techniques in order to control Edward's behavioral problems. As a result, Edward was scheduled to begin speech therapy at Child Guidance.

In 1979 the family sold their home and temporarily moved into the Socorro Independent School District (SISD) where, in the fall, Edward was enrolled in the SISD kindergarten program. At enrollment, Mrs. F. shared the records from the Headstart program with the authorities at SISD. As a result, SISD placed Edward in a self-contained behavior modification classroom. Although his behavior continued to be a problem, Edward was controllable in that setting and his academic performance was acceptable.

In late fall of 1979, the family purchased a permanent residence in CISD and moved back into that district. On November 21, 1979, Edward was withdrawn from SISD and enrolled in the kindergarten program at CISD. When Mrs. F. produced the Headstart and SISD documentation regarding Edward's speech and behavioral problems, she was informed that the CISD program had no self-contained behavior modification classroom and that Edward would be placed in a regular classroom. He immediately began a pattern of disruptive and aggressive behavior toward his teachers and peers. Edward's teacher was in regular contact with Mrs. F. complaining of Edward's tantrums and vocal outbursts and that Edward struck and bit the other children. As a result, Mrs. F. requested CISD to evaluate Edward for special education. The request was summarily denied on the basis that Edward was obviously too intelligent to qualify for special education.

Edward was passed to the first grade in the fall of 1980 and placed in a regular classroom. During the first grade the pattern of behavioral problems continued. In addition to his aggressive behavior, Edward consistently displayed reluctance or refusal to follow instructions to do his classroom assignments. This pattern of disobedience and refusal to participate in classroom activities and complete assignments would continue to the present date and was to emerge as Edward's dominant behavioral problem. At the end of the year, in spite of the fact that Edward's grades were passing, CISD determined to retain him in the first grade because of his behavioral problems and because he had not "matured" satisfactorily. Although Edward's parents consented to the retention, Mrs. F. made another request that her son be evaluated for special education. As before, the CISD authorities denied her request reiterating that Edward was too intelligent to qualify for special education.

During the next school year, 1981-1982, Edward repeated the first grade in the classroom of one Ms. Langston. Langston, a very strict disciplinarian, was much more successful in controlling Edward's behavior. Although Edward's behavior continued to be a serious problem, Mrs. F. did not receive constant communications regarding Edward's classroom behavior. At the end of the year Edward was promoted to the second grade.

111

Upon entering the second grade at CISD, Edward's new teacher was not as successful at controlling Edward and the incidents of his behavioral disruptions and difficulties sharply increased. Edward became increasingly unable to interact with peers and his teachers and the incidents of aggressive behavior toward the other children, i. e., fighting and striking, increased sharply. At times his behavior became such that the teacher found it necessary to isolate him from the rest of the class by moving his desk into the hallway. Edward's grades quickly dropped well below passing. Once again, Mrs. F. requested that her son be evaluated for special education services. As before, her request was denied on the basis of Edward's obvious intelligence.

Convinced that their son could not function in the present setting at CISD, in April, 1983 Mr. and Mrs. F. withdrew Edward from CISD and placed Edward in the Accelerated Christian Education School (ACE), a private facility. It was the hope of the family that the smaller enrollment at ACE would provide a more structured environment that would better control Edward's behavior. Unfortunately, ACE was also unsuccessful at controlling Edward's behavior. Edward finished out the 1982 1983 school year at ACE. In October of the following year, however, the facility advised Mr. and Mrs. F. that it could no longer tolerate Edward's behavior and requested that he be withdrawn. Edward was withdrawn and immediately re-enrolled in the third grade at CISD.

Upon re-enrollment at CISD, Edward's behavior immediately became such that, before the month was out, his teacher, Ms. Barton, was authoring notes to the principal expressing her desperation and exasperation in trying to deal with Edward. One such communication cited at least one incident of violent disruptive outburst and made it clear that Edward's study habits and his refusal to follow instructions without constant supervision and attention were consuming practically all of her time and energy. It is apparent that Edward characteristically misbehaved in this manner as evidenced by the fact that Barton was moved to call the principal's attention to occasions when Edward had cooperated and completed his assignments and hadn't behaved aggressively toward his peers. The record also reflects that Edward's behavior digressed to such an extent that Mr. Carroll Welch, the principal, saw fit to place Edward's desk in his office for a period of approximately three weeks. On April 26, 1984, Welch wrote Mrs. F. stating that he had personally tried everything at his disposal to motivate Edward. The note concluded by offering the opinion that there appeared to be no real hope of anyone doing much for Edward and asking for suggestions from Mrs. F. Mrs. F. responded with more requests for special education evaluation. Those requests were also denied for the reason previously expressed.[1] Edward's grades at the end of the year were well below passing and he was retained for the second time to repeat the third grade.

Finally, Edward's behavior and lack of cooperation became such a problem that, during the summer of 1984, Welch relented to Edward's being evaluated for special education eligibility. The concession was granted, however, on the condition that Mr. and Mrs. F. would shoulder the responsibility for having the evaluation conducted and that they would also bear the expense. The family immediately contacted sources at Texas Technical University which led to the recommendation of Dr. Richard B. Patterson, a clinical psychologist. Patterson examined Edward and issued his written evaluation on June 19, 1984. Patterson's report reflects that, although Edward was of average intelligence, he displayed a deficit in the area of mathematics and reflected that Edward suffered from visual-motor deficit. The report discussed Edward's history of emotional problems and classified him as having a "conduct disorder, socialized, non-aggressive" and a

112

"developmental arithmetic disorder." Patterson concluded that Edward certainly qualified for special education in the area of mathematics. He also urged a neurological screening and recommended that Edward would benefit from family counseling and structured learning environment such as a resource room.

An admission review and dismissal (ARD) committee was convened on September 15, 1984. Patterson accompanied Mrs. F. to the meeting as a non-voting participant. On the strength of Patterson's conclusions and recommendations, the ARD determined that Edward was eligible for special education services as both learning disabled, as a result of a visual-motor deficit, and emotionally disturbed. Edward's Individualized Education Plan provided for placemen] in the regular classroom with the exception that, for two hours of each day, Edward would be assigned to a resource room under the supervision of Ms. Jill Baeza. While in the resource room, one hour would be devoted to language arts and one hour would target mathematics. In addition, the school counselor would see Edward on a weekly basis. All voting members concurred with this placement.

Although Edward's behavioral problems and poor classroom study habits persisted in this new setting, the situation did improve dramatically. Edward was put on disciplinary report much less frequently and, with the resource aid of Ms. Baeza, Edward passed his work and was promoted to the fourth grade.

On September 18, 1985, the ARD was convened to determine the placement for the 1985-1986 school year. Patterson attended as a non-voting participant. The ARD, while continuing the dual coding of learning disabled and emotionally disturbed, took notice of the marked improvement in Edward's behavior and study habits over the past year. Edward was still prone to be disruptive and uncooperative, but the aggressive behavior had considerably subsided. The committee was optimistic that Edward had progressed to the extent that he could be totally mainstreamed without the need for regular attendance in the resource room. All voting members as well as Dr. Patterson concurred in the decision.

The setting quickly proved to be ineffective for the intended purpose. From the very beginning Edward was failing badly, his study habits promptly deteriorated, and his behavior dramatically worsened to the extent that, by late fall of 1985, his new principal, Mr. Forrester, telephoned Mrs. F. and advised her that Edward's placement in the district's alternative education program[2] at another campus might be warranted. Mrs. F. advised that she would not consent to such an action, immediately expressed her written opposition to any such plan and requested an ARD to review the present placement.

As requested by Mrs. F., a review ARD was convened on December 3, 1985. During the course of the meeting, the school representatives expressed frustration regarding limitations on the use of disciplinary alternatives as a result of the coding of emotionally disturbed; that the coding handcuffed their ability to punish Edward for misbehavior. The ARD adopted Dr. Patterson's suggestion that CISD have Edward evaluated by another source in order to review the appropriateness of his coding. It was also determined that additional testing be conducted to confirm or rule out learning disabilities in the area of auditory processing and visualmotor deficiencies. As a result, Edward was referred to Ms. Carlisle Navidomskis, CISD diagnostician, for a comprehensive assessment to include, inter alia, speech and language assessment by Dr. Margaret Maynard, CISD speech pathologist, and a psychological evaluation by Dr. Lawrence Bursiago, a private clinical psychologist hired by CISD.

113

Following the assessments, an ARD was convened on February 28, 1986, to consider the reports and recommendations of Navidomskis, Maynard, Bursiago, Baeza, and Patterson. The voting members of the ARD were Mr. Segura. building principal, Navidomskis, Ms. Barbara Herring, Edward's teacher, Baeza, Maynard, and Mrs. F. The ARD determined that Edward was to be passed to the fifth grade without promotion[3] and the LD coding was to be continued. It was also determined that Edward did not meet the criteria for coding as emotionally disturbed and that the coding would be dropped for the next school year. The placement for the coming year was designated as regular classroom with the exception of one hour each day in the resource room devoted to language arts. All voting members approved the placement with the exception of Mrs. F.

It is the actions and conclusions of the February 28, 1986 ARD that prompted Mrs. F. to file this appeal on behalf of her son. The appeal is brought to resolve two issues. First, Mrs. F. contends that Edward is emotionally disturbed and contests the AKD's decision to drop that coding. Second, Mrs. F. asserts that the ARD should not have reduced the amount of resource room assistance to only one hour each day and that Edward cannot be appropriately educated under the proposed placement.

Patterson testified that, since his first evaluation of June, 1984, Patterson has counseled Edward on a bi-weekly basis and that his assessment of Edward has remained unchanged since their first meeting, i.e., that Edward has a learning disability and an emotional disturbance which Patterson classifies as a conduct disorder, socialized, non-aggressive. Patterson explained that the term "non-aggressive" did not mean that the subject did not participate in aggressive behavior. Rather, it means that behavior patterns as a whole tend to swing the other way. The term "socialized" denotes the ability to interact with others. While Patterson concedes that Edward has made great progress in the area of controlling his anger, he nevertheless insists that Edward is emotionally disturbed and cannot be adequately educated in a normal classroom setting. He recommends a closely structured learning environment for Edward and finds the current placement completely inappropriate. Patterson readily admits that both he and Mrs. F. consented to cutting Edward's resource room aid in 1984 because he had made vast progress over the previous year and it was hoped that he could handle mainstreaming. Patterson now classifies that placement as an experiment that simply proved to be a complete failure. Patterson also admitted concurring in the 1985 resource cutback because he was concerned about Edward's dependence on his resource teacher. Edward's family background, his father's disability, the departure of his sister, and his lack of self-esteem and self-confidence were cited as major factors relating to Edward's lack of motivation. Edward has often related to Patterson that he has a sense of not belonging and feels the other children regard him as stupid. During the 1984 1985 school year when Edward was doing relatively well, Patterson noticed a definite positive emotional change in Edward. A corresponding negative change in emotions was noted since the more recent cutback in Edward's access to the resource room. Edward's emotional state and sense of self-esteem fluctuate correspondingly with his success in school at a given period in time. When questioned about specific federal eligibility criteria, Patterson stated that his findings reflect that Edward lacks the ability to build and maintain satisfactory interpersonal relationships with peers and teachers and consistently exhibits inappropriate types of behavior or feelings under normal circumstances. Patterson emphasized that the school experience, taken as a whole, is viewed by Edward as a negative experience.

On the basis of his examination of Edward on February 5, 1986, the report submitted to

114

the ARD by Dr. Bursiago presented findings and conclusions regarding Edward that are practically identical to those of Patterson. Bursiago diagnosed Edward as having a "conduct-disorder, socialized, nonagressive." His report concluded, inter alia, as follows:

It is felt that the emotional disorder will adversely affect his educational performance by causing inappropriate types of behaviors or feelings under normal circumstances; inhibit his learning ability; cause a general pervasive mood of unhappiness under normal circumstances; and inhibit his ability to build and maintain satisfactory interpersonal relationships with peers and teachers.

All of his in-school and out-of-school behaviors reflect symptoms consistent with the diagnosis.

The report also listed ten "functional implications" that were, in Bursiago's opinion, a direct result of Edward's emotional disturbance. Those functional implications are as follows:

1. Over-aggressiveness

2. Inability to follow instructions,

3. Lack of apparent interest in activities in the classroom

4. Absent-mindedness and forgetfulness

5. Consistent failure to do assigned work

6. Lack of self-reliance

7. Inability to accept responsibility

8. Satisfaction with inadequate performance

9. Poor coordination,

10. Difficulty in writing

Both Bursiago's report and his subsequent testimony strongly opined that Edward does qualify for special education as emotionally disturbed. His report and his testimony left no doubt regarding his conviction that Edward could not be adequately educated in a normal classroom setting. The report recommended a closely structured learning environment and even went so far as to detail the type of environment needed and included many positive recommendations for behavior modification techniques. Bursiago indicated that, while he did not recommend completely removing Edward from the regular classroom, he should receive as much resource aid as possible until he catches up with his grade level. Only then would mainstreaming be appropriate. Bursiago expressed surprise at the ARD's decision to drop the coding of emotionally disturbed and was clearly of the opinion that the recommended placement was inadequate.

Navidomskis' report reflects that Edward qualifies for special education as learning disabled in the area of language arts. While the report references the topic of emotional

115

problems she skirts the issue of eligibility as emotionally disturbed, referring the reader to the reports of Patterson and Bursiago. Navidomskis does not appear to have reached any conclusion regarding Edward's eligibility as emotionally disturbed. Rather, she cites the referenced reports and observes that, "based on the above information, characteristics of the student's behavior do appear to significantly influence his educational placement and programming. They do not appear to affect his ability to follow the school's disciplinary rules."

The speech, language and hearing evaluation conducted by Maynard found that Edward's communication skills were within normal range and he failed, therefore, to qualify any longer for speech therapy. During the hearing, Maynard opined that Edward was a "normal eleven or twelve-year old" and did not qualify for coding as emotionally disturbed because he failed to meet all criteria and that he was not seriously emotionally disturbed. She stated that, for her to classify a child as emotionally disturbed, the child's behavior would have to be "really bizarre or dangerous or they were just there they weren't dealing with reality." Maynard indicated that a handicapping condition was not Edward's real problem; that his real problem was maintaining his grades. Maynard also testified that Edward was being adequately and safely educated in the regular classroom. When asked for a definition of the term "adequately educated," Maynard stated that Edward should be able to function and interact socially and, perhaps, hold a job. As a further example of Edward's on-going adequate education, she observed that, in the event that Edward contracted laryngitis and could not speak, he had the skills to enable him to write a note requesting help. Maynard made it clear that she viewed Edward's problem as one of personal motivation, stating that he had the ability to do his work in the regular classroom if he only wanted to. When referred to Edward's being placed in the principal's office for a period of weeks, Maynard characterized such a practice as a "time out" and as being an acceptable tool. She further stated that, from the behavioral reports reviewed by the ARD, she felt that Edward was not unlike any of the other students and that it was not all that unusual for children to get into mischief and have to spend some time in the principal's office. Maynard closed her testimony by stating that, given Edward's level of intelligence and the rather mild nature of his learning disability, there was no reason why he shouldn't be an average or above-average student.

Respondent's witnesses cited the marked decrease in Edward's aggressive behavior toward peers and teachers as a major factor in the ARD's decision to drop the coding of emotionally disturbed. All parties agree that, even though Edward still has a problem with aggressive behavior and has some difficulty relating to his peers, he has made considerable improvement in this area. His "disruptive" behavior has begun to shift away from violent conduct. His pattern of behavior is now dominated by persistent refusal to follow instruction and participate in classroom activities. Simply stated, Edward's behavior is dominated by an almost complete lack of interest and motivation in the regular classroom and the teacher's constant attention is required to prompt Edward to complete classroom assignments. As a result, the other children are ignored while the available classroom time is consumed by the attention demanded by Edward.

Ms. Jill Baeza, Edward's resource teacher for the past two years, joined in the ARD's conclusion that the criteria for emotional disturbance had not been met. She referenced unspecified Texas Education Agency (TEA) criteria requiring that such a disturbance must be "severe" and referenced federal criteria requiring a finding that one be "seriously emotionally disturbed," stating that Edward simply didn't measure up to those standards.

116

She indicated that the ARD was very concerned about adopting an interpretation that was too "loose." She related that she would define an emtionally disturbed person as one who lacked the ability to be selective and who could not control their behavior. Noting that, from time to time Edward would follow instructions and would complete a lesson, Baeza suggested that such was proof that Edward could control his conduct and could not, therefore, be emotionally disturbed. Baeza also agreed with Maynard's assessment that, given Edward's intelligence and the mild nature of his learning disability, there was no reason why he could not accomplish his tasks with little or no modifications to the regular classroom.

The record is abundantly clear that, while working closely with Edward over the last two years in the restrictive confines of the resource room, Ms. Baeza has formed a strong bond with Edward and has gained his trusL It is equally apparent that, because of their relationship, Baeza has little or no trouble motivating Edward to do his work because Edward wants to perform for her. Aside from his relationship with Baeza, the record is devoid of any indication that Edward relates positively toward anything or anyone connected with the school environment.

Baeza is of the candid opinion that Edward's problems are the result of neither a learning disability nor an emotional disorder. Rather, it is her opinion that Edward is preoccupied with his father's illness and other problems relating to his situation at home. Acknowledging that Edward does exhibit a lack of self-confidence and self-esteem as is characteristic of all learning disabled children, she offered that Edward and she are able to overcome those obstacles because they are close and work very hard together on those problems.

Baeza was adamant that one of her paramount concerns was Edward's growing dependence on her. In her opinion, it is very important to wean Edward away from her influence and that he be required to function in a normal setting. It was also Baeza's opinion that Edward needs to be subjected to the same disciplinary standards and sanctions as are the other children. As a member of the AD, Baeza stated that the committee hoped to accomplish this goal by placing Edward in an effective placement "for a long enough period of time as to become effective for Edward."

Herring's testimony focused largely on Edward's classroom behavior, She essentially testified that Edward's behavior has been constant throughout the 1985-1986 school year and that his behavior has not been extraordinary from that of her other students.

DISCUSSION

ISSUE: Does Petitioner qualify for special education services as an emotionally disturbed child?

Respondent does not appear to contend that Edward is not emotionally disturbed to some extent. Rather, Respondent argues that the degree and relative severity of Edward's disturbance does not meet the statutory and regulatory criteria for eligibility for coding as emotionally disturbed.

The provisions of 34 C.F.R. 300.5(b)(8)(i) and (ii) contain the federal statement of eligibility criteria for emotional disturbance. The regulation sets out the criteria as follows:

117

Reg. 300.5 Handicapped Children

(b) The terms used in this definition are defined as follows:

(8) "seriously emotionally disturbed" is defined as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance:

(A) an inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) inappropriate types of behavior or feelings under normal circumstances;

(D) a general pervasive mood of unhappiness or depression; or

(E) a tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed.

The federal regulation's counterpart in state law is found at Tex. Educ. Code Ann. Section 21.503(b)(1) and (6), defining the eligibility criteria for emotional disturbance as follows:

Sec. 21.503 Eligibility Criteria

(b) The following classifications of handicapped students shall serve as the general eligibility criteria for participation in a district's special education program:

(1) "Handicapped students" means students between the ages of 3 and 21, inclusive:

(A) with educational handicaps (physically handicapped, auditorially handicapped, visually handicapped, mentally retarded, emotionally disturbed, learning disabled, speech handicapped, autistic, or multiply handicapped); and children leaving and not attending public school for a time because of pregnancy; and

(B) whose disabilities are so limiting as to require the provision of special services in place of or in addition to instruction in the regular classroom.

(6) "Emotionally disturbed students" means students whose emotional condition is psychologically orpsychiatrically determined to be such that they cannot be adequately and safely educated in the regular classes of the public schools without the provision of special services.

118

During the course of the hearing, Respondent focused on the difference in the language of these authorities and expended considerable time and effort rationalizing these provisions with the ARD's decision to drop the coding of emotionally disturbed. Needless to say, there was a sharp difference of opinion between the parties as to how the two authorities should be interpreted and reconciled. Thus, before embarking on an analysis of the evidence, it seems necessary and appropriate to begin by attempting to define the eligibility standard established by the two authorities and to compare them in terms of whether they present different standards of eligibility and, if so, which authority is more specific and/or controlling.

On several occasions during their testimony, Baeza and other of Respondent's witnesses inferred that one of the reasons it was necessary to review Edward's coding was because of changes in the eligibility criteria which had been recently enacted or adopted by the Texas Education Agency (TEA). It was explained that the ARD needed to insure that Edward's coding was consistent with those changes. The witnesses' references to these changes were vague and it was apparent that they had no firm idea of the nature of any such changes or when they were made or became effective. In that context it should be noted that the only legislative criteria for coding as emotionally disturbed is found in the previously cited authorities at 34 C.F.R.3O0.5, hereinafter referred to as the federal criteria, and Tex. Educ. Code Ann. Section 21.503, hereinafter referred to as the state criteria. Moreover, insofar as eligibility for ED coding is concerned, there has been no change in these authorities since long before Edward was first considered and admitted to CISD's special education program. There are no administrative regulations enacted or adopted by TEA defining eligibility criteria for emotional disturbance.

It is also relevant to take note of the obvious difficulty the testifying members of the February 28, 1986 ARD exhibited in trying to verbally reconcile the federal and state authorities with the decision to drop the coding of emotionally disturbed. It is quite clear that the ARD did not view those authorities as synonymous. It was equally clear that the ARD considered the federal criteria to be more restrictive or narrow. In truth, while the language of the federal and state criteria is somewhat different, there is no conflict between the two.

The testimony of Respondent's witnesses clearly reflects that the ARD erroneously interpreted the federal criteria and measured Edward's eligibility status by a standard far more restrictive than that intended by the authors of the regulation. There appears to be little doubt that the ARD members overly emphasized the fact that the federal criteria prefaced the phrase "emotionally disturbed" with the word "seriously." The testimony also reflects that the ARD was impressed with the specific inclusion of schizophrenic children while socially maladjusted children are specifically excluded. The members of the ARD apparently focused on such ominous terminology to the extent that the ARD inappropriately elevated the threshold of eligibility as emotionally disturbed so as to exclude maladies less serious than debilitating mental disorders.

Of the five ARD voting members who represented CISD, Maynard, Herring, and Baeza testified at the hearing. Maynard and Baeza stated their personal interpretations of the eligibility criteria for coding as emotionally disturbed. Their definitions are discussed in the previous section of this decision. Herring did not offer a personal interpretation during her testimony. Thus, it must be presumed that, with the exception of Mrs. F., the opinions of Maynard and Baeza were fairly representative of the ARD committee as a whole.

If one were, therefore, to synopsize the testimony of Maynard and Baeza in an effort to articulate the standard of eligibility maintained by the ARD, one reaches the conclusion that, in order for Edward to qualify for coding as emotionally disturbed, he must exhibit bizarre and dangerous behavior, be detached from reality, and not be able to control his conduct or behavior. It is submitted that it is ludicrous to proffer that the authors of the federal or state criteria intended such a restrictive eligibility threshold. Indeed, if such were the correct interpretation, the only children who could qualify as emotionally disturbed are those whose afflictions are such that they should also be considered for institutionalization or, at the very least, isolation from the other nonhandicapped children.

For educational purposes, there is no logical reason why the same general rationale underlying the criteria for determining eligibility as an emotionally disturbed child should vary from the reasoning applied throughout 34 C.F.R. 300.5 to determine eligibility for other handicapping conditions. In fact, that same controlling rationale or criteria is clearly articulated in the subsections governing each type of handicapping condition. The common criteria is simply that the condition, once established, be such that it "adversely affects educational performance." The language appears no less than eleven times throughout the regulation. As to the handicapping condition of emotional disturbance, after describing five types of specific qualifying behaviorofwhich the subject individual must exhibit only one, the regulation goes on to require only that the behavior must have been exhibited over a long period of time and to such a degree "which adversely affects educational performance."

Even a cursory examination of the provisions discloses that the same two-part test for eligibility is carried throughout the federal criteria in reference to all other listed handicapping conditions. First, the handicapping condition is generally defined or described. Second, eligibility is conditioned on a showing that the condition "adversely affects educational performance." It would make no sense whatsoever to assume that the legislators intended to qualify all other handicapping conditions on a standard of adverse effect on educational performance while restricting admission as emotionally disturbed to only those in the most serious states of emotional distress.

The only real difference between the state and federal criteria is the additional state mandated safeguard that emotional disturbance is to be diagnosed psychologically or psychiatrically. Although the language of the state criteria varies from that of its federal counterpart, the test is, for all intents and purposes, the same. After defining or describing the handicapping condition, the second phase of the state test conditions eligibility on a showing that the condition is such that the child "cannot be adequately or safely educated in the regular classroom without the provision of special services." It logically follows that any unsafe and/or inadequate educational placement will necessarily also adversely affect a child's educational performance. Thus, it is submitted that both sets of criteria, though containing different language, are virtually interchangeable.

It should be noted that, even if there were a significant variance between the state and federal eligibility criteria, it is a basic principle of law that, where a conflict exists, federal law controls. A state may not, therefore, enact a valid statute or regulation that would deny special education services to a child who qualifies under federal criteria. This observation serves to reinforce the premise that the questioned state criteria was meant to complement its federal counterpart. The observation also permits us to focus on the federal criteria insofar as this appeal is concerned.

120

Determining an individual's eligibility for coding as emotionally disturbed is, therefore, quite uncomplicated. One need only first verify that emotional disturbance has been psychologically or psychiatrically diagnosed and then proceed to compare the individual's conduct and behavior to the provisions of 34 C.F.R. 300.5(b)(8)(i). Let us now apply this process to Edward.

The first part of the eligibility test is uncontested. The psychologists hired by both parties have diagnosed Edward as being emotionally disturbed. It is also clear that Edward meets the specific eligibility criteria of 34 C.F.R 300.5(b)(8)(i). In that regard, the evidence clearly supports the findings and conclusions of Bursiago and Patterson. Edward has exhibited an inability to build or maintain satisfactory interpersonal relationships. From the record, it appears that Baeza is the only person outside Edward's immediate family with whom he identifies and enjoys an interpersonal relationship. On the whole, Edward is portrayed as a lonely child who fails to relate with his peers because he senses they regard him as stupid. As to Edward's other teachers, it shall suffice to state that, with the exception of Baeza, Edward's behavior has driven them to distraction. The same might also be said for those administrators who took it upon themselves to attempt to personally take charge of Edward's behavioral problems. The evidence also reflects that Edward is not a happy child and exhibits a general mood of unhappiness or depression and continually displays inappropriate behavior under normal circumstances, i.e., his constant misbehavior and complete lack of motivation. Moreover, the functional implications of Edward's emotion-al disturbance, as enumerated in Bursiago's report, have most certainly adversely affected Edward's educational performance. Indeed, the evidence establishes that, for extended periods of time, those functional implications have literally shut down Edward's learning process.

Respondent, on the other hand, would portray Edward as a perfectly normal boy of twelve years who happens to have an extremely mild learning disability which, with the aid of minimal assistance, should not inhibit his educational progress. While Respondent's witnesses acknowledge that Edward is uncooperative and does sometimes misbehave, they indicate that his behavior is not all that extraordinary and not unlike that displayed by other children. In other words, with the exception of evidence presented by Bursiago, CISD's psychologist, Respondent's entire approach toward Edward appears to be couched in the contention that Edward has no emotional disturbance as is recognized by eligibility criteria and that any behavior problems could be contained or eliminated by normal disciplinary techniques.

To be concise, this appeal concerns an abused child whose behavior has earned the grave concern of the psychologists representing both parties. The child's behavior has directly caused his withdrawal from the public school system, two retentions, and the loss of three grade levels of performance in seven years of public education. His behavior is such that he has recently been considered for placement in a facility reserved by law for those children who are found to be incorrigible. One can hardly classify conduct of this duration and magnitude as conduct not so different from that of other children.

Without regurgitating the evidence adduced regarding Edward's past and present behavioral history, it shall suffice that the record does not support Respondent's position. Rather, the evidence portrays a child whose emotional disturbance and resulting behavior has substantially negated his educational opportunities to date. Moreover, history has given every indication that Edward will continue along this disastrous path until his

condition is recognized and properly addressed.

ISSUE: Does the Individualized Education Plan developed by the February 28, 1986 ARD provide Petitioner with a free appropriate public education in the least restrictive environment?

Appropriateness

In order to intelligently examine the sufficiency of the Individualized Education Plan devised for Edward by Respondent's ARD, it is necessary to do so in light of the definition or test of a free appropriate public education espoused by the United States Supreme Court in Hendrick Hudson Central School District, Westchester County, et al. v. Rowley: by her Parents, Rowley et al., 458 U.S. 176 (1982), hereinafter referred to as Rowley.

Rowley involved a dispute over the educational program of Amy, a deaf child who was being mainstreamed in the school's regular classroom. The record reflects that Amy was adept at lip-reading and was a very bright, remarkably well-adjusted child who interacted and communicated well with her peers and who had developed an extraordinary rapport with her teachers. Amy was performing better than the average nonhandicapped child in her class and was easily advancing from grade to grade. In spite of Amy's performance and success, her parents challenged the IEP because it did not provide her with a qualified sign language interpreter in all classes. It was alleged that, although Amy was performing well academically, she was being denied an appropriate education because the absence of the sign language interpreter prevented her from achieving her full academic potential.

The decision in Rowley reversed the opinion of the lower court which had held that the IEP must address the individual child's full potential "commensurate with the opportunity provided to other children." The Supreme Court defined free appropriate public education within the meaning of the EAHCA as follows:

We therefore conclude that the `BASIC FLOOR OF OPPORTUNITY' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." (Emphasis added)

The Court acknowledged that determining whether the educational benefit is sufficient was a much more difficult problem and made it clear that its decision addressed only the facts and circumstances at bar. The Court went on to hinge its ruling on its finding that the IEP provided for a reasonable educational goal for a handicapped person in the child's educational placement, stating as follows:

[T]he IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

To put Rowley in its proper context, the Court simply found that children capable of being educated in the regular classroom can expect only to have an opportunity to master the essential elements of the required courses of study for that grade level and, accomplishing that, to pass to the next grade level. Stated in the context of the handicapped child, the

Court held that the IEP need not provide an educational plan adopting goals set at the farthest reach of the handicapped child's potential. Rather, the plan need only calculate for the attainment of reasonable educational goals. The Court further found that the reasonable goal of a mainstreamed handicapped child is exactly the same as his or her nonhandicapped peers, i.e., the mastery of the essential elements of the varying courses of study and resulting promotion to the next grade level. Simply stated, the Court tailored its decision to what it determined to be a reasonable educational goal for that particular handicapped child in that educational setting.

Thus, Rowley provides us with an absolute test to determine the "basic floor of opportunity" mandated by the EAHCA. That test is one of educational benefit. The Court also established that educational benefit is to be measured in light of a reasonable educational goal for the child in question and shall not be geared to maximum or full potential. Although the Court took care to limit its ruling on sufficiency of the educational benefit to the facts then at bar, the Court, nevertheless, provided sound reasoning that is equally applicable to instances involving children with other handicapping conditions and varying educational placements.

In truth, Rowley's "floor of opportunity" test is of little or no practical use in assessing the benefit provided by an IEP. It is difficult to imagine an IEP that would fail to comply with this phrase of Rowley. Even the most deficient IEP will provide the child with some minute degree of educational benefit. In this case, no one has argued that Edward's IEP will not provide him with any educational benefit. Rather, the question is whether Edward's IEP provides an opportunity for sufficient educational benefit as to enable Edward to achieve a reasonable educational goal.

If the Rowley criteria for determining sufficiency is clinically applied in the context of Edward's placement in the regular classroom with minimal resource assistance, the IEP would clearly provide sufficient benefit. Both parties agree that Edward is not deficient in the area of intelligence. Respondent's witnesses conceded that Edward has always been intellectually able to accomplish his assignments and that there is no intellectual reason for his loss of three grade levels. With the exception of minimal resource aid, Edward's placement is the same as that of the subject child in Rowley and, as was the case in Rowley, the reasonable educational goal for mainstream placement is mastery of the courses of study and promotion to the next grade level. This has been Edward's educational goal since he first enrolled at CISD. Petitioner may not validly assert that the program provided by the IEP does not provide Edward with the opportunity to attain that goal. The necessary materials and instructional services are certainly there for the taking. If Edward satisfactorily completed the work presented him, he should master the courses and pass to the next grade.

Edward is not, however, analogous to the child in Rowley and his rather unusual educational history precludes the assessment of his IEP in such a clinical manner. In order to properly judge the adequacy of his placement and the sufficiency of educational benefits, it is necessary to do so in light of Edward's educational history and the factors that led to his present placement and, ultimately, to this appeal.

Edward's parent brought him to CISD's kindergarten program armed with evidence of prior child abuse and documentation from his previous placement in the Headstart program and at SISD referencing an existing speech handicap and the possibility of emotional

123

disturbance. At the very least, Edward's slight speech impediment and the fact that SISD had placed Edward in a self-contained setting should have been enough to cause any prudent educator to refer Edward for evaluation. Instead, Respondent ignored the obvious and placed Edward in the regular classroom. Later in the year Mrs. F.'s direct request for special education evaluation was denied because of Edward's intelligence level. Repeated requests for evaluation were made by Mrs. F. during the following four years. All requests were summarily denied by Respondent for the same cited reason in spite of the fact that Edward's behavior had already resulted in his failing two grade levels and had been the controlling factor in his parent's decision to temporarily remove him from public education. In fact, the record reflects that, with the exception of the year Edward repeated the first grade, his behavior at CISD had been practically unmanageable.

Finally, after five frustrating years, Respondent's representatives acknowledged the presence of a problem symptomatic of a handicapping condition and consented to Edward being evaluated. Incredibly, the concession was conditioned on Edward's parents assuming responsibility for conducting the evaluation and for bearing the resulting expenses. It shall suffice that it is difficult to imagine a more blatant and glaring violation by Respondent of the duties imposed by the EAHCA and attendant federal and state regulations. Edward was not fully evaluated by Respondent in accordance with requirements of law until early 1986, over six years after Edward first enrolled at CISD and approximately twenty months after CISD acknowledged the existence of a problem suggesting the need for special education. Nevertheless, thanks to the persistence of Mrs. F., special education was finally being brought to Edward.

Since Edward's admission to special education, the placement and program proscribed by Respondent's ARDs have been programs geared toward maintenance of his current educational level. The programs provided for mainstream placement complemented with minimal resource aid and counseling. The goal was to provide sufficient educational benefits as would present Edward with the opportunity to master the required studies of his current grade level and to qualify for promotion. In so placing Edward, the ARDs ignored the fact that, by the time Edward was recognized as an eligible handicapped child, he was already two grades behind. Moreover, the ARD also overlooked the fact that a major contributing factor, if not the primary cause, for Edward's past failures was Respondent's habit of turning a deaf ear toward Mrs. F.'s requests and a blind eye toward the evidence and the obvious. Had Respondent discharged its responsibility and evaluated Edward early in his educational career, there is every indication that, with minimal help, he would presently be on grade level with his age group. Speculation aside, it cannotbe denied that early action should have greatly improved Edward's present sorry academic state.

Simply stated, Respondent comes to the bench with unclean hands and may not utilize Rowley to vindicate itself by now providing Edward with an IEP geared toward mastery of the current level of education and promotion to the next. The rationaie of Rowley may not apply where the child's gross educational deficiencies result from the inappropriate actions or inactions of the educational authorities. As a result, the appropriate program to which Edward is entitled is a program embracing an educational goal that goes beyond mere maintenance. The appropriate program should provide for an exhaustive effort to assist Edward to recover lost educational benefits. The educational goal should encompass a plan to do everything possible to restore Edward to the educational level of his age group. Moreover, Edward is not now, nor has he ever been provided with a free appropriate

124

public education by Respondent. Until the 1984-1985 school year the placement was inappropriate as a matter of law because he was completely denied the special education services for which he was qualified. The succeeding special education placements and the present placement are deemed inappropriate because they fail to provide a goal of restoring lost educational benefits.

Least Restrictiveness

Least restrictiveness is mandated in the provisions of 34 CIR 300.550) as follows:

(b) Each public agency shall insure:

(1) That to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and

(2) That special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Each handicapped child must, therefore, be educated as closely as is possible in the regular classroom environment with non-handicapped children.

The past and current special education placements for Edward have, with the exception of brief resource assistance, been mainstream placements. Edward's placement for the 1986-1987 school year consists of mainstream placement with one hour each day of resource room assistance in the area of mathematics. Mrs. F. contests the placement as inappropriate on the basis that the placement is not restrictive enough to permit her son to benefit from the educational services provided. More specifically, Mrs. F. contends that Edward's behavioral problems stemming from his emotional disturbance render it necessary that he be placed in a closely structured learning environment.

Respondent has countered these contentions with three responses. First, Edward does not qualify for such a placement because he does not meet the eligibility criteria for emotional disturbance; that his misbehavior is not unlike that of other children and may be controlled through the use of normal disciplinary techniques. Second, even if Edward is emotionally disturbed, placement in the regular classroom is necessary to comply with the requirement of least restrictiveness. Third, the placement in the regular classroom with minimal resource assistance is necessary to combatEdward's growing dependence on his resource teacher, Ms. Baeza.

It is unnecessary to devote additional time or discussion to Respondent's first argument. The question of Edward's eligibility for coding as emotionally disturbed has been adequately examined in a previous part of this Decision. It shall suffice that he is found to be emotionally disturbed within the meaning of applicable criteria.

Respondent's second argument was evidenced by its witnesses' numerous references that the ARD's quest for least restrictiveness inevitably led to the adoption of a placement in the regular classroom. The witnesses made it clear that the ARD was of the opinion that

125

a more restrictive placement would violate 34 CF 300.5500). If nothing else, the ARD's decision proves it to be a very poor student of history. With the exception of two isolated and brief periods, Edward's behavior has been unmanageable. Contrary to Respondent's attempts to depict Edward merely as a mischievous youth, the record establishes that he has made a shambles of every attempt to control his behavior and make him cooperate with classroom protocol. It is also adequately clear that his antics have so consumed the time and attention of his teachers that the quality of education enjoyed by his classmates has also been diminished. There is absolutely nothing in the record to indicate that a primarily mainstream placement for the coming year would be any more successful than prior attempts. To the contrary, the evidence discloses that the only educational settings in which Edward has achieved any degree of success have been those placements where he received structured supervision either under the tutelage of a strict disciplinarian or in the form of increased resource assistance. Even in those instances, Edward merely passed his work and was promoted with the rest of his class. As previously stated, in view of the facts and circumstances presented in this appeal, mere promotion is not an acceptable educational goal. It is iomatic that a highly structured and comprehensive program must be crafted in order for Edward's behavior tobe contained to the extent that he will have an opportunity to recapture the lost benefits of the previous years.

As to Edward's growing dependence on his resource teacher, it must be conceded that such represents a legitimate concern. In light of the existing facts and circumstances, however, it is aconcern of relatively low priority. The highest priority is Edward's continuing education and the repair of past damage. That priority must be attended to above all else. Edward's education must not be bantered away in exchange for emotional or social independence. Edward has the remainder of his life in which to attain self-reliance. We have but a few more short years in which to provide him an appropriate education.

In reality, considering Edward's past history, his refusal to cooperate and lack of motivation presents no mystery. Edward entered public education with emotional problems and an accompanying lack of self-esteem and self-confidence. These emotional problems coupled with the fact that his handicaps went unserved for five years caused Edward to fall behind in his work and, ultimately, to fail. Each new year brought new failures which further reinforced his lack of self-esteem and self-confidence. By the time Edward was granted access to special education the damage was done. One doesn't have to be a practicing psychologist to understand Edward's lack of motivation. The past seven years have conditioned Edward to expect and accept failure and have given him little to be motivated about. It is submitted that seven years is an eternity to a child of twelve. Any placement deemed appropriate for Edward must necessarily include intensive efforts through counseling and all other available resources to instill in Edward that he is intelligent and that he is a worthwhile individual. Common sense dictates that this objective must be interwoven with academic objectives if either is to be achieved.

FINDINGS OF FACT

Having considered the evidence and matters offIcially noticed, in my capacity as Hearing Officer, I find the following therefrom:

1. Petitioner is an eligible handicapped child within the meaning of the EAHCA.

2. Respondent is a public independent school district duly constituted pursuant to the

applicable laws of the State of Texas.

3. Petitioner is a resident of Respondent CISD and has, with the exception of the 1983-1984 school year, been enrolled in the CISD public education program since the fall of 1979.

4. It is uncontested that Petitioner qualifies for special education services as learning disabled.

5. Petitioner has been psychologically diagnosed as emotionally disturbed.

6. During the entire course of Petitioner's enrollment at CISD, Petitioner has, to a marked degree, exhibited the following characteristics which have adversely affected his educational performance:

A. an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

B. inappropriate types of behavior or feelings under normal circumstances; and

C. a general pervasive mood of unhappiness or depression.

7. Petitioner is currently coded by Respondent's ARD as learning disabled. Petitioner is not coded as emotionally disturbed.

8. During the course of the first five years of Petitioner's enrollment at CISD, Respondent refused repeated requests by Petitioner's parent to evaluate Petitioner for special education services. Respondent's refusals were made in light of the following facts of which Respondent had knowledge:

A. Petitioner had a history as an abused child.

B. Petitioner had a speech impediment.

C. Petitioner had a history of behavioral problems when enrolled in the early childhood Headstart program.

D. Petitioner's behavioral problems had continued at his placement in his previous resident school district, resulting in his being placed in a self-contained classroom.

E. Petitioner's behavioral problems at CISD persisted to the extent that they either caused or directly contributed to Petitioner's being retained twice during a period of four school years.

F. Petitioner's behavioral problems at CISD caused his parents to temporarily remove him from the public school system and place Petitioner in a private facility. Petitioner's behavior also caused the private facility to decline to continue to serve Petitioner.

G. Petitioner's behavior at CISD was such that it was often deemed necessary to remove Petitioner from the classroom. In at least one such instance, Petitioner's desk was moved

127

into the school principal's office for a period of approximately three weeks.

H. Petitioner's behavior at CISD was such that school authorities discussed or considered placing him in a separate disciplinary facility reserved by state statute for children found guilty of incorrigible conduct.

I. With the exception of brief, isolated periods, all attempts to control Petitioner's conduct and behavior in the regular classroom have been unsuccessful.

9. The facts and circumstances known to Respondent's representatives were such that would cause a prudent educator to recognize the need to evaluate Petitioner for the existence of handicapping conditions.

10. Petitioner attended CISD for six years before he was evaluated and identified as eligible for special education services.

11. Respondent's failure to identify and serve Petitioner's handicaps has significantly contributed to Petitioner's loss of three grade levels of educational performance.

12. The current IEP provided Petitioner by Respondent's ARD provides Petitioner access to instructional and related services which, if satisfactorily completed, would permit Petitioner to be promoted to the next grade level. The IEP does not encompass a program or plan which would provide Petitioner an opportunity to recover lost educational units or credits.

CONCLUSIONS OF LAW

Having considered the evidence, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Hearing Officer, I conclude as follows:

1. Petitioner is an eligible handicapped child within the meaning of the EAHCA and qualifies for special education and related services pursuant to the applicable eligibility criteria for the learning disabled and the seriously emotionally disturbed.

2. Respondent is the resident school district within the meaning of Tex. Educ. Code Ann. Section 21.502(2) (Vernon Supp. 1984) and is responsble for providing Petitioner with a free appropriate public education in the least restrictive environment.

3. THe IEP currently provided Petitioner by Respondent's ARD fails to provide Petitioner with a free appropriate public education in the least restrictive environment. The IEP fails to provide an appropriate education because it does not provide Petitioner with sufficient educational benefit and fails to include the goal of recovering educational benefits lost by Petitioner in previous years. The IEP is not least restrictive because the placement provided is not restrictive enough to permit Petitioner to benefit sufficiently from special education services.

4. In order to provide Petitioner with a free appropriate public education in the least restrictive envirionment, the IEP must provide for a highly structured environment, the IEP must provide for a highly structured educational setting in which Petitioner's behavioral problems stemming from his emotional disturbance may be controlled. Moreover, the IEP

128

must provide an intensive program utilizing all available resources toward the educational goal of helping Petitioner recover educational benefits lost during his previous year at CISD.

ORDER

After due consideration of the record of appeal and the foregoing Findings of Fact and Conclusions of Law;

IT IS THEREFORE ORDERED that, at the earliest opportunity, Respondent shall convene an admission review and dismissal committee for the purpose of properly coding Petitioner's handicapping conditions consistent with the Findings of Fact and Conclusions of Law presented in this Decision.

IT IS FURTHER ORDERED that the admission review and dismissal committee develop an individualized education plan for Petitioner that will provide Petitioner with educational benefits and goals consistent with the Findings of Fact and Conclusions of Law presented in this Decision.

IT IS FURTHER ORDERED that Petitioner's appeal is in all things, GRANTED.

[1] Pet. Ex. 9 reflects that, although Respondent steadfastly declined to evaluate Petitioner for special education eligibility. Respondent apparently recognized Petitioner's slight speech impediment and was providing speech therapy at least as early as 1981. The record fails to explain Respondent's justification for denying access to the evaluation process while, at the same time, recognizing eligibility for special education related services.

[2] The alternative education program (REP) is established by Tex. Educ. Code Aim. Section 21.301 (Vernon Supp. 1984). The REP is a separate educational placement or facility for children whose conduct has been found to be incorrigible. Before a handicapped child may be placed in an REP, a qualiied group of professionals must determine that the questioned conduct was not related to the handicapping condition In any event, placement for a period in excess often days mustbe done by an ARD. See 19 Tex. Admin. Code 133.28 (McGraw-Hill, 1983).

[3] The provisions of 19 Tex. Admin. Code 75.195 preclude the retention of any elementary student who had previously repeated two different grade levels.

**Copyright 2008 © LRP Publications**

129

**507 IDELR 183**
507 LRP 8364

*In re Kristopher H.*

**Washington State Educational Agency**

**85-12**

**September 4, 1985**

## Related Index Numbers

**160.010 Due Process Hearings, Evidentiary Considerations**
**160.025 Due Process Hearings, In General**
**160.045 Due Process Hearings, Scope of Hearing Officer's Authority**
**175.050 Eligibility Criteria, Serious Emotional Disturbance**
**445.010 Serious Emotional Disturbance, Eligibility Criteria**

## Case Summary

Written psychiatric report was admissible despite lack of opportunity to cross-examine individual who prepared it, since state law provides that hearing officers may admit and consider any evidence that is relevant and possesses probative value.

After district evaluated student and found him neither learning disabled nor behaviorally disabled (BD), parents requested hearing to obtain independent assessment. Student was described as productive learner in structured classroom, although he was often hostile or suspicious of others and often used excuse of illness to leave class.

Although issues presented for hearing involved assessment, administrative law judge interpreted scope of assessment as including determination of eligibility for special education and decided that issue as well. He rejected district's position that student is not BD because his educational performance has not been adversely affected. Administrative law judge held that district misperceived scope of education, which includes not only instruction, but embraces all forms of human experience. Student who is hostile, aggressive, and withdrawn in interpersonal relationships is not being educated and meets criteria for BD classification. He then ordered independent educational assessment at district's expense and development of plan for student by evaluator and district representative.

## Judge / Administrative Officer

Homan, Administrative Law Judge

## Full Text

A hearing in the above-captioned matter was held before Administrative Law Judge, Frank G. Homn at Battleground, Washington June, 24, 1985. Roger H. and Kathy H. the acting parents of Kristopher H. were present and represented themselves. The Battleground

130

School District was represented themselves. The Battleground School District was represented by William Coats, Attorney for the School District. Also present from the Battleground School District were Kenneth Crawford, Lorie Temple, Fred Knispel, Gary Vrouillet, K. Jakutis.

## STATEMENT OF THE CASE

The appellant, Battleground School District requested a hearing in accordance with WAC 392-171-3271(2)(b) to determine if the independent assessment requested by Roger and Kathy H. for Kristopher H. will be at public expenses.

## FINDINGS OF FACT

1. Kristopher H. was a third grade student in the Chief Umtuch Elementary School in the Battleground School District (District) during the 1984-85 school year. Mr. and Mrs. H., Kristopher's uncle and aunt who are his acting parents, approved a special education assessment for Kristopher on March 8, 1985 after be came a "focus of concern."

2. Kristopher was referred for assessment by his then teacher, Mrs. Baty, who identified certain areas for concern: (a) problems in social relationships: (b) tendencies towards being easily distracted; and (c) difficulty remaining on task.

3. Kristopher was given several standardized tests designed to evaluate his intellectual potential and actual academic achievement. The tests given were the Woodcock Reading Test, Wide Range Achievement Test, key Math Test, Woodcock-Johnson Achievement Test and the Wechsler intelligence Test.

4. According to Lorie Temple, Director of Special Services for the District, his comprised a complete and adequate battery of academic tests. Additionally, the District had the assessment reviewed by Kay Jakutis whose responsibility was to monitor program compliance for the Superintendent of Public Instruction and the Education Service District.

5. Ms. Jakutis found the academic testing to be complete and adequate. Mr. and Mrs. H. have requested additional testing for Kristopher, however, according to the District his could be counter-productive.

6. Kristopher was determined to be of average I.Q. and to be performing at or near grade level and on the whole his behavior in the classroom was relatively unremarkable according to Mr. Frank Knispel, Kris's third grade teacher who replaced Mrs. Baty. However, it was Kris's behavior outside the classroom which had occasioned a great deal of concern. He was disruptive on the school bus and showed to great deal of aggressiveness and hostility towards his peers in unstructured situations or demonstrated withdrawal and suspicion toward adult figures. Kris would also use the excuse of illness (upset stomach) to frequently excuse himself from class. Nonetheless, the psycho educational assessment summary completed on April 26, 1985 concluded "Kris does not qualify for special services under any handicap and condition. Testing did not identify the presence of a specific learning disability . . . Kris does not qualify as a seriously behaviorally disabled student as per WAC 392-171-386 . . ." The assessment went on to conclude:

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=507+LRP+8...   2/14/2008

Most importantly, any behavioral maladjustment/inappropriateness has not adversely affected educational performance. In a typically structured regular classroom setting, Kris is an actively involved and productive learner. Actual scholastic achievement (academic skills) are commensurate with or above chronological age/grade placement and cognitive potential. Thus, there is no need for special education. Instructional strategies, procedures, materials, ect. do not need to be modified. An individualized and prescriptively specific educational program is certainly not necessary when a student is performing so well under established methodologies.

7. Sometime during the spring semester the District reported to the Child Protective Services (CPS) that there was a possibility of Kristopher being a victim of sexual abuse. The record seems to indicate this was based on some sexually explicit language by Kris and hearsay statements from other students that Kris had had sexual relations with a teenage girl.

8. There is no indication what if any action was taken by CPS since the results of investigations are apparently confidential. However, it would seem from that point on relations with Roger and Kathy H. and the District deteriorated drastically. This attitude was also colored by their thinking that the District was not making every effort to deal with Kris's problems.

9. On May 14, 1985 a conference was held with Roger and Kathy H., the school principal, Keith Johnson, Ken Crawford, Lorie Temple and Fred Knispel. The following program was agreed upon:

(a) During recess periods, an additional playground aide would be hired. This would permit close supervision of Kris's activities. The child would check in with the playground aide at regular intervals. He would be provided "tokens" for appropriate behavior during those nterval periods. A social reinforcer would be coupled, whereupon Kris would receive praise for desired behavior.

(b) Tokens earned on the playground and in other unstructured settings could be banked and/or cashed-in-for such rewards as stickers and sugar-free candy. A thirty-dollar ($30.00) purchase order for Learning World has been forwarded to Mr. Knispel, permitting him to purchase reinforcers that would be particularly motivating for Kris.

(c) The parents agreed that they would positively reinforce (provide extra privilages) (sic) on the basis of affirmative reports from school.

(d) In an effort to enhance self-concept, it was also suggested that experiences in the Resource include peer tutoring opportunities where he would assist younger and less capable pupils.

10. Although we had no direct testimony from the playground aide whose responsibility it was to monitor Kris' activities in unstructured settings, the District nonetheless had the impression the program was working. Then, on May 21, 1985 a letter was received from Roger and Kathy H. which suspended the above program "except for the recess reward schedule in conjunction with Knispel." The letter expressed a great deal of hostility toward the District using such pejorative terms as "atrocity" and accusing the District of allowing Kris to be "scarred more by Umtuch."

132

11. On or about May 30, 1985 Kris was evaluated by Cheryn Grant, D.O., a child psychiarty fellow at Oregon University. Her psychological assessment was in pertinent part as follows:

Kris's deterioration and behavior certainly indicates that some intervention is important at this time. If appropriate interventions are not made, this is child who will undoubtedly end up in some type of residential treatment facility and he is certainly a child who is at risk for delinquent behavior as he gets older.

Diagnosis (DSM III) 313.81 Oppositional Disorder Plan:

School: Mr. and Mrs. H. and the school need to work out an appropriate behavioral modification program for Kris. It is important that this program be consistent and that the school have the backing of Kris's guardians to manage this program. He is functioning at close to grade level academically and therefore does not qualify for special classrooms for the emotionally handicapped although he does appear to be an emotionally disturbed young man who would benefit from special services in a special behavorial program. Without these services most probably Kris's behavior will continue to deteriorate and he will at some point qualify for special programs.

Individual therapy with Kris can be attempted. This will undoubtedly be a slow process, as he is a suspicious, young man and does not make relationships easily.

Family therapy and or/couples therapy for Roger and Kathy is quite important. This family appears to be quite symbiotic and to have difficulty in separating. Kris is very good at wedging himself between members of the family and making himself the focus for all family difficulties. The family needs to work on appropriate discipline methods for Kris, and also work should be done in helping people to deal with their feelings regarding him and his behavior.

Day treatment if available is certainly an option that can be considered for Kris, especially if his behavior in school continues to deteriorate. If various outpatient modalities do not work, and Kris's behavior continues to deteriorate as it has over the course of the last year, he will undoubtedly end up in residential treatment.

Prognosis: Prognosis for Kris is quite guarded at this time. He shows significant problems, which have gotten worse, as have his family's problems, both within and without the external environment, most particularly school.

12. We note parenthetically that the District objected strenuously to the introduction of Dr. Cheryn Grant's report during the hearing on the grounds that it had been delineated, and had large sections excised from it at the time of hearing. The complete and unexpurgated report was not received until after the hearing. Further, the District objected on the grounds they did not have the opportunity to cross-examine Dr. Grant. We deal with the District's objections later in this decision.

13. In the report Dr. Grant noted she was aware of the allegations of sexual abuse and apparently was not concerned. She concluded, "There is no real clear evidence from this examination of sexual abuse of Kris and he denies that this abuse took place." We find therefore as a fact that there was no sexual abuse of Kristopher.

133

14. Roger and Kathy H. made objections to the assessment of Kristopher by the Battleground School District in correspondence dated May 17, 1985. Five objections were noted.

a. "The testing done was incomplete with several important categories omitted." At the hearing Mrs. H. testified that she did not object to the I.Q. testing but that she felt the academic tests were incomplete. Her contention was that more than one academic test should be given.

b. "The findings were biased and selfserving for the District since reports during the school year (this year and last) indicate that Kristopher H.'s performance was well below grade level in mathematics, reading, spelling, and comprehension."

c. "Where a child's education is at stake we question whether adequate and conclusive testing can be totally accomplished in a little over two weeks and still merit serious consideration."

d. "We question the location of the testing. We are concerned that Ms. Temple chose to test Kris within the sphere of influence of Keith Johnson and Diana Dunlop and Lorraine Baty. We seriously question whether an objective assessment could be accomplished"

e. "We question the expertise of Lorie Temple in conducting this testing and the validity of her conclusions. In an educational nutshell --- most PhDs insist on making opinions on children, acknowledging the extreme difficulties even after the laborious and length sessions in reaching accurate conclusions. Because of your staff's inability to constructively educate Kris, we believe his case deserves better than Lorie Temple, and who we would assume is an MS, maybe even RN. With Psych. training, having limited association with other than rural setting students."

The District urges that we limit our consideration in this case to those objections raised by Roger and Kathy H.

15. Mr. and Mrs. H. conceded at the hearing that Kristopher H. did not qualify as a learning disabled student. They claim, however, that he did qualify as a seriously behaviorally disabled student under WAC 392-171-386. Ms. Temple noted at the hearing that she was concerned that if Kris were to be labeled "behaviorally disabled" he would be seriously stigmatized and that this label could well follow him through the rest of his academic

**507 IDELR 191**
507 LRP 8367

*Oakland Unified School District*

**California State Educational Agency**

**SE 85383**

**May 9, 1985**

**Related Index Numbers**

175.050 Eligibility Criteria, Serious Emotional Disturbance
445.010 Serious Emotional Disturbance, Eligibility Criteria

**Case Summary**

Despite emotional problems of student who had been neglected, including difficulty interacting with others, unhappiness, and inappropriate behaviors, he is not seriously emotionally disturbed because these characteristics are not exhibited to a marked degree and are not pervasive.

Student was taken into protective custody of court and declared dependent in January 1983 due to neglect in home. He has been placed in five foster homes since that time. During kindergarten, which he began at age six in 1983-84 school year, he sometimes appeared withdrawn, but generally interacted with others, cooperated and learned quickly. After temporary placement at residential center for emotionally disturbed students for evaluation, he initially withdrew as much as 90% of the time, but continued to make progress. Although by March 1985 his reading skills were only at 1.5 grade level, math skills were at 2nd to 3rd grade level. There were indications of emotional problems including talking about violence, complaining of upset stomach not related to illness, playing with fire and sleepwalking. When district denied request of student's representative for classification as seriously emotionally disturbed, representative requested due process hearing.

Despite student's emotional problems, hearing officer found him not seriously emotionally disturbed because he does not meet criteria for that handicapping condition. He does not exhibit inability to learn; although chronologically a second grader, he began kindergarten late and is progressing adequately. In addition, student does not exhibit inability to build or maintain satisfactory interpersonal relationships; although he is slow to interact, he eventually develops relationships. Despite inappropriate types of behavior and feelings under normal circumstances observed over a long period of time, these behaviors are occasional, do not occur to a "MARKED DEGREE" and do not adversely affect educational performance. Student has periods of sadness and depression, often related to concerns about his future, but there is not a PERVASIVE mood of depression. Finally, despite physical complaints, there is no indication of TENDENCY to develop physical symptoms or fears associated with personal or school problems.

**Judge / Administrative Officer**

135

Joe, Hearing Officer

**Full Text**

### DECISION

The matter was heard before Spencer Joe, Hearing Officer of the Office of Administrative Hearings, State of California, in Oakland, California on April 16, 17, 23 and 24, 1985.

Present for the Petitioner were Ernie Wing and Varghese Vengapally. Petitioner was represented by Pamela Fyfe, Deputy County Counsel.

Appearing for the Respondent was George Swartz. Respondent was represented by Douglas Reiss, Attorney.

Oral and documentary evidence were received, the record was closed and the matter was submitted upon receipt of post-hearing briefs on April 29, 1985.

The Hearing Officer makes the following final decision.

ISSUE

Is Petitioner seriously emotionally disturbed within the meaning of 34 CFR 300.5(b)(8)?

FINDING OF FACT

1. Petitioner is a 7.4 year old male. He currently resides in a foster home which is the Respondent's service area.

2. Petitioner was declared a dependent of the court in April, 1983. Petitioner was taken into protective custody on January 25, 1983 pursuant to evidence of child neglect and the discovery by the police of a partially decomposed body of Petitioner's sibling. The body had been there for approximately three months and was found under a mattress. Petitioner has been in five foster homes since January, 1983.

3. Petitioner was six years old when he first entered kindergarten. He attended Respondent's kindergarten class from October, 1983 until May, 1984. The kindergarten class had approximately 28 students. Petitioner occasionally appeared very quiet and withdrawn with a solemn look. The teacher was able to regain Petitioner's attention and return him to his work by "joking" him out of it. Petitioner was able to change activities easily; he played and interacted well with children; he was able to share his experiences with others; he was generally cooperative, although quiet and reserved; there were no notable acts of misbehaving or acting our behavior.

Petitioner was able to name letters of the alphabet; identify works that rhyme; tell which words indicated same or different; to sound out beginning sounds; identify numbers 0 through 10; to visually discriminate words; to listen to a story and answer questions about the story. Petitioner was in the top learning group in the class. He was able to maintain his standing within this group. He learned quickly and did not require repetition of lessons by the teacher. His in-class performance was consistent with his California Test of Basic

136

Skills (CTBS) achievement scores. The test is normed on a nationwide standard. Petitioner had mastered areas of visual recognition, sound recognition, and oral vocabulary; receiving percentile scores of 88, 80 and 90, respectively. This indicates that Petitioner had successfully completed the kindergarten curriculum in the area of reading.

The testimony from the Petitioner's foster mother corroborates the evidence concerning Petitioner's educational performance during that kindergarten year. The foster mother noted that Petitioner learned well in Kindergarten and recalled that she was told by the teacher that he was doing well in the class. The foster mother was pleased with the progress made in that class.

4. Petitioner was placed in Children's Garden, a private nonprofit center serving emotionally disturbed children and families, for assessment and evaluation of needs, in May, 1984. As part of the evaluation process, Petitioner attended an ungraded class with seven students and a teacher and an aide at the Marin Academic Center.

Petitioner initially exhibited withdrawal and depression for as much as 90 percent of the time. Staff had difficulty bringing Petitioner out of depression. He would sit alone for a couple of hours, or lie on his bed sobbing or look out the window. At times he would go through the motions of an activity but would not talk, or interact with others.

5. Petitioner was assessed in May and June of 1984, shortly after the placement in the Marin Academic Center. The Peabody Individual Achievement test noted grade equivalency scores in reading recognition of 1.4; reading comprehension 1.3; mathematics 1.2; general information .8. On the Woodcock Reading Mastery test, Petitioner achieved grade equivalency scores of 1.7 for letter identification and 1.2 for work identification. On the Gates MacGinitie Reading test, Petitioner achieved a vocabulary grade scores of 1.2, and comprehension of 1.4.

These scores indicate that Petitioner was performing at grade level at the time Petitioner entered the Marin Academic Center.

6. By the end of Petitioner's stay at the Marin Academic Center, March, 1985, Petitioner was doing second and third grade level work in mathematics. Petitioner did experience some interference with his reading. At times, Petitioner was not able to read and would only stare at the words even though the material was not new. The evidence does not indicate when this behavior occurred. Petitioner was reading at the mid-first grade level by March, 1985. The discrepancy between Petitioner's math and reading ability is not unusual in that math is a process using concrete thinking skills and reading is abstract.

Petitioner also has a problem with letter reversals. This is possible caused by a visual motor deficit and is common for boys up to eight years of age. It has been noted that the frequency of letter reversals increase with the degree and amount of Petitioner's moodiness and depression.

7. Petitioner has made friends at Children's Garden and the Marin Academic Center. Petitioner had neighborhood friends when he lived with his current foster mother prior to his placement at Children's Garden. He has renewed those peer relationships when he recently returned to the foster mother's home.

8.  The evidence established a strong correlation between Petitioner's increased moodiness and periods when peers were leaving Children's Garden for other placements, or when Petitioner became concerned about his future placement. This was apparent towards the latter part (approximately November, 1984) of Petitioner's stay at Children's Garden.

9. Petitioner has low self esteem. He presents himself as careful, guarded and inhibited. At times, he appears solemn and moody. His withdrawal behaviors are only momentary. He has shown much improvement compared to earlier descriptions of these behaviors. He returns to task with redirection or coaxing, or on his own without intervention. He is also described as "sneaky" because he will pinch or pull the hair of another student when the teacher's back is turned.

10. Petitioner has exhibited behaviors which are indicators of an emotional problem:

a) He described in detail, a trip to Nigeria to a therapist. Petitioner's experience was deemed a fantasy;

b) He was extremely tearful after a slight injury;

c) Engages in "scary" talk about monsters and violence;

d) Over a period of approximately eight months, Petitioner overate and had an upset stomach, five to eight times or vomited, approximately three times. These incidents were not related to an illness, were not an avoidance behavior, and may be related to depression.

e) At his foster home, he has played with fire; denied doing certain acts, but recants after carefully thinking out the event when asked to do so in a nonconfrontational manner, sleepwalking and nightmares have decreased.

DETERMINATION OF ISSUE

Petitioner is not seriously emotionally disturbed within the meaning of 34 CFR 300.5(b)(8). Under this provision:

"`Seriously emotionally disturbed' is defined as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance:

(A) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers:

(C) Inappropriate types of behavior or feelings under normal circumstances;

138

(D) A general pervasive mood of unhappiness or depression;

or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed."

Petitioner does not have an inability to learn, Petitioner has made academic progress while in kindergarten and at the Marin Academic Center (see Findings of Fact 3, 5 and 6). Petitioner's contention that he should be doing better is not persuasive. Although exhibit 10, page 3, shows Petitioner's chronological grade placement as the second grade in May and June 1984, the facts show that Petitioner had just been removed from kindergarten, and that Petitioner had achieved appropriate grade equivalency scores (see Findings of Fact 5).

Petitioner does not have an inability to build or maintain satisfactory interpersonal relationships with peers and teachers. Although Petitioner pinches or hits other students or may frighten them with "scary" talk, this has not inhibited friendships (see Findings of fact 7). Petitioner may be cautious and slow to open up to adults, but Petitioner has maintained satisfactory relationships with adults.

Petitioner exhibits inappropriate types of behavior or feelings under normal circumstances (see Findings of Fact 10). These may have collectively qualified as occurring over a "long period of time." However, these are one time or occasional behaviors which cannot be construed, individually or collectively as to a "marked degree," or to such an extent as to adversely affect educational performance. Educational performance, in addition to academic performance, includes peer interactions, participation in class activities, and following directions. The evidence shows that some impairment in these activities has occurred, but these have been slight, and does not support a determination of adverse educational impact. Evidence of Petitioner's most current performance, approximately since November 1984, indicates Petitioner is interacting with peers and participating in class in a satisfactory manner.

Petitioner does not have a pervasive mood of unhappiness or depression. The evidence is clear that Petitioner has periods of sadness and depression. But this is not currently a pervasive mood. Staff from Children's Garden and the Marin Academic Center testified that Petitioner's depression has increased in the last few months. A "less then 50%" figure or "much disintegration" was proferred as the amount of depression. There was not, however, persuasive testimony or evidence which supported this contention. If the behavior was as severe as alleged, it is most peculiar that this was not noted in the report to the Superior Court; or that Children's Garden did not need to update its final evaluation summary of October 31, 1984 to reflect the alleged increase in depression; or that Children's Garden did not record and document the severe forms of behavior in case notes which are typically made by diagnostic and treatment centers.

The evidence was insufficient to show the Petitioner has a tendency to develop physical

http://www.specialedconnection.com/LrpSecStoryTool/servlet/GetCase?cite=507+LRP+8...   2/14/2008

symptoms or fears associated with personal or school problems.

The evidence is clear that Petitioner has emotional problems. This case evokes sympathy and concern for the welfare and future of this child. However, Petitioner is not "seriously emotionally disturbed" within the meaning of 34 CFR 300.5(b)(8). He may have exhibited the characteristics in varying degrees, but fails to meet the qualifying conditions of "inability" 34 CFR 300(B)(8)(i)(A) & (B), "pervasive" 34 CFR 300(b)(8)(i)(D), or "tendency" 34 CFR 300(b)(8)(i)(E).

Additionally, the characteristics have not been established by the evidence to currently be "to a marked degree" and "which adversely affects educational performance."

## ORDER

Petitioner's request to be found eligible for special education is denied.

**Regulations Cited**

**34.300.5.B.8**

**Copyright 2008 © LRP Publications**

**503 IDELR 256**
503 LRP 7615

*In re: Burton Valley School District*

**California State Educational Agency**

**SE-508**

**February 3, 1982**

**Related Index Numbers**

135.015 Definitions/IDEA, Other Terms Generally
175.050 Eligibility Criteria, Serious Emotional Disturbance

**Case Summary**

Because the phrase "adversely affects educational performance" in Reg. 300.5(b)(8) is a general concept which includes more than the acquisition of basic skills, Federal regulation supersedes a county policy which defines "educational performance" so that those students who have acquired basic academic skills are excluded from special education; therefore, where student's emotional difficulties affect his very ability to be in a classroom, district must identify and serve him as seriously emotionally disturbed.

Parents of child with behavior problems requested that school district identify him as seriously emotionally disturbed and provide him with special education services. County policy, however, defined "educational performance" in Reg. 300.5(b)(8) as the "ability to demonstrate the acquisition of basic academic skills." Because the student was performing at or close to grade level in all academic areas, school district proposed placing him in regular classes.

According to hearing officer, Federal law must supersede county policy since the term "educational performance" in Reg. 300.5(b)(8) includes more than the acquisition of basic academic skills. Ruling that student required special services in order to learn to control his behavior to a sufficient degree to enable him to remain in a classroom, hearing officer directed district to prepare IEP for student which would address emotional needs.

**Judge / Administrative Officer**

Janet Saunders, Hearing Officer

**Full Text**

This matter was heard before Janet Saunders, Hearing Officer of the Office of Administrative Hearings, State of California in Porterville, California on January 26, 1982.

The Petitioner was represented by Susan E. Gong, Attorney at Law.

The Respondent was represented by John Lehmann, Program Manager.

141

Oral and documentary evidence was received, the record was closed and the matter was submitted.

Issue

Is Petitioner eligible for special education as a seriously emotionally disturbed child?

Findings

1. Petitioner is 13 1/2-year-old boy with a severe conduct disorder and a depressive disorder. He does not have a learning disability or a language disorder. He is bright, articulate, has a good memory and has acquired basic academic skills.

2. A severe conduct disorder a diagnosis describing undersocialized aggressive behavior, or a child who consistently violates the rights of others for a period of more than six months and shows violence against persons and property. Petitioner demonstrates high degree of aggression; he views all interactions as aggressive interactions which he must respond to in an aggressive way; he is physically aggressive towards peers and sets up situations of physical aggression; he is aggressive towards property. Petitioner would pull pictures off the classroom wall and throw furniture. Petitioner is not able to deal with problems without acting them out. he gets out of control and unreachable; when he is in this state, he does not respond to verbal prompts and must be physically restrained.

A depressive disorder is exhibited through his inability to get appropriate gratification from peers and adults, his extremely low self-esteem and self-confidence, his periodic sad and lonely affect and his amount of rage.

3. Petitioner has difficulties with peers. He teases and plays tricks on his classmates; fights and provokes aggression. This behavior is much more than "mischief"; this behavior differs in intensity from mischief, leads to other inappropriate behavior and, as stated by Petitioner's former psychiatrist, is the tip of the iceberg and not the iceberg itself.

Petitioner exhibits inappropriate types of behavior and feeling. A look or a noise will set him off on a rage; in anger, he will bang his head against the wall, attack a police car with rocks and dirt or step on a classmate's eyeglasses.

He exhibits a general pervasive mode of unhappiness and depression which has a cyclical effect. His aggression leads to low self-esteem, which leads to depression and aggression.

4. Petitioner has acquires a good academic foundation. From a academic standpoint, he is able to perform a grade level or close to grade level in all areas. His grades for academics in the sixth grade were from B-plus to C. Untimed standardized tests given in July 1981 indicate above grade level functioning ability in reading and language and slightly below grade level in arithmetic. Because these scores were not timed and Petitioner was given as much time as he needed to complete the exam, the scores are not valid test scores; however, they do give some indication of Petitioner's functioning ability

Other standardized test scores have been erratic over the years and demonstrate inconsistent progress. For example, in 1978, 1979, and 1980, in reading, Petitioner scored in the 74 percentile, 89 percentile and 73 percentile, respectively. In language, he scored

142

in the 72,69, and 46 percentile for those same years; in arithmetic, he scored in the 67, 91, and 72 percentile.

5. The Tulare County Office of Education has developed the following policy to define the phrase "adversely affects a child's educational performance" as it is used in 34 CFR Reg. 300.5(b)(8). That policy is as follows:

It is the position of the Tulare County Responsible Local agency that educational performance for the purpose of identification of a special education student as behavior disordered or severely emotionally disturbed be defined as the ability to demonstrate the acquisition of basic academic skills. A significant deficiency in academic skill attainment is a necessary condition for identification as behavior disordered or severely emotionally disturbed. It must be judged that the academic deficiency is a direct result of the handicapping condition.

6. Petitioner has a long term history of behavior difficulties in school. He was suspended a number of times and then expelled at the end of the 1980/81 school year after numerous incidents of fighting; disrupting school activities; using profane language; disrupting cafeteria activity; being rude, disrespectful and defiant. After the school had, in its own words, exhausted its (discipline) resources, Petitioner was expelled to protect the safety and education of the other students. After expulsion in July 1981 parents placed Petitioner into a psychiatric hospital.

7. Petitioner's emotionality is pervasive and affects all his life processes. His behavioral difficulties in school are caused by his emotionality. His academic behavior is also affected. His academic performance is erratic; he is distracted from his work because of his emotionality. He has difficulty focusing on academics and directing his attention. When Petitioner is distracted because of his emotionality, he is prevented from thinking, remembering and working.

Also, school attendance affects the education of a child. The more exposure there is to material, the more opportunity a student has to learn.

8. Petitioner left the psychiatric hospital on October 21, 1981 and from October 27 to December 28, 1981 attended a "Learning Opportunity Program." The learning opportunity program is not a special education program but is an alternative to the regular program. Students are placed there because of behavior or attendance problems.

While in the learning opportunity program, Petitioner was mainstreamed into two regular classes. His behavior and academic performance in the learning opportunity and regular classes were good. He did not exhibit intense anger and responded to direction.

During that time period, Petitioner took anti-depression and anti-psychotic medication. He did not take that medication when he was at the psychiatric hospital.

9. Parents placed Petitioner into a different psychiatric hospital when a space became available on December 29, 1981. Parents regarded the learning opportunity program to be an interim program between the first hospital who released Petitioner because he needed long term treatment and the second hospital.

143

Determination

Petitioner is eligible for special education as a seriously emotionally disturbed child.

Basis for Determination

34 CFR Reg. 300.5(b(8) defines "seriously emotionally disturbed" as it is used as an eligibility criteria for special education services:

(8) "Seriously emotionally disturbed" is defined as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance;

(A) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) Inappropriate types of behavior or feelings under normal circumstances;

(D) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic or autistic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed.

Evidence clearly establishes that, over a long period of time and to a marked degree, Petitioner has exhibited the characteristics described in subsections (B) (C), and (D) above, See Findings 2,3,6, and 7. The question remains: do these conditions adversely affect his educational performance.

Because Petitioner has acquired basic academic skills, the County criteria, if applied, would make him ineligible for special education. However, Federal regulations requires that the handicapping condition "adversely affect educational performances." This is a more general concept and includes more than the acquisition of basic academic skills. Federal regulation superseded County policy; the Federal criteria is applicable.

Petitioner's emotional difficulties affect his very ability to be in a classroom. His poor behavior is not remediable by the usual discipline controls available in the regular program. Petitioner gets out-of-control, unreachable and violent at minor provocations. Revocation of privileges and suspension from school do influence not him. He needs special programs and services to enable him to meet even a threshold level of educational performances, i.e., attendance at school.

144

The County has exhausted its regular resources and has suspended and expelled Petitioner. Expert testimony established that if Petitioner were returned to a regular class, even if a brief period of good behavior ensued, his emotional disturbance would, in time, make it impossible for him to learn on a consistent basic. When his disorder is is less volatile, he can learn. However, his conduct disorder is certain to manifest; it is too pervasive and well entrenched to disappear without comprehensive therapy. When the disorder manifests, Petitioner's behavior will be unacceptable to school authorities and he will be suspended. Petitioner needs special services in order to learn to control his behavior to a sufficient degree to enable him to remain in a classroom. It is self-evident that the inability to be present in a classroom adversely affects one's educational performance.

It is further noted that Petitioner's erratic standardized test scores over a three-year period indicate that Petitioner's educational performance is adversely affected by his condition.

District contends that Petitioner was able to function well in the learning opportunity program and therefore, should be able to function in a regular classroom. Petitioner's experience in the learning opportunity program is not conclusive. First, he received medication during that period, and according to experts, long-term medication is not the treatment of choice for Petitioner. Second, Petitioner demonstrates what experts term a honeymoon period, i.e., a fairly short period of functional behavior in a new situation where Petitioner is able to cope with various demands and act appropriately.

After some weeks, he becomes less able to cope with demands and control his behavior and will flare up more and more often until his behavior can no longer be considered functional. Petitioner's ability to maintain himself in the learning opportunity program can be explained by his medication, the honeymoon phenomena and Parents' attempts to make the interim period from one hospital to another as smooth as possible; considering the severity of Petitioner's disorder, this brief period of good behavior is not sufficient to show that Petitioner can function in a regular program.

ORDER

1. Petitioner is a seriously emotionally disturbed student and is eligible for special education.

2. An Individualized Education Program (IEP) team shall meet within 15 days of receipt of this Decision. The team shall consider this Decision and shall prepare an IEP with goals and objectives which address Petitioner's peer relations, frustration tolerance, compliance to school rules, aggression, self-esteem and other factors which relate to his emotionality and educational performance.

**Copyright 2008 © LRP Publications**

**502 IDELR 374**
502 LRP 7411

*In re: East Side Union High School District*

**California State Educational Agency**

**SH-267**

**August 8, 1981**

**Related Index Numbers**

**175.050 Eligibility Criteria, Serious Emotional Disturbance**
**385.015 Private School Placements, Residential Placement**

**Case Summary**

Student is seriously emotionally disturbed where she exhibits an inability to learn which cannot be explained by intellectual, sensory or health factors. Fact that student clearly exhibited socially maladjusted behavior did not negate her handicapped status because an emotional disturbance and social maladjustment are not mutually exclusive under Reg. 300.5(b)(8)(ii).

In December 1979, parent unilaterally placed student with behavior problems, who had been made ward of court because of delinquency, in residential facility. Hearing officer considered whether (1) student was handicapped: (2) residential placement was necessary to provide her with FAPE: (3) district or another agency was responsible for providing student with FAPE; and (4) district was responsible for reimbursing parent for residential placement costs from December 1979.

(1) Hearing officer ruled student was handicapped, i.e., seriously emotionally disturbed, because she exhibited an inability to learn which could not be explained by intellectual, sensory, or health factors: fact that student clearly exhibited socially maladjusted behavior did not negate her handicapped status because an emotional disturbance and social maladjustment are not mutually exclusive under Reg. 300.5(b)(8)(ii). (2) Student required 24-hour, structured environment to deal with her academic failure, truancy, substance abuse, and other emotional problems. (3) Hearing officer ruled that school district was estopped from denying its responsibility to provide student with FAPE because it failed to raise argument earlier, factual record at hearing was inadequate to determine financial responsibility, and it would be unfair to student to allow or solicit evidence as to nature of wardship or placement at such a late date. In estopping district from denying responsibility, hearing officer made no finding on merits of district's position regarding interagency responsibility for placement. (4) Under Reg. 300.342, school district cannot unduly delay providing a student with special education and related services. Because there was no question that student would have been harmed by remaining in her current public placement pending exhaustion of administrative remedies, hearing officer found that parent was justified in placing her in residential facility and entitled to damages or reimbursement of placement costs; in Boxall v. Sequoia, court ruled that 20 U.S.C. 1415 authorized it to award damages. Ruling that "it would be foolish to argue that hearing

146

forums may not similarly provide for reimbursement," hearing officer awarded parent residential placement costs from December 1979.

**Judge / Administrative Officer**

David Girard, Hearing Officer

**Full Text**

DECISION

The hearing was held on September 17, 1980, at Administrative Office of the East Side Union High School District, 830 North Capitol Avenue, San Jose, California before David W. Girard, Hearing Officer of the Office of Administrative Hearings.

Parent representative, [ ], Hearing. Joseph G. Schumb, Jr., Brief.

District representative, James Doyle, Hearing. Jane E. Slenkovich, Brief.

Statement of Facts

1. [ ], hereinafter, Pupil, is a 17-year-old girl born June 10, 1963.

2. Pupil currently attends CEDU school, a private residential school, located in San Bernardino County.

3. Pupil's father unilaterally placed Pupil at CEDU in December 1979.

4. CEDU is California State certified to serve children with special education needs.

5. Pupil's father lives within the boundaries of the East Side Union High School District, hereinafter District.

6. From April 1979 to November 1979 (prior to CEDU enrollment), Pupil resided with her father and attended District's Piedmont Hills High School in the 11th grade.

7. In April 1979, Pupil was delinquent and made a ward of the Santa Clara County Court for an indefinite period.

8. Prior to her enrollment at Piedmont, Pupil attended eight different schools in five years where she was expelled, suspended or failed.

9. While at Piedmont, Pupil received generally failing grades and was frequently truant.

10. In January 1980, Pupil's parent (through an agent) requested that the District provide Pupil with special educational services.

11. District required various authorizations and proof of agency prior to acting on Pupil's parent's request.

147

12. District psycho-educationally assessed Pupil on July 25, 1980.

13. Previous to the July 25, 1980 assessment, Pupil had been privately, psychologically assessed by Michael Nissen, M. S. in December 1978.

14. Pupil has also been psycho-educationally assessed by Jan Horn, Licensed Educational Psychologist, December 1980 at Hearing Officer's initiative for an independent assessment.

15. Pupil has received psychologist counseling as follows:

a. December 1978 to April 1979 -- Michael Nssen, M. S.;

b. Summer 1978 -- Fern Mitchell, Licensed Clinical Social Worker;

c. April 1979 to Fall 1979 -- Virginia Heenan, Clinical Psychologist.

16. Pupil:

a. has at least normal intelligence;

b. has a short attention span;

c. has a history of lying and stealing;

d. is sarcastic and disrespectful;

e. is defiant;

f. has strained relations with her parents;

g. is suspicious;

h. is defensive;

i. has poor impulse control;

j. exhibits asocial and antisocial behavior;

k. has used drugs and alcohol;

l. has run away from home for a three-week period in the fall of 1979;

m. has been truant;

n. has a poor self-image;

o. has no neurological or sensory motor deficiency;

148

p. sometimes gets physically ill when put under pressure.

17. Pupil is performing at grade levels as follows:

a. word recognition - 13;

b. spelling - 9.9;

c. mathematics - 7.8.

18. Pupil has received generally failing grades the last two years in the 10th and 11th grades.

Issues

I

Is Pupil handicapped?

II

Is residential placement necessary to provide Pupil with a free appropriate public education (FAPE)?

III

Is District or some other agency responsible for providing Pupil with a FAPE?

IV

Is District responsible for reimbursing Pupil's parent for residential placement costs from December 18, 1979?

Conclusions

I

Pupil is handicapped: seriously emotionally disturbed.

II

Residential placement is necessary to provide Pupil with a FAPE.

III

District is estopped from denying it has responsibility for providing Pupil with a FAPE.

IV

149

District is responsible for reimbursing Pupil's parent for residential placement costs.

Discussion

I - Pupil Is Handicapped: Seriously Emotionally Disturbed (SED)

Pupil has exhibited an inability to learn which cannot be explained by intellectual, sensory, or health factors, 34 CFR Reg. 300a.5(b)(8)(1)(A). She has normal intelligence. There is no evidence of sensory deficiencies or health impairment; yet, Pupil is unable to learn. "Inability" is understood to mean either lack of capacity or fitness to learn. See Webster's 7th Edition New Collegiate Dictionary, "inability" at page 421, "ability" at page 2, "unable" at page 963, "incapable" at page 422. Clearly, Pupil has the capacity to learn; however, she is not fit to learn because of her emotional problems. It is not necessary to find that she is totally unable to learn because all that is required is a finding that there is some unfitness or inability which has occurred over a long period, to a marked degree, and has adversely affected educational performance. Here, there is substantial evidence that she has been unable to learn over a long period of time. She has attended eight different schools in the last five years and experienced various types of behavioral problems over that five-year span. There is evidence that her problems exist to a marked or a noticeable (Webster's, at page 517) degree because she has been involved in everything from truancy to stealing to substance abuse, to running away from home, all of which has adversely affected her educational performance. Her classroom grades show that in the last two years she has become a failure and is below grade level in spelling and math. The existence of Pupil's severe emotional disturbance is strongly supported by the opinion of Mr. Mitchell, a clinical social worker, Dr. Virginia Heenan, and Dr. Jan Horn in the December 1980 independent assessment.

Children who are socially maladjusted are not defined as handicapped, 34 CFR Reg. 300.5(b)(8)(ii); see also, CEC 56026(d). Pupil clearly exhibits socially maladjusted behavior. But 34 CFR Reg. 300.5(b)(8)(ii) specially allows that SED and a social maladjustment are not mutually exclusive. Also, it does not matter whether Pupil's emotional disturbance is caused by non-school factors, in whole or in part, because all that matters is that her condition makes her unable to learn.

II - Residential Placement Is Necessary To Provide Pupil With FAPE

Over the past five years, Pupil has been an educational vagabond, bouncing from school to school -- not to mention from parent to parent and relatives. She has been a runaway, truant, and substance abuser. She has a history of lying and stealing. She has been ejected from schools and been made a ward of Superior Court for delinquency. She has poor impulse control and exhibits antisocial behavior. Her report cards show she is now an academic failure. While she exhibits some academic strengths, she nevertheless scores some three years below grade level in math. If ever there was a child who needed a highly structured environment, Pupil is that child. Moreover, Pupil needs a highly structured setting 24 hours a day. It is clear that Pupil's non-school social environment is a major cause of her school problems. Her tendency to run away and use drugs and alcohol as a means of coping with stress outside of school spills over and affects her overall performance. As a result, Pupil requires an environment which not only can control her around the clock but also provide crisis intervention, counseling, and an integrated school life and environment. It is needed for consistency in dealing with Pupil's emotional

150

problems. It is necessary so the she is fit to be educated.

III - District Is Estopped From Denying It Is Responsible for Providing Pupil FAPE

District is estopped from now asserting that it has no responsibilty to provide Pupil with a FAPE. In its brief of February 12, 1981, District argued for the first time that it was not responsible because, effective July 28, 1980, State law makes a County in which a private school is located (San Bernardino County) responsible for providing a FAPE. District responsibility is not only a legal question but a factual question. The factual record here is inadequate to the task. For example, the copy of the wardship order in evidence doesn't even bear a date. Moreover, it would not be practical or fair to allow or solicit evidence of the extent and nature of wardship, placement and other matters at this late date.

The District had a full opportunity to raise such matters earlier and chose not to do so. It should be noted also that the State of California is ultimately responsible for providing special education. Perhaps the exact State agency or subdivision responsibility may be sorted out between various agencies at some later time. There is no evidence or argument on that point, however, and it is not proper at this time to have Pupil look elsewhere than to District.

It should also be noted that by estopping the District from denying its responsibility, there is no finding on the merits of the District's position regarding interagency responsibility.

IV - District Is Responsible for Reimbursing Pupil's Parent for Costs of Residential Placement

Pupil started attending District school in April 1979. Pupil's parent unilaterally placed her in a residential school in December 1979. Pupil required a residential placement at the time of this hearing. Pupil required residential placement at the time her parent unilaterally placed her. The only question is whether Pupil's parent had a legal right to have District pay for his unilateral act.

Generally, there is no provision for reimbursement for unilateral private placement. If the parties disagree on what placement is appropriate, the proper remedy is to request a hearing. While administrative and judicial remedies are being exhausted, the status quo is required to be maintained unless the parties agree otherwise, 34 CFR Reg. 300.513. Nevertheless, comments following 34 CFR Reg. 300.342, clearly indicate that there can be no undue delay in implementing an Individualized Education Program, IEP. It would constitute an undue delay if there is a reasonable expectation of harm to a child who remains in his/her current placement pending exhaustion of administrative procedures. Given Pupil's poor impulse control, substance abuse, running away and delinquent behavior, there can be no question of the danger of harm to Pupil if she stayed in her then current public school placement until administrative remedies were exhausted. There was little, if any, possibility she could educationally hold her own in District placement. There was danger that she would suffer educationally, and it is no exaggeration to say even physically, if an appropriate placement was not made at the time Pupil's parent unilaterally made it.

District has cited authority for the proposition that there is no legal basis for reimbursement for unilateral private placement. Pupil has contended the opposite. Without commenting

151

explicitly on each and every case cited, it is fair to say generally that only one, Boxall v. Sequoia Union High School District (1979), 464 F. Supp. 1104, 3 EHLR 551:239 [1979-80 DEC.], has any precedential value here. Other cases cited are not binding as precedent or distinguishable on the facts. Moreover, none provides the kind of well-reasoned opinion which recommends itself on the basis of its analysis alone. In Boxall, a parent sought reimbursement for tutoring expenses unilaterally incurred before administrative procedures were exhausted. The defendant district moved for dismissal, arguing among other things, that there could be no reimbursement because the court was not empowered to award damages. In deciding against granting a motion to dismiss, Boxall relied on legislative history and ruled that 20 U.S.C. 1415 (625 of P.L. 94-142) provides the court with authority to award damages. Obviously, if Federal courts can award damages, it would be foolish to argue that hearing forums may not similarly provide for reimbursement. To deny that right would force all reimbursement cases to be appealed to the courts.

ORDER

District shall reimburse Pupil's parent for the costs of residential private placement beginning in December 18, 1979.

**Copyright 2008 © LRP Publications**

**501 IDELR 205**
501 LRP 6881

*Jeffrey K. v. Concord Carlisle High School*

**Massachusetts State Educational Agency**

**2135**

**January 16, 1979**

**Related Index Numbers**

175.050 Eligibility Criteria, Serious Emotional Disturbance

**Case Summary**

The origin of a child's emotional disturbance "is not a factor in the determination of eligibility for services for which the LEA is responsible."

Emotionally disturbed and learning disabled child was evaluated by LEA, which recommended placement in special education program at local public high school. Parents rejected recommendation on grounds that program was inadequate to treat child's disabilities and did not recognize his emotional needs. Instead, parents elected to place child in private school and requested LEA funding. When LEA refused, parents requested hearing.

Hearing officer for Bureau of Special Education Appeals (BSEA) sustained appeal and ordered LEA to pay child's tuition for current school year. Officer criticized LEA for its tendency to minimize child's emotional needs as "attitudinal" and merely a response to "parents' philosophy." Officer noted that "neither state nor federal law fixes responsibility based on the causality of an emotional problem but looks to the effect on the student's educational growth." The origin of a child's emotional disturbance "is not a factor in the determination of eligibility for services for which the LEA is responsible." Although officer acknowledged LEA's capability to provide child with appropriate program, he concluded that they did not have such a program at present and that the private school was therefore appropriate for the current year.

**Full Text**

DECISION

This decision is written pursuant to Massachusetts General Laws c71B, c30A and the regulations promulgated thereunder. A hearing was held on November 17 and December 5, 1978 at 115 Stow Street, Concord, Massachusetts in response to a request filed by Mr. and Mrs. Earl K. with the Bureau of Special Education Appeals on November 3, 1978. Said request followed a rejected educational plan and a mediation session agreed to and attended by both parties.

History of the Case

153

Jeffrey K. is a 17 1/2 year old young man who is currently attending Charles River Academy, (hereinafter CRA) a C.766 approved private day school located in Cambridge, Massachusetts. He was enrolled there in a 502.5 prototype program by his parents at their expense on October 1, 1978 following the rejection of an educational plan proposed by Concord Carlisle High School. (hereinafter CCHS) Said educational plan which is the subject of this hearing proposes a 502.3 prototype program in the 10th grade that provides tutoring in the areas of reading, language and math as well as counseling to address a recognized emotional problem. The plan was developed by CCHS in August, 1978 and was presented to and rejected by Mr. and Mrs. K. on August 30, 1978

Jeffrey has a history of difficulty with school which is well documented in the record. (see package of school Exhibits, 56) During his years in elementary school in Carlisle a variety of special needs were identified and addressed. As early as the first grade retention was recommended because of "immaturity and academic failure." Speech correction therapy was provided during 1967-69, remedial tutoring in reading and spelling during 1970-72. Despite the remedial work Jeffrey consistently scored below grade level and below his ability level in most subjects. While in grade 5 behavioral problems were recognized by one of his teachers Nancy Hall who described him as "inattentive and uncooperative in class" as well as "impudent and trustworthy." During that year Hall also noted that the scores on many of the tests administered to Jeff dropped below their level of the previous June (1971). Another 5th grade teacher, Tate, noted that Jeff had "acted in a very strange manner this year . . . Jeff seems to slip in and out of reality many times." Although little information was available for grades 6 through 8, a Carlisle Public School Background Data form dated March 3, 1975 notes low achievement on the Iowa test of basic skills, low grades, and a continuing concern of staff about Jeff's learning, speech and emotional problems. A suggestion was made that a complete evaluation take place upon transfer to CCHS.

Jeff entered CCHS in September 1975 as a regular education student. He had difficulty with this program as evidenced by his grades in 1975-1977 which ranged from B-F with the majority of academic subjects between C- and D. In May, 1977, Jeff was referred for a full evaluation at the request of CCHS teacher (Exhibit P2) and with the consent of his parent, Mrs. Welma K. This evaluation took place in June, 1977 and resulted in a finding of "no special needs". Although the above finding was made, at that time CCHS staff recognized Jeff's sense of social isolation and his fear of being harassed at school. This concern was discussed with Mrs. K. in June, 1977. In September an evaluation meeting was held which resulted in the following decisions:

1) Jeff's course of studies in regular education was appropriate.

2) Jeff required intervention through individual or group meetings to reassure him and calm his fears of harassment by other students. (see Dennen, Background Notes, P2)

These meetings did not begin until January, 1978. In November, 1977 a second meeting was held with Mrs. k. to discuss a failing grade in algebra and a recommendation by that teacher for placement in a lower algebra class. Mrs. K. disagreed with the recommendation and would not allow the transfer. Subsequent to that meeting various attempts were made by CCHS staff to schedule Jeff for participation in a social work group to alleviate his growing anxiety but because of scheduling and other problems (see Exhibit S6) the participation did not begin until January, 1978 when Jeff began to see school

154

social worker Bob Raskind on a regular basis.

During the time between January, 1978 and March 1978 the deterioration in Jeff's ability to function in school continued and was obvious to all. His attendance was poor and eventually he ceased attending school except for meetings with Bob Raskind. Jeff was evaluated at his parents' initiative during March, 1978 by Dr. Christopher Connolly, Ph. D. That report recommended modification of Jeff's program in methodology to include remedial assistance, increased work with Bob Raskind, and a psychiatric evaluation. A meeting was scheduled by CCHS on March 31, 1978 to discuss Jeff's current situation with his parents and to plan for the remainder of the school year. Mr. and Mrs. K. declined to attend that meeting. Jeffrey did not attend CCHS for the remainder of the 1977-78 school year. In the interim period he was seen in therapy by Dr. Bruce Hauptman, M.D., from March, 1978 to September, 1978. He worked at various times as a dishwasher.

Issue

Whether the educational plan proposing a 502.3 prototype program in Concord-Carlisle High School is adequate to meet the special needs of Jeff k., and if not whether the 502.5 program at Charles River Academy or some other alternative program is adequate to meet Jeff's special needs?

Discussion of the Evidence

Parents' Case:

The parent's evidence was focused on three major points:

1) That the June, 1977 finding of no special needs was erroneous and the resulting failure to deliver special education services to Jeffrey contributed to his subsequent deterioration. 2) That Jeffrey's current needs require intervention and remediation of his recognized learning disabilities and a therapeutic milieu to aid in the resolution of emotional issues. This type of milieu is provided at Charles River Academy. 3) That the 502.3 plan proposed by CCHS was not adequate for Jeffrey because it did not integrate or adapt the regular education services and that it did not manifest a clear understanding of Jeff's current emotional needs.

* * *

School's Case

The school's evidence focused on the following points:

1) The 502.3 educational plan as developed was adequate to meet Jeff's special needs. CCHS was not required by the regulations to develop the "best" plan but an adequate one.

2) The parent's attitude about CCHS and expectations about Jeff's future excluded the possibility of Jeff being placed there.

* * *

155

Findings and Conclusions

Jeffrey K. is a child in need of education defined by C.766 103, and P.L. 94-142, 121a.5(8) and (9). While there was no dispute between the parties as to Jeff's eligibility for special education and related services there was a tendency on the part of CCHS to characterize some of Jeff's problems as attitudinal, to attribute some of his response to his parents' philosophy and to stress academic needs rather than emotional needs. The overwhelming weight of the evidence, however, points to Jeff as a child with a primary emotional disturbance which is both severe and complex. There is ample evidence to indicate that Jeff's emotional problems have adversely affected his education performance to marked degree and over a long period of time. (See early reports from Carlisle, November 3, 1977 report of M.E. Carrigan, Shaheen report.) Both C.766 and P.L. 94-142 require special education and related services to be provided to students such as Jeffrey when there is established a nexus between the disturbance and the inability to make effective progress in a regular education program. P.L. 94-142 121a.5(8) includes a series of descriptors that serve as indicia of such nexus:

"(A) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (C) Inappropriate types of behaviour or feelings under

normal circumstances; (D) A general pervasive mood of unhappiness or depression;

or (E) A tendency to develop physical symptoms or fears

associated with personal or school problems."

The evidence demonstrates that Jeffery has had marked problems in areas B through E.

Note that neither state nor federal law fixes responsibility based on the causality of an emotional problem but looks to the effect on the student's educational growth. Thus, while the etiology of a student's emotional disturbance may be important in selecting a treatment modality, it is not a factor in the determination of eligibility for services which the LEA is responsible.

In addition to an emotional disturbance of some severity it was undisputed on the record that Jeffery has at least moderate learning disabilities that require special education services.

After a careful review of all of the evidence I conclude that the 502.3 IEP that was proposed by CCHS in August, 1978 is inadequate to meet the special needs of Jeffrey. I base this conclusion on the following factors:

1) All of the experts who recently evaluated or reviewed evaluations of Jeff K. agreed that his emotional problems at this time require a "therapeutic milieu," (Shaheen, Connolly, Roditi, Howard) whether at CCHS or at a private school setting.

2) The 502.3 plan proposed by CCHS fails to adequately address the severity of Jeff's

emotional problems. Significantly more emphasis, at least in terms of time allocated, was placed by CCHS in dealing with Jeff's learning disabilities even though they had sufficient knowledge of Jeff's shaky selfconcept. (Dennen, March, 1978) One session weekly of counseling was provided and no consideration was given to the need for a therapeutic milieu or more intensive therapy.

3) While there was some testimony by CCHS that an IEP providing a transition program from CRA into a 502.4 program in CCHS based on the recommendations of Shaheen could be developed, it was unclear what form this IEP would take. Raskind recommended an Outward Bound oriented philosophy and Howard stated that an IEP could be developed providing an initial "therapeutic milieu" in the Learning Center with a gradual transfer to the 502.3 proposed IEP. While I am convinced that this could be done by CCHS it has not been done and was only presented as a possibility at the hearing. Therefore in the light of testimony of Connolly and Shaheen regarding the current fragile and vulnerable state of Jeffrey I am reluctant to return him to CCHS absent clear and convincing evidence that an adequate "therapeutic milieu" and support services would be available to him. It is not clear from the evidence why CCHS did not have a more current picture of Jeffrey in August, 1978 when the IEP was developed, particularly as more recent information was crucial to the development of an adequate IEP. This problem, however, was apparent throughout Jeff's years at CCHS -- the degree of severity of the disturbance went unrecognized until substantial deterioration had set in.

I conclude that the IEP presented by CRA is an adequate and appropriate educational plan for Jeff. I so conclude because its major intervention strategies seek to assist Jeff with his emotional growth and development. It does provide a more "therapeutic milieu." The plan also addresses with sufficient detail and clarity Jeff's recognized need for remediation in math and reading. (It is in this respect alone, however, that I find the two plans similar.) CCHS' staff also testified that CRA was an appropriate educational placement for students with needs similar to Jeffrey's. CRA is a C.766 approved 502.5 day school.

However uncooperative or unreasonable the attitude of the parents may be it in no way discharges the obligation of a school to provide free appropriate public education for a child in need of special education.

It therefore follows that CCHS is responsible for the 502.5 placement at CRA from October 1, 1978 through the end of the 78-79 school year. During the spring, assuming sufficient progress has been made by Jeff, CCHS will meet with CRA staff, Jeff and his parents to develop a transition program to return to CCHS in September, 1979.

**Copyright 2008 © LRP Publications**